UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| VS. | : | CR 06-02-01-T |
| | : | |
| ROBERT A. URCIUOLI, | : | |
| FRANCES P. DRISCOLL, | : | |
| PETER J. SANGERMANO, JR., and | : | |
| ROGER WILLIAMS MEDICAL CENTER | : | |

**DEFENDANT ROBERT A. URCIUOLI'S**
**MOTION TO DISMISS THE INDICTMENT**

NOW COMES Defendant Robert A. Urciuoli ("Urciuoli")and hereby moves to dismiss all thirty-eight counts in the Indictment as to him on the grounds that none of the allegations in the Indictment can support a legally viable conspiracy to commit mail fraud violation, under 18 USC § 371 (Count 1), or honest services mail fraud violation, under 18 USC §§ 1341 and 1346 (Counts 2 to 38). In support of this Motion, Urciuoli relies on his accompanying Memorandum of Law, submitted herewith and incorporated herein by reference.

WHEREFORE, Defendant Robert A. Urciuoli respectfully requests that this Court dismiss all counts in the Indictment as to him.

ROBERT A. URCIUOLI

By his Attorneys,

Kristie M. Passalacqua, Bar No. 6945
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, RI 02903
(401) 274-2000
(401) 277-9600

Michael J. Connolly (MA BBO # 638811)
*Pro Hac Vice Counsel*
Hinckley, Allen & Snyder LLP
28 State Street
Boston, MA 02109
(617) 345-9000
(617) 345-9020

Richard M. Egbert (MA BBO #151800)
*Pro Hac Vice Counsel*
99 Summer Street
Suite 1800
Boston, Massachusetts 02110
(617) 737-8222
(617) 737-8223 (fax)

Dated: April 3, 2006



#575186

**CERTIFICATION**

I hereby certify that I mailed a true and accurate copy of the within Motion to Dismiss the Indictment to counsel of record, as stated below, on April 3, 2006:

Robert Clark Corrente
United States Attorney
United States Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903

Gerard B. Sullivan
Criminal Chief
United States Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903

Luis M. Matos
Assistant U.S. Attorney
United States Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903

Dulce Donovan
Assistant U.S. Attorney
United States Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903

William P. Devereaux
Holland & Knight LLP
One Financial Plaza, Suite 1800
Providence, RI 02903

Thomas C. Frongillo, Esq.
Weil Gotshal & Manges
100 Federal Street, Floor 34
Boston, MA 02110

Thomas G. Briody, Esq.
Law Office of Thomas G. Briody
72 Pine Street, First Floor
Providence, RI 02903

John A. Pappalardo, Esq.
James P. Redding, Esq.
Greenburg Traurig LLP
One International Place
Boston, MA 02110

Kevin J. Bristow, Esq.,
1309 Turks Head Building
Providence, RI 02903

Kristie M. Passalaqua



#575186

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| VS. | : | CR 06-02-01-T |
| ROBERT A. URCIUOLI,<br>FRANCES P. DRISCOLL,<br>PETER J. SANGERMANO, JR., and<br>ROGER WILLIAMS MEDICAL CENTER | : | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT ROBERT A. URCIUOLI'S**
**MOTION TO DISMISS THE INDICTMENT**

Defendant Robert A. Urciuoli ("Urciuoli") respectfully submits the following Memorandum of Law in support of his Motion to Dismiss the Indictment in this matter.

**I.**

**PRELIMINARY STATEMENT**

Urciuoli is charged with willfully causing former State Senator John Celona to deprive the Rhode Island citizenry of their right to Celona's honest services. The heart of the alleged fraud scheme is that Celona had an undisclosed conflict of interest, because he schemed and conspired with the Defendants to hold himself out as a consultant for the Village at Elmhurst, LLC ("the Village") when actually he worked for Roger Williams Medical Center ("RWMC"). The Government posits that, because Celona's relationship with RWMC was intentionally concealed, Celona's legislative actions involving bills affecting RWMC and its affiliates defrauded the public of Celona's honest services. Taking all of the allegations in the Indictment as true, the Government's theory is fatally-flawed for several reasons.

First, Urciuoli engaged RWMC's legal counsel to seek an advisory opinion from the Rhode Island Ethics Commission regarding Celona's consulting contract with the Village. In requesting the advisory opinion, Urciuoli and RWMC notified the Ethics Commission that the Village was half-owned by RWMC through a subsidiary, and that Celona was being paid to work for the Village *and RWMC affiliates* of the Village. The ensuing Ethics Commission Advisory Opinion prohibited Celona from participating in legislation regarding assisted living facilities, but allowed Celona to participate in legislation regarding hospital regulation, nursing homes, general health care, and other issues. The disclosures to the Ethics Commission were then published on page B-1 of The Providence Journal. The Government simply cannot meet its burden to prove that Urciuoli intended to conceal from the public Celona's financial relationship with RWMC when Urciuoli disclosed that relationship to the Ethics Commission and made it headline news.

Second, the Government claims that Rhode Islanders were defrauded of their rights to Celona's honest services because: (i) Urciuoli had Celona advocate for more ambulance runs from certain municipalities to Roger Williams Hospital; (ii) Urciuoli had Celona arrange meetings between RWMC and two health insurers to resolve reimbursement and contract issues; and (iii) Urciuoli and codefendant Fran Driscoll ("Driscoll") advocated RWMC's position to Celona on general health care legislation.[1] The first two allegations cannot support an honest services fraud case because they do not involve legislative action, which is required to sustain an honest services fraud charge. As to the third allegation, the Ethics Commission found as a matter of law that Celona could participate in general health care legislation that would impact RWMC, despite his financial ties to RWMC. The Ethics Commission cited R.I. Gen. Laws § 36-14-7(b),

[1] It must be noted that many of the allegedly conspiratorial communications among Celona, Urciuoli, and others simply involve Celona informing RWMC representatives of the status of health care legislation. See e.g., Indictment ¶¶ 70, 73.

which allows such participation when the "benefit or detriment accruing to the Senator and/or the Village/[RWMC] affiliates would affect them to no greater extent than any other similarly situated members of a significant and definable group." See Exhibit A.[2][3]

Third, numerous courts have recognized the inherent risk in honest services mail fraud cases of making federal felonies out of state law misdemeanor violations, such as the Rhode Island Ethics Code at issue here. The vagaries inherent in the honest services fraud doctrine, combined with the unique facts here -- including express approval by the Rhode Island Ethics Commission, render this a compelling case for dismissal under the rule of lenity.

Accordingly, none of the allegations can support a legally viable honest services mail fraud theory and the Indictment should be dismissed.

## II.

## THE ALLEGATIONS IN THE INDICTMENT[4]

On January 5, 2006, a grand jury returned a thirty-eight (38) count Indictment against Urciuoli, RWMC, Driscoll and Peter J. Sangermano, Jr. ("Sangermano"). Count 1 of the Indictment alleges a conspiracy to deprive the citizens of Rhode Island of Celona's honest

---

[2] The general rule is that a Court may only consider the four corners of the indictment when ruling on a motion to dismiss. United States v. Welsch, 327 F.3d 1081, 1090 (10th Cir. 2003). However, an indictment may be dismissed at the pretrial stage based on evidence beyond the four corners of the indictment when "the operative facts are undisputed and the government fails to object to the district court's consideration of those undisputed facts in making the determination regarding a submissible case." See United States v. Brown, 925 F.2d 1301, 1304 (10th Cir. 1991); United States v. Wood, 6 F.3d 692, 695 (10th Cir. 1991); United States v. China Star, Inc., 375 F. Supp. 2d 1291, 1292 (D. N.M. 2005) (following the tenth circuit); see also Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993) (holding that when ruling on a motion to dismiss, the court may refer to documents, the authenticity of which is not disputed, official public records, documents central to plaintiffs' claim and documents sufficiently referred to in the complaint).

[3] Defendant Urciuoli is filing, contemporaneously with this motion, a motion for leave to exceed the 10 page limitation on Exhibits set forth in the Court's Standing Order. The Government has assented to the relief requested in that motion. If granted, Urciuoli will promptly file and serve an Appendix including all of the Exhibits referenced herein.

[4] For purposes of this motion only, the factual allegations in the Indictment are accepted as true. United States v. J. Tirocchi & Sons, Inc., 187 F. Supp. 778, 778 (D.R.I. 1960).

services in violation of 18 U.S.C. §§ 371, 1341 and 1346. See Indictment ¶¶ 13-94. The conspiracy is alleged to have two objectives: (1) to pay Celona, under the guise of a consulting agreement with the Village, to influence his official legislative actions to benefit the political and financial interests of RWMC and its affiliates; and (2) to deceive the State of Rhode Island and its citizens concerning Celona's relationship with RWMC. Id. at ¶¶ 15-16. Counts 2 through 38 allege substantive mail fraud violations involving the same alleged scheme. Id. at ¶¶ 95-107.

## A. **The Parties**

RWMC is a Rhode Island not-for-profit corporation and the parent company of Roger Williams Hospital ("Hospital"). Indictment ¶ 4. It is also the sole shareholder of the following three entities: (1) Roger Williams Realty Corporation ("Roger Williams Realty"), a Rhode Island for-profit corporation that owns and manages real estate for the benefit of RWMC; (2) Elmhurst Extended Care Facilities, Inc. ("Elmhurst"), a Rhode Island for-profit corporation that operates a skilled nursing and intermediate care facility; and (3) Elmhurst Health Associates, a Rhode Island for-profit corporation that operates a pharmacy and provides outpatient laboratory services. Id. Urciuoli is the former President and Chief Executive Officer of RWMC. Id. at ¶ 1. Driscoll is the former Senior Vice President, External Affairs, Corporate Communications and Development for RWMC. Id. at ¶ 2.

The Village is an assisted living facility, which, during the period covered by the Indictment, was a joint venture between Roger Williams Realty and SANAT Properties, LLP ("SANAT"). Id. at ¶ 5. Defendant Sangermano is a principal of Village Retirement Communities, LLC, which was a part owner of SANAT. Id. at ¶¶ 3 and 5.

Celona was a Rhode Island State Senator from January 1995 through March 2004. Id. at ¶ 6. From on or about January 4, 2001, through on or about December 11, 2003, Celona was Chairman of the Senate Corporations Committee. Id.

## B. The Rhode Island Code of Ethics

Rhode Island has a part-time, citizen legislature. Representatives and Senators elected to serve in the General Assembly, therefore, typically hold full-time employment in private businesses and in various professions. Thus, it is inevitable that individual legislators will encounter legislation in the course of performing their official duties that may impact their respective businesses or professions, and thus their financial interests, as the General Assembly enacts legislation that over time affects all industries.

In order to set standards of conduct for all public officials and employees, including legislators, the General Assembly enacted the Rhode Island Code of Ethics ("Code of Ethics") in June of 1987. Indictment ¶ 11. The Code of Ethics prohibits, among other things, any person subject to the Code of Ethics from having "any interest, financial or otherwise, direct or indirect," or engaging "in any business, employment, transaction or professional activity," or incurring "any obligation of any nature, which is in substantial conflict with the proper discharge of his or her duties or employment in the public interest and of his or her responsibilities" as prescribed in the laws of the State of Rhode Island. R.I. Gen. Laws. § 36-14-5(a). The Code of Ethics also provides that a public official has a conflict of interest if he "has reason to believe or expect that he...or any business associate, or any business by which the person is employed or which the person represents will derive a direct monetary gain...by reason of his of her official activity." R.I. Gen. Laws. § 36-14-7(a).

The Code of Ethics, however, expressly allows members of the General Assembly to participate in legislation where the legislator or his employer is part of a broad group or industry whose members will be similarly impacted by the legislation. R.I. Gen. Laws § 36-14-7(b). Specifically, the statute permits a legislator to vote on legislation that affects the legislator's financial interests or those of his employer where such interests are affected to no "greater or lesser extent than the interests of all other members of the affected group or profession to which the legislator...or his employer...belongs." Id.

The Code of Ethics governs all elected and appointed state and municipal officials, as well as employees of state and local government, boards, Commissions and agencies. R.I. Gen. Laws § 36-14-3. The Code of Ethics does not apply to individuals outside of public service, such as the individual Defendants in this case. See id. [5]

In 1987[6] the Rhode Island Ethics Commission was created to enforce the provisions of the Code of Ethics and investigate violations of it. Indictment ¶ 11. The Ethics Commission has jurisdiction to adjudicate complaints, issue findings, and remove elected officials from office. R.I. Gen. Laws §§ 36-14-12, 36-14-13 and 36-14-14. The Ethics Commission also has the authority to issue advisory opinions relating to the requirements of the Code of Ethics. R.I. Gen. Laws § 36-14-11.

[5] The knowing and willful violation of the Ethics Code by a public official is a misdemeanor. R.I. Gen. Laws § 36-14-19 ("Any person who knowingly and willfully violates the provisions of this chapter shall, in addition to the civil penalties provided herein, be guilty of a misdemeanor punishable by a fine of not more than one thousand dollars ($1000) and/or imprisonment for no longer than one year.").

[6] In 1976, the Rhode Island General Assembly enacted the state's first Code of Ethics and created the Conflict of Interest Commission. That Code governed the activities of state and municipal elected and appointed officials and required all such officials to meet newly imposed financial disclosure requirements. The Conflict of Interest Commission enforced the statute. In November, 1986, Rhode Island voters adopted a constitutional amendment mandating that the General Assembly "establish an independent, non-partisan ethics commission" (R.I. Const. art. III, sec. 8). In 1987, the General Assembly replaced the Conflict of Interest Commission with a 15-member Ethics Commission. In 1992, the Assembly reduced the size of the Ethics Commission to the current nine members.

C. Celona's Consulting Agreement

In or about August 1997, Celona met with Urciuoli and requested employment with RWMC. Indictment ¶ 21. Urciuoli advised Driscoll that he was interested in hiring Celona as a consultant to RWMC. Id. at ¶ 22. Thereafter, Urciuoli, Driscoll and Sangermano drafted a consulting agreement outlining Celona's job duties (the "Consulting Agreement"). Id. at ¶¶ 23-25. Pursuant to the initial draft of the Consulting Agreement, Celona's primary job was "to heighten awareness among seniors (the elderly) of the greater Providence community as to programs and services available at Roger Williams Medical Center and its affiliated entities." Id. at ¶ 23. The final, executed Consulting Agreement required Celona to provide various public relations and marketing services to the Village and RWMC's wholly-owned nursing home, Elmhurst, including heightening awareness among seniors of the programs and services provide by those organizations, among other obligations. See Exhibit B. The Consulting Agreement also required Celona to "keep abreast of legislative issues and regulations at the local, state and federal levels that impact or could impact the Village delivery of care with particular emphasis on efforts to regulate or license assisted living facilities." Id.

It was unmistakably clear from the terms of the Consulting Agreement that Celona was obligated to serve the economic interests of RWMC, both as to its wholly-owned nursing home and its half-owned assisted living facility. Indeed, Urciuoli and Driscoll expressly acknowledged that Celona would encounter conflicts of interest between his duties as a Senator and his duties to the Village and the RWMC affiliates in conjunction with requiring Celona to cooperate with *RWMC's counsel* in *RWMC's efforts* to seek an Ethics Commission Advisory Opinion. The Consulting Agreement provided:

> Given your position as a Rhode Island state senator, there will be situations in which your performance hereunder will conflict with your responsibilities as a senator. It is essential to delineate what areas of conflict may develop. Accordingly, counsel to RWMC will assist you with preparing and submitting a request for an advisory opinion from the Rhode Island Ethics Commission. You agree to cooperate fully with such efforts and consent to this agreement being attached to such request.

See Exhibit B. Thus, contrary to the Government's legal theory, in requiring this precautionary measure, Driscoll and Urciuoli not only did not conceal Celona's economic relationship with RWMC, they required scrutiny of it by legal counsel and the Ethics Commission.

## D. RWMC's Letter to the Rhode Island Ethics Commission

As contemplated by the Consulting Agreement, Urciuoli directed legal counsel for RWMC to prepare a letter to the Ethics Commission on Celona's behalf to obtain guidance on the extent to which Celona could continue to perform his legislative functions. Indictment ¶ 41. On or about April 6, 1998, counsel for RWMC, James R. McGuirk of Edwards & Angell, sent a letter to the Ethics Commission, requesting an advisory opinion regarding the extent to which Celona could continue to propose, debate and vote on health care issues before the General Assembly in light of his consulting duties to the Village and RWMC affiliates. See Exhibit C. The letter attached a copy of the Consulting Agreement. Indictment ¶ 44; see also Exhibit C.

In the letter, Attorney McGuirk painstakingly spelled out the numerous ways in which Celona's consulting relationship was connected to RWMC. First, McGuirk made it clear that, while Celona was engaged by the Village, the "Village is a joint venture between Roger Williams Realty Corporation ("RWRC") and SANAT, LLP." See Exhibit C. McGuirk further explained that "RWRC, Roger Williams Hospital and Elmhurst Extended Care Facility, Inc. are all members of the same group of controlled companies, which have Roger Williams Medical Center as their sole member or holding company." Id. Second, McGuirk explained the nature of

two of the businesses of the Roger Williams entities mentioned in the letter, stating, "Roger Williams Hospital is an acute care hospital and Elmhurst Extended Care Facility, Inc. is a 200-bed nursing home with a hospice unit." Id. In providing that information, McGuirk underscored the fact that Celona had financial ties to Roger Williams Hospital and Elmhurst in order to facilitate the Ethics Commission's assessment of Roger Williams-related conflict issues. Third, McGuirk explicitly advised that Celona would be working for the Village and "other *facilities* such as the Elmhurst Extended Care Facility, Inc., ..." Id. (emphasis added). Fourth, in highlighting the areas where he believed conflicts were likely to arise, McGuirk enumerated "health care issues such as elderly affairs, nursing home issues, hospital regulations, hospital reorganizations and health care in general." Id. Here again, McGuirk underscored Celona's financial ties to Roger Williams Hospital and Elmhurst. Lastly, McGuirk pointed out that, in regard to preparing the instant letter, he was being paid by RWMC. Id. ("The undersigned has been engaged by RWMC to seek an advisory opinion ...").

It is difficult to imagine how McGuirk could have been more clear in disclosing the financial ties between Celona and RWMC under the Consulting Agreement, as well as the likely conflicts that would occur in light of those ties.

## E. The Ethics Commission's Response – Advisory Opinion 98-59

In April 1998, the Ethics Commission responded to RWMC's letter with Advisory Opinion 98-59 (the "Advisory Opinion"). See Exhibit A. The Advisory Opinion reflects that the Ethics Commission understood Celona would be working for the Village and other RWMC affiliates, in that it states Celona would be working for the Village "and its related facilities, such as the Elmhurst Extended Care Facility, Inc." Id. Furthermore, the Advisory Opinion expressly acknowledged that Celona's job responsibilities required him to "keep abreast of legislative

issues and regulations at local, state and federal levels that potentially could impact delivery of care by the Village *and its related facilities*." Id. (emphasis added). Thus, based on information supplied by McGuirk, acting at the direction of Urciuoli, the Ethics Commission expressly understood that Celona would be monitoring "legislative issues" for Roger Williams affiliates.

The Ethics Commission concluded, among other things, that Celona could not participate in legislation relating to assisted living facilities. Id. The Ethics Commission also ruled that Celona could "fully participate and vote on broad-based legislation involving general health care issues of public interest." Id. The Advisory Opinion stated further that "general legislation relating to elderly affairs, nursing home issues and hospital regulations is likely to impact all corners of the health care industry in the state, as well as many related industries," and that, under R.I. Gen. Law § 36-14-7(b), "any benefit or detriment accruing to the Senator and/or the Village/affiliates would affect them to no greater extent than any other similarly situated members of a significant and definable group." Id.

Furthermore, the Advisory Opinion provided two "illustrative" examples of situations where it permitted public officials to participate in official decision-making even though the decision-making would directly affected their financial interests. Id. First, in Advisory Opinion 96-71, the Ethics Commission determined that a legislator could participate and vote on legislation regulating the sale of insurance by banks even though the legislator requesting the opinion was an insurance agent. Id. Second, in Advisory Opinion 96-24, the Ethics Commission determined that a Newport Zoning Board member could participate in matters affecting the bed and breakfast industry even though the Zoning Board member owned a hotel. Id. In citing these precedents, the Ethics Commission sent the unambiguous message that Celona could "fully participate and vote" on legislation regarding hospitals, nursing homes, and other health care

issues even though he had direct financial ties to RWMC and its affiliates, so long as he complied with the Section 6 Notice requirement.

**F. Alleged Overt Acts In Furtherance of the Conspiracy to Defraud**

The Indictment alleges several courses of conduct engaged in by the Defendants and Celona that allegedly furthered the scheme to defraud the citizens of Rhode Island of their right to Celona's honest services. The conduct generally falls into three categories: (i) Celona's efforts to increase ambulance runs from certain municipalities to Roger Williams Hospital; (ii) Celona's efforts to facilitate meetings between RWMC officials and representatives of two health insurers – Blue Cross & Blue Shield of Rhode Island ("Blue Cross") and United Healthcare of New England ("United"): and (iii) the Defendants efforts to cause Celona to take positions on legislation favored by RWMC and/or the Village.

**1. Ambulance Runs**

In early 1998, Urciuoli advised Driscoll and others that rescue runs were a source of revenue for the Hospital because they brought revenue producing patients into the facility, and that Roger Williams Hospital was not getting its "fair share" of rescue runs from certain municipalities. Id. at ¶ 35. To address this issue, Urciuoli sought to have Celona "take care of" the rescue run problem "politically." Id. at ¶ 36. At the direction of Urciuoli and Driscoll, Celona attempted to persuade municipalities to increase the number of ambulance transports directed to the Hospital, including meeting with the Chief of the North Providence Fire Department. Id. at ¶¶ 37-38.

The Indictment makes no allegation that Celona's efforts to increase rescue runs to the Hospital involved any type of legislative action.

### 2. Celona's Involvement with Blue Cross and United

The Indictment alleges that, at the request of Urciuoli, Celona supported RWMC in its negotiation of reimbursement and contract issues with Blue Cross and United. Id. at ¶¶ 73-91. With respect to Blue Cross, the Indictment alleges that Urciuoli requested Celona to arrange meetings between RWMC and the Chairman of Blue Cross "in order to discuss ongoing negotiations" between Blue Cross and RWMC. Id. at ¶ 84. The meeting was sought "because RWMC was having difficulty obtaining a contract on terms favorable to RWMC." Id. The Indictment alleges that in June 2003, Urciuoli advised the RWMC Finance Committee that the Hospital had obtained a new contract with Blue Cross. Id. at ¶ 86.

Similar allegations are set forth in the Indictment about meetings Celona arranged between representatives of RWMC and United. Id. at ¶¶ 87-91. The meetings with United were to discuss ongoing contract negotiations between RWMC and United. Id. at ¶¶ 87-88. In October 2003, Urciuoli reported to the RWMC Finance Committee that United would agree to RWMC's proposal that United pay twenty-five percent (25%) increase over the company's prior year contract, among other terms. Id. at ¶ 91.

There is no allegation in the Indictment that draws any connection between Celona's involvement in facilitating negotiations between RWMC and either Blue Cross or United and any legislative activities. The Indictment contends that Celona arranged the meetings with the health insurers "by virtue of the power of his appointment as Chairman of the Corporations Committee." Id. at ¶¶ 85, 88. According to the Indictment, however, the meetings were not part of any official Senate or Corporations Committee proceedings. Rather, they were meetings among private parties discussing private business. The Indictment otherwise fails to allege that Celona's actions with respect to Blue Cross or United involved any legislative activity. The

Indictment likewise fails to allege that Urciuoli ever requested or sought legislative action from Celona in connection with Blue Cross or United.

### 3. Consultation Regarding Legislation

Celona had numerous communications with Driscoll and Urciuoli regarding pending or proposed legislation and RWMC's position with respect to such legislation. Those communications include statements by the Defendants advocating RWMC's position, as well as updates from Celona advising of the status of certain legislation. The legislation includes:

#### a. ***Alzheimer's Legislation - 98-H 8229***

Senate Bill 98-H 8229, an "Act Relating to Residential Care and Assisted Living Facilities," prohibited health facilities from holding themselves out as offering Alzheimer's care to patients unless the facilities were licensed as nursing homes or hospitals. See Exhibit D. As such, the Bill would have affected all hospitals and nursing homes in Rhode Island.

#### b. ***Conversion Legislation - 98-S 2796 and 99-S 1053***

Senate Bill 98-S 2796 prohibited directors, trustees, or officers from serving on the board of a newly converted hospital, see Exhibit E, and Senate Bill 99-S 1053 would amend the Hospital Conversion Act by requiring the Department of Health to review acquisitions of all not-for-profit or for-profit corporations by for-profit hospitals. See Exhibit F. As such, these bills would affect all hospitals in Rhode Island.

#### c. ***Moratorium Legislation – 99-H 6122***

House Bill 99-H 6122, amended the extension of the moratorium on licensing new nursing home beds, as did a companion bill, House Bill 99-S 0509. See Exhibit G and H. Both bills would impact all nursing homes and assisted living facilities in Rhode Island. House Bill 99-H 6122 was never passed by the House. Companion bill 99-S 0509 was passed by the

Senate. Celona filed a § 6 Notice recusing himself from the vote and the deliberation. See § 6 Notice for 99-S 0509, dated June 30, 1999, attached hereto as Exhibit I.

**d. *Cancer Council – 99-H 5220***

House Bill 99-H 5220, proposed the creation of the Rhode Island Cancer Council, Inc., which would provide private and public resources for the establishment and implementation of a state-wide Cancer Plan. See Exhibit J. The Bill would have affected all hospitals and other cancer-related health care providers in Rhode Island.

**e. *PILOT Legislation – 99-H 5086***

House Bill 99-H 5086, would have required tax exempt, not-for-profit institutions in the City of Providence to make up for any potential financial short fall in any funding by the State in the Payment In Lieu Of Taxes program ("PILOT"). See Exhibit K. This Bill would have affected every non-profit organization in the City Of Providence, including all hospitals, universities, private schools, churches, and a myriad other charitable and public interest organizations.

**f. *Bone Marrow Legislation – 99-H 5917***

House Bill 99-H 5917 imposed upon the Department of Health and the Roger Williams Cancer Center the establishment a centralized bone marrow registration list. See Exhibit L. Celona is alleged to have contacted another State Representative, at the request of Fran Driscoll, regarding hospital reimbursement for registration costs associated with the uninsured. After speaking to the other State Representative, Celona advised Driscoll that he learned the Bill was drafted incorrectly and that it would be corrected to cover the registration costs for the uninsured." Accordingly, while this bill related specifically to Roger Williams Hospital, Celona's participation was limited to unmasking an error in a draft bill, according to the

allegations in the Indictment. There is no allegation that Celona engaged in any lobbying activity regarding this bill. Nor is there any allegation as to the likely economic impact correction of the error would have had to Roger Williams Hospital, *i.e.,* a couple hundred dollars a year or more.

g. ***Ovarian Cancer Legislation – 99-H 6183***

In recognition of the threat of ovarian cancer to the female population in the state, House Bill 99-H 6183 would require the Department of Health through the Cancer Council to sponsor annual public education campaigns about ovarian cancer. See Exhibit M. As such, this Bill may have had a tangential impact on health care providers in Rhode Island that treated ovarian cancer, which would include hospitals, oncology practice groups, and other cancer treatment organizations throughout the State.

g. ***Federal Medicare Cuts***

The Indictment references a Celona press statement that urged reversal of federal Medicare cuts. The Indictment further alleges that Celona failed to reveal that he was working on prompt payment issues and utilization review issues for RWMC when he made the press statement. Medicare cuts affect tens of thousands of hospitals and other health care providers all around the country. Medicare is a federal program over which the Rhode Island General Assembly has no jurisdiction. In response to this press statement, Urciuoli thanked Celona for his "support." The "support" to which Urciuoli referred obviously had no connection to any legislative action undertaken by Celona or any other Rhode Island State legislator.

## III.

## STANDARD OF REVIEW

Dismissal of an indictment is warranted where, as here, construing the facts in the light most favorable to the government, the Government's theory of prosecution fails as a matter of law. See United States v. Treadwell, 566 F. Supp. 80, 83 (D.C. 1983) ("it is the government's theory that fails, not the weight of its evidence. For this reason, dismissal of the mail fraud counts is warranted."); see also United States v. Hope, 861 F.2d 1574, 1578 (11th Cir. 1988) (affirming dismissal of count in indictment because allegations in indictment failed to state a violation of the charged offense).

While it is generally true that an indictment is constitutionally adequate if it contains the elements of the offense charged, fairly informs a defendant of the charge against which he must defend, and enables him to plead an acquittal conviction in bar of future prosecutions for the same offense, Hamling v. United States, 418 U.S. 87, 117 (1974) (quotations omitted), it is axiomatic that, "[t]o be legally sufficient, the indictment must assert facts which in law constitute an offense and which, if proved, would establish prima facie the defendant's commission of that crime." United States v. Superior Growers Supply, Inc., 982 F.2d 173, 177 (6th Cir. 1992); citing Fleisher v. United States, 302 U.S. 218 (1937). Indeed, the Supreme Court has cautioned:

> Undoubtedly the language of the statute may be used in the general description of the offense, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged.

Hamling, 418 U.S. at 117-18 (quotations omitted). If the indictment is legally deficient, the proper result is dismissal of the indictment. United States v. Landham, 251 F.3d 1072, 1080 (6th Cir. 2001); citing Superior Growers, 982 F.2d at 177.

The Indictment fails to allege facts which, even when viewed in the light most favorable to the Government, constitute an honest services fraud violation by Urciuoli or any of the Defendants. In other words, the facts alleged by the government in the Indictment simply do not conform to the statutory requirements of honest services mail fraud. See United States v. Risk, 843 F.2d 1059, 1061 (7th Cir. 1988) (affirming dismissal of indictment because government's characterization of the undisputed facts did not constitute a violation of any statute, and explaining, "the district court found no violation and correctly dismissed the indictment, not because the government could not prove its case, but because there was no case to prove.")

## IV.

## ARGUMENT

### A. The Elements of Proof for Honest Services Mail Fraud[7]

In order to prove honest services mail fraud, the government must prove the elements of mail fraud under 18 U.S.C. §1341, as well as the requirements 18 U.S.C. § 1346. In order to prove mail fraud, the government must prove that: (1) the defendant participated in a scheme or artifice to defraud;[8] (2) the defendant participated knowingly, willfully and with specific intent to defraud; and (3) the defendant used the mails in furtherance of the scheme. United States v. Woodward, 149 F.3d at 54. "Willfully" means to act knowingly and purposely, with intent to do something the law forbids . . . with bad purposes either to disobey or to disregard the law." Id. The Government must establish that the defendant believed he was committing a crime or

[7] The Indictment charges one count of conspiracy to commit honest services mail fraud, in violation of 18 U.S.C. § 371, and thirty-five counts of honest services mail fraud, in violation of 18 U.S.C. §§ 1341 and 1346. In regard to Count One, the Government will be required to prove that the object of the agreement would meet all the essential elements of the underlying offense, *i.e.* honest services mail fraud. United States v. Yefsky, 994 F.2d 885, 890-91 (1st Cir. 1993). Accordingly, the legal analysis focuses on the requirements of that offense.

[8] Section 1346 defines the term "scheme or artifice to defraud" as a scheme or artifice to deprive another of the intangible right of honest services.

violating the law at the time that he made use of the mails. Id. Good faith is a complete defense to mail fraud, and the burden is on the government to prove lack of good faith beyond a reasonable doubt. Id.

In honest services cases, the First Circuit has determined that the government must prove two kinds of fraudulent intent: "intent to deceive the public" and "intent to deprive the public of the legislator's honest services." United States v. Sawyer, 85 F.3d 713, 729 n. 12 (1st Cir. 1996) ("Sawyer I"). For the Government to establish the latter of the two intent requirements, it must prove that the defendant intended to influence the legislator in his "*official* action." Id. at 729 (emphasis added).

While public officials, as fiduciaries toward the public, may commit honest services fraud if they deliberately conceal material information from the public, McNally, 483 U.S. at 371-72 (Stevens, J., dissenting), private citizens do not owe the same fiduciary duty to the public. As a result, the Honest Services Doctrine is applied less frequently to private citizens involved in political corruption cases. See United States v. Sawyer, 239 F.3d 31, 36 (1st Cir. 2001) ("Sawyer II") (noting that the honest services doctrine was "applied for the first and only time against a state lobbyist who is not himself a public official"); see also United States v. Murphy, 323 F.3d 102, 111 (3rd Cir. 2003) ("The prosecution of a private party is, however, a horse of another color."). In cases against non-public officials, the Government must prove that the target of the scheme is the deprivation of the official's honest services. Sawyer I, 85 F.3d at 725.

If the "scheme" does not, as its necessary outcome, deprive the public of honest services, then independent evidence of the intent to deprive another of those services must be presented. Id.; citing United States v. D'Amato, 39 F.3d 1249, 1257 (2d Cir. 1994) ("where the scheme does not cause injury to the alleged victim as its necessary result, the government must produce

evidence independent of the alleged scheme to show the defendant's fraudulent intent."); United States v. Von Barta, 635 F. 2d 999, 1005-06 n.14 (2d Cir. 1980) (noting that "the prosecution must prove that some actual harm or injury was at least contemplated").

**B. The Allegations Do Not Establish Intent To Deceive the Public**

The Government's theory of prosecution as to Urciuoli fails because the facts alleged in the Indictment do not establish that Urciuoli intended to deceive the public. To establish specific criminal intent to deceive the public, the government must show the defendant knew that his or her actions were fraudulent and, despite this knowledge, proceeded to take steps designed to conceal these fraudulent actions. Sawyer II, 239 F.3d at 47; see also United States v. Grandmaison, 77 F.3d 555, 558 (1st Cir. 1996) (after defendant recused himself from local governing board based on a conflict of interest, the defendant "secretly took steps to manipulate the contracts" by giving other board members information tapes, gifts, and gratuities); United States v. Silvano, 812 F.2d 754, 756-58 (1st Cir. 1987) (defendants continually made intentional and knowing false statements to other public officials with the specific intent to deceive them). Therefore, unless it can be inferred from allegations in the Indictment that Urciuoli intentionally concealed Celona's relationship with Roger Williams from the public, the Indictment must be dismissed.

**1. Celona's Alleged Conflict of Interest Was Disclosed**

The heart of the Government's honest services fraud theory is its allegation that Celona, Urciuoli and the other Defendants deceived the State of Rhode Island and its citizens concerning Celona's relationship with RWMC by failing to disclose Celona's conflict of interest to the Rhode Island Ethics Commission and seeking an advisory opinion from the Ethics Commission based on false, misleading and incomplete information. See Indictment ¶ 20. The Indictment

specifically alleges that Urciuoli, Driscoll and Celona "misrepresented the true nature of the work he had been and would be performing" and "failed to disclose that Celona had been performing political services for RWMC." Id. at ¶ 44

The McGuirk correspondence and Ethics Commission Advisory Opinion – both of which are cited in the Indictment -- squarely refute those allegations. See United States v. Brown, 925 F.2d at 1304; United States v. Wood, 6 F.3d at 695; United States v. China Star, Inc., 375 F. Supp. 2d at 1292 (D. N.M. 2005) (following the Tenth Circuit); Watterson v. Page, 987 F.2d at 3 (holding that when ruling on a motion to dismiss, the court may refer to documents, the authenticity of which is not disputed, official public records, documents central to the claim in dispute and documents sufficiently referred to in the complaint). The McGuirk letter to the Ethics Commission clearly discloses that Celona would be working for affiliates of RWMC, and that Celona expected to "debate" and "vote" on legislation involving "hospital regulation, hospital reorganizations" and "nursing home issues," among other issues. See Exhibit C. McGuirk went so far as to state in the letter that these facts "raise issues of conflict" for Celona. Id. Thus, McGuirk, acting at the direction of Urciuoli and Driscoll, not only did not conceal Celona's conflict issues in his new position, he flagged them and sought authoritative guidance from the Ethics Commission.

The Advisory Opinion acknowledges that McGuirk, acting on behalf of RWMC and Celona, had informed the Ethics Commission that:

> Pursuant to the consulting agreement, the Senator's responsibilities require him to keep abreast of legislative issues and regulations at local, state and federal levels that potentially could impact delivery of care by the Village *and its related facilities*.

See Exhibit A. There can be no question that the Ethics Commission was referring to RWMC and its affiliates in referring to "its related facilities." The Advisory Opinion acknowledges that



575964

the Village was owed by RWRP and SANAT, LLP, and that RWRP was wholly-owned by RWMC. Id. Moreover, earlier in the Advisory Opinion, the Ethics Commission refers to the Villages' "related facilities, such as Elmhurst Extended Care Facility, Inc. (Elmhurst)," which is another wholly-owned RWMC affiliate. Id.

It is therefore unmistakably clear that the Ethics Commission understood Celona was required "to keep abreast of legislative issues and regulations at local, state and federal levels that potentially could impact delivery of care" at Roger Williams Hospital, Elmhurst, and other RWMC affiliates. Id. Furthermore, the disclosures reflected in the Advisory Opinion about Celona's financial ties with RWMC and its affiliates were then published on a story featured on page B-1 of the Providence Journal. See Exhibit N. Thus, the Government cannot possibly establish that Urciuoli intended to deceive the public about Celona's conflicts of interest when he engaged McGuirk to make full disclosure to the Ethics Commission and the public at large.

Following issuance of the Advisory Opinion, it was incumbent upon Celona to file Notices under Section 6 of the Ethics Code to advise the Senate of the nature of his relationship with the Village and the RWMC affiliates, and "a statement as to why, despite that relationship he is able to vote and otherwise participate fairly, objectively and in the public interest. See Exhibit A. There is no allegation in the Indictment that Celona conspired with any of the Defendants not to file such Notices. In fact, it is a matter of Public record that Celona filed no less than fifty-six Section 6 Notices disclosing his consulting relationship during the period covered by the Indictment. See Exhibit I.

The Indictment further alleges that the Defendants "failed to disclose that RWMC would be funding the payments made by the Village to Celona." Indictment ¶ 44. McGuirk's letter to the Ethics Commission, and the attached Consulting Agreement, states that the Village agreed to

compensate Celona at a rate of $700 per week. See Exhibit C. The McGuirk letter also states that the Village is half-owed by an RWMC subsidiary. Id. McGuirk's letter, therefore, informed the Ethic's Commission that a joint venture, of which an RWMC subsidiary was a partner, would be compensating Celona, for his work for the Village and Elmhurst, which was wholly-owned by RWMC.[9] For purposes of conducting its conflict of interest analysis, the Ethics Commission was made fully aware of Celona's financial ties to RWMC. Any further disclosure as the source of the funds paid to Celona would not have made a material difference to the Ethics Commission. Accordingly, omitting that information cannot amount to fraud, as the omission could not be considered material, as a matter of law. See Neder v. United States, 527 U.S. 1, 25 (1999) ("we hold that materiality of falsehood is an [essential] element of the federal mail fraud, wire fraud, and bank fraud statutes"); United States v. Colon-Munoz, 192 F.3d 210, 221 (1st Cir. 1999) (an indictment charging mail or wire fraud must contend that the alleged scheme or artifice to defraud "involved *material* falsehoods") (emphasis added); U.S. v. Gaudin, 515 U.S. 506, 509 (1995) (statement must have a natural tendency to influence, or be capable of influencing, the decision or the decision-making body to which it was addressed).

**2. Celona's Participation In Legislation Regarding Hospital, Nursing Home And General Health Care Issues Was Approved By The Ethics Commission**

Nor can Celona's alleged participation in the legislation cited in the Indictment form the basis of an honest services fraud prosecution of Urciuoli. As articulated in Sawyer I and Mandel, the essence of honest services fraud is the fact that the public is deprived of what it is *entitled* to – i.e., the public official's honest and faithful service. See Sawyer I, 85 F.3d at 724; see also Mandel, 591 F.2d at 1362. In Sawyer I, the Court further reasoned, "[a] public official has an

[9] Notably, the Indictment does not allege that McGuirk was misinformed by Urciuoli or anyone else, about the source of the funds paid to Celona. The clear inference from that omission is that McGuirk was well aware of the source of funds paid to Celona and simply made a judgment that it was not materially important to point out that RWRP was the source in light of all the other disclosures.

affirmative duty to disclose material information to the public employer. (Citation omitted.) When an official fails to disclose a personal interest in a matter over which he has decision-making power, the public is deprived of its right either to disinterested decision making itself or, as the case may be, to full disclosure as to the official's potential motivation behind the an official act." Id. 724. It follows that, if the legislator's actions conform with the applicable state law governing his conduct, then the citizens are not deprived of that official's honest services as a matter of law.

Here, Urciuoli and Driscoll, through McGuirk, made full disclosure to the Ethics Commission of the potential for conflicts of interest in Celona's legislative duties stemming from the Consulting Agreement. Following that disclosure, the mechanism put in place under Rhode Island law – review by the Ethics Commission – ran its course. In light of the facts presented by McGuirk, the Ethics Commission applied Rhode Island law governing ethical standards for public officials and set clear parameters to govern Celona's conduct. The Ethics Commission drew a clear distinction between unacceptable conflicts of interest (i.e., participation in assisted living facility legislation) and acceptable conflicts (i.e., participation in legislation affecting nursing homes, hospitals, and general health care issues, so long as the requisite Section 6 Notices were filed by Celona).

Under Rhode Island law, the citizens of Rhode Island were entitled to no less and no more. The Ethics Commission expressly permitted Celona to "*fully participate and vote*" on matters concerning "broad-based legislation involving general health care issues of public interest," so long as he filed a § 6 Notice disclosing the potential conflict of interest. See Exhibit A. The Ethics Commission determined that participation in "[g]eneral legislation relating to elderly affairs, nursing home issues and hospital regulations" was permissible under R.I. Gen.

Laws § 36-14-7(b), because "any benefit or detriment accruing to the Senator and/or the Village/affiliates would affect them to no greater extent than any other similarly situated members of a significant and definable group." Id.

In other words, the Ethics Commission determined that, notwithstanding Celona's relationship with RWMC, Celona's participation in "broad-based legislation involving general health care issues of public interest" was a permissible conflict of interest. Id. Celona's participation in broad-based, general health care legislation, therefore, did not deprive the citizens of Rhode Island of something to which they were entitled.

Because all but one[10] of the legislation described in the Indictment was "broad-based legislation involving general health care issues of public interest," Celona's participation as to those bills was precisely what the Ethics Commission had authorized and, thus, was entirely lawful. The Alzheimer's legislation affected equally all hospitals and nursing homes in Rhode Island. The conversion legislation affected equally all hospital conversions involving for-profit and not-for-profit corporations. The moratorium legislation never made it to vote and Celona recused himself with respect to its companion bill. The cancer council legislation affected equally all hospitals and other cancer care providers in Rhode Island. The PILOT legislation extended beyond the health care industry to all tax-exempt entities in Providence – including all hospitals, universities, churches and public interest organizations, to name a few. The ovarian cancer legislation was not even targeted at hospitals or health care facilities.

As such, Celona was expressly permitted by the Ethics Commission to fully participate and vote in this legislation, provided he made Section 6 disclosures when necessary. Thus, the

[10] As discussed above, House Bill 99-H 5917, the Bone Marrow legislation predominately related to Roger Williams Hospital. Celona's involvement in regard to that Bill, however, amounted to inquiring and being informed about a modest error in the Bill. The Indictment makes no allegations about any improper lobbying or voting in regard to that Bill.

allegations in the Indictment with respect to Celona's involvement with these bills simply cannot support an honest services fraud case.

### C. The Indictment Fails To Allege A Scheme To Defraud Under 18 USC § 1346

Section 1346 provides that for the purpose of the mail fraud statute, the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible *right* to honest services. 18 U.S.C. § 1346. This requires the Court to consider what services the citizens of Rhode Island have a *right* to expect from Celona. The cases in which a deprivation of an official's honest services is found typically involve either bribery of the official or her failure to disclose a conflict of interest, resulting in personal gain. Sawyer I, 85 F.3d at 724. The Indictment here focuses on the conflict of interest theory of the honest services doctrine, as there are no allegations of secret payments being made to Celona, only that the truly-interested parties behind payments to Celona were not properly disclosed.

The rights of the citizens of Rhode Island to Celona's disinterested and honest service were limited to *official* legislative action. Id.(the public's right is limited to disclosure of "the official's potential motivation behind *an official act*") (emphasis added); Silvano, 812 F.2d at 759; United States v. Bloom, 149 F.3d 649, 656 (7th Cir. 1998) (reversing the honest services fraud conviction of a Chicago alderman who, in his private capacity as a lawyer, advised a client to use a proxy bidder at a tax scavenger sale at which the client's property was being auctioned, thereby depriving the city of tax revenues; and finding that the scheme did not involve anything that the defendant did in his *official capacity* as an alderman) (emphasis added).

The question, then, is what constitutes *official* actions of a state legislator. The Sawyer I decision is instructive on this point. The Court in Sawyer I enumerated the type of official

actions that would be taken by the Chairperson of a legislative Committee, such as Celona, in an "official capacity." 85 F.3d at 720. Such action would include: "to schedule hearings, assign bills to the hearing calendar and subsequent executive sessions, advocate bills at executive sessions, guiding and take other action to advance [bills] through the Committee," and, of course, voting on legislation. Id. As is apparent from Sawyer I, then, a legislator's *official* actions involve the legislative process.

**1. The Ambulance Runs**

It is part of the alleged scheme to defraud at issue that Urciuoli sought Celona's assistance to increase rescue runs to the Hospital. Indictment ¶¶ 35-38. Celona's rescue runs efforts cannot serve as the basis of an honest services fraud prosecution because those actions do not involve *official* action on Celona's part. See Sawyer I, 85 F.3d at 724-25. The Indictment does not allege that Celona's efforts to increase rescue runs to the Hospital involved legislation or legislative action of any sort. In fact, there is nothing in the Indictment that connects Celona's efforts with respect to rescue runs to any type of official action in his capacity as a state senator.

By contrast, the scenarios where courts have found honest services fraud all involve some type of *official* action. See United States v. Boots, 80 F.3d 580, 592-94 (1st Cir. 1996) (involving scheme to bribe Native-American police chief in exercise of his border patrol duties); United States v. Holzer, 816 F.2d 304, 308 (7th Cir.) (judge's systematic receipt of bribes and "loans" to influence official actions), vacated, 484 U.S. 807 (1987) (ordering reconsideration in light of McNally v. United States, 483 U.S. 350 (1987), which held that the mail fraud statute did not prohibit schemes to defraud citizens of their intangible, non-property right to honest and impartial government and led to Congress' enacting of 18 U.S.C. § 1346); United States v.

Isaacs, 493 F.2d 1124, 1149-51 (7th Cir. 1974) (public officials received bribes intended to induce special favors and preferential treatment for certain racing interests).

The Eighth Circuit has noted that, "[t]he concept of fraud upon the public may clearly fall within the ambit of the mail fraud statute where dishonest conduct by a public official directly implicates *the functions and duties of that official's public office*." United States v. Rabbitt, 583 F. 2d 1014, 1024 (8th Cir. 1978) (emphasis added). The Rabbitt case involved a Missouri State representative charged with defrauding the citizens of Missouri by accepting a ten percent commission on state contracts awarded to an architectural firm and failing to disclose his interest in those contracts. The court found that the contracts had been awarded based on merit and that "Rabbitt did not, in his official capacity, control the awarding of state contracts to architects." Id. at 1026. The court reversed Rabbitt's convictions on the mail fraud counts. The court reasoned that whether "a showing of dishonesty on the part of a state official, *outside his official duties*, with no financial loss to the state constitutes a fraud on the public and thereby statutory mail fraud is, in our opinion, highly questionable." Id. at 1024 (emphasis added).

In this case, Celona's efforts to increase rescue runs did not involve any type of official decision-making or participation in the legislative process, nor does the Indictment make that allegation. Thus, Celona's efforts to increase rescue runs to Roger Williams Hospital cannot – as a matter of law – serve as the basis of an honest services fraud prosecution of Urciuoli. See Sawyer I, 85 F.3d at 724-25; United States v. Bloom, 149 F.3d at 656.

**2. The Insurance Company Negotiations**

Likewise, Celona's involvement with contract negotiations between RWMC, on the one hand, and Blue Cross or United, on the other, cannot serve as the basis of an honest services fraud prosecution of Urciuoli. The Indictment alleges that Urciuoli advised Celona that he was



575964

not satisfied with the reimbursement rates that the Hospital was receiving from Blue Cross and United and requested Celona to arrange meetings between RWMC and the respective insurers. Id. ¶ 74. The Indictment does not allege that Urciuoli requested or sought legislative action from Celona in connection with Blue Cross and United. As such, Celona's involvement with contract negotiations between the Hospital and Blue Cross and United cannot – as a matter of law – serve as the basis of an honest services fraud prosecution of Urciuoli.

**D. Federalization Of A State Misdemeanor Offense**

Prosecuting Urciuoli for honest services fraud would be, in essence, federalizing misdemeanor state ethics laws, and is precisely the situation cautioned against by Judge Harrington and the First Circuit. Judge Harrington, the former United States Attorney for the District of Massachusetts, warned that the elastic nature of the Honest Services Doctrine threatens the liberty and reputation of individuals undeserving of criminal prosecution under a federal felony statute:

> This court re-emphasizes the threat to liberty and reputation of individuals which occurs when federal prosecutors selectively transform state ethics violation…typically enforced by the imposition of civil penalties, into serious federal felonies. The government should be wary of the broad language and elastic interpretation of the federal criminal fraud statute, and refuse to engage in the innovative prosecutorial process of 'federalization' of state laws.

United States v. Sawyer, 74 F.Supp.2d 88, 105 (Harrington, J.) (D. Mass. 1999), rev'd, 239 F.3d 31, 49 (1st Cir. 2001) (supporting Judge Harrington's cautionary note); see also Thomas DiBiagio, *Politics and the Criminal Process: Federal Public Corruption Prosecutions of Popular Public Officials Under the Honest Services Component of the Mail and Wire Fraud Statutes*, 105 DICK. L. REV. 57, 63 (2000) ("There are few areas of federal criminal law as ambiguous as the criteria for prosecution under section 1346.")

Although the First Circuit overruled Judge Harrington's decision on other grounds, it highlighted the importance of his warning to federal prosecutors: "We caution further that 'every transgression of governmental obligations' should not be turned into a federal felony. Judge Harrington has spoken forcefully to this point." Sawyer II, 239 F.3d at 49. In highlighting Judge Harrington's warning, the First Circuit reiterated its concerns expressed earlier in Sawyer I, that the honest services doctrine should not be overextended in conflict cases involving ethics violations: "[t]o allow every transgression of a state governmental obligation to amount to mail fraud would effectively turn every such violation into a federal felony; this cannot be countenanced." Sawyer I, 85 F.3d at 713, 728.

The risk of an unwarranted expansion of federal criminal law is compounded by the fact that the honest services fraud doctrine "eludes easy definition." Sawyer I, 85 F.3d 724. Judge Winter of the Second Circuit has noted:

> One searches in vain for even the vaguest contours of the legal obligations created beyond the obligation to conduct governmental affairs "honestly" or "impartially," to ensure one's "honest and faithful participation" in government ....

United States v. Margiotta, 688 F.2d 108, 142-143 (2d Cir. 1982) (Winter J., concurring in part and dissenting in part). Also instructive are the observations of the Seventh Citcuit in United States v. Bloom:

> [V]iolations of statelaw fiduciary duties do not turn into mail fraud just because the mails are used in the process. ... But if 'not every breach' is criminal fraud, where is the line? Its location cannot be found by parsing § 1341 or § 1346, a profound difficulty in a criminal prosecution.

149 F. 2d at 654.

This case illustrates how the honest services doctrine is vulnerable to abuse through overly aggressive interpretation of the statute by the Government. In sum, this alleged theft of a

legislator's honest services either involves conduct totally outside the legislative process or conduct that was expressly approved by the Ethics Commission. At worst, this case amounts to possible misdemeanor violations of the Rhode Island Ethics Code on the part of Celona. See United States v. Bloom, 149 F3d at 656 (noting that "the rule of lenity … requires doubts to be resolved against criminalizing conduct," in dismissing honest services mail fraud charges). As noted above, the Ethics Code does not even apply to non-public officials, such as the Defendants here.

The facts alleged in the Indictment simply do not rise to the level of a federal felony.

## CONCLUSION

In light of the foregoing, the Government's theory of prosecution as to Urciuoli fails as a matter of law. Therefore, the Indictment must be dismissed as to Urciuoli.

ROBERT A. URCIUOLI

By his Attorneys,

Kristie M. Passalacqua

Kristie M. Passalacqua, Bar No. 6945
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, RI 02903
(401) 274-2000
(401) 277-9600

Michael J. Connolly (MA BBO # 638811)
*Pro Hac Vice Counsel*
Hinckley, Allen & Snyder LLP
28 State Street
Boston, MA 02109
(617) 345-9000
(617) 345-9020

Richard M. Egbert /KMP
Richard M. Egbert (MA BBO #151800)
*Pro Hac Vice Counsel*
99 Summer Street
Suite 1800
Boston, Massachusetts 02110
(617) 737-8222
(617) 737-8223 (fax)

Dated: April 3, 2006

**CERTIFICATION**

I hereby certify that I mailed a true and accurate copy of the within Memorandum of Law in Support of Motion to Dismiss Indictment to counsel of record, as stated below, on April 3, 2006:

Robert Clark Corrente
United States Attorney
United States Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903

Gerard B. Sullivan
Criminal Chief
United States Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903

Luis M. Matos
Assistant U.S. Attorney
United States Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903

Dulce Donovan
Assistant U.S. Attorney
United States Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903

William P. Devereaux
Holland & Knight LLP
One Financial Plaza, Suite 1800
Providence, RI 02903

Thomas C. Frongillo, Esq.
Weil Gotshal & Manges
100 Federal Street, Floor 34
Boston, MA 02110

Thomas G. Briody, Esq.
Law Office of Thomas G. Briody
72 Pine Street, First Floor
Providence, RI 02903

John A. Pappalardo, Esq.
James P. Redding, Esq.
Greenburg Traurig LLP
One International Place
Boston, MA 02110

Kevin J. Bristow, Esq.,
1309 Turks Head Building
Providence, RI 02903

Kristie M. Passalacqua



575964