**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **v.** | : | **CR 06-02-1T** |
| | : | |
| **ROBERT A. URCIUOLI,** | : | |
| **FRANCES P. DRISCOLL, and** | : | |
| **PETER SANGERMANO, JR.,** | : | |

**UNITED STATES' OBJECTION TO DEFENDANT**
**URCIUOLI'S MOTION TO DISMISS THE INDICTMENT**

On April 3, 2006, Defendant Robert Urciuoli filed a Motion to Dismiss the Indictment. For the reasons stated in the accompanying memorandum of law filed simultaneously herewith, the United States objects to the motion.

Respectfully submitted,

ROBERT CLARK CORRENTE
United States Attorney

Dated: April 17 2006

LUIS M. MATOS
DULCE DONOVAN
Assistant U.S. Attorneys

# CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of April, 2006, I caused to be sent by first class regular mail a true copy of the within United States' Objection to Defendant Urciuoli's Motion to Dismiss the Indictment to:

Richard M. Egbert, Esq.
99 Summer Street
Suite 1800
Boston, MA 02110

Kevin J. Bristow, Esq.
501 Turks Head Building
Providence, RI 02903

John A. Pappolardo, Esq.
James P. Redding, Esq.
Greenburg Traurig LLP
One International Place
Boston, MA 02110

Michael J. Connolly
Hinckley Allen Snyder LLP
28 State Street
Boston, MA 02109

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | CR 06-02-1T |
| | : | |
| ROBERT A. URCIUOLI, | : | |
| FRANCES P. DRISCOLL, and | : | |
| PETER SANGERMANO, JR. | : | |

**UNITED STATES' MEMORANDUM IN SUPPORT OF ITS OBJECTION TO DEFENDANT URCIUOLI'S MOTION TO DISMISS THE INDICTMENT**

## I. Introduction

On January 5, 2006, a federal grand jury returned an indictment charging Defendants Robert A. Urciuoli, Frances P. Driscoll, and Peter J. Sangermano with conspiracy to commit honest services mail fraud.[1] The Indictment also charges Defendant Driscoll with one count of honest services mail fraud and Defendants Uriciuoli, Sangermano and RWMC with thirty-six counts of honest services mail fraud. On April 3, 2006, Defendant Urciuoli filed a Motion to Dismiss the Indictment.[2]

Defendant makes three arguments in support of his motion. First, Defendant contends that the allegations in the Indictment do not establish that Urciuoli intended to deceive the public, a requirement in any honest services mail fraud case. Second, Urciuoli argues that the Indictment

[1] The Indictment also named Roger Williams Medical Center ("RWMC") in counts 1 and 3-38. As the Court is aware, subsequent to the Indictment being filed, Defendant RWMC entered into a Deferred Prosecution Agreement ("DPA") with the United States. Pursuant to the terms of the DPA, and the United States' Motion to Dismiss RWMC from the Indictment, on April 8, 2006, the Court dismissed RWMC from the case.

[2] Additionally, Defendants Driscoll and Sangermano have filed separate motions to dismiss which substantially incorporate the arguments Urciuoli posits in support of his motion. The United States is filing separate objections addressing Driscoll and Sangermano's motions.

fails to allege a scheme to defraud under 18 U.S.C. § 1346 because it does not specify that Celona undertook "legislative" actions at the behest of his employer, RWMC. Third, Defendant urges the Court to dismiss the Indictment because he is, in his words, "undeserving" of federal prosecution. Def.'s Mem. in Supp. (Hereinafter "Supp. Mem.") at 28. Defendant's arguments fail.

In arguing that the allegations in the Indictment do not establish that he intended to deceive the public, Defendant maintains that not only was former Rhode Island State Senator John Celona's conflict of interest disclosed to the Rhode Island Ethics Commission, but the Ethics Commission explicitly approved Celona's participation in the legislation cited in the Indictment. Urciuoli submits numerous documents which he contends evidence the transparency with which RWMC hired Celona as a consultant. For example, Defendant contends that an April 6, 1998, letter to the Rhode Island Ethics Commission "painstakingly spelled out the numerous ways in which Celona's consulting relationship was connected to RWMC." Supp. Mem. at 8. The Indictment alleges otherwise. See Indictment ("Indict.") ¶ 44. ("In the April 6, 1998 letter, Urciuoli, Driscoll, and Celona failed to disclose that Celona had been performing political services for RWMC. Urciuoli and Driscoll also failed to disclose that RWMC would be funding the payments made by the Village to Celona. In so doing, Urciuoli, Driscoll, and Celona misrepresented the true identity of his employer and misrepresented the true nature of the work he would be performing.").

Deciding factual questions which go to the heart of the United States' case is not appropriate on a motion to dismiss. See e.g. United States v. Alfonso, 143 F.3d 772, 776-77 (2d. Cir. 1998). At this stage of the proceeding, the Indictment's validity is tested solely by its

allegations, not whether the United States can prove its case at trial. See Costello v. United States, 350 U.S. 359, 363 (1956). An indictment is deemed legally sufficient if it "elucidates the elements of a crime, enlightens a defendant as to the nature of the charge against which she must defend, and enables her to plead double jeopardy in bar of future prosecutions for the same offense." United States v. Sepulveda, 15 F.3d 1161, 1192 (1st Cir. 1993). The Indictment clearly meets this standard. Whether the representations made to the Ethics Commission concerning Celona were accurate, and whether the Ethics Commission's opinion is of any value in light of those representations, are some of the key questions to be answered in the case and as such are appropriately left to be determined at trial.

Urciuoli's argument that the § 1346 charges lack allegations that Celona undertook "legislative" actions at the behest of his employer, RWMC, also fails. To make out an honest services fraud case, the United States need not allege that the public official engaged in "legislative" actions. All that is required is that the Defendant intended to influence a public official in her duties and that he intended for the public official to fail to disclose a conflict of interest. The Indictment properly alleges both. Indict. ¶¶ 15-20.

Finally, in asking the Court to dismiss the Indictment because he is "undeserving" of federal prosecution, Supp. Mem. at 28, Uricuoli urges the Court to apply the Rule of Lenity and dismiss the Indictment. The Rule of Lenity, however, has no application in this case where the statute under which Urciuoli is being prosecuted is not ambiguous. Accordingly, his motion to dismiss should be denied.

## II. Factual Background

The following facts are drawn exclusively from the Indictment.[3]

Throughout the relevant time period, Defendant Urciuoli was the President and Chief Executive Officer of RWMC. Indict. ¶ 1. From 1989 until May of 2000, Defendant Driscoll was Senior Vice-President, External Affairs, Corporate Communications and Development for RWMC. Id. ¶ 2. Defendant Sangermano was a principal of Village Retirement Communities, LLC, a not-for-profit corporation dedicated to developing and operating assisted living facilities. Id. ¶ 3.

RWMC was the parent company for Roger Williams Hospital (the "Hospital") and the the sole member and shareholder in Roger Williams Realty Corporation ("Roger Williams Realty"), a corporation that owned and managed real estate for the benefit of RWMC, and Elmhurst Extended Care Facilities, Inc., a skilled nursing and intermediate care facility. Id. ¶ 4. The Village at Elmhurst, LLC (the "Village"), was an assisted living facility that was equally owned by Roger Williams Realty and SANAT Properties, LLP.[4]

Generally, the Indictment charges that from August of 1997 through January 8, 2004,

---

[3] As discussed more fully in Section III.A. infra, in deciding Urciuoli's Motion to Dismiss the Indictment, the Court is limited to considering the facts alleged in the Indictment and is bound to accept those facts as true. See United States v. Sampson, 371 U.S. 75, 78-79 (1962). Nevertheless, Urciuoli rarely cites the allegations in the Indictment in support of his arguments in favor of dismissal. The United States, however, limits its discussion of the relevant facts to those alleged.

[4] SANAT was a partnership between Village Retirement Communities and NATCO Products, Inc. Id.

Defendants conspired with John Celona, a former Rhode Island State Senator,[5] to defraud the citizens of the State of Rhode Island of their intangible right to the honest services of Celona, and to have those services performed free from deceit, favoritism, bias, conflict of interest and self-enrichment.[6] Indict. ¶ 14. The objects of the conspiracy were: (1) to pay money to Celona, pursuant to a consulting agreement, "so as to improperly influence and affect the official actions of Celona, specifically, to cause him to use his influence, power and authority as a State Senator to benefit the political and financial interests of RWMC and its affiliates; and (2) to deceive the State of Rhode and its citizens concerning Celona's relationship with RWMC in order for Celona to continue to promote the political interests of RWMC and its affiliates." Id. ¶¶ 15, 16.

The Indictment sets forth the process by which Defendants caused Celona to enter into a consulting agreement with the Village in order to provide Celona with money in exchange for his political support on matters of interest to RWMC and the Village pending before the Rhode Island General Assembly. In essence, Defendants hired Celona as a consultant for the Village to work on issues relating to senior affairs while their true purpose was to have Celona perform duties for RWMC and report to Frances Driscoll. Id. ¶¶ 21-25. Celona's consulting agreement with the Village was a way of hiding Celona's relationship with RWMC from the State of Rhode Island and its citizens, allowing Celona to promote RWMC's political interests in his official

---

[5] Celona was a State Senator from January 2, 1995, through on or about March 9, 2004. From January 4, 2001, through December 11, 2003, Celona was the Chairman of the Senate Corporations Committee, which possessed jurisdiction over legislation and matters affecting commerce, for-profit as well as not-for-profit business corporations, including but not limited to, health care providers, health care related insurance companies, and pharmacies. Id. ¶¶ 6, 7.

[6] In a separate case, pursuant to a Plea Agreement with the United States, on August 25, 2005, Celona plead guilty to an Information charging one count of honest services mail fraud.

capacity without revealing the true nature of Celona's work relationship to RWMC and the attendant conflict of interest.

Defendants' deception included, but was not limited to, obtaining a Rhode Island Ethics Commission opinion based on false and misleading information. Id. ¶¶ 41-44. The Indictment details how Defendants Urciuoli and Driscoll sent an April 6, 1998, letter to the Ethics Commission[7] stating that Celona was employed by the Village to promote services provided to senior citizens. Attached to the Ethics Commission letter was also a copy of the consulting agreement, which stated that Celona was being hired by the Village to "heighten awareness among seniors (the elderly) of the greater Providence community as to programs and services available" at the Village and Elmhurst Extended Care. Id. ¶¶ 24-25, 12. In the April 6, 1998, letter, Defendants Urciuoli and Driscoll failed to disclose that Celona had been performing political services for RWMC, reporting to Driscoll, and that RWMC was funding the Village's payments to Celona. Id. ¶ 44. Thus, Defendants' letter to the Ethics Commission wholly misrepresented the true identity of Celona's employer and the true nature of the work he was and would be performing. Id. ¶ 44.

For example, despite the fact that the Consulting Agreement specified that Celona was

---

[7] The Rhode Island Ethics Commission was an independent commission created by the State of Rhode Island. Indict. ¶ 11. The Ethics Commission was charged with ensuring that public officials and employees adhered to the highest standards of ethical conduct, respected the public trust and the rights of all persons, were open, accountable, responsive, avoided the appearance of impropriety, and did not use their position for private gain or advantage. In June of 1987, the Rhode Island General Assembly enacted the Rhode Island Code of Ethics in Government. The Ethics Commission had the authority to investigate violations of the Code of Ethics and enforce its provisions. The Ethics Commission also possessed the authority to issue advisory opinions relating to the requirements under the Code of Ethics. As an elected State official, Celona was subject to the Code of Ethics. Id.

charged with increasing senior awareness as to the programs available at the Village and Elmhurst Extended Care, Urciuoli and Driscoll had already tasked Celona with influencing municipalities to increase the number of ambulance transports to the Hospital. See e.g. id. ¶¶ 35-38. In addition, in or about early 1998, prior to submitting the letter to the Ethics Commission, Urciuoli and Driscoll informed Celona that they opposed Senate Bill 98-S 2796, an act which prohibited directors, trustees, or officers from serving on the board of a newly converted hospital. Id. ¶ 39. Subsequently, on or about March 16, 1998, Celona sent Defendant Driscoll a facsimile in which he advised that, in regard to Senate Bill 98-S 2796, he was making calls to "kill the bill" in Committee. Id. ¶ 40. On or about April 23, 1998, in response to the false and fraudulent April 6, 1998, advisory opinion request, Celona received an opinion from the Ethics Commission outlining the legislative duties that he could undertake. Id.

Having deceived the Ethics Commission into endorsing a relationship between Celona and the Village that did not exist, Urciuoli continued throughout the next approximately six years to direct Celona to use his "influence, power and authority" to take official actions which benefitted RWMC and its affiliates. Id. 14, 19. The Indictment details numerous official actions Celona undertook at Defendants' behest, including but not limited to opposing Cancer Council legislation, id. ¶¶ 54-60, Payment in Lieu of Taxes legislation, id. 61-64, bone marrow legislation, id. ¶¶ 65-67, and influencing individuals and corporations doing business with RWMC in a manner intended to financially benefit RWMC, id. ¶¶ 19(d), 73-86, 87-91. Over time, Defendants rewarded Celona for his efforts, increasing his original weekly salary from $700 to $1,000. Id. ¶¶ 92-94. In all, Defendants paid Celona approximately $260,638.63 for his services. Id. ¶ 32.

## III. Argument

### A. The Court's Review of the Indictment is Limited to the Four Corners of the Document

Despite relying on some 60-odd pages of exhibits in support of virtually every argument he makes in support of his motion, Defendant Urciuoli concedes that "[t]he general rule is that a Court may only consider the four corners of the indictment when ruling on a motion to dismiss." Supp. Mem. at 3 n.2. Urciuoli then suggests that "an indictment may be dismissed at the pretrial stage based on evidence beyond the four corners of the indictment when 'the operative facts are undisputed and the government fails to object to the district court's consideration of those undisputed facts in making the determination regarding a submissible case.' " Id. (quoting United States v. Brown, 925 F.2d 1301, 1304 (10th Cir. 1991)). In this case, the operative facts are disputed and the United States does object to the Court's consideration of facts and evidence beyond those facts cited in the four corners of the Indictment.

Indeed, in United States v. Hall , 20 F.3d 1084 (10th Cir. 1994), the Tenth Circuit clarified its ruling in Brown, the case which Defendant cites as justifying his submission of exhibits:

> Although we recognize that the preferred approach in testing the sufficiency of an indictment **cautions against** consideration of the strengths and weaknesses of the government's case through fact-finding pretrial hearings, we read Brown and Wood[8] as authority which allows a district court to dismiss charges at the pretrial stage **under the limited circumstances where the operative facts are undisputed and the government fails to object to the district court's consideration of those undisputed facts in making the determination regarding a submissible case.** Under this scenario, a pretrial dismissal is essentially a determination that, *as a matter of law,* the government is

[8] Defendant also cites the Tenth Circuit's opinion in United States v. Wood, 6 F.3d 692 (10th Cir. 1991), as authority for the proposition that the Court may, in certain circumstances not present here, consider evidence beyond the four corners of the Indictment in ruling on a defendant's motion to dismiss.

> incapable of proving its case beyond a reasonable doubt. **We note, however, that such a scenario is not likely to recur and we caution both the trial courts and counsel that the procedure here employed is indeed the rare exception**. Here, the government did not dispute the facts surrounding the section 924(c)(1) charge . . . . Under these limited circumstances, we find no procedural error in the district cour's handling of the motion to dismiss.

Hall, 20 F.3d at 1088 (internal citations omitted) (emphasis added).[9] Where, as here, the United States objects to the consideration of facts outside the Indictment and where facts alleged in the Indictment are disputed, addressing Defendant's motion to dismiss by reference to the exhibits he has submitted is not permitted.

**B. Sufficiency of the Indictment Standard**

Rule 7(c)(1) of the Federal Rules of Criminal Procedure mandates that an indictment "must be a plain, concise and definite written statement of the essential facts constiting the offense charged . . . ." An indictment is legally sufficient if it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and . . . enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." Hamling v. United States, 418 U.S. 87, 117 (1974). "An indictment is generally sufficient if it sets forth the offense in the words of the statute including all the elements." United States v. Holmes, 632 F.2d 167, 169 (1st Cir. 1980). As discussed below in Section III.D., the Indictment meets this standard.

---

[9] In addition to Brown and Wood, Defendant cites Watterson v.Page, 987 F.2d 1, 3 (1st Cir. 1993), as holding that when ruling on a motion to dismiss a court may consider certain documents outside the complaint. Watterson is a civil case addressing evidence appropriately considered by a court in ruling on a motion to dismiss a complaint under Federal Rule of Civil Procedure 12(b) and is of no relevance to the instant criminal proceeding.

### C. Motion to Dismiss Standard

Federal Rule of Criminal Procedure 12(b) provides that "[a]ny defense, objection, or request, which is capable of determination without trial of the general issue may be raised before trial by motion."

> A pretrial motion is generally "capable of determination" before trial if it involves questions of law rather than fact. **Rule 12(b) ensures trial will be efficient and that the defendant will raise objections which are capable of determination without necessitating a "mini trial" of the general issue** before the actual trial on the merits. A claim that is raised on a pretrial motion to dismiss must go to the jury if the claim is substantially intertwined with the evidence concerning the alleged offense.

United States v. Taylor, 931 F. Supp. 1447, 1450 (N.D. Ind. 1996) (emphasis added) (citations omitted). An indictment's validity is tested solely by its allegations, not by whether the United States can prove its case at trial. See Costello, 350 U.S. at 363. "It is axiomatic that, in a criminal case, a defendant may not challenge a facially valid indictment prior to trial for insufficient evidence. Instead, a defendant must await a Rule 29 proceeding or the jury's verdict before he may argue evidentiary sufficiency." United States v. Gambino, 809 F. Supp. 1061, 1079 (S.D.N.Y. 1992). "[W]hen the Court considers a motion to dismiss an indictment, it must not conflate or confuse permissible claims based on sufficiency of the government's **allegations** with impermissible claims based on sufficiency of the government's **evidence**." United States v. Triumph Capital Group, Inc., 260 F. Supp.2d 44, 448 (D. Ct. 2002) (emphasis added) . Thus, "a technically sufficient indictment 'is not subject to dismissal on the basis of factual questions, the resolution of which must await trial.' " Id. (quoting United States v. Alfonso, 143 F.3d 772, 776-77 (2d. Cir. 1998)). As detailed below, Defendant Urciuoli's arguments in support of his motion to dismiss are based almost exclusively on factual issues which require resolution at trial.

Accordingly, his motion to dismiss should be denied.

### D. Honest Services Mail Fraud

To establish a violation of 18 U.S.C. § 1341, the government must prove two elements: (1) the defendant's knowing and willing participation in a scheme or artifice to defraud with the specific intent to defraud, and (2) the use of the mails in furtherance of the scheme to defraud. United States v. Sawyer, 239 F.3d 31, 39-40 (1st Cir. 2001) ("Sawyer II"). With respect to the first element, 18 U.S.C. § 1346 provides that "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. Section 1346, and therefore § 1341, "reach[es] schemes to defraud individuals of the intangible right to honest services of government officials." United States v. Sawyer, 85 F.3d 713, 723-24 (1st Cir. 1996) ("Sawyer I") (citing United States v. Grandmaison, 77 F.3d 555, 565-66 (1st Cir. 1996)). Because the Indictment here alleges such a scheme, with respect to the first element, the United States must prove that Defendants "acted with two kinds of intent: that [they] intended to deprive the public of [a public official's] honest services, and that [they] intended to deceive the public." Sawyer II, 239 F.3d at 41. The "first kind of intent" requires either that the Defendants "intended to influence [a public official] in [his or her] official action" or that the official fail to disclose a conflict of interest resulting in personal gain. Id. at 40-41.

The United States may demonstrate an intent to influence a public official in his official action in several ways. "For example, a bribery-like, corrupt intent to influence official action necessarily is an intent to deprive the public of an official's honest services. A person might not, however, give an unlawful gratuity with the intent to effect a specific quid pro quo. Rather, . . . a person with continuing and long-term interest before an official might engage in a pattern of

repeated intentional gratuity offenses in order to coax ongoing favorable official action in derogation of the public's right to impartial official services." Id. at 41.

The Indictment, which charges conspiracy to commit honest services mail fraud in Count 1, and mail fraud, Counts 2-38, alleges all that §§ 1341 and 1346 require. See e.g. Indict. ¶¶ 14-16, 97-98, 105. For example, Paragraph 96 of the Indictment avers:

> The Grand Jury further charges that from in or about August 1997, through in or about December 2003, Defendants URCIUOLI, DRISCOLL, and SANGERMANO, knowingly devised and intended to devise a scheme and artifice to defraud the State of Rhode Island and its citizens of their intangible right to the honest services of John Celona and to have those services performed free from deceit, favoritism, bias, conflict of interest and self-enrichment.

See also Indict. ¶ 14. Paragraphs 97 and 98 allege that the two objects of the scheme were to "influence and affect" Celona's official actions and to deceive the State of Rhode Island and its citizens concerning RWMC's relationship with Celona.

> 97. It was the object of the scheme to pay money to Celona, pursuant to a consulting agreement, so as to improperly influence and affect the official actions of Celona, specifically, to cause him to use his influence, appointment power, and authority as a State Senator to benefit the political and financial interests of RWMC and its affiliates from which Celona was receiving money.
>
> 98. It was further an object of the scheme to deceive the State of Rhode Island and its citizens concerning Celona's relationship with RWMC in order for Celona to continue to promote the political interests of RWMC and its affiliates from which Celona was receiving money.

See also Indict. ¶¶ 15, 16. The Indictment, tracking the language of §1341, also alleges that Defendants, "for the purpose of executing the scheme and artifice to defraud" "knowingly and willfully cause[d] to be placed in an unauthorized depository for mail matter" checks to Celona, "to be sent and delivered by the United States Postal Service." See ¶¶ 104, 107, Counts 2-38. On its face then, the Indictment properly and sufficiently pleads its mail fraud counts. It alleges

all of the elements of 18 U.S.C. §§ 1341 and 1346. It describes the nature of the scheme to defraud, the intent with which the scheme was devised, and the mail communications sent in furtherance of scheme. Accordingly, Urciuoli's motion should be denied.

**E. The Allegations in the Indictment Squarely Allege that Defendant Urciuoli Intended to Deceive the Public**

Urciuoli contends that the Indictment fails to allege facts which "establish" that he intended to deceive the public. Supp. Mem. at 19. Citing Sawyer II, Urciuoli contends that "[t]o establish specific criminal intent to deceive the public, the government must show that the defendant knew that his or her actions were fraudulent and, despite this knowledge, proceeded to take steps designed to conceal these fraudulent actions." Supp. Mem. at 19.

Whether Defendants possessed the requisite intent under the mail fraud statute is a question for the jury. See e.g. United States v. Forzese, 756 F.2d 217, 220 (1st Cir. 1985); United States v. Themy, 624 F.2d 963, 965 (10th Cir. 1980); United States v. Hopkins, 357 F.2d 14 (6th Cir. 1966). Thus, to the extent Urciuoli asks this Court to rule that the Indictment's allegations fail to demonstrate he possessed the requisite intent under § 1341, his motion must fail.

Furthermore, Sawyer II does not require the level of proof Urciuoli urges. The portion of the Sawyer II opinion cited by Urciuoli addresses whether sufficient evidence existed at trial to show that Sawyer intended to influence official action. Sawyer contended that he thought his expenditures were lawful and merely part of " ' goodwill entertaining.' " Sawyer II, 239 F.3d at 47. However, the First Circuit noted that sufficient evidence existed that revealed Sawyer's awareness of the state gratuity laws and his "understanding that he might be violating those statutes." Id. Those violations provided some evidence of Sawyer's intent with respect to certain

expenditures and cast doubt on his claim that he believed them to be lawful. Id. As to whether Sawyer also demonstrated an intent to deceive the public, the Circuit held: "[I]t appears that the requisite intent to deceive could have been shown either through Sawyer's own acts of deception toward the public with respect to the gift/gratuity statute violations, **or through his efforts to ensure that the legislators deceived the public with respect to violations. The latter requires evidence only that Sawyer intended to cause the legislators intentionally to fail to disclose material information about the violations, although evidence that he intended the legislators to affirmatively misrepresent themselves would also suffice."** Id. at 48 (emphasis added).[10]

As discussed above, the Indictment clearly avers that Uricuoli did in fact intend to deceive the public and that he intended for Celona to deceive the public as well. Indict. ¶ 44, 98, 100, 102. Indeed, in referencing the April 6, 1998, Ethics Commission letter, Urciuoli concedes that "[t]he Indictment specifically alleges that Urciuoli, Driscoll and Celona 'misrepresented the true nature of the work [Celona] had been and would be performing' and 'failed to disclose that Celona had been performing political services for RWMC.' " Supp. Mem. at 19-20, citing Indict. ¶ 44.

Nevertheless, in an attempt to prove otherwise, Urciuoli attaches to his motion the April 6, 1998, letter to the Ethics Commission and the Ethics Commission opinion, arguing that the documents "squarely refute those allegations" because they "clearly disclose that Celona would

---

[10] Even though the United States need not meet the level of proof articulated by Urciouli, the Indictment's detailed allegations of the lengths Urciuoli went to conceal the true nature of Celona's relationship with RWMC suggest his consciousness of guilt. See United States v. Dial, 757 F.2d 163, 170 (7th Cir. 1985) ("The defendants' elaborate efforts at concealment provide powerful evidence of their own consciousness of wrongdoing.").

be working for affiliates of RWMC." Supp. Mem. at 20. Nowhere is Urciuoli's attempt to have this Court decide questions of fact as a precursor to dismissing the Indictment more obvious.

The Indictment alleges that in sending the April 6, 1998, letter to the Ethics Commission, with a copy of the Consulting Agreement attached, Uriciuoli and Driscoll failed to disclose that Celona had been performing political services for RWMC, failed to disclose that RWMC would be funding the payments made by the Village to Celona, and thus misrepresented the true identity of his employer and misrepresented the true nature of the work he would be performing. Indict. ¶ 44. Thus, the fact that the Ethics Commission issued an opinion endorsing the misrepresentations Urciuoli and Driscoll made in the April 6, 1998, letter is hardly a defense to the steps Defendants are alleged to have taken to deceive the public. If anything, the Ethics Commission's opinion, and whether news of Celona's work for the Village was reported in the news media, another item outside the four corners of the Indictment cited by Urciuoli, Supp. Mem. at 21, demonstrate the <u>success</u> of the deception. Indeed, Defendants' lies were being reported as facts. Whether the Ethics Commission letter and the attached Consulting Agreement actually refute the allegations in the Indictment are fact questions appropriately left for the jury to decide, not issues which the Court can determine in ruling on Urciuoli's motion to dismiss.[11] <u>See</u>

---

[11] One of the cases cited by Urciuoli as support for his claim that the United States must demonstrate that he knew his actions were fraudulent, yet continued to take steps to conceal his actions is <u>United States v. Grandmaison</u>, 77 F.3d 555 (1st Cir. 1996). <u>Grandmaison</u> is a sentencing case in which the First Circuit addressed the issue of whether the district court mispprehended its authority to depart downward based on the defendant's argument that his offense conduct constituted aberrant behavior. <u>Id.</u> The defendant's conduct in that case, discussed merely as background by the court, in part, actually supports the United States' theory of criminal liability in the instant case. Grandmaison, a part-time New Hampshire alderman, recused himself from participating in the Nashua Board of Alderman's consideration of certain construction contracts because he worked for one of the contending construction firms. Nevertheless, Grandmaison, after recusing himself, continued successfully to lobby his

Triumph Capital Group, 260 F. Supp.2d at 448. Thus, his motion should be denied.

### F. Celona's Work on Behalf of RWMC Was Not "Approved" by the Ethics Commission

Urciuoli also argues that many of the actions Celona is alleged to have undertaken on behalf of RWMC involved broad-based legislation, which, based on Defendants' "full disclosure" to the Ethics Commission, was precisely the type of legislation on which Celona was allowed to participate and vote. Supp. Mem. at 23. Thus, Urciuoli contends, Celona's actions conformed with state law governing his conduct and the public was not deprived of his honest services. Id.

Urciuoli's argument is misplaced, and again amounts to nothing more than an argument that the United States will be unable, at trial, to prove its case. First, notwithstanding Urciuoli's conclusory statements that Defendants "made full disclosure" to the Ethics Commission and that "[a]ny further disclosure as (sic) the source of the funds paid to Celona would not have made a difference to the Ethics Commission, " the Indictment alleges otherwise. Indict. ¶ 44. The accuracy of Defendants' representations to the Ethics Commission is one of the key issues in the case and involves factual questions, including intent questions, the jury will have to decide. This Court cannot, in the context of the present motion, determine the truthfulness of the statements made in the April 6, 1998, letter, or whether the letter contained material omissions.[12]

---

"aldermanic colleagues" to award his company the contract. Id. In this case, Defendants and Celona, through the false and fraudulent Ethics Commission request, seemingly removed from public view the specter of Celona taking official action on items in which RWMC held a financial, or other, interest. In reality, Defendants fully intended that Celona would continue to do RWMC's bidding on all matters of importance to RWMC.

[12] Urciuoli urges the Court to find, as a matter of law, that Defendants' failure to disclose to the Ethics Commission that RWMC was funding payments to Celona cannot constitute a

Second, since the accuracy of Defendants' statements contained in the Ethics Commission letter are at issue, the import of the Ethics Commission's opinion delineating Celona's permissible field of activity is also in question. See Indict. ¶ 44. Indeed, as discussed above, the Indictment alleges that the April 6, 1998, advisory opinion request "failed to disclose that Celona had been performing political services for RWMC," "failed to disclose that RWMC would be funding the payments made by the Village to Celona," and "misrepresented the true identity of his employer and . . . the true nature of the work he had been and would be performing." Id. Therefore, the Ethics Commission opinion, which was based on these false and fraudulent representations, is simply additional proof that one of the objects of the scheme, to deceive the public, had been accomplished, and is not evidence of full disclosure. Accordingly, Urciuoli's motion to dismiss should be denied.[13]

---

material omission as required to make out a § 1341 case. Supp. Mem. at 22. The materiality of the falsehood, or omission, is an element under § 1341, and as such, must be submitted to the jury. See Neder v. United States, 527 U.S. 1 (1999) (materiality is an element of mail, wire and bank fraud statutes) ; United States v. Gaudin, 515 U.S. 506 (1995) (where materiality is an element of crime, must be submitted to jury). Furthermore, in United States v. Silvano, 812 F.2d 754, 759 (1st Cir. 1987), a case cited by Urciuoli, the court held that failure to disclose material information by someone who, like Celona, has a duty to disclose to his employer, in this case the State of Rhode Island and its citizens, "where the non-disclosure could or does result in harm to the [employer] is a violation of the [mail fraud] statute." (alteration in original).

[13] Urciuoli is wrong in his suggestion that in making out an honest services fraud case the United States needs to show that Celona broke state law. As discussed above, in demonstrating that Urciuoli acted with the requisite intent to deprive the public of its right to the honest services of John Celona, the United States need only demonstrate that Urciuoli intended to influence Celona in his official action, or that he intended Celona to fail to disclose a conflict of interest resulting in personal gain. Sawyer II, 239 F.3d at 40-41. The Indictment alleges both. Indict. ¶¶ 99-102. Thus, Defendant's discussion of whether the legislation Celona took action on at Urciuoli's arguing was broad-based has no place in the analysis of whether the Indictment properly alleges an honest services fraud case.

### G. The Indictment Sufficiently Alleges a Scheme to Defraud Under 18 U.S.C. § 1346

Urciuoli further maintains that the Indictment fails to allege a scheme to defraud under § 1346 because it fails to assert that Celona undertook "legislative" actions. According to Urciuoli, since the public's right to honest services derives from its right to have a public official perform official actions free from bias, the public does not have a right to have non-official actions performed impartially. Further, Urciuoli contends, official actions must involve the legislative process. Thus, failure to disclose a conflict of interest that might exist concerning non-legislative actions does not state a claim under the honest services mail fraud doctrine. Because the Indictment focuses exclusively on a conflict of interest theory of the honest services doctrine, the Indictment fails as a matter of law. Supp. Mem. at 25-26.

Again, Urciuoli's argument fails on a number of points. First, Urciuoli is not correct in asserting that the Indictment only alleges a conflict of interest honest services fraud. As discussed above in section III.D., the United States can demonstrate that the target of the scheme is the deprivation of the official's honest services either by showing that Defendant Urciuoli "intended to improperly influence a public official in her duties, or that he intended for public officials to fail to disclose a conflict of interest." Sawyer II, 239 F.3d at 46. The Indictment alleges both. For example, the Indictment states that "[i]t was the object of the scheme to pay money to Celona, pursuant to a consulting agreement, so as to improperly influence and affect the official actions of Celona, specifically, to cause him to use his influence, appointment power, and authority as a State Senator to benefit the political and financial interests of RWMC and its affiliates from which Celona was receiving money." Indict. ¶ 97. Further, paragraph 98 states

"[i]t was further an object of the scheme to deceive the State of Rhode Island and its citizens concerning Celona's relationship with RWMC in order for Celona to continue to promote the political interests of RWMC and its affiliates from which Celona was receiving money." Moreover, the Indictment avers that Defendants "caused Celona to enter into a consulting agreement in order to provide him money in exchange for his political support" and that as part of the scheme Defendants "influenced and affected Celona in his official actions as a State Senator and Chairman of the Senate Corporations Committee in a manner which benefitted RWMC and its affiliates." Indict. ¶¶ 99, 101.

In addition, in proving an honest services fraud case, the United States need not demonstrate that the Defendants actually influenced a public official in his duties, only that they intended to. Sawyer II, 239 F.3d at 46-47. Indeed, United States v. Holzer, 816 F.2d 304 (7th Cir. 1987), cited by Defendant, supports this point. Supp. Mem. at 26. In Holzer, the court addressed whether the "systematic and long-continued receipt of bribes by a public official, coupled with active efforts to conceal bribe taking from the public and the authorities," fell within the purview of the mail fraud statute. 816 F.2d at 308. In holding that it did, the court stated "[i]t is irrelevant that, so far as appears, Holzer never ruled differently in a case because of a lawyer's willingness to make him a loan, so that his conduct caused no demonstrable loss either to a litigant or to the public at large." Id. at 308.

Furthermore, nothing in the case law suggests that a legislator's official actions encompass solely "legislative" acts. In fact, one of the cases cited by Urciuoli makes clear that a legislator's actions are not merely limited to acting on legislation. In Holzer, the court expressed its disagreement over the Eighth Circuit's conclusions in United States v. Rabbitt, 583 F.2d

1014, 1024-26 (8th Cir. 1978), also cited by Defendant. In Rabbitt, the Eighth Circuit reversed Rabbitt's honest services mail fraud conviction because the awarding of contracts over which Rabbitt was alleged to possess some influence, were awarded on a merit basis by individuals over whom Rabbitt possessed no authority. 583 F.2d at 1026. The Holzer court "doubt[ed] the soundness" of the Eighth Circuit's reasoning in Rabbitt and stated that "[t]he fact that the defendant did not control the award of contracts should not be decisive if his position as a state legislator gives his recommendations a weight independent of their intrinsic merit." 816 F.3d at 309.

Further, United States v. Boots, 80 F.3d 580, 592 (1st Cir. 1996), also cited by Urciuoli, demonstrates that what constitutes a public official's "official" actions is a question of fact and can encompass more than what is specified in an official's formal duties. One of the issues in Boots, a Travel Act case, was whether the intended recipient of a bribe's formal duties encompassed enforcing federal or Canadian law.[14] The court concluded they did not. Nevertheless, the court also found that the police chief's "official" duties did – "an honest municipal police officer would be expected to keep his eyes open for and report federal and . . .

---

[14] The Interstate Travel Act punishes "[w]hoever travels in interstate or foreign commerce ... with intent to ... promote, manage, establish, carry on, or facilitate ... any unlawful activity, and thereafter performs or attempts to perform" such an act. 18 U.S.C. § 1952(a). Bribery in violation of state law is an "unlawful activity" within § 1952. See United States v. Arruda, 715 F.2d 671, 681 (1st Cir.1983). The Maine bribery statute, charged in Boots, provided in relevant part:

> 1. A person is guilty of bribery in official and political matters if:
>
> A. He promises, offers, or gives any pecuniary benefit to another with the intention of influencing the other's action, decision, opinion, recommendation, ... or other exercise of discretion as a public servant . . . .

17-A M.R.S.A. § 602(1)(A).

foreign criminal violations; receiving something of value to turn a blind eye would limit his discretion in his official capacity as tribal police chief." Id. at 592.

Urciuoli cites United States v. Bloom, 149 F.3d 649, 656 (7th Cir. 1998), as further support for his contention that an honest services fraud case must involve an individual's official duties. Supp. Mem. at 25. Bloom was a part-time city alderman, who, in his private life, was a lawyer. In his private-lawyer capacity, Bloom had counseled clients on how to purchase properties at city auction without paying the deficient property taxes owed on the properties. The government argued that as a fiduciary of the city, even when acting in his private-lawyer capacity, Bloom owed Chicago his undivided loyalty. The court refused to accept the government's honest services fraud theory of the case because Bloom's improper counseling of his clients had nothing to do with his position as an alderman.[15] Bloom, 149 F.3d at 654-55.

In this case, the Indictment clearly alleges that Defendants intended to influence Celona in the performance of his official actions. See e.g. Indict. ¶ 15 ("It was the object of the conspiracy to pay money to Celona, pursuant to a consulting agreement, so as to improperly influence and affect the official actions of Celona, specifically, to cause him to use his influence, appointment power, and authority as a State Senator to benefit the political and financial interests

---

[15] Notably, the Bloom court distinguished Bloom's conduct from situations where the defendant is alleged to have converted "to private use information that [he] possessed by virtue of [his] public position[]." 149 F.3d at 655. "Secret conversion of information received in a fiduciary capacity is a form of fraud against the owner of that information." Id. The Indictment in the instant case contains precisely that type of allegation against Defendants. See ¶ 101(c) ("It was further part of the scheme that Urciuoli, Driscoll, and Sangermano, influenced and affected Celona in his official actions as a State Senator and Chairman of the Senate Corporations Committee in a manner which benefitted RWMC and its affiliates, including but not limited to directing Celona to use his influence, power and authority . . . to provide information, **acquired in the course of and by reason of his official duties**, to RWMC and its affiliates . . . .").

of RWMC and its affiliates from which Celona was receiving money."); see also ¶¶ 19, 97,101. Urciuoli cites Celona's alleged involvement in Blue Cross and Blue Shield and United Health Care's contract negotiations with RWMC over reimbursement rates as examples of actions Celona undertook which are unrelated to his official duties. However, the Indictment alleges otherwise.

For example, the Indictment avers that "[o]n or about various dates from the fall of 1997 through the end of 2003, Urciuoli advised Celona that he was not satisfied with the reimbursement rates that the Hospital was receiving from Blue Cross and United and directed Celona to advocate, **as Chairman of the Senate Corporations Committee,** for more favorable reimbursement from each organization." Id. ¶ 74. Similarly, the Indictment states that "[o]n or about February 10, 2001, Celona sent an electronic mail message to Urciuoli advising that he had met with certain individuals from Blue Cross and a hospital association to discuss reimbursement issues. Celona had called the meeting, **by virtue of the power of his appointment as Chairman of the Corporations Committee**, in order to advocate RWMC's position. At the meeting, Celona advised representatives of Blue Cross that he wanted to see Prompt Payment accomplished so that hospitals could get there fair share of reimbursement." Id. ¶ 78. Further, paragraph eighty-four alleges that "[o]n or about a date prior to January 30, 2003, Urciuoli requested that Celona, **by virtue of the power of his appointment as Chairman of the Corporations Committee**, obtain a meeting with the Chairman of Blue Cross in order to discuss on-going contract negotiations because RWMC was having difficulty obtaining a contract on terms favorable to RWMC." See also id. ¶ 85.

The Indictment contains similar language in the section alleging that Defendant Urciuoli

tasked Celona, "by virtue of the power of his appointment as Chairman of the Corporations Committee" with "obtain[ing] a meeting with the Chairman of United Health Care in order to discuss on-going contract negotiations because RWMC was having difficulty obtaining a contract on terms favorable to RWMC." Id. ¶ 87. Moreover, the Indictment alleges that the United meeting to discuss on-going contract negotiations took place in Celona's State House office, provided to him as Chairman of the Senate Corporations Committee. Id. ¶ 88. Thus, the Indictment alleges not only that Defendant Urciuoli enlisted Celona's assistance in RWMC's negotiations with Blue Cross and Blue Shield and United in Celona's official capacity, but that Celona took action in his official capacity. See Holzer, 816 F.2d at 309 (suggesting that a state legislator's official duties for purposes of making out an honest services fraud case might encompass mere recommendations by that public official where his position "gives his recommendations a weight independent of their intrinsic merit"). These allegations go well-beyond the "private life" type actions which the Bloom court found fell outside the scope of §1346.

Urciuoli also focuses on the Indictment's allegations concerning his tasking Celona to take action to improve the number of ambulance runs to the Hospital. See Indict. ¶¶ 35-38. However, the Indictment specifically alleges that Urciuoli "advised an individual known to the Grand Jury that [he] was going to have Celona take care of the rescue run problem **politically**." Indict. ¶ 36. He thereafter directed Celona to influence municipalities. Hence, Urciuoli was attempting to use Celona's official position for the benefit of RWMC.

Moreover, not all of the overt acts alleged in the Indictment need be official actions. The overt acts alleged in the indictment and the existence of the scheme to defraud illustrate the steps

Defendants took to effectuate the scheme. For example, the paragraphs of the Indictment detailing the efforts Celona took to increase ambulance runs to the Hospital illustrate, among other things, that Defendants' representations to the Ethics Commission regarding Celona's true employer and the nature of the work he had been and would be performing, were false, and show that Defendants' true intent was to have Celona work for the Hospital. As the Court is aware, even at trial, the United States is not required to **prove** all of the facts alleged in the Indictment. See United States v. Salazar, ___ F.3d ____, 2006 WL 903217, (9th Cir. April 10, 2006). Accordingly, Urciuoli's motion to dismiss should be denied.

**H. The Rule of Lenity Does Not Support Dismissal of the Indictment**

Finally, Urciuoli argues that the Indictment should be dismissed because he is "undeserving" of federal prosecution. Supp. Mem. at 28. Urciuoli contends that this case includes aspects of the federal prosecution of state public officials which the First Circuit warned against in Sawyer I and Sawyer II. In addition, Urciuoli suggests that, at most, this case involves Celona's state law ethics violations and that, in any event he, as a private citizen is not subject to the State Ethics Code. He urges the Court to apply the rule of lenity and dismiss the Indictment.

Urciuoli's arguments are baseless. In the face of true ambiguity in a statute's meaning, the rule of lenity allows courts to adopt from alternative, equally viable statutory interpretations, the interpretation least onerous to the defendant. See Reno v. Koray, 515 U.S. 50, 64-65 (1995). A statute is not ambiguous merely because courts differ over its proper construction. Id. "The rule of lenity applies only, if after seizing everything from which aid can be derived, we can make no more than a guess as to what Congress intended." Id. at 65 (internal quotations omitted). As the First Circuit's decisions in Sawyer I and Sawyer II, make clear, there is nothing

ambiguous in the type of conduct Congress intended to criminalize through § 1346. The rule of lenity has no application in the instant case.

Defendant Urciuoli also cites Sawyer I as evidence that the First Circuit has concerns about the prosecution of private citizens under the honest services mail and wire fraud statutes.[16] See Supp. Mem. at 18, 29. He suggests that the facts of this case, as alleged in the Indictment, fall within the reservations expressed by the Circuit concerning federal prosecutions of state officials. They do not.

The concerns expressed by the Court in Sawyer I derived, in part, from the theory of criminal liability articulated by the United States in that case. 85 F.3d at 741 ("Our concern arises from the close relationship between lobbying activities that are lawful from the standpoint of federal law, even if deplorable, and associated or slightly more extreme versions of such conduct that can constitute federal violations. The problem is, in some respects, novel; the reason for its novelty is that it appears that prosecutions on facts like these have generally not been brought."). Those concerns have no place in the instant case which does not involve improper lobbying, but where the Indictment alleges that Defendants hired Celona, a public official, as an employee of RWMC, and then lied to the Ethics Commission and the public in

---

[16] Urciuoli also cites United States v. Murphy, 323 F.3d 102 (3rd Cir. 2003), as support for his claim that prosecuting private citizens under the honest services mail and wire fraud statutes is an anomoly. Indeed, Urciuoli quotes from the Third Circuit's opinion in Murphy: "The prosecution of a private party is, however, a horse of another color." Sup. Mem. at 18. Urciuoli leaves out of this quote, however, the most important word. It was not the prosecution of a "private party" which gave the circuit pause, but the prosecution of a "private party **official**." Murphy, 323 F.3d at 111. Murphy was the former Chairman of the Republican Party in New Jersey. He was being prosecuted **as a public official**. Whether Murphy's position as party Chairman appropriately placed him in the "public official" category was the concern of the court in that case, not whether he could be prosecuted as a private citizen under § 1346.

order to hide the relationship, thus enabling Celona to do RWMC's bidding without an apparent conflict of interest.

In addition, in Sawyer I, the court rejected the idea that a violation of state gratuity law constituted a per se violation of the honest services mail and wire fraud statutes, hence the court's statement which Urciuoli quotes in his memorandum. Supp. Mem. at 29 ("To allow every transgression of state governmental obligations to amount to mail fraud would effectively turn every such violation into a federal felony.") (quoting Sawyer I, 85 F.3d at 728). Thus, the court continued "to prove the intent to commit honest services fraud, the jury [must] find that Sawyer *intended to influence or otherwise improperly affect the official's performance of duties*, not merely that he intended to violate the state statute." Id. at 729 (emphasis in original). This is precisely what the Indictment alleges. See Indict. ¶ 97 ("It was the object of the scheme to pay money to Celona, pursuant to a consulting agreement, so as to improperly influence and affect the official actions of Celona, specifically, to cause him to use his influence, appointment power, and authority as a State Senator to benefit the political and financial interests of RWMC and its affiliates from which Celona was receiving money."). As the Circuit has made clear, a public official's duty of disclosure "arises not exclusively by statute, but also from the general fiduciary duty a public official owes to the public." Sawyer II, 239 F.3d at 30. Hiring a public official to work for you, and lying about it to the public and the State Ethics Commission to conceal the relationship, is precisely the type of conduct which Congress sought to criminalize in enacting § 1346. Urciuoli's actions fall precisely within scope of the statute and his Motion to Dismiss the Indictment should be denied.

## IV. Conclusion

Based upon the foregoing, the United States respectfully requests that the Court deny Defendant Urciuoli's Motion to Dismiss the Indictment.

Respectfully submitted,

ROBERT CLARK CORRENTE
United States Attorney

Dated: April 17, 2006

LUIS M. MATOS
DULCE DONOVAN
Assistant U.S. Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of April, 2006, I caused to be sent by first class regular mail a true copy of the within United States' Memorandum in Support of its Objection to Defendant Urciuoli's Motion to Dismiss the Indictment to:

Richard M. Egbert, Esq.
99 Summer Street
Suite 1800
Boston, MA 02110

Kevin J. Bristow, Esq.
501 Turks Head Building
Providence, RI 02903

John A. Pappolardo, Esq.
James P. Redding, Esq.
Greenburg Traurig LLP
One International Place
Boston, MA 02110

Michael J. Connolly
Hinckley Allen Snyder LLP
28 State Street
Boston, MA 02109

K. Anderson