# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement") made as of the 24th day of March, 1998, is among **Roger Williams Medical Center**, a Rhode Island non-profit corporation (the "Medical Center") and its wholly-owned subsidiary, **Roger Williams Hospital**, a Rhode Island non-profit corporation ("Hospital") and all subsidiaries and affiliates of the Medical Center and the Hospital (collectively the "Affiliates") (and collectively the Medical Center, the Hospital and the Affiliates are called the "Employer") and **Robert A. Urciuoli** of Providence, Rhode Island (the "Executive").

WHEREAS, the Employer desires to employ the Executive, and the Executive desires to accept such employment, on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual agreements and covenants herein, the parties hereto agree as follows:

1. Employment. The Employer hereby employs the Executive, and the Executive derives his authority from, and is directly responsible to, the Board of Trustees of the Medical Center (the "Board") and hereby agrees to serve the Employer as the President and Chief Executive Officer ("President") of each of the Medical Center and the Hospital and perform the duties described in Section 2 hereof and such other reasonable duties of an executive nature as shall be fixed from time to time by the Board for a period commencing as of March 24, 1998 and ending on September 30, 2001 (the "Initial Employment Period"). Thereafter this Agreement shall extend for an unlimited additional number of twelve (12) month periods unless either party hereto elects not to renew the

same by giving notice at least sixty (60) days prior to the expiration of the Initial Employment Period or any annual renewal thereof. Notwithstanding the foregoing, in the event that the Medical Center and/or the Hospital engage in a transaction which constitutes a change of control (a "Transfer Transaction"), and if as provided in Section 19 of this Agreement, the successor or acquiror agrees to be bound by the terms hereof, then as of the effective date of such Transfer Transaction ("Transaction Date"), this Agreement shall be extended for a three (3) year period commencing as of the Transaction Date and shall automatically be renewed for additional three (3) year terms immediately following the expiration of the initial three (3) year period (the initial three year period and each renewal term being hereinafter referred to as a "Transaction Employment Period"), subject, however, to termination by either the successor/acquiror or by the Executive by written notice to the other, which notice must be given on or before 120 days prior to the expiration of the then Transaction Employment Period. Upon such notice, this Agreement shall terminate at the end of such Transaction Employment Period. For purposes of this Section 1, a Transfer Transaction shall be deemed to mean any merger, sale, reorganization, affiliation agreement, or sale of substantially all of the assets of the Medical Center in one or in series of transactions in which (a) a majority of the persons constituting the Board of the Medical Center are not members of the Board immediately following transaction, or (b) where a person or persons other than the persons who had the authority immediately prior to such transaction have the power to appoint or elect either at that time or in the future a majority of the Board of the Medical Center, or (c) the Employer no longer owns and/or operates the Hospital.

2. Duties. The Executive shall render full time services to the Employer as President and Chief Executive Officer. The Executive shall be the chief executive officer of the Employer and shall be responsible for the efficient and orderly administration of all operations of the Employer shall administer, manage and direct the affairs and business of the Employer and shall implement and carry out the policies established by the Board. The Executive shall report to the Board and shall perform such executive duties and services as may from time to time be assigned to him by the Board, including serving as an officer or director of any Affiliate or other entity affiliated with the Employer. It is the intention of the Employer and the Executive that, subject to the Employer's charter and by-laws and the Executive's legal responsibilities as an officer of the Employer, and subject to the authority retained by the Board, the Executive shall have full discretionary authority to control the day-to-day operations of the Employer and to incur such obligations on behalf of the Employer as may be necessary or appropriate in the ordinary course of its business. Consistent with the foregoing, the Executive shall have responsibility for the planning, direction, coordination, management and administration of the operation and activities of the Employer. During the Employment Period, the Executive shall devote his full business time and his best efforts, business judgment, skill and knowledge to the performance of his duties and responsibilities hereunder and shall not otherwise engage in any business activities which conflict with his duties to the Employer hereunder. The Employer encourages participation by the Executive on community boards and committees and in activities generally considered to be in the public interest, provided, however, the Board shall have the right to approve or disapprove, in its sole discretion, the Executive's

participation on such boards and committees if, in the judgment of the Board, such participation may conflict with the Employer's interest or with the Executive's duties or responsibilities.

3. Compensation. As remuneration for his services and obligations to the Employer hereunder, the Employer will pay annually to the Executive during the Employment Period a salary at an annual rate of $268,000 (the "Base Salary"). Base Salary will be reviewed in January, 1999 and thereafter in January for each succeeding year during the Employment Period by the Board or a Committee of the Board. Such Base Salary as adjusted from time to time shall not be subject to reduction. Merit increases will be based upon performance and the compensation policies of the Employer for executive employees, as established from time to time by the Board. Additionally, the Executive shall be eligible to participate in such executive incentive bonus plans as may be established by the Board for any fiscal year during the Employment Period. A fiscal year of the Employer commences October 1 and ends on the following September 30.

4. Working Facilities. The Executive shall be furnished with an office, an executive secretary and such other facilities, staff support and services as the Board shall determine in its sole discretion to be necessary and/or appropriate to enable the Executive to carry out his duties hereunder.

5. Expenses. The Executive shall be permitted to attend, during working days, such professional and educational meetings as well as to attend to such outside professional duties in the hospital field as he shall reasonably determine to be in the best interest of the Employer. Attendance at such meetings shall be considered in furtherance

of his duties as President and shall be fully compensated service time and shall not be considered vacation time. The Employer shall reimburse the Executive for all reasonable travel and related expenses incurred by him incident to his attendance at such meetings and incident to his duties under this Agreement. The Executive shall also be reimbursed for such reasonable entertainment expenses as the Board may approve generally or as part of an authorized budget for Employer related purposes. All such expenses shall be reimbursed or paid subject to presentment to the Employer of itemized accounts of expenditures by and in accordance with the Employer's internal auditing policies.

6. Vacations. The Executive shall be entitled each year during the Employment Period to a vacation of four (4) weeks per year, during which time his compensation shall be paid in full. Each vacation shall be taken by the Executive at a time or times during which his absence from his duties as President will not adversely affect the operations of the Employer. In the event the Executive shall not take the four weeks vacation to which he is entitled in any year, any vacation time not taken shall be paid at the Base Salary rate per week for the year for such vacation time not taken. The Executive has, prior to the date of this Agreement, accrued eighty-three (83) vacation days prior to the Employer's change to its current policy of non-accrual of vacation time not taken. Accordingly, at such time as the Executive shall elect, the Executive shall receive payment in full, subject to required withholdings, of such accrued eighty-three (83) vacation days based on his Base Salary at the time of payment.

7. Health Care and Other Benefits. During the Employment Period the Employer shall provide and pay for health and dental insurance for the Executive which

provides major medical family coverage. The Executive shall receive any and all other benefits which the Employer may from time to time authorize for its full time employees.

The Employer also agrees at its expense throughout the Employment Period to:

(a) insure the Executive under its general liability insurance policy for all acts done by him in good faith as President;

(b) contribute its share of payments due with respect to two (2) Connecticut Mutual Life Insurance Company life insurance policies on the life of the Executive in the face amounts of $300,000 and $778,064, respectively, as set forth in that certain Split Dollar Agreement between the Hospital and the Executive dated October 25, 1990, as amended April 1, 1992 (the "Split Dollar Agreement"). The provisions of the Split Dollar Agreement are incorporated herein by reference and made a part of this Agreement. Upon any termination of employment of the Executive, the provisions of the Split Dollar Agreement shall apply as to any benefits due thereunder to the Executive. The Executive acknowledges that all tax consequences of such contributions under the Split Dollar Agreement are his responsibility and neither the Hospital nor the Employer shall indemnify the Executive for any penalty or tax nor adjust the Executive's compensation to account for the imposition of any tax;

(c) contribute each year on behalf of the Executive to the Hospital Defined Contribution Retirement Plan;

(d) pay the Executive $155,556, subject to necessary withholdings, during fiscal year 1998 with the intent that the Executive purchase in his name and for his account

and benefit a variable annuity contract (the "Annuity") and during the month of October each year this Agreement is in effect, commencing October, 1998, the Employer shall pay the Executive $40,000, subject to necessary withholdings, with the intent that such amount be contributed by the Executive to the Annuity;

(e) maintain and pay premiums for the benefit of the Executive of the existing group long-term disability insurance policy and such additional individual disability insurance policy as shall be obtained which will collectively provide a benefit of not less than seventy percent (70%) of the Executive's Base Salary after six (6) months of disability (as defined in such policies), provided the Executive passes required physical examinations for any such policy not in effect as of the date of this Agreement. Such disability benefits continue until age 65 as set forth in such policies;

(f) maintain and pay its required portion of the premiums (with the Executive to pay his required portion) of the existing $350,000 face value Connecticut Mutual Group Term Carve Out life insurance policy on the Executive's life;

(g) reimburse the Executive for personal financial planning expenses not to exceed $2,500 annually; and

(h) lease a vehicle at a rental amount not to exceed $700.00 per month during the Employment Period with the Executive having the right to supplement monthly rentals in excess of $700.00 per month, provided, however, if this Agreement is terminated, the Executive shall assume all rental obligations of such vehicle subsequent to the termination date.

8. Termination by Board. The Board may, in its discretion, terminate the Executive's duties as President and Chief Executive Officer. Such action shall require a majority vote of the entire Board and become effective upon written notice to the Executive or at such later time as may be specified in said notice (the "Termination Notice"). After such termination, all rights, duties and obligations of both parties shall cease except that the Employer shall continue to pay the Executive his then Base Salary for the month in which his duties are terminated and for each of the following thirty (30) consecutive months as an agreed upon termination payment. During such termination payment period, the Employer shall maintain the Executive's dental, health and major medical insurance coverage and shall provide the benefits set forth in Sections 7(e) and 7(f), but shall not provide the benefits set forth in Sections 7(b), (c), (d), (g) and (h) of this Agreement. Within ninety (90) days after the termination date set forth in the Termination Notice, the Employer shall pay to the Employee such amount as is set forth in Schedule I attached hereto, less necessary withholdings, with the intent that such amount be contributed by the Executive to the Annuity (the "Termination Amount"). The Executive shall also be entitled to outplacement services then offered by the Employer. Such termination payments shall be made in all instances of termination by the Board except in the event of discharge for "cause" which for purposes hereof is limited to:

(i) any willful misconduct by the Executive which results or is reasonably intended to result, directly or indirectly, in the improper gain or impermissible personal enrichment of

the Executive which would have an adverse effect (whether financial or otherwise) on the Employer;

(ii) conviction of the Executive by a court of competent jurisdiction of (a) any felony or (b) any crime involving moral turpitude which adversely affects the Employer;

(iii) any material breach by the Executive of any of his obligations under this Agreement which would have an adverse effect (whether financial or otherwise) on the Employer or any willful refusal by the Executive to perform the duties reasonably assigned to him by the Board, which breach or refusal continues for more than ten (10) days after written notice given to the Executive pursuant to a vote of a majority of the members of the Board, such vote to set forth in reasonable detail the nature of such breach or refusal; or

(iv) Executive's unexcused absence (other than for disability) of more than one (1) week without consent of the Board.

In the event the Executive is terminated for cause, no Termination Amount shall be paid and all Base Salary and all other benefits provided hereunder shall cease as of as of the termination date.

9. De Facto Termination. Should the Employer in its discretion, materially reduce the nature and scope of the Executive's title, duties or authority, such that it can be

reasonably found that he is no longer performing the duties as the President and Chief Executive Officer of the Employer, or if the Employer shall relocate the Executive's principal office to a location greater than a radius of fifty (50) miles from Providence, Rhode Island (it being understood that Boston, MA and its immediate suburban environs are within such 50 mile radius), the Executive shall have the right, in his discretion, to terminate this Agreement by written notice delivered to the Chairman of the Board. After such termination, the Executive shall be entitled to the termination payments described above in Section 8. In the event the Executive so elects to terminate employment, written notice must be given by the Executive to the Employer within one hundred eighty (180) days following the date he knew or reasonably should have known of the reduction of such title, duties or authority. Such notice shall set forth in reasonable detail the basis for such cause and the Employer shall have thirty (30) days after the receipt of such notice to cure such cause and if not then cured, employment may so terminate at the end of the month in which such cure period expires. The Termination Amount defined in Section 8 shall be paid at the end of the month in which such cure period expires.

10. Termination by Employee. (a) Except as provided in Section 10(b), in the event the Executive wishes to terminate this Agreement for any reason other than the change in duties described in Section 9 above, the Executive shall give one hundred twenty (120) days notice of his decision to terminate this Agreement. At the end of such one hundred twenty (120) days, or such earlier date as the Executive shall actually leave the employ of the Employer, all rights, duties and obligations of both parties to this

Agreement shall cease and the Employer shall have no obligation to pay the Termination Amount.

(b) In the event of a Transfer Transaction, the Executive shall have the right, at any time between the period beginning on the first anniversary of the Transaction Date and ending forty-five (45) days thereafter, to terminate this Agreement for any reason by giving one hundred twenty (120) days notice of his decision to terminate this Agreement under this Section 10(b). In the event of such termination, the successor or acquiror shall pay the Executive the Termination Amount defined in Section 8 on such termination date and such successor or acquiror shall also continue to pay the Executive his then Base Salary for the month in which he ceases to provide services hereunder and for each of the following twenty-four (24) consecutive months as an agreed upon termination payment and during such termination payment period, the successor or acquiror shall maintain the Executive's dental, health and major medical insurance coverage and shall provide the benefits set forth in Sections 7(e) and 7(f) but shall not provide the benefits set forth in Sections 7(b), (c), (d), (g) and (h) of this Agreement, provided, however, in the event the Executive is otherwise employed during all or any portion of months thirteen (13) through twenty-four (24) following such termination of employment under this Section 10(b), all compensation and other benefits received by the Executive from any other employer(s) or contractors shall reduce, dollar for dollar, such compensation and dental, health and major medical insurance coverage benefits otherwise payable by the successor or acquiror to Executive. The Executive shall timely and accurately report and any all compensation and benefits received during such period from other employer(s) or contractors.

11. Disability. If, during the Employment Period, the Executive shall become unable to perform his services as contemplated in this Agreement by reason of any illness or incapacity for a period of six (6) consecutive months, the Employer may terminate this Agreement by written notice to the Executive. During such period, the Executive will continue to receive compensation and benefits as set forth in this Agreement and, after termination, the Executive will be entitled (i) to those disability benefits provided to him under the disability policy set forth in Section 7(e) above and (ii) for the first twenty-four (24) months following disability termination, he shall be entitled to receive from the Employer an amount equal to his Base Salary less the amount of disability benefits received under such disability policy and for such period shall also receive benefits as set forth in this Agreement. The Executive's Base Salary shall be reinstated upon his return to full time employment with the Employer and fulfillment of his duties as described in this Agreement. If the Executive shall return to his employment with the consent of the Board after such absence, the Employer shall be deemed to have waived its right to terminate the employment of the Executive on account of such absence.

12. Death of the Executive. If the Executive dies during the Employment Period, the Employer shall pay to the estate of the Executive the compensation which would otherwise be payable to him up to the end of the month in which his death occurs. If the Executive dies subsequent to termination of this Agreement but during a period or periods within which the Employer is required under this Agreement to continue or otherwise provide payment or benefits, those payments or benefits shall be paid to the estate of the Executive, provided, however, in the event of death, no Termination Amount shall be paid.

13. Confidential Information. The Executive shall not at any time divulge, use, furnish, disclose or make accessible to anyone, other than an employee or trustee of the Employer with a reasonable need to know, any knowledge or information with respect to confidential or secret data, procedures or techniques of the Employer, provided, however, that nothing in this Section 13 shall prevent the disclosure by the Executive of any such information which at any time comes into the public domain other than as a result of the violation of the terms of this Section 13 by the Executive or which is otherwise lawfully acquired by the Executive.

14. Withholdings. All payments made by the Employer under this Agreement shall be subject to necessary withholdings in accordance with applicable state and federal law.

15. Indemnification. During the period of his employment hereunder, the Employer agrees to indemnify the Executive in his capacity as an officer of the Employer, and as an officer and member of the Board of Directors of any subsidiary or affiliate of the Employer for which the Executive is rendering services at the request of the Employer, all to the maximum extent permitted under the laws of the State of Rhode Island. The provisions of this Section 15 shall survive expiration or termination of this Agreement for any reason whatsoever.

16. Legal Fees. In the event any suit or action is commenced by either party to enforce any terms or conditions of this Agreement, including, but not limited to, the enforcement of an arbitration award, the prevailing party shall be entitled to all costs and reasonable attorneys' fees.

17. Notices. Any notices, requests, demands and other communications provided for by this Agreement shall be sufficient if in writing and delivered in person or sent by registered or certified mail, postage paid, to the Executive at the last address the Executive has filed in writing with the Employer or, in the case of the Employer, at its main office, attention of the Chairman of the Board.

18. Entire Agreement. This Agreement constitutes the entire Agreement between the parties and may not be changed except by a writing duly executed and delivered by the Employer and the Executive in the same manner as this Agreement. This Agreement supersedes in its entirety that certain Employment Agreement among the parties dated as of October 1, 1995.

19. Binding Effect; Non-assignability. This Agreement shall be binding upon and inure to the benefit of the Employer and its successors. In the event of a Transfer Transaction, the Employer shall require as a condition to such Transfer Transaction that such successor or acquiror specifically accept the terms of this Agreement including the obligation hereunder to pay the Termination Amount. In the event the Employer proceeds to close a Transfer Transaction and the successor or acquiror does not agree to accept the terms of this Agreement, then, on the Transaction Date, the Employer shall pay the Executive all amounts otherwise required to be paid under Section 8 of this Agreement as if this Agreement were so terminated thereunder and this Agreement shall then be deemed to have been terminated under Section 8. Neither this Agreement nor any rights arising hereunder may be assigned or pledged by the Executive during his lifetime. This

Agreement shall inure to the benefit of and be enforceable by the Executive's personal or legal representatives, executors, administrators, successors and heirs.

20. No Mitigation. The Employee shall not be required to mitigate the amount of any payment provided for in this Agreement by seeking other employment or otherwise, nor shall any payment provided for in this Agreement be reduced by any compensation earned by the Executive as the result of employment by another employer after the termination of his employment with the Employer.

21. Amendment. This Agreement may be amended or modified only by a written instrument signed by the Executive and by a duly authorized representative of the Employer.

22. Enforceability. If any portion or provision of this Agreement shall to any extent be declared illegal or unenforceable by a court of competent jurisdiction, then the remainder of this Agreement, or the application of such portion or provisions in circumstances other than those as to which it is so declared illegal or unenforceable, shall not be affected thereby, and each portion and provision of this agreement shall be valid and enforceable to the fullest extent permitted by law.

23. Applicable Law. This Agreement shall be construed and enforced in all respects in accordance with the laws of the State of Rhode Island.

24. Arbitration. Should any dispute arise hereunder, it shall be resolved by binding arbitration under the commercial rules of the American Arbitration Association by a single arbitrator sitting in Providence, Rhode Island chosen through the American Arbitration Association. The Employer and the Executive shall bear its and his own respective costs

(including attorneys fees) incurred in connection with any arbitration. The parties hereto shall share equally the arbitrator's fees and expenses.

IN WITNESS WHEREOF, the Medical Center and the Hospital have caused this Agreement to be executed by the Chairman of the Board thereunto duly authorized and the Executive has hereunto signed this Agreement, all as of the day and year first above written.

ROGER WILLIAMS MEDICAL CENTER

By: ______________________
Herbert W. Cummings
Chairman of the Board
of Trustees

ROGER WILLIAMS HOSPITAL

By: ______________________
Herbert W. Cummings
Chairman of the Board
of Trustees

______________________
Robert A. Urciuoli

w:\wpwin\docs\dla\empag3.urc

## SCHEDULE I

**Termination Amount**

| If the Termination Event Requiring A Termination Amount Payment Occurs During Fiscal Year Commencing October 1: | The Termination Amount Shall Be: |
| --- | --- |
| 1998 | $675,726 |
| 1999 | $622,690 |
| 2000 | $568,325 |
| 2001 | $511,919 |
| 2002 | $454,760 |
| 2003 | $396,890 |
| 2004 | $338,770 |
| 2005 | $279,317 |
| 2006 | $236,191 |
| 2007 | $167,262 |
| 2008 | $113,379 |
| 2009 | $ 62,670 |
| 2010 | $ 15,736 |
| 2011 | -0- |

w:\wpwin\docs\dla\empag3.urc