# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

FEDERAL GRAND JURY INVESTIGATION

REGARDING

THE RELATIONSHIP OF JOHN CELONA WITH

ROGER WILLIAMS MEDICAL CENTER,
ITS AFFILIATED CORPORATIONS, ROBERT URCIUOLI
AND FRANCIS DRISCOLL

---

# ROGER WILLIAMS MEDICAL CENTER'S BRIEF

**ADDRESSED TO:**

**ROBERT CORRENTE**
U.S. ATTORNEY FOR THE
DISTRICT OF RHODE ISLAND

**KENNETH P. MADDEN**
FIRST ASSISTANT U.S. ATTORNEY

**GERALD B. SULLIVAN**
ASSISTANT U.S. ATTORNEY
CHIEF OF CRIMINAL DIVISION

**LUIS M. MATOS**
ASSISTANT U.S. ATTORNEY
CHIEF OF CIVIL DIVISION

**DULCE DONOVAN**
ASSISTANT U.S. ATTORNEY

---

*Presented By*

**ROGER WILLIAMS MEDICAL CENTER**
**HOLLAND & KNIGHT LLP**
William P. Devereaux, Esq.
John P. Walsh, Esq.

Dated: August 11, 2005

## TABLE OF CONTENTS


PAGE

I. INTRODUCTION ..... 1

II. SUMMARY OF THE FEDERAL GOVERNMENT'S ALLEGATIONS ..... 5

- A. Alleged Mail Fraud ..... 5
- B. Alleged Concealment from the Public ..... 6
- C. Alleged Personal Gain Sought by RWMC and its Employees ..... 7
- D. Alleged Specific Intent to Deceive and Deprive the Public ..... 8

III. SUMMARY OF LEGAL ARGUMENT ..... 9

- 1. There Was No Scheme to Defraud ..... 9
- 2. There Was No Specific Intent to Deceive ..... 9
- 3. There Was No Specific Intent to Deprive the Public of Celona's Honest Services ..... 9
- 4. There is No Basis for Any Hobbs Act Claim ..... 9

IV. FACTUAL BACKGROUND ..... 10

- A. The Failed RWMC – Columbia Merger ..... 10
- B. Celona Asks RWMC for a Job ..... 12
- C. RWMC's Request for an Advisory Opinion ..... 16
- D. The Ethics Commission Issues Its Advisory Opinion ..... 18
- E. The Ethics Opinion Authorized Celona to Participate and Vote on Matters Relating to General Health Care Legislation, as Long As He Filed the Requisite Rule 6 Notice ..... 19
- F. Attorney McGuirk's Letter of Instruction to Celona ..... 21
- G. The Providence Journal Published An Article On May 1, 1998 Detailing Celona's Relationship With The Village and Other RWMC Affiliates ..... 21
- H. Celona's Annual Financial Statements Identify His Relationship With The Village ..... 22
- I. Celona's Assistance With the Equitable Distribution of Municipal Rescue Runs ..... 23
- J. Celona's Involvement with the Blue Cross & Blue Shield Reimbursement Issues ..... 26
- K. Celona's Involvement with Contract Issues Between RWMC and United Healthcare ..... 30
- L. Celona's Participation on the Legislation Outlined in the Celona Charging Document ..... 33

PAGE

M. While the Ethics Commission Made Numerous Findings of Probable Cause Against Celona Based on His Relationship With Other Undisclosed Principals, the Ethics Commission Made No Finding of Probable Cause Against Celona Based on His Relationship With RWMC and Its Affiliates .......... 34

1. First Ethics Complaint: Celona's Connections with Blue Cross, CVS, and CRI .......... 37
2. Second Ethics Complaint: Celona's Connections with New England Ambulance and RWMC .......... 38
3. Third Ethics Complaint: Celona's Connection with CVS .......... 39

V. LEGAL ARGUMENT .......... 41

A. The Federal Government Cannot Establish Two Critical Elements for an Honest Services Doctrine Prosecution: (1) A "Scheme" Intended to Conceal a Conflict of Interest Resulting in Personal Gain for RWMC or Its Employees; And (2) The Specific Criminal Intent to Commit a Federal Felony 38.......... 41

1. The Elements of the Honest Service Doctrine .......... 42
2. There Was No Scheme to Defraud the Public .......... 44

a. RWMC Disclosed all Material Facts About its Relationship with Celona to the Public .......... 49
b. The Federal Government's Concealment Theory Does Not Deal With Material Facts That Would Alter the Ethics Opinion .......... 52
c. In 1998, Celona's Decision-Making Power or Discretionary Authority was Insufficient to Advance the Personal Interests of RWMC or its Employees .......... 56

3. There Was No Specific Criminal Intent in This Case to Either: (1) Deceive the Public about RWMC's Relationship with Celona; or (2) to Deprive the Public of Celona's Honest Services .......... 61

a. RWMC Can Present a Compelling Case That There Was No Intent to Deceive the Public About Its Relationship with Celona .......... 61

**PAGE**


b. RWMC Can Present a Compelling Case That There Was No Intent to Deprive the Public of John Celona's Honest Services ..... 68

B. The Federal Government Cannot Establish a Violation of the Hobbs Act Because There is No Evidence of a *Quid Pro Quo* Payment Made to Celona ..... 71

C. Any Prosecution of RWMC and Its Employees Under the Sawyer/Woodward Line of Cases Would Ignore the First Circuits' Repeated Warnings About Turning a Misdemeanor Ethics Cases Into a Serious Federal Felony. ..... 73

D. Based on the Criteria Set Forth In the Thompson Memorandum, The Federal Government Should Not Indict RWMC ..... 75

1. Roger Williams Medical Center ..... 75

a. History & Services ..... 75
b. Keeping the Best Employees ..... 76
c. The Focus on Senior Care ..... 77
d. Development of North Campus for Senior Care ..... 78
e. Diagnostic and Research Services ..... 79
f. Fundraising ..... 80
g. Free and Uncompensated Care ..... 80
h. Conclusion ..... 80

2. Robert Urciuoli ..... 81
3. Frances Driscoll ..... 82
4. Seriousness of Offense ..... 85
5. Pervasiveness of Wrongdoing with Corporation ..... 86
6. Voluntary Cooperation ..... 86
7. Corporation's History ..... 87
8. Compliance Program ..... 87
9. Remedial Action ..... 87
10. Collateral Consequences ..... 87

a. Mandatory Exclusion ..... 88
b. Permissive Exclusion ..... 89

11. Adequacy of Other Enforcement ..... 90

VI. CONCLUSION ..... 91

# INDEX OF EXHIBITS

1. McGuirk Petition dated 4/6/98
2. Ethics Opinion dated 4/23/98
3. § 6 Notices filed with the Ethics Commission
4. § 6 Notices filed with the State Senate
5. Celona's Annual Financial Statements
6. Providence Journal articles dated 5/1/98 and 3/4/04
7. Various Providence Journal articles
8. First Ethics Complaint filed against Celona dated 12/9/03
9. First Probable Cause Finding dated 10/4/04
10. Second Ethics Complaint filed against Celona dated 3/3/04
11. Second Probable Cause Finding dated 12/10/04
12. Third Ethics Complaint filed against Celona dated 6/29/04
13. Third Probable Cause Finding dated 2/23/05
14. Criminal Information filed against Celona
15. Celona's Plea Agreement
16. 1998-S-2796
17. 1999-H-5220
18. 1999-S-0509
19. 1999-H-6122
20. 2000-H-6809
21. 2000-S-3048
22. 2001-S-0653
23. Various Providence Journal Articles
24. Hospital Conversion Act
25. Drafts of Celona Consulting Agreement
26. Various Documents illustrating Celona's work on elderly affairs
27. Signed Consultant Contract
28. McGuirk letter dated 4/27/98
29. Rescue Run Statistics
30. Dr. Patinkin Memorandum dated 3/13/98

31. Celona Memorandum dated 3/6/98
32. Celona Memorandum dated 3/13/98
33. Other Celona Memoranda
34. Providence Journal Article dated 5/11/99
35. § 6 Notice dated 6/30/99
36. § 6 Notice dated 4/31/01
37. Thompson Memorandum
38. Village at Elmhurst Operating Agreement dated 5/1/96
39. Urciuoli letter dated 1/5/98
40. Amendment to Village at Elmhurst Operating Agreement dated 1998
41. Corporate Compliance Program
42. RWMC Financial Information

## I INTRODUCTION

The Department of Justice ("DOJ") has indicated that it is investigating former State Senator John Celona's relationship with CVS Pharmacy, Inc. ("CVS"), Blue Cross & Blue Shield of Rhode Island ("Blue Cross") and Roger Williams Medical Center ("RWMC"). For RWMC, this investigation has focused on activities surrounding a consultant contract between John Celona and one of RWMC's partially owned subsidiaries, the Village at Elmhurst Assisted Living Facility (the "Village" or "the Village at Elmhurst"). In an effort to avoid an indictment, RWMC submits this brief for your consideration.

From statements made by federal investigators and various Assistant U.S. Attorneys, RWMC assumes that it is a subject of the investigation. RWMC's CEO, Robert Urciuoli (Urciuoli), and its former Vice President, Frances Driscoll (Driscoll), have been informed that they are targets of this investigation. RWMC has also been advised that former Rhode Island State Senator John Celona has entered into a plea agreement with the Government and is cooperating with this investigation. The government's investigation of RWMC and its executives has focused on potential violations of 18 U.S.C. §§ 1341, 1343 and 1346 (the "Honest Services Doctrine") and 18 U.S.C § 1951 (the "Hobbs Act").

The Government's theory appears to rely heavily upon fax transmittals from Celona to either Urciuoli or Driscoll containing comments by Celona and, in some instances, responses by Urciuoli or Driscoll to Celona (the "Fax Evidence"), as well as the testimony of John Celona. This brief will present evidence and legal argument showing that, even if the Fax Evidence is viewed in the light most favorable to the Government, a prosecution of RWMC or its two executives cannot meet all of the required elements to prove a violation of the Honest Services Doctrine or the Hobbs Act. In addition, a compelling case exists that neither Urciuoli, nor Driscoll, possessed the specific criminal intent to commit federal felonies under these statutes.

The government's theory is that RWMC, and its executives, planned an elaborate, concealed scheme beginning in 1997 to hire John Celona, a Rhode Island State Senator from North Providence, to be RWMC's secret legislative advocate in the Rhode Island State Senate, who would promote healthcare legislation helpful to RWMC or, alternatively, work against legislation that would be hurtful to RWMC's interests. As part of this alleged fraudulent scheme, the U.S. Attorney's office apparently believes that RWMC and Celona (along with a number of other unnamed, or unwitting, co-conspirators) conspired to keep this relationship "concealed" from the public—a requirement under the Honest Services Doctrine—by seeking an advisory opinion from the Rhode Island Ethics Commission (the "Ethics Commission"), which was allegedly based upon information that either intentionally misled the public about Celona's "true" relationship with RWMC, or withheld material facts from the Ethics Commission about Celona's relationship with RWMC and its affiliates.

Yet, RWMC can demonstrate with the following evidence that there is no basis for the government's theory that RWMC concealed its "true" relationship with John Celona from the Rhode Island public:

(1) RWMC disclosed to the Ethics Commission the full details surrounding Celona's relationship with the Village, RWMC, Roger Williams Hospital, Elmhurst Extended Care Facility Nursing Home ("Elmhurst Nursing Home"), and Roger Williams Realty Corporation ("Roger Williams Realty"). This description asserted that RWMC is a holding company that wholly owns Roger Williams Hospital, Elmhurst Nursing Home, and the Realty Corp, and partially owns the Village through Roger Williams Realty Corp's 50% interest. (*See* McGuirk Petition, dated April 6, 1998, attached as **Exhibit 1**)[1];

(2) the RWMC's petition to the Ethics Commission expressly disclosed that Celona would be performing services not only for the Village, but also for other RWMC affiliates, such as the Elmhurst Nursing Home. *Id.*;

(3) the Ethics Commission explicitly recognized in its advisory opinion (the "Ethics Opinion") that Celona would be working for the Village and other RWMC affiliates as "their" agent (*See* Ethics Opinion, dated April 23, 1998, attached as **Exhibit 2**);

1 A chart of this disclosure is included within this brief in section IV(C).

(4) the Ethics Commission permitted Celona to "fully participate and vote" on matters involving general healthcare issues, including issues specifically related to "nursing home issues" and "hospital regulations" (*Id.*, **Ex. 2**);

(5) the Celona relationship with the Village and the RWMC affiliates was disclosed in numerous public filings, including more than 50 so-called § 6 recusal notices (covering 93 legislative bills) filed with the Ethics Commission, as well as a number of § 6 Notices filed with the State Senate. (*See* § 6 Notices filed with the Ethics Commission, attached as **Exhibit 3**; and § 6 Notices filed with the State Senate, attached as **Exhibit 4**.) Celona also disclosed his financial interest in the Village in his annual financial statements. (*See* Celona annual financial statements, attached as **Exhibit 5**).

(6) the Providence Journal reported to the public on May 1, 1998 that Celona had an employment relationship with the Village that incorporated work for other RWMC affiliates, noting in particular that "Celona's duties would include work for Elmhurst Extended Care Facility, which is another arm of the Providence Medical Center." The Providence Journal also reported to the public on March 4, 2004 that "[Celona] ***made no secret*** of the relationship between the assisted-living center [the Village] and the hospital when his Feb. 1, 1998, hiring a (sic) came to light a few months later." (*See* Providence Journal Articles, dated May 1, 1998 and March 4, 2004, attached as **Exhibit 6**) (emphasis added).

Utilizing this and other evidence, this brief will demonstrate that Celona's relationship with RWMC, and its affiliates, was adequately disclosed to the public and, therefore, a case under the Honest Services Doctrine fails as a matter of law.

RWMC believes that its presence as a subject of this investigation arises from the fact that John Celona had allegedly **concealed** his financial relationships with a number of other entities, which apparently occurred around the time that Celona became the Chair of the Senate Corporations Committee in 2001. In contrast to the RWMC situation, these financial relationships were **not** disclosed to the Ethics Commission, or any other public body, in a reasonable and timely manner. When these relationships were finally disclosed to the public in late 2003 by the Providence Journal, a media firestorm erupted, which focused, primarily, on former Senate President Bill Irons and Senator Celona, and their relationships with CVS and Blue Cross. Under intense media scrutiny, Irons and Celona resigned from the State Senate. (*See* Various Providence Journal Articles, attached as **Exhibit 7**.)

After this media storm erupted, three complaints were subsequently filed with the Ethics Commission against Senator Celona based on his financial connections with CVS, Blue Cross, C.R.I. Communications, New England Ambulance, and RWMC. The Ethics Commission issued a "probable cause" finding that Celona had violated Rhode Island ethics laws in regard to his financial involvement with all of these entities **except one: RWMC**. In particular, the Ethics Commission did not find probable cause that the financing of Celona's salary through Roger Williams Realty and Celona's activities concerning municipal rescue runs amounted to violations of state ethics laws. (*See* First Ethics Complaint filed against Celona, dated December 9, 2003, attached as **Exhibit 8**); First Ethics Compliant probable cause finding, dated October 4, 2004, attached as **Exhibit 9**; Second Ethics Complaint, dated March 3, 2004, attached as **Exhibit 10**; Second Probable Cause Finding, dated December 10, 2004, attached as **Exhibit 11**; Third Ethics Complaint, dated June 29, 2004, attached as **Exhibit 12**; and Third Probable Cause Finding, dated February 23, 2005, attached as **Exhibit 13**).

This investigation has threatened the viability of a significant community asset. RWMC is a hospital complex that employs over 1,450 people and provides much needed medical care to the Greater Providence community, including over $18,000,000 in free and uncompensated health care during the past 2 years alone. The lifeblood of a non-profit, stand alone, medical facility such as RWMC is its reputation in the community because this type of facility relies upon significant donations from the public. RWMC also believes that the motivations of its employees, including Urciuoli and Driscoll, have always been directed toward assuring the continued viability of RWMC and for no other reason.

It is sincerely hoped that you will review this brief carefully and exercise, prudentially, the considerable discretion a Federal Prosecutor possesses. With this in mind, RWMC presents the following for your consideration.

## III SUMMARY OF LEGAL ARGUMENT

1. **THERE WAS NO SCHEME TO DEFRAUD:** In cases under the Honest Service Doctrine (which do not involve specific bribery schemes), the Government must establish that the fraudulent scheme involves a "failure to disclose a conflict of interest, resulting in personal gain." Here, the evidence will show that John Celona's relationship with the Village and the other RWMC affiliates was formed for a legitimate business purpose and was fully disclosed in numerous public filings with the Ethics Commission and in a May 1998 Providence Journal article. Moreover, the evidence will also show that Celona lacked the political power in 1998 necessary to advance the legislative interests of RWMC, making it very unlikely that Celona's employment was part of a fraudulent scheme to deprive citizens of his honest services. For these reasons and more, RWMC can demonstrate that there was no violation of the Honest Services Doctrine.

2. **THERE WAS NO SPECIFIC INTENT TO DECEIVE:** Under the Honest Services Doctrine, the federal government must prove that RWMC or its individual employees possessed the specific intent to deceive the public about Celona's relationship with RWMC and its affiliates as part of a scheme to deprive the public of Celona's honest services. Here, the evidence will show that Celona's consulting contract was expressly conditioned upon his cooperation with RWMC's counsel in obtaining an advisory opinion from the Ethics Commission and that the specific terms of that arrangement, including the consulting contract itself, were disclosed publicly to the Ethics Commission. Furthermore, RWMC's counsel clearly indicated to the Ethics Commission that Roger Williams Realty, one of RWMC's wholly owned subsidiaries, was a 50% owner of the Village, and that Celona would be providing services to the Village and to other RWMC affiliates, such as the Elmhurst Nursing Home. The evidence will also establish that RWMC's counsel took specific steps to instruct Celona about his obligations as a legislator once the Ethics Opinion was issued.

3. **THERE WAS NO SPECIFIC INTENT TO DEPRIVE THE PUBLIC OF CELONA'S HONEST SERVICES:** The Honest Services Doctrine also requires the federal government to prove that RWMC, or its individual employees, had the specific intent to deprive the Rhode Island citizenry of Celona's honest services. In this case, John Celona was hired for legitimate and substantive business purposes based on his contacts with senior citizens and the substantial network of relationships that he had developed within the Rhode Island elderly community. In fact, Celona's work for the Village and for other RWMC affiliates, such as the Elmhurst Nursing Home, more than paid for his annual salary. Furthermore, when Celona was hired in 1998, he had been a member of the State Senate for only three years, had just voted against the Senate leadership on a high profile issue (the Hospital Conversion Act), and was a member of a small dissident group of senators who had no practical, political influence, all of which clearly weigh against any rational notion that he was hired in 1998 to take advantage of his political influence.

4. **THERE IS NO BASIS FOR ANY HOBBS ACT CLAIM:** The Hobbs Act requires a *quid pro quo* understanding between a public official and a private party, wherein the private party is providing money to the public official to take some official act. Here, it must be demonstrated that the Village's payments to Celona for his consulting work somehow constituted a *quid pro quo* payment for his assistance, *inter alia*, in allegedly strong-arming Blue Cross and United Healthcare to provide RWMC with more favorable reimbursements for

the health care services it had provided. The Village paid Celona for over two years before these contract issues ever surfaced. Moreover, Celona had a contractual right to receive these payments for the non-legislative services he was performing for RWMC's affiliates. Furthermore, a third-party audit, commissioned by Blue Cross' own executives, showed that RWMC was owed millions in reimbursement monies that had been withheld from the Hospital. Thus, to the extent Celona helped to bring the parties together to negotiate a resolution affecting a non-profit medical facility, he actually provided honest services.

## IV FACTUAL BACKGROUND

### A. THE FAILED RWMC-COLUMBIA HCA MERGER

In the 1990s, many hospitals in Rhode Island had merged into a series of networks with other regional medical facilities. During this merger activity, Lifespan and Care New England emerged as strong brand names in the regional health care industry, making it more difficult for smaller, stand-alone hospitals to compete with these larger institutions. In response to these merged networks, and what it meant to competition in the health care arena, RWMC examined several different options; ultimately, it decided in 1997 to merge with the for-profit health care network, Columbia HCA, based in Nashville, Tennessee.

At that time, the proposed merger required the approval of RWMC's Board of Directors and the approval of the Rhode Island Department of Attorney General, in its role as the guardian of non-profit charitable trusts. After lengthy deliberations, RWMC's Board approved the proposed merger with Columbia because it concluded that RWMC was going to face increasingly difficult challenges as a stand-alone facility in the New England health care market. The Department of Attorney General then began its review of the proposed merger. (*See generally*, Providence Journal Articles, attached as **Exhibit 23.**)

At this same time, U.S. Congressman Patrick Kennedy, who had formed a distinctly adversarial relationship with Columbia HCA concerning some health care issues in Washington, D.C., publicly announced that he was opposed to the merger. Kennedy then prevailed upon his former colleagues in the Rhode Island General Assembly to introduce the "Hospital Conversion

### D. BASED ON THE CRITERIA SET FORTH IN THE THOMPSON MEMORANDUM, THE FEDERAL GOVERNMENT SHOULD NOT INDICT RWMC

In determining whether charges should be sought against corporate institutions, the Department of Justice's so-called "Thompson Memo" directs United States Attorneys to examine not only the seriousness and substance of criminal allegations, but also the prospective damage that an indictment of a corporation could cause to the public and the employees that are the lifeblood of that corporation. (*See* Thompson Memo, attached as **Exhibit 37**.) To understand this potential impact, RWMC provides herein some key information related to the institution which is RWMC, as well as some background information about Robert Urciuoli and Frances Driscoll. Moreover, RWMC believes that the relevant criterion in the Thompson memorandum establishes that RWMC should not be subject of a criminal indictment.

#### 1. Roger Williams Medical Center

#### a. History & Services

Roger Williams Medical Center ("RWMC") was established in 1878, as the Homeopathetic Hospital of Rhode Island. It is located on Chalkstone Avenue in the one of Providence's oldest urban neighborhoods. RWMC is a community owned and governed non-profit healthcare organization which provides some of the most advanced specialty care available in Rhode Island today. Essentially, the medical center encompasses a hospital and emergency room; a laboratory and diagnostic imaging center; a home care program; community physician offices, established through the statewide ContinuCare program; long-term care facilities, such as the Elmhurst Extended Care Nursing Home, and RWMC's affiliation with The Village at Elmhurst Assisted Living Facility; as well as RWMC's extensive community outreach program. The medical center is also affiliated with Boston University School of Medicine. This designation provides RWMC with the privilege of

teaching future physicians and allows individuals and families in Rhode Island to have access to the most up-to-date diagnostic and treatment procedures available.

The hospital employs approximately 1450 people, from specialty surgeons and doctors, to nurses, physical therapists, medical technologists, research assistants, speech pathologists, occupational therapists, radiology technologists and various regular service providers.

RWMC is known as a "specialty hospital" and its floor plan is organized to group patients with similar health problems together. The hospital is equipped to provide critical care, intensive care, sub-acute care, general recovery, home care, long-term care (through RWMC's Elmhurst Extended Care and its affiliation with The Village at Elmhurst assisted living facility), and end of life care through Hospice Care of Rhode Island, which is located on the first floor of the Elmhurst Extended Care Facility. The Joint Commission on Accreditation of Healthcare Organizations ("JCAHO") has consistently awarded RWMC scores in the 90's which are considered first rate. Affiliation with the B.U. School of Medicine also ensures that RWMC's physicians and staff remain proficient in the most advanced diagnostic and treatment methods.

**b. Keeping the Best Employees**

One of RWMC's top priorities is to focus on employee job satisfaction and the Hospital provides a generous "cafeteria" style benefits plan for its 1450 employees which includes health and dental insurance, (with co-pay); life insurance, at no cost, equal to two times the employees annual salary; long-term disability insurance, at no cost; group rates for personal, auto, home and boat insurance; emergency care at RWMC, without the co-payment required by commercial health providers; and a defined retirement plan, in which employees become eligible after completing 1000 hours, or more, of service to RWMC. The hospital also provides work-life seminars and on-site leadership development seminars for its workforce, along with a pharmacy prescription service. RWMC has a demonstrated track record for recruiting and keeping the best employees. As an

example, most of the executive staff of the hospital has served at RWMC in excess of fifteen years each.

c. **The Focus on Senior Care**

RWMC has long been a regional leader in the provision of health care to seniors. Through the vision of RWMC's physicians and planners and, especially the contribution of nationally noted geriatrics specialist, Dr. Marsha Fretwell, M.D., RWMC established its ContinuCare Program. Today, the ContinuCare Program at RWMC has offices in senior centers and living complexes throughout Rhode Island, where our elderly have access to primary care physicians who specialize in gerontology, the study of health issues specifically related to aging. RWMC has established an extensive network to provide for seniors' medical needs, from the hospital setting to homecare, including a specialized, in-patient geriatric unit for seniors suffering from mental illness.

RWMC established its geriatric psychiatry unit to focus on seniors with mental and emotional conditions more typically found in the elderly. This unit focuses on specific mental and emotional problems seen most often in the elderly population such as loneliness and depression, medical-prescription addiction, and mental impairments caused by stroke. The geriatric-psychiatry unit also offers counseling for families of Alzheimer's patients to assist them in coping and caring for loved ones suffering from Alzheimer's disease.

Doctors in the geriatrics specialty have acquired specific training in the aging process and are skilled in diagnostic, therapeutic, preventive, and rehabilitative aspects of illnesses in the elderly population. Geriatric physicians must be skilled in understanding drug interactions (due to the multiple drugs that seniors often take) and the common problems of old age, including, incontinence, bone-breakage, Parkinson's disease, Alzheimer's disease, and dementias. To cater to the special needs of the elderly, RWMC geriatricians actually provide care outside of the hospital, in patients' homes, in nursing homes, and in senior centers throughout the State. At the time that Dr.

Marsha Fretwell established the ContinuCare Program at RWMC, she was a professor at Brown University Medical School and had been recognized as one of the "Best Doctors in America," as published by Woodward/White Incorporated. Dr. Fretwell is also the co-author of the "Practical Guide to the Care of the Geriatric Patient". She trained a number of the physicians presently serving in RWMC's geriatric care program.

d. **Development of North Campus for Senior Care**

In the mid 80s, RWMC, as part of its ContinuCare Program, purchased and renovated the Lying In Hospital facility located across the street, and to the north, of the existing RWMC hospital facility. The nursing home was renamed the "Elmhurst Extended Care Facility". Elmhurst Extended Care ("Elmhurst" or "Elmhurst Extended Care") is the only nursing home in the state affiliated with a hospital and it provides 200 beds for elderly care. The nursing home was renovated and designed to provide quality care in a residential setting and offers 24 hour skilled nursing care and rehabilitative services with three levels of care: (1) short-term care; (2) long-term care; and (3) Alzheimer's and dementia care. Elmhurst adopted a unique approach to nursing-home life by incorporating the "Eden Alternative," which emphasizes nature, animals, and the presence of children, to weave pleasant reminders of home life into the traditional nursing home setting. Elmhurst has consistently been ranked as one of the top nursing facilities in Rhode Island; recognized by JCAHO, it is Medicare and Medicaid certified.

RWMC, through its development corporation, Roger Williams Realty, also entered into a joint venture in 1996 with SANAT, Inc. to construct The Village at Elmhurst (the "Village"). (*See* Operating Agreement, attached as **Exhibit 38**.) The Village is an assisted living community also located on the north campus close to the Elmhurst Nursing Home. The Village provides an upscale retirement living option for the senior community which includes housekeeping services and transportation, with the security of knowing that a medical center is right next door. The Village

also contains the "courtyard" concept which was designed specifically for the care of Alzheimer's patients. The Courtyard provides a safe and comforting environment for its tenants with the timing and staffing of daily routines designed to reflect an understanding and sensitivity to the problems faced by Alzheimer's patients. In 2004, the medical center sold its interest in the Village, but it still maintains affiliated services with the facility.

RWMC has also built an extensive community outreach program which extends from the previously mentioned senior centers to malls, schools, and workplaces. RWMC consistently promotes activities such as a Senior Living Expo at the Warwick Mall; blood pressure and bone density screenings at various convention center events; and frequent blood drives.

**e. Diagnostic and Research Services**

RWMC also provides comprehensive diagnostic and therapeutic imaging services and recently purchased an 8000 CT imaging system and a new MRI system. The hospital offers a 24-hour-result turn around, and same-day scheduling. RWMC also has a pain-management clinic, which is staffed by a team of pain management specialists who deal with the latest advances in the field of alleviating pain for surgery patients and for those suffering from chronic conditions, such as arthritis and migraine headaches.

RWMC is also a leader in cancer care in New England with its Adell R. Decof Cancer Center (the "Cancer Center"). The Cancer Center provides state of the art diagnostic-testing facilities and treatment for cancer patients. The medical center also employees 39 principle investigators on its cancer research staff who pursue a wide range of research activities. RWMC's cancer research center was recently the recipient of 20 million dollars in grants which have allowed it to create its newest major research initiative, the Center for Stem Cell Biology, the only program of its kind in the state of Rhode Island. The new stem cell biology program also emphasizes the mentoring of promising junior faculty involved in the research of bone marrow stem cells.

**f. Fundraising**

Compared to five years ago, hospitals today receive substantially fewer dollars from Medicare, Medicaid, private health insurance, and managed-care organizations, for the services they provide. The only way RWMC, and institutions like it, can continue to provide a high quality of medical care in the community is through fundraising efforts focused on individuals or corporations who provide gifts to the medical center. RWMC has historically focused on several successful fundraising vehicles such as its Annual Fund, The Henry Allen Whitmar Society, matching gifts, and various special gift funds. RWMC also promotes fundraising events such as the Annual Memories and Miracles Golf Tournament and the Annual Roger Williams Golf Classic to raise funds on behalf of the hospital. A significant percent of the hospital's annual operating budget is dependent upon private giving and federal and state grants.

**g. Free and Uncompensated Care**

RWMC, especially due to its urban location, provides a significant amount of free, or uncompensated medical care to residents of the State of Rhode Island. In the past two years alone, RWMC has provided more than $18,000,000 worth of free and uncompensated medical care. (*See* RWMC Financial Information, attached as **Exhibit 42**.)

**h. Conclusion**

RWMC is quite simply a community resource and treasure. Any allegations of criminal misconduct which might be brought against it, or any of its senior executives, will certainly cause significant problems for the future viability of this medical center to attract and keep the best doctors, nurses and employees and to raise the necessary funds to provide quality medical care to the community.

**2. Robert Urciuoli**

Robert A. Urciuoli is president and chief executive officer of Roger Williams Medical Center and has served the hospital for over 30 years. He first began working at the hospital in 1972. Prior to assuming the presidency of the hospital in 1988, he was acting president and chief executive officer. His additional responsibilities at the hospital have included: chief operating officer, vice president of operations, vice president of professional services, director of fiscal controls and planning, and budget director. In essence, Mr. Urciuoli has spent his entire professional career at RWMC.

Mr. Urciuoli has also been the recipient of a number of community service awards. He was the recipient of a special award of recognition by Hospice Care of Rhode Island at its annual meeting. Additionally, Mr. Urciuoli was the recipient of the Red Cross 1997 Outstanding Community Service Award. Mr. Urciuoli was also named the 1993 Valedictorian of the "Nu Class" of Leadership Rhode Island. For the term, January 1999 through December 2002, Mr. Urciuoli served as an alternate delegate to the House of Delegates for the American Hospital Association.

Mr. Urciuoli currently holds several community board positions. He serves on the board of the Hospital Association of Rhode Island; the board of directors for the Greater Providence Chamber of Commerce; the board of directors of the Rhode Island Life Science Industry Group; and the board of trustees of Healthcare Provider Services. He also sits on the board of HELP (Health and Education Leadership for Providence). Invited by the Director of the Department of Health, Patricia Nolan, Mr. Urciuoli serves on the Steering Committee for the Rhode Island Quality Performance Measurement and Reporting Program. Most recently, Mr. Urciuoli was appointed to the Trustees Council of Leadership Rhode Island.

Mr. Urciuoli has also served the community in the past by being on the boards of junior Achievement of Rhode Island, the American Heart Association, Rhode Island Kidney Foundation,

Leadership R.I., and the R.I. MRI Network (Chairman). He was appointed by Governor Almond to the Board of Higher Education.

Mr. Urciuoli's other professional activities include memberships in the American Academy of Medical Administrators, the President's Council of Providence College, and the Hospital Superintendents Club of New England.

Robert Urciuoli's background clearly indicates that he has long been committed to his community and the State of Rhode Island throughout his life. A native of the State, he graduated from LaSalle Academy and the University of Rhode Island. Mr. Urciuoli has remained active with the University by serving as a trustee of the University of Rhode Island Foundation. He is also a member of the University of Rhode Island's College of Business Administration Advisory Council.

Mr. Urciuoli's entire professional career has been devoted to Roger Williams Medical Center. He has been involved, for years, in promoting the Hospital and increasing its fundraising network. Despite an increasingly competitive and difficult economic health care environment, Mr. Urciuoli has led the Medical Center through some very difficult periods. Nevertheless, for the last two years, RWMC has been able to report a modest profit which, in itself, is a very significant accomplishment. All of Mr. Urciuoli's efforts in his working career have been focused on the sustained viability of Roger Williams Medical Center.

**3. Frances Driscoll**

Frances Driscoll is 66 years old. Mrs. Driscoll was raised in Providence and graduated from Rhode Island College in 1961 with a degree in Education. She began her teaching career at Nathan Bishop Junior High School, teaching English, Social Studies, and Drama. While working at Nathan Bishop, Fran met Donald Driscoll, the school's vice principal. They were married on April 18, 1964. To avoid any appearance of favoritism, Fran asked to be moved to Central High School in 1963 where she taught English. Between 1965 and 1968, Fran and her husband had three children:

Donald Driscoll, Jr., Christin Marie Driscoll, and Deirdre Anne Driscoll. During this time, Fran began studying, part-time at night, for her Masters Degree in English which she was awarded in 1968.

In 1972, Fran accepted a position as Executive Director for the Rhode Island Interagency Council on Smoking where she managed youth and adult anti-smoking programs for 14 different educational agencies. After the program ended in 1979, Mrs. Driscoll worked as the Bryant College Director of Public Information (79-84), as an advertising consultant for the Rhode Island Small Business Development Center (83-90), and as the Director of Public Affairs for Rhode Island Group Health Association (85-89). By all accounts, Mrs. Driscoll excelled in each job.

In 1989, Fran returned to the neighborhood of her childhood and took a position at Roger Williams Medical Center as Vice President for Public Relations & Development. She was later promoted to Senior Vice President for External Affairs and Development in 1994. While at RWMC, Fran's primary job was to coordinate all fundraising and development activities. She achieved a number of particularly substantive accomplishments which included:

- The complete reorganization and reconstruction of RWMC's Development Department and expanding the donor base for RWMC from 600 to 6000;
- Conducting successful fundraising campaigns to support construction of the Ambulatory Surgery Unit;
- Raising $5.4 million for the Horizons of Hope Capital Campaign for Cancer Treatment and Research;
- Successfully managing the campaign to designate RWMC as Rhode Island's first Bone Marrow Transplantation Unit.
- Established a horticultural therapy garden at Elmhurst Nursing Home.

At RWMC, Fran devoted herself to fulfilling the mission of the medical center. She worked tirelessly to advance the good work and community orientation of RWMC. Her efforts were instrumental in allowing the medical center to offer highly specialized, state-of-the-art medical care

to those in need while still remaining a community based hospital in one of Providence's outer neighborhoods.

In May of 2000, Fran left RWMC for a position as Vice President at Landmark Medical Center in Woonsocket. She remained in that position for approximately one year until she decided to open her own consulting business, Palumbo Driscoll Associates. She is currently semi-retired, working as a consultant on a part-time basis for a number of non-profit organizations.

Mrs. Driscoll has also been an active participant in various professional and community based organizations on both a local and national level. She earned professional designation as an APR (Accredited Public Relations Specialist) and was a founding member of the Public Relations Society Association, Southern New England Chapter, and also served as its President for several terms. On a national level, Mrs. Driscoll was chosen as Chair of the Health Academy and served on the Executive Board of the Public Relations Society of America.

Mrs. Driscoll has also won several significant awards for fundraising. In 1999, she was named by the Rhode Island Chapter of Fundraising Executives as the Fundraiser of the Year. Two years later, she was named the "Alumni of the Year" at Rhode Island College. She was also honored in 2003 by the Public Relations Society Health Academy with a Lifetime Achievement Award.

Fran Driscoll has been consistently committed throughout her life to both her family and to her community. Between 1971 and 1986, she served on the PTA in the Ponagansett school system and presided as PTA President for several terms in the 1970s. Mrs. Driscoll was a member and officer of the League of Women Voters; a board member for the March of Dimes; a founding member and president of the Rhode Island Association of Women Deans; a member of the State Health Services Council; a member of the Board of Children's Friends and Services; and a Trustee of the Rhode Island College Foundation.

In addition, Fran and Don Driscoll have volunteered at their local church, St. Philips in Smithfield, for the past 20 years, as religious teachers for junior high students and as church lectors. Clearly, this is a person of demonstrated integrity which she has consistently demonstrated over many years and which can easily be confirmed by a number of community leaders.

A significant number of respected citizens can attest that Fran Driscoll is, above all else, a very ethical person who would not have the capacity to intentionally commit a federal felony. If Fran Driscoll made any errors in judgment during her employment at RWMC, over five years ago, they were unintentional and certainly not part of a planned scheme to deprive the citizens of Rhode Island of the honest services of John Celona.

**4. Seriousness of Offense**

The Thompson Memo advises U.S. Attorneys to consider the "nature and seriousness of the offense, including the risk of harm to the public, and applicable policies and priorities, if any, governing the prosecution of corporations for particular categories of crime." RWMC and its employees agree that political corruption is a very important matter that must be taken seriously. Here, RWMC and its employees funded the acquisition of an Ethics Opinion to protect RWMC and to ensure that John Celona would know which legislative actions were allowed and which were prohibited. RWMC conditioned Celona's contract on his cooperation with the Ethics Commission and provided him with specific instructions to follow the requirements set forth in the opinion. Given that Celona filed 55 § 6 Notices covering 93 different pieces of legislation, it would appear to a reasonably prudent person that he was following these instructions. If Celona did cross ethical lines, it was not at the request of RWMC's employees. RWMC believes it did everything reasonably possible to properly disclose its relationship with Celona to the public. This effort should be given serious consideration.

**5. Pervasiveness of Wrongdoing with Corporation**

The Thompson Memo will consider the "pervasiveness of the wrongdoing within the corporation, including the complicity in, or condemnation of, the wrongdoing by corporate management." While RWMC certainly disputes that there was criminal wrongdoing in this case, on RWMC's part, the facts illustrate that RWMC is a community owned and operated medical center. Its mission is providing much needed health care to the community, including the provision of over $10 million in pro bono care last year alone. There is no evidence that any RWMC employee was motivated by anything other than the success and survivability of the Medical Center. There is no evidence of a corporate culture of "wrongdoing" or a "pervasiveness of wrongdoing."

**6. Voluntary Cooperation**

U.S. Attorneys consider the "corporation's timely and voluntary disclosure of wrongdoing and its willingness to cooperate in the investigation of its agents, including, if necessary, the waiver of the corporate attorney-client and work product protection." From the beginning of this investigation, RWMC has cooperated with investigators in providing over 9,000 documents in response to three federal subpoenas. When some of the subpoenas requests were unclear, RWMC attorneys contacted the U.S. Attorney's office for clarification to ensure that the right documents were provided. RWMC has also made all of its employees, not represented by separate counsel, available to be interviewed and has ensured that all subpoenaed witnesses appear at any grand jury proceedings.

Waiver of the attorney-client privilege is but one factor in the Thompson memo and it must be recognized that case law in the First Circuit does not recognize limited waivers. Therefore, if a person or corporation decides to waive any attorney-client privilege it can be construed that the privilege is waived as to the world (which several respected legal commentators have warned

against). Therefore, the government must recognize that this is but one factor to consider and that it has wide precedential effect beyond just this particular investigation.

**7. Corporation's History**

U.S. Attorneys are instructed to consider the "corporation's history of similar conduct, including prior criminal, civil, and regulatory enforcement actions against it.." While RWMC disputes allegations of criminal activity here, there is no evidence of prior allegations of Honest Services Mail Fraud or Hobbs Act type violations anywhere in its history.

**8. Compliance Program**

The Thompson Memo will consider the "existence and adequacy of the corporation's compliance program." RWMC has instituted a strong compliance program. (*See* Compliance Program, attached as **Exhibit 41**.)

**9. Remedial Action**

The Thompson Memo says that the prosecutor should consider the "corporation's remedial actions, including any efforts to implement an effective corporate compliance program or to improve an existing one, to replace or discipline management, wrongdoers, to pay restitution, and to cooperate with the relevant government agencies." RWMC will agree to appoint a corporate ethics officer familiar with all State and Federal Ethics laws to ensure that all of its actions comply with appropriate federal and state rules and regulations.

**10. Collateral Consequences**

The Thompson Memo instructs that the U.S. Attorney should consider the "collateral consequences, including disportionate harm to shareholders, pension holders and employees not proven personally culpable and impact on the public arising from the prosecution." The collateral consequences of an indictment are overwhelming. An indictment of the hospital could very well be the death knell for a 127 year old health care institution. Roger Williams Hospital is a non-profit

"stand-alone" community hospital that has struggled to survive among larger hospital networks. If indicted, it may lose two significant sources of funding: federal money and private donations.

While RWMC strongly disputes its involvement in federal criminal activity, a potential conviction has to be considered and a conviction of RWMC could "de-bar" RWMC from receiving any federal money. The Federal Exclusion Statute ("Exclusion Statute") provides for the exclusion of individuals and entities who have been convicted of a range of offenses from *all* Federal health care programs. *See* 42 U.S.C. § 1320a-7. This means that no payments will be made to an excluded entity from any Federal health care program—including Medicare, Medicaid, and all other plans and programs that provide health benefits funded directly or indirectly by the United States—for any items or services furnished by the entity. The prohibition against Federal program payment for items or services furnished by excluded entities also extends to payment for administrative and management services that, while not directly related to patient care, are a necessary component of providing items and services to Federal program beneficiaries.

Moreover, the term "convicted" in the Exclusion Statute is not narrowly defined but rather includes "when a plea of guilty or *nolo contendere* by the individual or entity has been accepted by a Federal, State or local court." *Id.* at § 1320a-7(i)(3). Thus, even nolo or a guilty plea can have major ramifications on an entity such as RWMC.

a. **Mandatory Exclusion**

Mandatory exclusion requires exclusion from federal health care programs for at least five years. *Id.* at § 1320a-7(c)(3). The Exclusion Statute demands exclusion from Federal health care programs in four circumstances:

1) Conviction of Medicare-related crimes, id. at § 1320a-7(a)(1);

2) Conviction relating to patient abuse or neglect, id. at § 1320a-7(a)(2);

3) Felony conviction relating to health care fraud, id. at § 1320a-7(a)(3); and

4) Felony conviction relating to controlled substances, id. § 1320a-7(a)(4).

Given the events surrounding RWMC, subsections (1), (2), and (4) clearly do not apply. It is unclear whether subsection (3), relating to felony convictions involving health care fraud, would be applicable. However, if the OIG determined that the felony health care fraud subsection did apply, RWMC would potentially be excluded for a period of at least five years if convicted. Id. at § 1320a-7(c)(3)(B). Exclusion for any length of time, but especially five years or more, would most certainly have a devastating effect on both RWMC and the people it serves daily. Without reimbursement from Federal health care programs, RWMC would he forced to close. The poor and working-class community in which RWMC sits would be hit particularly hard by the hospital's closure.

**b. Permissive Exclusion**

There are several events for which the Secretary of HHS *may* exclude individuals or entities from participating in federal health care programs. *See* 42 U.S.C. § 1320a-7(b). As with the provisions outlining mandatory exclusion, it not entirely clear whether accepting a plea or being convicted of non-health care fraud charges would expose RWMC to permissive exclusion. However, the stiffer the penalty, the higher the charge imposed and the more numerous the counts charged, the more likely OIG would scrutinize RWMC, making RWMC more vulnerable to discretionary exclusion.

In the case of RWMC, the most pertinent event for which exclusion is permissive is conviction relating to misdemeanor fraud. *Id.* at § 1320a-7(b)(1). An entity convicted of misdemeanor fraud in connection with the delivery of a health care items or services, or with respect to any act or omission in a federally or state-funded health care program, may be excluded at the Secretary's discretion. *Id.* at § 1320a-7(b)(1)(A). Exclusion is also permissible for the conviction of any criminal fraud offense "with respect to any act or omission in a program (other than a health

care program) operated by or financed in whole or in part by any Federal, State, or local government agency." *Id.* at § 1320a-7(b)(1)(B).

If the Secretary excludes an entity under this subsection, the exclusion shall last a minimum of three years. *Id.* at § 1320a-7(c)(3)(D). As explained before, exclusion for any period of time would have a deleterious effect on RWMC and the community it serves, but a three-year exclusion would be particularly debilitating, most likely causing the hospital to close its doors.

While RWMC feels strongly that it did not engage in or commit any crimes in this case, due to the content of the Thompson memo it is incumbent upon us to discuss the potential ramifications of a conviction.

**11. Adequacy of Other Enforcement:**

The Thompson Memo instructs the U.S. Attorney to consider the "adequacy of remedies such as civil or regulatory enforcement actions." In this case, both the Rhode Island Attorney General's office and the RI Ethics Commission have repeatedly reviewed the same evidence essentially available to the federal government and found no grounds for indictment. While RWMC understands that separate statutes are involved here, RWMC has cooperated fully with a previous State grand jury investigation and was advised that none of its employees were targets of that investigation and that the investigation was a joint State-Federal investigation. In fact, it appears that Federal prosecutors and Federal agents sought disclosure of the State grand jury testimony for use in this investigation and we are listed on the Rhode Island Superior Court Rule 6(e) disclosure list as having been allowed to review this testimony. Both Robert Urciuoli and Frances Driscoll testified at that State Grand Jury and RWMC was advised by the presiding Assistant Attorney General that the State was satisfied with the testimony and credibility of the witnesses provided by RWMC.

Here, again, RWMC has cooperated by providing over 9,000 documents to the Federal government, a substantial portion of which were previously provided to the State grand jury. Many

of the same witnesses called to the State grand jury have been called, again, and have cooperated with this Federal grand jury.

In other words, some consideration should be given to the amount of time spent by this non-profit entity in cooperating with these investigations as well as the anxiety and uncertainty that is created when an institution is "under investigation" and its loyal employees are told to search for volumes of documents and then appear before grand juries to testify. These events have ripple effects that reverberate throughout an institution.

In essence, we ask you to consider that a publicly elected official has apparently already admitted to wrongdoing; are society's interests served by potentially threatening the viability of a community health care institution based, substantially, on the testimony of that former public official?

## VI <u>CONCLUSION</u>

In *Berger v. United States*, 295 U.S. 78, 88 (1934), decided over 70 years ago, the United States Supreme Court wrote:

> The United States Attorney is a representative not of an ordinary party to a controversy but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; **and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.**

*Berger v. U.S.*, 295 U.S. 78 (1934) (emphasis added).

The tougher decisions for a prosecutor to make are when not to charge a case. Agreeing with the advocacy of a law enforcement officer is oftentimes the easier decision for a prosecutor. However, the respected prosecutor is the one who recognizes that his or her job is both an administrator of justice and an advocate, and whose goal is to seek justice, not merely to win a conviction.