# EXHIBIT C

10/6/2005

FD-302 (Rev. 10-6-95)



FEDERAL BUREAU OF INVESTIGATION

Date of transcription

at

John Celona voluntarily appeared at the United States Attorney's office for the District of Rhode Island with his attorney William Dimitri. Celona was advised that he was being interviewed regarding documents recently provided to the FBI that he was not previously shown. Celona provided the following information.

Celona was shown a copy of a fax (GPH 000830) dated 2/17/98 from himself to Fran Driscoll which stated, "Fan - enclosed is a copy of 98-H 8229. Vin Mesolella is out of town, but I will get to him as soon as he returns to first, identify the motive of the bill (i.e. those behind it) and second to work to defeat it before it moves anywhere. I'll keep you posted. Thank you - John." Celona stated that now that he has seen this fax, he specifically recalls that Fran Driscoll contacted him and told him about the bill and asked him to do what he could do to defeat the bill because it would hurt the Village at Elmhurst relative to an Alzheimer's Unit. Driscoll told him that Representative Mesolella was from North Providence so Celona should be able to contact him in an attempt to defeat the legislation. Celona contacted Mesolella who told him that he had put the legislation in for someone and that Mesolella really was not interested in it. Celona stated that Mesolella had no interest in the substance of the bill.

Celona was shown a copy of Senate bills 99-S0112 which requires that in those emergency situations that arise out of a 911 call, only ambulances operated by a municipal corporation or a nonprofit organization shall be utilized and 99-S0112 As Amended which adds "for municipalities by contracted services, by fire districts" to the language of the bill. Celona stated that he thinks that he put this bill in at the request of one of the labor unions. He believes that the bill was amended because the town of Bristol contracts its ambulance services. At this point in time and without further documentary evidence, Celona does not recall any involvement of Roger Williams Medical Center in this bill.

Investigation on 10/6/05 at Providence, RI

File # 194B-BS-94790 Date dictated 10/6/05

by SA W. Dennis Aiken, Det. Shari Russell

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

IN THE MATTER OF:

ROGER WILLIAMS MEDICAL CENTER

Testimony of JOHN CELONA, a Witness herein, heard before the JUNE 2005 SPECIAL GRAND JURY on THURSDAY, DECEMBER 8TH, 2005, 11:34 A.M., in Room 126A of the John O. Pastore Federal Building, Two Exchange Terrace, Providence, Rhode Island.

PRESENTED BY:

LUIS M. MATOS, ESQUIRE
ASSISTANT U.S. ATTORNEY

Diane J. DeStefano, RPR
(401) 782-4441

Q. From where?
A. North Providence.
Q. And was he someone that you were on politically good terms with?
A. Yeah. We went -- you know, we weren't like close, close friends, but we were on politically good terms. We never had like -- worked hard for one another but we were on good terms. I knew his brother more than him as far as going to school with him and things.
Q. After you spoke with Fran Driscoll about the bill and she told you to work to defeat it, did you have conversations with anyone else related to The Village at Elmhurst or Roger Williams Medical Center?
A. I think it might have been Sangermano I believe.
Q. Let me show you on the screen what has previously been marked as Grand Jury Exhibit No. 13. Do you remember you previously testified about reports of activities that you prepared for Fran Driscoll?
A. Yes, sir.
Q. And if you look at the third item in that report, does it say -- it's up on your screen, "Advise Mr. Sangermano on Mesollela legislation and

explain its problems to the sponsoring committee members. Resulted in legislation being held."

Did you have a conversation with Mr. Sangermano?

A. Yes.

Q. Can you explain how that conversation with Mr. Sangermano came about?

A. On behalf of Fran Driscoll, she asked that I forward it to Peter Sangermano, which I did. And then I believe he called me or -- at the time I had a pager, I didn't have a cell phone, and I called him back and he said obviously he didn't want the legislation, it would hurt him and that -- you know, to do what I can to defeat it and also that he would speak with John, meaning John Harwood, who was the Speaker of the House at the time and whom I understood to be a long-time childhood friend of Mr. Sangermano's.

Q. Did he in -- did you discuss with him what you were intending to do in order to work to defeat it?

A. Yes.

Q. What did you tell him?

A. I told him I would talk to Vin Mesollela and ask him what his motive was and what the prognosis of it would be.

Q. And this is after you had a consulting agreement that didn't indicate anywhere on the consulting agreement that you would be working actively to defeat legislation for The Village; is that correct?

A. Yes.

Q. And Mr. Sangermano was aware of that consulting agreement?

A. Yes.

Q. He had signed it, you had signed it?

A. Yeah, he signed it.

Q. After you had your conversations with -- did -- what else, if anything, transpired in your conversation with Peter Sangermano?

A. I think that was about it if I remember correctly.

Q. And after that, what did you do, Mr. Celona?

A. I spoke with Representative Mesollela, and he had told me that he had put --

Q. Can I interrupt you for a second? Did you go visit Mr. Mesollela?

A. I know I spoke with him on the phone. I may have seen him in the hallways, as many times you see it, legislators in the hallways and things like that, but I know I spoke with him on the phone at least, and I asked him what was the motive behind it

and he told me, and I asked him if it was a priority of his and I said that it wasn't a priority of mine.

Q. And did you ask him to do anything?

A. Yes. I said I didn't want it passed.

Q. What did he say in response to that?

A. He said, "It's not a priority of mine so don't worry about it."

Q. After you had that conversation with him about the fact that you didn't want it passed -- actually, at that conversation, did you tell him on whose behalf you were asking that he not push the legislation?

A. No, sir.

Q. Did you in any way inform him that it was a bill that would affect The Village at Elmhurst, your employer?

A. No, sir.

Q. Did you tell him that it was Fran Driscoll or anyone at Roger Williams who hired you, that they had asked you to work to defeat the legislation?

A. No, sir.

Q. And then you reported back to Fran Driscoll that you spoke to Sangermano, and it goes on to say that resulted in legislation being held; is that correct?

A. Correct.

Q. And did you check to see that the legislation was held?

A. Yes, sir.

Q. And if you look back at Grand Jury Exhibit No. 221 that's in front of you, does that document have some handwriting on it?

A. Yes, sir.

Q. Do you know whose handwriting that is?

A. No, sir.

Q. What is it?

A. It says, "To be heard 2/25/98"

Q. That was sometime after your conversation with Fran Driscoll or your fax to Fran Driscoll of 2/17/1998, correct?

A. Correct.

Q. And your understanding, according to your message to Fran later in your report, was that it was held; is that correct?

A. Yes.

Q. The reports of activity, if you remember, what did Fran Driscoll say she planned to do with your reports of activity?

A. She needed to have the reports on my activity so she could present them to the hospital board.