# EXHIBIT F

**U.S. Departı. at of Justice**

*United States Attorney*
*District of Rhode Island*

Fleet Center
50 Kennedy Plaza, 8th Floor
Providence, Rhode Island 02903

(401) 709-5000
FAX (401) 709-5001

August 2, 2006

Michael J. Connolly, Esq.
Kristie M. Passalacqua, Esq.
Hinckley Allen Snyder LLP
1500 Fleet Center
Providence, RI 02903

Kevin J. Bristow, Esq.
505 Turks Head Building
Providence, RI 02903

John A. Pappalardo, Esq.
James P. Redding, Esq.
Greenburg Traurig LLP
One International Place
Boston, MA 02110

Re: United States v. Urciuoli, et al.
CR. No: 06-02T

Dear Counsel:

Enclosed please find a CD that contains supplemental discovery, including additional materials in compliance with the Court's July 24, 2006, Order. Specifically, enclosed are: (1) a copy of the Celona proffer 302 with additional items that have been unredacted; (2) an excerpt of agent notes taken on October 25, 2004; and (3) Grand Jury exhibits 200-207, which were inadvertently omitted from previous discovery materials. Please note that, in regard to the Grand Jury exhibits, we believe that the documents were previously produced but may not have been identified as Grand Jury exhibits. Also, please note that the Celona 302 contains an error where it lists that an interview occurred on November 17, 2004. The date of that interview was November 18, 2004.

If you have any questions, please do not hesitate to contact me or Dulce Donovan.

Sincerely,

ROBERT CLARK CORRENTE
United States Attorney

LUIS M. MATOS
Assistant U.S. Attorney
Chief, Criminal Division

cc: Richard Egbert, Esq. (w/out encls.)

11/19/2004

FD-302 (Rev. 10-6-95)



**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription

at

On 9/1/04, John Anthony Celona voluntarily appeared at the United States Attorney's office for the District of Rhode Island with his attorney, William Dimitri, Jr. Celona appeared for the purpose of being interviewed by the FBI under the terms of a proffer agreement which Celona had signed prior to his appearance. Prior to Celona being asked any questions by the interviewing agents, AUSAs Craig Moore and Peter Neronha were present and asked Celona if he understood the terms of the proffer agreement. After Celona stated that he understood those terms, AUSAs Moore and Neronha were not present for the remainder of the interview. This interview was conducted on 9/1/04, 9/7/04, 9/9/04, 9/13/04, 9/15/04, 10/25/04, 10/28/04, 11/1/04 and 11/17/04. Investigators participating in those interviews were as follows:

| | |
|---|---|
| 9/1/04- 9/15/04 | FBI SA W. Dennis Aiken, FBI SA Michael Kohn and IRS SA Joel Burman |
| 10/25/04 | FBI SA W. Dennis Aiken, IRS SA Joel Burman, Rhode Island State Police (RISP) Sergeant Brian Casilli and RISP Detective Shari L. Russell |
| 10/28/04 | FBI SA W. Dennis Aiken, RISP Sergeant Brian Casilli and RISP Detective Shari L. Russell |
| 11/1/04 | FBI SA W. Dennis Aiken, IRS SA Joel Burman, RISP Sergeant Brian Casilli and RISP Detective Shari L. Russell |
| 11/17/04 | FBI SA W. Dennis Aiken, IRS SA Joel Burman and RISP Sergeant Brian Casilli. |

Celona's attorney William DiMitri was present for all interviews.

**BACKGROUND**

Celona provided personal descriptive data as follows:

Name: John Anthony Celona
[redacted]

Investigation on 11/04/04 at Providence, RI

File # 194B-BS-93514 Date dictated 11/4/04

by SA W. Dennis Aiken, SA Michael Kohn, SA Joel Burman Sgt. Brian Casilli, Det. Sheri L. Russell

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Education: Graduate of Providence College with a Bachelors degree in Political Science

Celona advised that he was born and grew up in North Providence, Rhode Island working for his father as a gas station attendant. In 1970, Celona's father had a heart attack and Celona and his brother bought a lawn mower business. Celona's brother had back surgery and became disabled. Once Home Depot and Lowes came into the area and began selling lawn mowers, Celona's lawn mower business, an independent company, could no longer compete in the market place. After the lawn mower business, they attempted various endeavors such as sportswear embroidery without success. Celona and his brother sold Celona, Inc. in 1998. Since that time, Celona has performed consulting work for various persons / entities under his own name as a sole proprietorship. Celona stated that he has no involvement with Cel-Bro Construction, Inc., a Rhode Island corporation, and is not related to the John Celona that is involved in that business.

Celona started his political career in 1972 when he ran for a seat on the North Providence Town Council. He lost that first election, but won in 1974. He was elected to the council again in 1976 and 1978. He served as councilman at large from 1980 - 1992. Celona was married in 1993. In 1994 he was elected to the Rhode Island Senate by special election. He assumed office in 1995 and was reelected every year since then.

Since Celona has been a Senator, he has been done consulting work for the following companies:

Village at Elmhurst - 1998 through 2003
Discovery Group - 2003
CRI Communications, Inc. - 2002 and 2003
New England Ambulance - 2002 to present
Certified Restoration - 2003
Intercity Maintenance -2003
CVS Pharmacy, Inc. - 2000 through 2003

Celona stated that he served on the Senate Corporations Committee from 1995 until the day he left the Senate. Celona stated that over the years this committee was known by various names, but is commonly referred to as the Senate Corporations Committee. Celona stated that several years ago, the responsibilities of the Senate Corporations Committee changed and they lost jurisdiction over finance, technology, and non health

FD-302a (Rev. 10-6-95)

194B-BS-93514

Continuation of FD-302 of John Anthony Celona, On 11/04/04, Page 3

related insurance companies. They have retained regulatory jurisdiction over healthcare related insurance companies, pharmaceutical companies and pharmacies for the entire time that Celona has served on that committee. Issues were assigned to the various committees by the Senate leaders. Celona became chairman of that committee when Senator William Irons became Senate Majority Leader in January of 2001.

When Celona became Chairman of the Senate Corporations Committee in January of 2001, there had been a riff between then Senate Majority Leader Paul Kelly and Senator William Irons based on Senator Irons' desire to become Senate Majority Leader. Celona and Senator Joseph Montalbano, who also served on the Senate Corporations Committee, were close associates. Senator Irons called upon Celona and asked him if he would have Celona's support for Majority Leader. Celona said that he would support Senator Irons as long as Senator Montalbano did not object because Celona thought Senator Montalbano might have wanted the position. Subsequently, Celona and others supported Senator Irons who became Senate Majority Leader. Afterwards, Irons named Celona as Chairman of the Senate Corporations Committee. When Senator Irons became Senate President, Senator Montalbano became Senate Majority Leader.

During the time period in which Celona was Chairman of the Senate Corporations Committee, lobbyists would more often than not take legislation that they wanted to introduce in the Senate to Senate President Irons and/or Senate Majority Leader Montalbano. Celona stated that Senators Irons and Montalbano were his "bosses" and that he did what they said. Celona stated that Linda Calista, a legislative employee, would meet with Senator President Irons and Senate Majority Leader Montalbano to determine which bills would progress and which ones would not progress through the legislative session. Celona described Calista as being the "Head of Legislation" for the Senate. She is still employed in the legislature and now may be the Deputy Chief of Staff. Calista would then meet with the various committee chairpersons and provide them with the bill posting list. Celona added that Senate employee Stacy Paradise sat in on some of the meetings with Calista as did Kristen Silvia who was Calista's assistant. (Celona stated that rumors persisted that Senator Irons was having an extra-marital affair with Paradise.) The bill posting list would identify the legislation that would not progress through the legislature with a typed notation "NGN" next to those bills. Celona stated that "NGN" meant "Not Going Nowhere." Celona explained that the "NGN" status was determined in the Senate by Senator President Irons and Senate

FD-302a (Rev. 10-6-95)

194B-BS-93514

Continuation of FD-302 of John Anthony Celona, On 11/04/04, Page 4

Majority Leader Montalbano. Celona stated that bills marked "NGN" were not to get any hearings. Celona stated that he did not have the power to overcome a "NGN" status determined by the Senate leadership because they had the power to cancel a hearing if one were scheduled. If a lobbyist would bring a bill directly to Celona for introduction or opposition, Celona would contact Senators Irons and/or Montalbano to determine what Celona's position would be. Celona would take the position that Senators Irons and/or Montalbano directed. Celona stated that the only matters to which he may take exception would be matters of philosophical difference such as pro-life, gay rights, etc. Occasionally, a "NGN" bill may get a hearing as a ruse, but that hearing would have no real affect on the status of the bill.

Celona stated that oftentimes legislators would sponsor legislation on behalf of constituents although the sponsoring legislator did not actually support the legislation. Celona stated that before each session he would ask each senator that sponsored legislation if they really supported that legislation in that if they did not, he did not want to waste the committees time with that legislation.

Celona stated that when controversial issues developed before his committee, he would sometimes form working groups to try to develop some middle ground on bills before they came up for a vote. Celona would include all sides of the issue in these workgroups.

[redacted]

[redacted]

FD-302a (Rev. 10-6-95)

194B-BS-93514

Continuation of FD-302 of John Anthony Celona, On 11/04/04, Page 5

**CVS PHARMACY, INC.**

[redacted]

[redacted]

[redacted]

FD-302a (Rev. 10-6-95)

194B-BS-93514

Continuation of FD-302 of John Anthony Celona, On 11/04/04, Page 6

[redacted]

[redacted]

[redacted]

[redacted]

FD-302a (Rev. 10-6-95)

194B-BS-93514

Continuation of FD-302 of John Anthony Celona , On 11/04/04 , Page 7

[redacted]

[redacted]
Sometime shortly after the meeting at CVS, Celona told Robert Urscioili and Fran Driscoll of Roger Williams Medical Center that he would be working for CVS.

[redacted]

[redacted]

[redacted]

FD-302a (Rev. 10-6-95)

194B-BS-93514

Continuation of FD-302 of John Anthony Celona, On 11/04/04, Page 8

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] Initially during this interview Celona claimed that his reason for no longer supporting Pharmacy Freedom of Choice involved not only his receiving a consulting agreement from CVS providing him $1,000 per month, but also involved CVS allowing independent pharmacies into their network. Celona was shown a letter dated May 15, 1998 from Carlos Ortiz to Celona which states (in part), "Finally, I would bring your attention to the fact that negotiations with pharmacies in Rhode Island has created a network whereby all 42 Brooks pharmacies and 41 independent pharmacies are part of the network that will service pharmacy managed care programs." The letter further states, "This means that every domestically incorporated pharmacy in Rhode Island is part of the network." Celona admitted that the independents were in the network prior to his sponsoring two Pharmacy Freedom of Choice bills in January of 1999 and this could not have been a factor in his decision to no longer support Pharmacy Freedom of Choice legislation beginning in the year 2000. Celona stated that the moment he and CVS reached their agreement on February 10, 2000 and he began receiving payments from CVS, his support of Pharmacy

Freedom of Choice was over. Celona stated that this is supported by the fact that on March 7, 2000, a month after the CVS / Celona consulting agreement was signed, there was a Senate hearing on Senate Pharmacy Freedom of Choice legislation 2000S - 2774. Celona admitted that he actually did not vote because he could no longer support Pharmacy Choice because CVS had bought his vote. He did not want his change in position to be exposed through a vote.

[redacted]

[redacted]

FD-302a (Rev. 10-6-95)

194B-BS-93514

Continuation of FD-302 of John Anthony Celona, On 11/04/04, Page 11

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

FD-302a (Rev. 10-6-95)

194B-BS-93514

Continuation of FD-302 of John Anthony Celona, On 11/04/04, Page 12

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

FD-302a (Rev. 10-6-95)

194B-BS-93514

Continuation of FD-302 of John Anthony Celona , On 11/04/04 , Page 13

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

FD-302a (Rev. 10-6-95)

194B-BS-93514

Continuation of FD-302 of John Anthony Celona , On 11/04/04 , Page 14

[redacted]

[redacted]

Celona was shown his 2000, 2001 and 2002 financial statements he filed with the Ethics Commission. Celona acknowledged that he did not disclose his income from CVS on any of these forms. During his 9/1/04 interview, Celona initially explained that he did not include CVS because he only listed his major employer which was the Village at Elmhurst. On 9/1/04, Celona initially stated that his failure to disclose his agreement with CVS had nothing to do with his not obtaining an opinion from the Ethics Commission regarding CVS. On 9/1/04, Celona insisted that these were true statements in that his failure to disclose income from CVS was unintentional. This question was reviewed during Celona's 11/18/04 interview. Celona readily admitted that his 9/1/04 statement that his omission of CVS income from his 2000, 2001 and 2002 financial statements was unintentional was a lie. He stated that the fact is that he intentionally did not disclose his CVS income because he did not want anyone to know he was being paid by CVS because of the conflict of interest. He stated that this was also true of CRI Communications. Celona was asked if he understood the original agreement was that he tell the truth in this proffer interview and he stated that he understood that during the entire interview session. Celona stated that he understood and agreed that the lie about financial statements could cause the

FD-302a (Rev. 10-6-95)

194B-BS-93514

Continuation of FD-302 of John Anthony Celona, On 11/04/04, Page 15

government to negate any and all agreements and use Celona's statement against him.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

FD-302a (Rev. 10-6-95)

194B-BS-93514

Continuation of FD-302 of John Anthony Celona, On 11/04/04, Page 16

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

FD-302a (Rev. 10-6-95)

194B-BS-93514

Continuation of FD-302 of John Anthony Celona , On 11/04/04 , Page 17

[redacted]

[redacted]

[redacted]

[redacted]

CRI COMMUNICATIONS, INC. / BLUE CROSS & BLUE SHIELD OF RHODE ISLAND

FD-302a (Rev. 10-6-95)

194B-BS-93514

Continuation of FD-302 of John Anthony Celona , On 11/04/04 , Page 18

[redacted]

[redacted]

[redacted]

[redacted]

FD-302a (Rev. 10-6-95)

194B-BS-93514

Continuation of FD-302 of John Anthony Celona, On 11/04/04, Page 19

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

FD-302a (Rev. 10-6-95)

194B-BS-93514

Continuation of FD-302 of John Anthony Celona , On 11/04/04 , Page 21

[redacted]

[redacted]

[redacted]

[redacted]

FD-302a (Rev. 10-6-95)

194B-BS-93514

Continuation of FD-302 of John Anthony Celona, On 11/04/04, Page 22

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

FD-302a (Rev. 10-6-95)

194B-BS-93514

Continuation of FD-302 of John Anthony Celona , On 11/04/04 , Page 23

[redacted]

[redacted]

[redacted]

[redacted]

FD-302a (Rev. 10-6-95)

194B-BS-93514

Continuation of FD-302 of John Anthony Celona, On 11/04/04, Page 24

[redacted]

[redacted]

[redacted]

FD-302a (Rev. 10-6-95)

194B-BS-93514

Continuation of FD-302 of John Anthony Celona, On 11/04/04, Page 25

[redacted]

[redacted]

[redacted]

On December 4, 2003, Katherine Gregg's article appeared in the "Providence Journal." According to the article, three weeks

prior, "Blue Cross spokesman Scott Fraser said: 'I don't know of any connection that John has with Rhode Island Health Update.'" Celona stated that he knew Fraser and Fraser certainly should have known of his involvement in Rhode Island Health Update prior to that time. Celona stated that he did initially deny any involvement in the show, but later was forced to admit his involvement. Celona told Gregg that he knew nothing about Blue Cross' sponsorship until after he taped the first few episodes of the show. Celona said that was a lie. Celona also told Gregg that he had no recollection of talking to anyone at Blue Cross about sponsoring or airing the show. Celona stated that also was a lie. Celona stated that he told other lies to Gregg to include stating that he was never paid by anyone in connection with the show. These lies were all with Catucci's knowledge and support so that they could attempt to hide his real involvement. Celona stated that Catucci also lied to Gregg as part of the cover-up.

[redacted]

[redacted]

**RHODE ISLAND GREYHOUND OWNERS ASSOCIATION**

[redacted]

[redacted]

[redacted]

**ROGER WILLIAMS MEDICAL CENTER (RWMC)**

Celona has known RWMC President and Chief Executive Officer Robert Urciuoli through their membership at St. Anthony's Church and through Celona's associations with RWMC in the Rhode Island Senate and the Hospital Conversion Act in particular. Celona did not socialize with Urciuoli, but had a friendly relationship with him. In 1997, RWMC was attempting to be bought by Columbia Healthcare. During this time, Celona met with Urciuoli regarding legislation that was being supported by then Senate Majority Leader Paul S. Kelly which would prohibit the conversion of non-profit hospitals in Rhode Island to for-profit hospitals. This was referred to as the Hospital Conversion Act and was highly controversial. Senator Montalbano and Celona were opposed to Senator Kelly's position. Celona also was of the opinion that the Hospital Conversion Act was a bad bill. Senator Robert J. Palazzo had switched from supporting Senator Kelly to Supporting Senator Montalbano. Celona met with Senator Palozzo,

lobbyist Phil Noel and Urciuoli regarding this legislation. Celona is unsure whether Noel actually attended the meeting, but he was scheduled to be there. Celona understood that Urciuoli was meeting with every senator.

On 7/21/97, the night before the vote, Senator Montalbano had a meeting in the back of he 1025 Club to discuss strategy. That group, including Celona, was working with Governor Lincoln Almond to sustain his veto of the legislation that the Kelly group was trying to override. On 7/22/97, Celona's group was unsuccessful and Almond's veto was overridden. On 7/23/97, the day following the vote, Celona was back with Urciuoli to discuss what they were going to do. Fran Driscoll, Senior Vice President for External Affairs, Corporate Communication and Development of RWMC, was heavily involved in these activities.

Sometime between July 23, 1997 and August 25, 1997, Celona approached Urciuoli for a job with RWMC. Celona asked Urciuoli if there was anything available because Celona was closing his business. Urciuoli said he could work on doing something for Celona. Celona stated that he had multiple contacts with Urciuoli regarding a possible job after the vote on the Hospital Conversion Act. Celona stated that he was desperate for a job and was sending letters and resumes out to different locations. Celona and Urciuoli did not discuss the Village at Elmhurst at the time. Celona was aware of the Village at Elmhurst but was not aware of its relationship with RWMC.

Urciuoli put Celona in touch with Driscoll relative to Celona's potential employment. Celona and Driscoll met at Elmhurst Extended Care - a nursing care facility owned by Roger Williams Medical Center sometime in the summer or in the fall of 1997 and Driscoll asked Celona to come up with something he could do. The initial discussions between Celona and Driscoll were that Celona was going to do work for the Village at Elmhurst and do some work with Elmhurst Extended Care. Driscoll gave Celona some material on the Village at Elmhurst and Celona drafted a proposal and sent it to Driscoll. Driscoll and / or Urciuoli determined the pay scale, made and offer and Celona accepted it. There was no discussion as to who was going to pay Celona. Celona began working the beginning of February of 1998. Celona stated that Driscoll was an extreme micromanager and immediately began firing questions and instructions to Celona. Celona had very little contact with Peter Sangermano of the Village at Elmhurst. Celona stated that he may have met Sangermano before he was hired, but Sangermano did not

play a significant role in Celona's hiring or consulting activities throughout his tenure with the Village at Elmhurst / RWMC. Celona stated that it became immediately evident through his contacts with Driscoll that his primary "consulting" responsibilities involved RWMC and not the Village at Elmhurst at the rate of 95% RWMC and 5% Village at Elmhurst. Celona received $700 per week beginning 6/5/97 and those payments continued until 8/5/2000 when he began to receive $892.31 per week. He was paid that amount until March, 2002 when he began to receive $1,000 per week through 12/31/2003.

Most of Celona's communication with Driscoll were though fax and telephone. Celona stated that he does not believe that Driscoll had much use of the computer. After Driscoll left RWMC, Celona's contact with RWMC shifted to Urciuoli. Celona's communications with Urciuoli were mostly verbal.

Celona was shown a document titled, "Report of Activities February, 1998 - May, 1998." Celona advised that he prepared this at the direction of Driscoll and it details work he had done for RWMC and the Village at Elmhurst. Celona stated that most of the work was of his own initiative.

According to Celona, Driscoll immediately began utilizing Celona's senatorial position to further positions advantageous to RWMC. She had him obtain position papers, minutes, copies of legislation and asked him to try to sway other members of the legislature. She made clear RWMC's position as to legislative matters within the Senate Corporations Committee and other Senate Committees.

After the Hospital Conversion Act passed complicating to the extent that it effectively prohibited the conversion of non-profit hospitals to for-profit hospitals, RWMC continued to be interested in selling to a for-profit group. Representative Patrick Kennedy introduced legislation regarding a three year review period. Legislation was also introduced prohibiting members of boards for non-profit hospitals from serving on boards of for-profit hospitals if a conversion took place. During the initial phase of Celona's consulting agreement, Urciuoli, Driscoll and RWMC continued to have a keen interest in this type of legislation as Universal Health Services had some interest in purchasing RWMC. One such bill was 98S-2796 which prohibited trustees of purchased non-profit hospitals from continuing to serve as trustees once they are converted to for-profit hospitals. This bill had nothing to do with assisted living centers and was one of the first legislative

matters that Driscoll and Urciuoli tried to manipulate through Celona. Celona stated that at the time, he had little power in the Senate, but did what he could as a loyal employee of RWMC to speak with his counterparts to try to affect the legislation. There were several faxes to and from Driscoll and Celona involving this bill. One of the faxes dated 3/16/98 from Celona to Driscoll states, "Fran, I received your message. I have begun making calls to work to kill the bill in committee on Thursday. I will call you tonight. John." Celona stated that he believes this bill was in the Senate Judiciary Committee and that Driscoll told him that they wanted the bill killed. Celona continued to track the bill, speak to his Senatorial counterparts and send follow-up communications to Driscoll. The bill died in committee, but in reality not due to Celona because of his lack of real power. Celona stated that only Corporations Committee Chairman Irons and/or Senate Majority Leader Kelly would know why the bill was killed. During the same time period, Celona was in contact with Richard Wright of Universal Health Services on RWMC's behalf.

Around March or April, 1998, Attorney James R. McGuirk somehow got involved and Driscoll and McGuirk told Celona that he would need to get an advisory opinion from the Rhode Island Ethics Commission. McGuirk wrote the letter to the Ethics Commission. Celona did not provide Mcguirk any information contained in that letter and Celona assumes that McGuirk got the information from Driscoll. Celona stated that he did not recall getting a fax requesting any input into the letter. Celona stated that he did not provide any input as the details of the letter were worked out by McGuirk and Driscoll. Celona saw the letter before it went to the Ethics Commission and McGuirk told Celona that Celona would not have to go the Ethics Commission meeting as McGuirk had already been in contact with the Ethics Commission. Celona stated that McGuirk's letter to the Ethics Commission indicated that the Village at Elmhurst had engaged Celona to promote its services and those of its related facilities, such as the Elmhurst Extended Day Care Facility, Inc. Celona admitted that the letter gave no indication that Celona would be working primarily for RWMC. Celona stated that it had become clear to him by the time the letter was submitted to the Ethics Commission that he was not working for the Village at Elmhurst, but was working for RWMC. Celona chose not to correct the letter as he thought it was sufficient in that the letter disclosed that the Village at Elmhurst was a joint venture between Roger Williams Realty Corporation and SANAT, LLP. Celona stated that he did not have input into the drafting of the letter and does not know what information was provided to McGuirk.

Although Urciuoli had explained the relationships among the entities, Celona did not learn that RWMC was funding his salary at the Village at Elmhurst until after the Advisory Opinion was issued. Celona stated that if his relationship was accurately and fully disclosed to the Ethics Commission, he would not have been able to vote on issues involving hospitals. Celona stated that after the Advisory Opinion was issued, McGuirk attempted to appeal the ruling and asked that Celona be allowed to vote on matters involving assisted living facilities citing comparisons to legislators who are teachers voting on matters involving teachers.

During the time Driscoll was employed by RWMC, Celona reported to her exclusively 99% of the time. Driscoll told Celona that she reported to the RWMC Board of Directors. There were occasions when Celona met both with Driscoll and Urciuoli. Karen Medici was Driscoll's secretary. Celona stated that Driscoll would page him five to ten times a week, mostly about matters involving RWMC. Celona remembers one incident in particular on Election Day in 1998. Celona's son was at Hasbro Childrens Hospital with symptoms similar to spinal meningitis. While Celona was at the hospital tending his son, Driscoll persistently paged Celona. Celona stated that Driscoll would constantly ask him to fax hard copy communications rather than e-mails and she would often hand write instructions and/or questions on these communications. Celona does not know of how Driscoll communicated with Urciuoli and what the decision making process was between Driscoll and Urciuoli. Celona stated that his only goal was to be a loyal employee to RWMC and do what he was told. He never discussed job boundaries regarding the Advisory Opinion with Driscoll or Urciuoli.

Celona stated that in 1999, there was a movement to create The State of Rhode Island Cancer Council, Inc. On 1/20/99, House bill 99-H5220 was introduced by Representatives Peter J. Kilmartin, Suzanne M. Henseler, Steven M. Constantino, Joanne M. Giannini and Peter T. Ginaitt. That bill established the Cancer Council for the purpose of developing "a comprehensive and coordinated manner to develop and implement a statewide Cancer Plan which would include but not be limited to cancer treatment, care, research, prevention, detection and education. Driscoll and RWMC learned of this initially asked Celona to subtly check on the legislation to see where it was going and who was supporting it. This evolved into Driscoll letting Celona know that they were strongly opposed to this legislation with one reason being that they did not like the doctor that was supporting the Cancer Council. Celona sent a fax to Driscoll on 2/23/99 sending her a

copy of the House bill and reported that there was no corresponding Senate bill. He told her that the would "begin (his) research on its support and report. When Driscoll learned that Rep. Giannini was a sponsor of the Cancer Council bill, she instructed Celona to contact Rep. Giannini and tell her that she should be concerned about her political future if she continues to support this bill because of the number of voters in Rep. Giannini's district that work for RWMC.

Celona contacted Rep. Giannini and relayed Driscoll's message and Rep. Giannini agreed to no longer support the Cancer Council legislation. On February 24, 1999, Celona sent Driscoll a memo reporting his contact with Rep. Giannini. Celona continued to follow the Cancer Council bill closely and contacted Rep. Giannini on other occasions to ensure that she was no longer supporting the legislation. Celona continued to follow this legislation into 2000 and report to Driscoll. On 2/8/00, he sent Driscoll a memo that he had a copy of the Rhode Island Cancer Council's report that was a "recommendation derived from the Roundtable on Women's Issues in Cancer." Celona pointed out that, "Representative Giannini took part in the roundtable" and that he would "have another 'talk' with her about her pledge to me to run any other health care activities by me and RWMC prior to participation." Celona told Driscoll on that same fax that the had spoken with Senator Irons on 2/7/00 and that "while stopping short of using the word 'moratorium' as he did last week, he said that 'we should act in an extremely deliberate fashion until the seas calm' on health care bills. Celona added, "This makes it all the more important for us at RWMC to develop a legislative strategy as soon as possible." The matter of the Cancer Council was ultimately resolved through the Cancer Council being established through the issuance of a large grant.

Driscoll continued to contact Celona by fax and telephone regarding various matters of the legislature. Celona stated that in the late 1990s and early 2000s, Providence Mayor Vincent A. Cianci, Jr. was complaining that one of the primary causes of the City of Providence's desperate financial condition was the fact that non-profit institutions including hospitals were not paying property taxes. As a result, legislation was introduced which would allow cities or towns to levy, access and collect payments and/or services in lieu of taxes from nonprofit organizations to include nonprofit hospital facilities such as RWMC. This type of legislation was commonly known as PILOT legislation. Driscoll and RWMC were strongly opposed to this type of legislation, some of which was sponsored by Rep. Giannini of Providence who was also

working at Providence City Hall. In early 1999, Driscoll directed Celona to contact Rep. Gianni and again remind her of the number of constituents that work at RWMC and warn her of dire political ramifications if she were to continue to support such legislation. In approximately March of 1999, Celona contacted Rep. Giannini and relayed Driscoll's message. He reported the results of his efforts in fax to Driscoll on 3/8/99. Driscoll contacted Celona by return fax informing him that she was supposed to meet with Rep. Giannini and asked Celona if he had spoken to her. Celona spoke to Rep. Giannini again on 3/9/99 and reported to Driscoll by return fax telling Driscoll that Rep. Giannini "reiterated that the Payment in Lieu of Taxes (PILOT) legislation was dead." Celona also told Driscoll that he "told (Rep. Giannini) that she should watch what she signs in the future because these bills would be devastating for RWMC and her district." Celona told Driscoll that Rep. Giannini agreed. Celona also reported to Driscoll in that same fax that he also spoke to Rep. Giannini again regarding the Cancer Council legislation and that "she agreed to back off the bill."

Another example was in April of 1999 when there was a bill introduced regarding mandatory overtime for nurses. All of the hospitals were against the bill as were many nurses. On 4/12/99, Celona sent a fax to Driscoll asking her about RWMC's position on this legislation. They were also against it. It never passed.

Celona continued to follow-up on the Hospital Conversion Act and related legislation and report to Driscoll and Urciuoli. Driscoll and Urciuoli continued to direct Celona's activities regarding various legislative matters.

After Driscoll left in the spring of 2000, Urciuoli would contact Celona three or four times a week on the average. The biggest issue with Urciuoli was reimbursement rates with health care insurance companies. Celona had several meetings in his committee and he had also sponsored workshops for the parties involved to try to resolve reimbursement problems. After Celona was Chairman of the Senate Corporations Committee, he would meet with Tom Lynch, Ron Battista and Lynn Urbani of Blue Cross regarding reimbursement rates. Urciuoli would go to these meetings most of the time. Urciuoli hated Battista. The meetings would sometimes take place in Urciuoli's office and sometimes at Celona's office at the state house or in Celona's hearing room. Celona claims he also tried to do the same thing with Fatima Hospital.

Celona stated that towards the end of 2001, Blue Cross & Blue Shield of Rhode Island owed RWMC a significant amount of money in past due reimbursements. Urciuoli told Celona that as a result, RWMC could not keep its payroll. Urciuoli said he would probably have to go to Washington and to the Bond Council. Blue Cross had admitted that they owed the money, but were just refusing to pay. Urciuoli told Celona to put pressure on Blue Cross so they would pay what they owed. Celona admitted that at the time, he was Chairman of the Senate Corporations Committee and Blue Cross had financial interests in numerous legislative matters before his committee. Celona did what he was told by putting pressure on Tom Lynch of Blue Cross. Celona reported to Urciuoli by e-mail dated 12/21/01 telling Urciuoli, "Bob: I hope that I didn't lay it on Tom Lynch too much yesterday, but it was done in a systematic fashion in order to get him 'in line' for us. Needless to say, I'll keep up the pressure. Regards, John." Celona stated that "us" was RWMC. Urciuoli responded, "You didn't, he deserved to get cranked around. Again ---- thanks for you're help!"

In 2003, Celona was reporting directly to Urciuoli. United Health Care was in heated negotiations with RWMC over reimbursement rates. United wanted to pay less and Roger Williams wanted to receive more. The negotiations eventually broke down and Urciuoli had sent United Healthcare a termination letter from RWMC. Celona was concerned both for RWMC and for United Healthcare. Urciuoli told Celona to contact United Healthcare and try to force them back to the negotiation table. Celona contacted Bob Goldberg and Kelly Sheridan who were United Healthcare's lobbyists and had them attend a meeting with himself and Urciuoli at the Rhode Island State House. Celona, who was Chairman of the Senate Corporations Committee before which United Health Care had financial interest in several legislative matters, convinced United Health Care to negotiate with RWMC. Celona sent an e-mail to Urciuoli on 10/24/03 reporting the following: "Bob: It is Friday, October 24th and I just spoke with Kelly Sheridan and he told me that he had Farrell call yesterday to up the United figure. Did he contact you and do you want me to keep pressing. Please advise John." Celona stated that United settled with RWMC. Celona identified "Farrell" as being Steve Farrell, the Chief Operating Officer of United Health Care. Urciuoli and Farrell met without Celona and the matter was resolved.

Celona stated during his consulting agreement with the Village at Elmhurst which in reality was with RWMC he attempted to follow the instructions of the Advisory Opinion issued by the

FD-302a (Rev. 10-6-95)

194B-BS-93514

Continuation of FD-302 of John Anthony Celona , On 11/04/04 , Page 35

Ethics Commission. Celona admits, however, that the Advisory Opinion was issued based on incomplete information and was based on a false premise that he was working for the Village of Elmhurst when in fact, 95% of his "consulting" was with RWMC. Celona admits that he should have requested an Advisory Opinion regarding RWMC.

Celona's consulting agreement with the Village at Elmhurst ended at the end of 2003 around the same time of the media exposures of Celona's conflicts of interest. At the time, Urciuoli told Celona that he had presented a proposal to Village of Elmhurst President Sangermano, but Sangermano rejected the proposal. Urciuoli told Celona that he would try to find him some other position, but he never did.

Celona stated that he received his pay from the Village at Elmhurst although it was clear to him that 95% of his work was with RWMC. Celona would receive his checks mostly by mail, but he would sometimes pick them up at the Village at Waterman Lake headquarters in Greenville. The Village at Elmhurst gave Celona 1099s every year reporting his earnings. Celona admits that there were serious conflicts of interest in his lobbying for RWMC at the same time he was in effect being paid by them.

**NEW ENGLAND AMBULANCE**

Celona stated that he has known New England Ambulance owner John Vernancio most of life from North Providence. During legislative discussions regarding the fire code and Dioxin he got to know Vernancio better and became close to him. In October of 2001, Celona Vernancio was present when Celona received an award from the Hospital Association. Vernancio contacted Celona afterwards and they met at the Napa Valley Grille. Vernancio knew that Celona had some contact with serious health care organizations and Vernancio hired Celona beginning in 2002 to act as a consultant to try to get more business for New England Ambulance. In particular, Celona contacted various health care organizations regarding transfer and transportation ambulance runs. Vernancio paid Celona at a rate of $1200 per month beginning in 2002. As his part of the agreement, Celona contracted various entities and individuals who may need ambulance services. Celona met with Vernancio at RWMC and no agreement was reached. On one occasion, Vernancio was the low bidder for ambulance service to the Veteran's Hospital, but did not get the contract. Celona contacted Congressional representatives in an attempt to get the matter resolved in Vernancio's favor to no avail. There were also

occasions that Celona contacted lobbyists that appeared before the Senate Corporations Committee. Celona stated that he did not threaten to punish those lobbyists if they did not use Vernancio.

**INCOME TAX MATTERS**

Celona stated that he did not report income from New England Ambulance because he did not receive any 1099s from them until 2004. He had no special agreement with Vernancio for Vernancio not to report Celona's income and does not know why Vernancio did not submit a 1099. Celona stated that he intends on amending his tax returns once he gets his documents back that were seized by the Rhode Island State Police in the search of his residence.

Celona stated that his accountant, Jason Buco never asked if he had any income other than that for which he was providing copies of 1099s.

Celona admitted that he knew he had income from New England Ambulance, but at the time did not realize that he did not get a 1099. Celona stated that he gave his accountant what he had and signed off on his tax returns that the accountant prepared without reviewing them.

Community Media Services did not submit a 1099 to Celona and he forgot to report the income.

Celona stated that he almost always took extensions to pay his income tax because he did not have the money to pay. His accountant would call him and tell him how much he had to pay.

**CAMPAIGN FINANCE VIOLATIONS**

Celona stated that he has had bank accounts at Fleet, Citizens, Rhode Island Credit Union and Pawtucket Credit Union. When asked if there were anything unusual in his accounts that he should tell the FBI about, Celona advised that he deposited campaign monies into his personal account that he had not yet returned. Celona explained that he would write checks to himself and either deposit those checks to other accounts or cash those checks. He did not report these checks as income on his income tax.

FD-302a (Rev. 10-6-95)

194B-BS-93514

Continuation of FD-302 of John Anthony Celona , On 11/04/04 , Page 37

**OTHER MISCELLANEOUS ALLEGATIONS MADE BY CELONA**

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

FD-302a (Rev. 10-6-95)

194B-BS-93514

Continuation of FD-302 of John Anthony Celona, On 11/04/04, Page 39

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

FD-302a (Rev. 10-6-95)

194B-BS-93514

Continuation of FD-302 of John Anthony Celona, On 11/04/04, Page 40

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

FD-302a (Rev. 10-6-95)

194B-BS-93514

Continuation of FD-302 of John Anthony Celona , On 11/04/04 , Page 41

[redacted]

FD-302a (Rev. 10-6-95)

194B-BS-93514

Continuation of FD-302 of John Anthony Celona , On 11/04/04 , Page 42

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

FD-302a (Rev. 10-6-95)

194B-BS-93514

Continuation of FD-302 of John Anthony Celona , On 11/04/04 , Page 43

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

FD-302a (Rev. 10-6-95)

194B-BS-93514

Continuation of FD-302 of John Anthony Celona , On 11/04/04 , Page 44

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]