**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **v.** | : | **CR 06-02 T** |
| | : | |
| **ROBERT A. URCIUOLI,** | : | |
| **FRANCES P. DRISCOLL, and** | : | |
| **PETER SANGERMANO, JR.** | : | |

## UNITED STATES' TRIAL MEMORANDUM

### I. INTRODUCTION - STATUS OF THE CASE

On January 5, 2006, a federal grand jury returned an indictment charging Defendants Robert A. Urciuoli, Frances P. Driscoll, Peter J. Sangermano and Roger Williams Medical Center ("RWMC") with conspiracy to commit honest services mail fraud. The Indictment also charges Defendant Driscoll with one count of honest services mail fraud and Defendants Uriciuoli, Sangermano and RWMC with thirty-six counts of honest services mail fraud. RWMC has since entered into a deferred prosecution agreement.

### II. SUMMARY OF THE GOVERNMENT'S EVIDENCE

Throughout the relevant time period, Defendant Urciuoli was the President and Chief Executive Officer of RWMC. From 1989 until May of 2000, Defendant Driscoll was Senior Vice-President, External Affairs, Corporate Communications and Development for RWMC. Defendant Sangermano was a principal of Village Retirement Communities, LLC, a not-for-profit corporation dedicated to developing and operating assisted living facilities.

RWMC was the parent company for Roger Williams Hospital (the "Hospital") and the the sole member and shareholder in Roger Williams Realty Corporation ("Roger Williams

Realty"), a corporation that owned and managed real estate for the benefit of RWMC, and Elmhurst Extended Care Facilities, Inc., a skilled nursing and intermediate care facility. The Village at Elmhurst, LLC (the "Village"), was an assisted living facility that was equally owned by Roger Williams Realty and SANAT Properties, LLP.[1]

From August of 1997 through January 8, 2004, Defendants conspired with John Celona, a former Rhode Island State Senator,[2] to defraud the citizens of the State of Rhode Island of their intangible right to the honest services of Celona, and to have those services performed free from deceit, favoritism, bias, conflict of interest and self-enrichment.[3] Defendants did so by causing Celona to enter into a consulting agreement with the Village in order to provide Celona with money in exchange for his political support on matters of interest to RWMC and the Village pending before the Rhode Island General Assembly. In essence, Defendants hired Celona as a consultant for the Village to work on issues relating to senior affairs while their true purpose was to have Celona perform duties for RWMC and report to Frances Driscoll. Celona's consulting agreement with the Village was a way of hiding Celona's relationship with RWMC from the State of Rhode Island and its citizens, allowing Celona to promote RWMC's political interests in his official capacity without revealing the true nature of Celona's work relationship to RWMC

---

[1] SANAT was a partnership between Village Retirement Communities and NATCO Products, Inc.

[2] Celona was a State Senator from January 2, 1995, through on or about March 9, 2004. From January 4, 2001, through December 11, 2003, Celona was the Chairman of the Senate Corporations Committee, which possessed jurisdiction over legislation and matters affecting commerce, for-profit as well as not-for-profit business corporations, including but not limited to, health care providers, health care related insurance companies, and pharmacies.

[3] In a separate case, pursuant to a Plea Agreement with the United States, on August 25, 2005, Celona plead guilty to an Information charging one count of honest services mail fraud.

and the attendant conflict of interest.

Defendants' deception included, but was not limited to, obtaining a Rhode Island Ethics Commission opinion based on false and misleading information. Defendants Urciuoli and Driscoll sent an April 6, 1998, letter to the Ethics Commission stating that Celona was employed by the Village to promote services provided to senior citizens. Attached to the Ethics Commission letter was also a copy of the consulting agreement, which stated that Celona was being hired by the Village to "heighten awareness among seniors (the elderly) of the greater Providence community as to programs and services available" at the Village and Elmhurst Extended Care. In the April 6, 1998, letter, Defendants Urciuoli and Driscoll failed to disclose that Celona had been performing political services for RWMC, reporting to Driscoll, and that RWMC was funding the Village's payments to Celona. Thus, Defendants' letter to the Ethics Commission wholly misrepresented the true identity of Celona's employer and the true nature of the work he was and would be performing.

For example, despite the fact that the Consulting Agreement specified that Celona was charged with increasing senior awareness as to the programs available at the Village and Elmhurst Extended Care, Urciuoli and Driscoll had already tasked Celona with influencing municipalities to increase the number of ambulance transports to the Hospital. In addition, in or about early 1998, prior to submitting the letter to the Ethics Commission, Urciuoli and Driscoll informed Celona that they opposed Senate Bill 98-S 2796, an act which prohibited directors, trustees, or officers from serving on the board of a newly converted hospital. Subsequently, on or about March 16, 1998, Celona sent Defendant Driscoll a facsimile in which he advised that, in regard to Senate Bill 98-S 2796, he was making calls to "kill the bill" in Committee. On or

about April 23, 1998, in response to the false and fraudulent April 6, 1998, advisory opinion request, Celona received an opinion from the Ethics Commission outlining the legislative duties that he could undertake.

Having deceived the Ethics Commission into endorsing a relationship between Celona and the Village that did not exist, Urciuoli continued throughout the next approximately six years to direct Celona to use his “influence, power and authority” to take official actions which benefitted RWMC and its affiliates. The Indictment details numerous official actions Celona undertook at Defendants’ behest, including but not limited to opposing Cancer Council legislation, Payment in Lieu of Taxes legislation, bone marrow legislation, and influencing individuals and corporations doing business with RWMC in a manner intended to financially benefit RWMC. Over time, Defendants rewarded Celona for his efforts, increasing his original weekly salary from $700 to $1,000. In all, Defendants paid Celona approximately $260,638.63 for his services.

## III. STATUTES AND ELEMENTS OF OFFENSES

### A. Count 1: Conspiracy to Commit Mail Fraud

Count 1 of the Indictment charges conspiracy to commit honest services mail fraud, in violation of 18 U.S.C. § 371. In order to prove the conspiracy charge, the United States must show that:

(1) that the agreement specified in the indictment, and not some other agreement or agreements, existed between at least two people to commit mail fraud;

(2) that the defendants willfully joined in that agreement; and

(3) that one of the conspirators committed an overt act in an effort to further

the purpose of the conspiracy

First Circuit Pattern Jury Instructions, § 4.18.371(1).

A conspiracy is an agreement to disobey or to disregard the law. United States v. Pacheco-Ortiz, 889 F.2d 301 (1st Cir. 1989); United States v. Flaherty, 668 F.2d 566, 580 (1st Cir. 1981). The government must prove "an intent to agree and an intent to effectuate the commission of the substantive offense. A defendant need not have had the intent personally to commit the substantive crime." United States v. Piper, 35 F.3d 611, 615 (1st Cir. 1994), cert. denied, 513 U.S. 1158 (1995); see also United States v. Gomez-Pabon, 911 F.2d 847 (1st Cir. 1990). A conspiratorial agreement may be proved by either direct evidence or circumstantial evidence. United States v. Concemi, 957 F.2d 942 (1st Cir. 1992); United States v. Notarantonio, 758 F.2d 777 (1st Cir. 1985). A defendant's knowing participation in a conspiracy may be established by proof of surrounding circumstances. United States v. Paradis, 802 F.2d 553 (1st Cir. 1986). The agreement need not be express. It may consist of no more than a tacit understanding. United States v. Pacheco-Ortiz, supra, 889 F.2d 301 (1st Cir. 1989).

The government must prove that the defendant had knowledge of the basic agreement. United States v. Marsh, 747 F.2d 7 (1st Cir. 1984). However, the defendant need not have knowledge of all of the details of the conspiracy nor of all the participants in the conspiracy nor of their acts. United States v. Williams, 809 F.2d 75, 86 (1st Cir. 1986); United States v. Arruda, 715 F.2d 671 (1st Cir. 1983). The defendant need not participate in all of the activities of the conspiracy in order to be held a member of the conspiracy. Id. The government must prove each defendant knowingly and intentionally joined the conspiracy. United States v. Pacheco-Ortiz, 889 F.2d 301 (1st Cir. 1989).

A coconspirator is responsible not only for his own acts, but also for the acts of other conspirators done in furtherance of the conspiracy. Pinkerton v. United States, 328 U.S. 640 (1946); United States v. Rengifo, 858 F.2d 800 (1st Cir. 1988). For purposes of criminal liability as a conspirator, one who joins an ongoing conspiracy is deemed to have adopted the prior acts and declarations of his coconspirators made after the formation of and in furtherance of the conspiracy. Thus, the defendant is bound by all acts committed by coconspirators in furtherance thereof, including those acts committed without his knowledge before he joined the conspiracy. United States v. O'Campo, 973 F.2d 1015 (1st Cir. 1992); United States v. Cintolo, 818 F.2d 980 (1st Cir. 1987).

**B. Counts 2-38**

To establish a violation of 18 U.S.C. § 1341, the government must prove two elements:

(1) the defendant's knowing and willing participation in a scheme or artifice to defraud with the specific intent to defraud, and

(2) the use of the mails in furtherance of the scheme to defraud.

United States v. Sawyer, 239 F.3d 31, 39-40 (1st Cir. 2001) ("Sawyer II").

With respect to the first element, 18 U.S.C. § 1346 provides that "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. Section 1346, and therefore § 1341, "reach[es] schemes to defraud individuals of the intangible right to honest services of government officials." United States v. Sawyer , 85 F.3d 713, 723-24 (1st Cir. 1996) ("Sawyer I") (citing United States v. Grandmaison, 77 F.3d 555, 565-66 (1st Cir. 1996)). Because the Indictment here alleges such a scheme, with respect to the first element, the United States must prove that Defendants "acted

with two kinds of intent: that [they] intended to deprive the public of [a public official's] honest services, and that [they] intended to deceive the public." Sawyer II, 239 F.3d at 41. The "first kind of intent" requires either that the Defendants "intended to influence [a public official] in [his or her] official action" or intended that the official fail to disclose a conflict of interest resulting in personal gain. Id. at 40-41.

The United States may demonstrate an intent to influence a public official in his official action in several ways. "For example, a bribery-like, corrupt intent to influence official action necessarily is an intent to deprive the public of an official's honest services. A person might not, however, give an unlawful gratuity with the intent to effect a specific quid pro quo. Rather, . . . a person with continuing and long-term interest before an official might engage in a pattern of repeated intentional gratuity offenses in order to coax ongoing favorable official action in derogation of the public's right to impartial official services." Id. at 41.

The government may prove that the defendant intended to deceive the public concerning his conduct either through the defendant's own acts of deception towards the public or the defendant's efforts to ensure the official deceived the public with respect to payments to the official. Evidence that the defendant intended to cause the official intentionally to fail to disclose material information about payments to that official is sufficient to show that the defendant intended that the public be deceived with respect to the defendant's payments to the official. At bottom, the government must present sufficient evidence to establish defendant's intent that the public be deceived with respect to payments to the public official. Sawyer II, at 48-49.

### C. Aiding and Abetting

Defendants are also charged with aiding and abetting the scheme to defraud, in violation of 18 U.S.C. § 2. A defendant may be treated as a principal even though he himself may not have actually consummated the crime. The government need not prove the identity of the principal, nor need the government convict the principal. The government need only prove that the substantive offense was committed by someone and that the defendant aided and abetted him. United States v. Campa, 679 F.2d 1006 (1st Cir. 1982). Aiding and abetting is not a separate charge, but a theory of prosecution. A court may always instruct on the theory of aiding and abetting as long as the evidence warrants such an instruction. United States v. Sanchez, 917 F.2d 607 (1st Cir. 1990).

The government must prove that a defendant associated himself with the venture of a codefendant, participated in it as something he wished to bring about, and sought by his actions to make it succeed. United States v. Bonfant, 851 F.2d 12 (1st Cir. 1988). Participation in every stage of the illegal venture is not necessary. It is sufficient if the participation occurs at some stage, accompanied by the knowledge of the result and an intent to bring about the result. United States v. Delgado Figueroa, 832 F.2d 691 (1st Cir. 1987).

## IV. ANTICIPATED LEGAL ISSUES

### A. Coconspirator Statements

Federal Rule of Evidence 801(d)(2)(e) excludes from the operation of the hearsay rule "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(e). The "government must show by a preponderance of the evidence that the defendant and declarant were in the same conspiracy and that the statement was made during

the course and in furtherance of the conspiracy." Bourjailly v. United States, 483 U.S. 171, 175 (1987); United States v. Marino, 277 F.3d 11, 25 (1st Cir. 2002). A defendant who joins a conspiracy is deemed to have adopted prior statements made in furtherance of that conspiracy. See, e.g., United States v. Saccocia, 58 F.3d 754, 778 (1st Cir. 1995) (noting that defendant, "[b]y joining that conspiracy at a later date ... effectively adopted co-conspirator declarations previously made").

To conserve judicial resources, the Court should conditionally admit the declaration and make its determination pursuant to United States v. Petrozziello, 548 F.2d 20 (1st Cir. 1987) at the close of all of the evidence, on the record and out of the jury's presence. United States v. Ciampaglia, 628 F.2d 632 (1st Cir. 1980).

**a. A Conspiracy.**

"The touchstone of conspiracy is an agreement to do an unlawful act, but each coconspirator need not know of or have contact with all other members, nor must they know all of the details of the conspiracy or participate in every act in furtherance of it." United States v. Martinez-Medina, 279 F.3d 105, 113 (1st Cir. 2002). "The jury may infer an agreement circumstantially by evidence of, inter alia, a common purpose, overlap of participants, and interdependence of various elements in the overall plan." Id. In addition, "[d]efendants may simultaneously be members of two conspiracies ... [A]nother conspiracy, larger than the one charged at trial, may provide the basis for the admission of the coconspirator's statements." Id., at 25-26 (citing United States v. Innamorati, 996 F.2d 456, 486 (1st Cir. 1993)("Whether this was a separate conspiracy or part of the larger ... conspiracy makes no difference so far as the admissibility of the statement ... is concerned")); United States v. Gigante, 166 F.3d 75, 82 (2nd

Cir. 1999); United States v. Orena, 32 F.3d 704, 713 (2nd Cir. 1994).

A defendant need not be specifically aware of the details of the statement for it to be admissible against him, as recently stated by the First Circuit:

> [t]he rule is that as long as it is shown that a party, having joined a conspiracy, is aware of the conspiracy's features and general aims, statements pertaining to the details of plans to further the conspiracy can be admitted against the party even if the party does not have specific knowledge of the acts spoken of.

United States v. Marino, 277 F.3d at 25 (citing United States v. Anguilo, 847 F.2d 956, 969 (1st Cir. 1988)).

**b. In Furtherance of the Conspiracy.**

The term "in furtherance of the conspiracy" means that the statement must tend to advance the object(s) of the conspiracy as opposed to thwarting its purpose. United States v. Masse, 816 F.2d 805 (1st Cir. 1987). A defendant who joins a conspiracy is responsible for statements of other coconspirators made in furtherance of the conspiracy even if such statements were made prior to his joining the conspiracy. United States v. Baines, 812 F.2d 41 (1st Cir. 1987). In making its Petrozziello findings, the Court may consider the hearsay statements themselves, but cannot rely solely on them in making its findings that Rule 801(d)(2)(E) has been satisfied. Bourjailly v. United States, 483 U.S. 171 (1987); United States v. Reynolds, 828 F.2d 46 (1st Cir. 1987).

Statements of a coconspirator which identify the participants, and discusses their continuing availability, are admissible. United States v. Crocker, 788 F.2d 802, 805 (1st Cir. 1986). Statements may be admitted as being "in furtherance" of the conspiracy, even if they do not achieve a goal of the conspiracy, if they reveal an intention to promote its objectives. United

States v. Guerro, 693 F.2d 10, 13 (1st Cir. 1982). Other statements which have been held to be "in furtherance" of a conspiracy explain roles of the conspirators, discuss future plans of the conspirators, and report significant events. See United States v. Masse, 816 F.2d 805, 811 (1st Cir. 1987) (conspirator's statement to an undercover agent identifying the defendant as the source of the cocaine); United States v. Pelletier, 845 F.2d 1126, 1128 (1st Cir. 1988) (conspirator's statement identifying a fellow conspirator as the drug source); United States v. Flores-Rivera, 56 F.3d 319, 330 (1st Cir. 1995) (conspirator's statement to an informant that the defendant was a member of the drug conspiracy); United States v. Guerro, 693 F.2d 10 (1st Cir. 1982) (conspirator's statements to an undercover agent reflecting an unsuccessful attempt to conduct drug transaction because of a problem with the drug supplier); United States v. Kaplan, 832 F.2d 676, 685 (1st Cir. 1987), cert. denied, 485 U.S. 907 (1988) (physician's and pharmacist's statements to each other regarding recruitment of a physician, referral system, and partial payment method with personal injury attorney in a false billing scheme involving a personal injury attorney and physicians); United States v. Innamorati, 996 F.2d 456, 486 (1st Cir. 1993) (statement by drug dealer to undercover agent that he was doing cocaine transaction with his brother even though the conspiracy between the brothers was not the conspiracy charged in the indictment); United States v. Sepulveda, 15 F.3d 1161, 1180-81 (1st Cir. 1993), cert. denied, 114 S.Ct. 2714 (1994)(conspirator's reporting of significant events to another including the police's discovery of cocaine while executing a search warrant and conspirator's sharing of information to another conspirator about the operation of a drug ring); United States v. Diaz, 16 F.3d 401 (1st Cir. 1994) (conspirator's admission to undercover agent about the role of her husband in the drug operation assured the agent that the conspirator could carry out her

end of the conspiracy without obstruction from her husband); and United States v. Saccoccia, 58 F.3d 754, 779 (1st Cir. 1995) (statements between drug dealers regarding the sale of cocaine in a money laundering conspiracy were links in the lengthy chain of the narcotics trafficking cycle and ongoing campaign to launder money).

**B. Admissibility of Business Records**

______A great number of the documents the government will introduce as evidence consist of records made and maintained in the ordinary course of business by business organizations, to include RWMC and the Village at Elmhurst. The Government will introduce records of communications, memoranda, check disbursements and financial statements. As such, they are not excluded by the hearsay rule. Rather, such memoranda, reports, records, or data compilations may be admitted either by testimony of a person with knowledge, or by certification that complies with Rule 902(11), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. Fed. R. of Ev. 803(6).

Rule 902(11) of the Federal Rules of Evidence permits the introduction of the original or a duplicate of records of regularly conducted business activity without the testimony of the records custodian or other witness:

> . . . if accompanied by a written declaration of its custodian or other qualified person . . . certifying that the record -
>
> (A) was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;
>
> (B) was kept in the course of the regularly conducted activity; and
>
> (C) was made by the regularly conducted activity as a regular practice.

> A party intending to offer a record into evidence under this paragraph must provide written notice of that intention to all adverse parties, and must make the record and declaration available for inspection sufficiently in advance of their offer into evidence to provide an adverse party with a fair opportunity to challenge them.

The Government has provided the defendant with the records that it intends to introduce pursuant to Rules 803(6) and 902(11), as well as copies of grand jury testimony of the RWMC custodian of records. In addition, the government is in the process of assuring that defendants have copies of all relevant written certifications. Thus, the defendant will have adequate opportunity to verify the accuracy and reliability of the records and/or certifying affidavits. Accordingly, the records are admissible under Rule 803(6), subject to defendant's relevancy objections.

**C. Admissibility of the Saylor Report**

As has been highlighted to the Court, defendants Uriciuoli and Driscoll intend to introduce select portions of the Saylor report, including a portion of the Saylor report relating to the propriety of the Celona contract. The report is inadmissible because it is not relevant to the issues at hand.[4] However, should Urciuoli take the stand, the allegations contained in the report are the proper subject for cross-examination.

---

[4] If the Court does in fact deem it relevant, it would presumably do so based on Urciuoli's theory of relevance, i.e, that ti goes to his state of mind regarding the Celona contract. The report would still be excludable, however, because Urciuoli's intent in entering into the contract is a question solely within the province of the jury.

### 1. The Saylor Report is not Relevant

Fed. R. Evid. 401 defines relevant evidence as "evidence having any tendency to to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

In early 1998, after the conspiracy had been hatched by the defendants, wide ranging of allegations of misconduct by Defendant Urciuoli arose at RWMC. As a result of the allegations, the Board of Trustees at RWMC engaged Dennis Saylor, Esq. to conduct an investigation into the allegations. Judge Saylor found numerous instances of impropriety by Defendant Urciuoli and, based upon a limited review, also concluded that Celona's **"contract"** was neither illegal nor unethical – the report says nothing about the underlying **conduct**. The investigation of the Celona contract was limited to determining whether Celona was getting paid for doing nothing. The Report, which was issued June 2, 1998, states "[w]e were asked to investigate the allegation that [Celona] was given a no-show job at the Village of Elmhurst assisted living center as payment for his efforts on behalf of the hospital during the Columbia/HCA matter. . . . Some employees [were] concerned that Mr. Celona was not qualified for the position and was getting a $30,000 check for doing no work." Judge Saylor's interview of Urciuoli, in which Urciuoli denied that Celona was a "ghost consultant," and his review of records relating to Celona's position lead Judge Saylor to conclude that Celona performed work in February and March of 1998, not whether that work was in accordance with the terms of the consulting agreement or the substance of what was represented to the Ethics Commission about what Celona would be doing.

The Indictment covers the period from August of 1997 to January 2004 and alleges

numerous overt acts which Urciuoli committed in furtherance of the conspiracy and the scheme to defraud before the Executive Committee even hired Goodwin. These acts include the execution of the consulting contract and the submission of the false and fraudulent April 1998 Ethics Commission letter. See Indict. ¶ 14, 21, 22, 24-27, 32, 41-44. Hence, Judge Saylor's conclusions concerning the Celona contract do **not** negate the possibility that Urciuoli possessed the *mens rea* necessary to commit honest services mail fraud.

To the extent that the Court allows defendants to introduce any portion of the Saylor report, the remainder of the report and/or evidence surrounding the circumstances under which the report was prepared must also be examined. Judge Saylor investigated accusations against Urciuoli within certain restrictions on the length of time to be devoted to the investigation and who he could interview. In addition, the scope of Judge Saylor's investigation concerning Celona was limited to determining whether Urciuoli was paying Celona for a no-show job in exchange for his prior legislative support. Whether Urciuoli was aware of these limitations on Judge Saylor are relevant to the jury assessing the credibility of Urciuoli's reliance on Judge Saylor's findings concerning the Celona contract

Further, the portions of Judge Saylor's report dealing with issues other than the Celona contract are also relevant. For example, the fact that Urciuoli deceived Judge Saylor concerning the Celona consulting contract and the fact that the Board refused to fire Urciuoli despite Judge Saylor's substantiated findings with respect to certain of the allegations concerning his expenditures, could have emboldened him to commit additional acts of honest services fraud involving Celona rather than leading him to believe that his actions were lawful

### 2. If Portions of the Saylor Report are Introduced, the Remainder of the Report Should Also be Admitted

If a portion of the Saylor report is introduced by the defendants, the rule of completeness requires that the remainder of the report be introduced. Fed. R. Evid. 106 requires that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." If the Court permits defendants to introduce the two-pages of the Saylor report addressing the Celona contract, fairness dictates that the remainder of the Report should be introduced contemporaneously with it.

Where "misunderstanding or distortion can be averted only through presentation of another portion" of a document "the material required for completeness is *ipso facto* relevant and therefore admissible." Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 172 (1988). "Rule 106 . . . justif[ies] the admission of previously excluded portions of partially received documents . . . only when necessary to explain the admitted, to place it into context, to ensure a fair and impartial understanding of the admitted portion, or to correct a misleading impression that might arise from excluding it." United States v. Rivera, 61 F.3d 131, 135-36 (2d Cir. 1995). Although it is an open question in this Circuit, United States v. Leon-Delfis, 203 F.3d 103, 115 (1st Cir. 2000), other courts have held that the excluded portion of the document must be admissible on independent grounds, United States v. Woolbright, 831 F.2d 1390, 1395-96 (8th Cir. 1987).

Permitting Urciuoli to introduce the two pages in the Saylor report addressing the Celona contract would leave the jury with the mistaken impression that the contract was the only

conduct for which Urciuoli was investigated. Judge Saylor's efforts in investigating the Celona contract must be placed in the proper context – the allegations of Urciuoli giving Celona a no show job was one of numerous allegations. The jury will be more likely to give greater weight to Judge Saylor's findings if they think that the Celona contract was all that Judge Saylor investigated.

### 3. Rule 608(b) Permits Inquiry Into Other Instances of Misconduct Cited in the Saylor Report and Occurring During Judge Saylor's Investigation Which Are Probative of Urciuoli's Untruthfulness

The Report and evidence underlying it present appropriate inquiry on cross-examination should Urciuoli take the stand. Even though under Rule 608(b) the United States may be prohibited from introducing extrinsic evidence of Urciouli's lies to Judge Saylor in the course of the investigation, for example concerning a trip to the Scottsdale Princess in Arizona, or of his submission of fraudulent expense sheets to the Hospital regarding that trip, because these actions are probative of Urciuoli's "character for truthfulness or untruthfulness" they may be inquired into on cross-examination. Urciuoli cannot expect to testify without having to explain his lack of candor to Judge Saylor concerning why he billed the Hospital for a non-existent "Health Care Issues of the 90s" conference. The fact that Urciuoli lied to Judge Saylor about another instance of alleged misconduct being investigated is highly probative of whether Urciuoli was truthful when speaking to Judge Saylor about Celona.

"The discretion of the district court under Rule 608 is guided by several factors, including whether the instances of prior untruthfulness [bear] some similarity to the conduct at issue, whether or not they [are] remote in time, whether they [are] cumulative of other evidence, and whether there [is] some likelihood they happened." United States v. Simonelli, 237 F.3d

19, 23 (1[st] Cir. 2001). The Court's ruling to permit such questioning is reviewed for an abuse of discretion. Id.

There is no question that many of the instances of misconduct investigated by Judge Saylor, namely Urciuoli's submission of false expense sheets and billing the Hospital for a non-existent conference, are prior bad acts tending to show untruthfulness. See e.g. id. ("[Q]uestions about altering time cards, inflating bills, and stealing away with records" are "prior bad acts that ten[d] to show untruthfulness.").

**4. The Saylor Report Is Admissible Under Rule 404(b)**

Judge Saylor's findings and evidence underlying them concerning Urciuoli's non-Celona related misconduct are admissible under Rule 404(b). As the Court is aware, evidence of other crimes or wrongs is not admissible in order to demonstrate action in conformity therewith. However, Rule 404(b) of the Federal Rules of Evidence permits the introduction of other "crimes, wrongs, or acts" in order to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, or accident . . . ." Fed. R. Ev. 404(b). The two-part test concerning whether Rule 404(b) evidence is admissible is to determine first whether the evidence has some "special relevance" other than merely to show character or propensity. See United States v. DeCicco, 439 F.3d 36, 50 (1st Cir. 2006). Next, even if the evidence has some special relevance, the evidence must be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.

In response to the Saylor report, Urciuoli admitted billing the approximately $16,000 in personal expenses to the hospital which he charitably characterized as "mistakes" or "bad error[s] in judgment." Urciuoli hired Celona in 1998. During this time-frame, indeed the time-

frame encompassed by the Saylor report, Urciuoli's lavish lifestyle depended, in part, upon his remaining CEO of the Hospital. Hiring State Senator Celona to work as the Hospital's advocate was one of Urciuoli's means of ensuring that the Hospital's legislative interests were protected. The Hospital's continued survival meant Urciuoli would continue as President and have Hospital funds at his disposal for family dinners and vacations.

### D. John Celona's Other Crimes

John Celona has plead guilty before this Court to three schemes to defraud the citizens of Rhode Island of his honest services – the Roger Williams scheme and two additional schemes involving Blue Cross Blue Shield of Rhode Island (Blue Cross) and CVS Pharmacy ("CVS"). Although defendant must have the opportunity to cross-examine Mr. Celona, the United States respectfully submits that defendants should not be afforded the opportunity to conduct a mini-trial on those schemes. Such inquiry will not be relevant to the matters at hand and will only tend to confuse and divert the jury from the issues relevant to the crimes charged in this case. Fed. R. Evid. 403, 608(b) and 611.

## V. PENDING MATTERS

The government is only aware of the following pending matter:

Defendant Urciuoli's Motion To Strike and For Other Relief

## VI. ESTIMATED TIME OF TRIAL

The United States estimates that its case will last two to three weeks.

Respectfully submitted,

ROBERT CLARK CORRENTE
United States Attorney

/S/LUIS M. MATOS
/S/ DULCE DONOVAN
LUIS M. MATOS
DULCE DONOVAN
Assistant U.S. Attorneys

CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of August, 2006, I caused the United States Trial Memorandum to be filed electronically and it is available for viewing and downloading from the ECF system.

Electronic notification:

Richard M. Egbert, Esq.
99 Summer Street
Suite 1800
Boston, MA 02110

John A. Pappolardo, Esq.
James P. Redding, Esq.
Greenburg Traurig LLP
One International Place
Boston, MA 02110

Michael J. Connolly
Kristie Passalacqua, Esq.
Hinckley Allen Snyder LLP
28 State Street
Boston, MA 02109

Notification by first class mail, postage prepaid:

Kevin J. Bristow, Esq.
501 Turks Head Building
Providence, RI 02903

/S/ LUIS M. MATOS
/S/ DULCE DONOVAN
DULCE DONOVAN
ASSISTANT U.S. ATTORNEY