UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA :
:
v. : Cr. No. 06-02-T
:
ROBERT A. URCIUOLI and :
FRANCES P. DRISCOLL :

**DEFENDANT ROBERT A. URCIUOLI'S MOTION FOR BAIL PENDING APPEAL AND INCORPORATED MEMORANDUM OF LAW**

Now comes the defendant Robert A. Urciuoli and respectfully moves, pursuant to 18 U.S.C. §3143(b), that this Honorable Court permit him to continue to be released upon the same conditions as he has been released pending trial and sentencing pending his appeal of his conviction, and perhaps his sentence, to the United States Court of Appeals for the First Circuit.

As reason therefor, defendant Urciuoli states:

1. On January 12, 2006, he was released on the posting of an unsecured appearance bond in the amount of $10,000 and upon other terms and conditions specified in the pretrial release order and has remained on pretrial release since that time. He has at all times complied with all the conditions of his release.

2. He is not likely to flee or to pose a danger to the safety of any other person or the community if his release is continued pending appeal.

3. His appeal is not for the purpose of delay and will raise substantial questions of law or fact likely to result in reversal or a new trial. Those questions include:

a. whether the Court erred in instructing the jury regarding the scope of honest services mail fraud;

b. whether the Court erred in not instructing the jury in accordance with Urciuoli's Proposed Instructions Nos. 13 and 15;

c. whether the evidence was sufficient to support Urciuoli's convictions.

As further reason therefor, defendant Urciuoli refers the Court to the memorandum of law included herein.

AUSA Luis Matos has informed counsel for Urciuoli that the government opposes the granting of this motion.

**MEMORANDUM OF LAW**

## I. THE STANDARDS GOVERNING BAIL PENDING APPEAL.

Under 18 U.S.C. §3143(b)(1)(B), a court considering a defendant's request for bail pending appeal must make two determinations: (1) whether "the appeal raise[s] a substantial question of law or fact and (2) whether, "if the substantial question is determined favorably to defendant on appeal, that decision is likely to result in reversal or an order for a new trial on all counts on which imprisonment has been imposed." *United States v. Bayko*, 774 F.2d 516, 522 (1st Cir. 1985). A "substantial question" is "a 'close' question or one that very well could be decided the other way." *Bayko*, 774 F.2d at 523. Whether or not the defendant's appeal presents a "close" question is to be decided on a case-by-case basis. *Id.* "[L]ikely to result in reversal or an order for a new trial" requires "that the claimed error not be harmless or unprejudicial." *Id.* The "likely to result" standard is to be applied "flexibly." *United States v. Colon-Munoz*, 292 F.3d 18, 20 (1st Cir. 2002). *See United States v. Powell*, 761 F.2d 1227, 1233 (8th Cir. 1985)(in deciding the second part of the standard, the court "must assume that the substantial question presented will go the other way on appeal and then assess the impact of such assumed error on the conviction").

The First Circuit has stressed that bail pending appeal is *not* "contingent on a finding by the district court that it is likely to be reversed." *Bayko*, 774 F.2d at 523. *See, e.g., United States v. Greenberg*, 772 F.2d 340, 341 (7th Cir. 1985)(district court does not have to find that it is more likely to be reversed than affirmed); *Powell*, 761 F.2d at 1232 ("a judge considering the question of bail pending appeal need not hold . . . that he or she has probably made a mistake"); *United States v. Miller*, 753 F.2d 19, 23 (3d Cir. 1985)("The federal courts are not to be put in the position of 'bookmakers' who trade on the probability of ultimate outcome"); *United States v. DeSimone*, 424 F.Supp.2d 344, 345 (D.R.I. 2006)(district court is not required to conclude that it is likely to be reversed).

> Thus, in determining whether there is a substantial question, a court must keep in mind that it is not being asked to reverse its position on issues decided at trial, nor is it being asked to grant a new trial. It must decide only that a significant issue exists that merits appellate review and that the issue is critical enough to the defendant's conviction that a contrary appellate ruling would warrant a reversal.

*United States v. Hicks*, 611 F.Supp. 497, 499 (S.D. Fla. 1985). The issues to be raised in Urciuoli's appeal meet this standard.

## II. THE COURT'S INSTRUCTIONS TO THE JURY REGARDING THE ELEMENTS OF HONEST SERVICES FRAUD RAISE A SUBSTANTIAL QUESTION WHICH, IF DECIDED FAVORABLY TO URCIUOLI ON APPEAL, IS LIKELY TO RESULT IN AN ORDER FOR A NEW TRIAL.

In his Pre-Trial Memorandum, Urciuoli took the positions that

> 6. The Indictment fails to allege a scheme to defraud under 18 U.S.C. §1346. The rights of the citizens of Rhode Island to Celona's disinterested and honest service were limited to *official* legislative action. . . .
>
> 7. Celona's efforts to increase rescue runs did not involve any type of official decision-making or participation in the legislative process, nor does the indictment make that allegation. Thus, Celona's efforts to increase rescue runs to Roger Williams Hospital cannot – as a matter of law – serve as the basis of an honest services fraud prosecution. . . .

> 8. Celona's involvement with contract negotiations between RWMC, on the one hand, and Blue Cross or United, on the other, cannot serve as the basis of an honest services fraud prosecution of Urciuoli. The indictment does not allege that Urciuoli requested or sought legislative action from Celona in connection with Blue Cross and United. As such, Celona's involvement with contract negotiations between the Hospital and Blue Cross and United cannot – as a matter of law – serve as the basis of an honest services fraud prosecution of Urciuoli.

Defendant Robert A. Urciuoli's Pre-Trial Memorandum (Doc. 145) at 6-7. Urciuoli also requested that the jury be instructed:

> The scheme to defraud in this case is a scheme to defraud the public of their right to a state legislator's honest services. Therefore, you must find that the scheme was intended to deprive the citizens of Rhode Island of the legislator's honest performance of services as a legislator. Thus, the object of the scheme must be his performance of his legislative duties; i.e., scheduling hearings, assigning bills to the hearing calendar and subsequent executive sessions, advocating bills at executive sessions, guiding and taking other action to advance bills through the Committee, and voting on legislation.

Proposed Instruction No. 13 (Doc. 162). Instead, the Court instructed the jury:

> The honest services that an elected official owes to citizens is not limited to the official's formal votes on legislation. It includes the officials' behind-the-scenes activities and influence in the legislation, *and it also includes other actions that the official takes in an official capacity, not what he does as a private individual but what he does under the cloak of his office.*

Tr. 10/2/06 at 163-64 (emphasis added).

In declining to give Urciuoli's proposed instruction and in instructing the jury that honest services fraud could include anything which the legislator did "under the cloak of his office," the Court erroneously expanded the reach of the federal mail fraud statute and permitted the jury to convict Urciuoli based upon conduct – Celona's involvement in the rescue runs issue and his facilitation of meetings between RWMC and Blue Cross and United – which is not encompassed within the ambit of honest services fraud. The First Circuit has stressed that "'[t]he broad scope of

the mail fraud statute . . . does not encompass every instance of official misconduct . . . that results in the official's personal gain.'" *United States v. Woodward*, 149 F.3d 46, 55 (1st Cir. 1998), *cert. denied*, 525 U.S. 1138 (1999), *quoting United States v. Sawyer*, 85 F.3d 713, 724 (1st Cir. 1996)(*Sawyer I*). Instead, "only if there is an intent to cause the recipient *to alter [his] official acts* may the jury find a theft of honest services." *Woodward*, 149 F.3d at 70 (emphasis added).[1] *See Sawyer I*, 85 F.3d at 741 (same); *id.* at 728 (honest services fraud requires an "improper motive to influence, or otherwise affect, the official *duties* of the recipient" (emphasis in original)); *United States v. Czubinski*, 106 F.3d 1069, 1076 (1st Cir. 1997)(government must demonstrate "that the wrongdoing at issue [was] intended to prevent or call into question the proper or impartial performance of that public official's *official duties*"(emphasis added)). *See also United States v. Bloom*, 149 F.3d 649, 656 (7th Cir. 1998)(reversing the honest services fraud conviction of a Chicago alderman who, in his private capacity as a lawyer, advised a client io use a proxy bidder at a tax scavenger sale at which the client's property was being auctioned, thereby depriving the city of tax revenues, because the scheme did not involve anything that the defendant did in his official capacity as an alderman).

---

1

The district court in *Woodward* instructed the jury that it could find a violation of the mail fraud statute only if it found "an intent on the defendant's part to be influenced *in his official legislative duties*." *Id.* at 71 (emphasis added).

The question thus becomes how to define a state legislator's "official duties." The controlling First Circuit case law, as well as decisions from other circuits, compels the conclusion that a legislator's official duties are those related to his discretionary decisionmaking in *legislative* matters and do not extend, as the government's theory in the indictment and at trial had it, to anything that Celona did in which he prefaced his surname with his legislative title, *i.e.*, did under the "cloak of his office"). The First Circuit has stressed again and again the crucial role of discretionary decisionmaking in honest services fraud, in *both* the bribery/gratuities *and* the undisclosed-conflict-of-interest forms of honest services fraud. For example, in *Woodward*, the Court concluded that "the connection between the gratuities and Woodward's official acts could have been justifiably inferred from the fact that Woodward had discretion to act in ways that would further the insurance company's interests; this discretion extended both to the bottom line (support of or opposition to the industry's position on legislation) and the degree of vigor with which Woodward championed the industry's positions." 149 F.3d at 62. In other words, Woodward's "official acts" were those in which he exercised discretionary decisionmaking in the legislative process, whether in making his own decision regarding how to vote on proposed legislation or in advocating the industry's position to other legislators contemplating proposed legislation.[2] *See Sawyer I*, 85 F.3d at 724 ("the fraud

---

2

Woodward "dispute[d] the extent to which, in his official capacity as chair of the Insurance Committee, he took action that served the interests of his benefactors." 149 F.3d at 60. In finding the evidence sufficient to support his conviction, the First Circuit pointed to Woodward's extraordinary pro-insurance industry voting record, his efforts to ensure that legislation favorable to the industry was reported favorably, and his "carrying" of bills sought by the insurance industry – all discretionary, *legislation-related* endeavors. *See id.* at 60-61; *see also Sawyer I*, 85 F.3d at 720.

involved in the bribery of a public official lies in the fact that the public official *is not exercising his independent judgment in passing on official matters*"(emphasis added)). Similarly, the *Woodward* Court stated, in the context of undisclosed conflicts of interest: "When an official fails to disclose a personal interest in a matter *over which [he] has decisionmaking power*, the public is deprived of its right either to *disinterested decisionmaking* itself, or as the case may be, to full disclosure as to the official's potential motivation behind an official act." 149 F.3d at 62 (emphasis added), *quoting Sawyer I*, 85 F.3d at 724. *See United States v. Sawyer*, 239 F.3d 31, 39 (1st Cir. 2001)(*Sawyer II*)("When a government officer *decides how to proceed in an official endeavor – as when a legislator decides how to vote on an issue* – his constituents have a right to have their best interests form the basis *of that decision*" (emphasis added)); *Woodward*, 149 F.3d at 61 (distinguishing *Czubinski* on the ground that Czubinski's "official duties did not include the discretionary decisionmaking role of a legislator").

The Court's stark division of a state legislator's acts into two categories – the solely private, on the one hand, and, on the other, anything that the legislator does "under the cloak of his office" was, accordingly, erroneously broad in that it encompassed, within the scope of acts which would constitute honest services fraud, acts which did not involve discretionary decisionmaking in the performance of Celona's *legislative duties*. The distinction is well illustrated by *United States v. Rabbitt*, 583 F.2d 1014 (8th Cir. 1978), *cert. denied*, 439 U.S. 1116 (1979), in which the Court reversed the mail fraud conviction of a state legislator who, in return for a 10% commission, invoked the influence of his office in recommending a particular architectural firm for state contracts. Honest services fraud, the Court stated, occurred "where dishonest conduct by a public official directly implicates the functions and duties of that official's public office." *Id.* at 1024.

Rabbitt's conviction could not stand, the Court continued, because he did not exercise discretionary decisionmaking power over the award of state architectural contracts:

> We . . . find no evidence that Rabbitt's conduct deprived the citizens of their right to honesty and fairness in the conduct of his official duties. *Rabbitt did not, in his official capacity, control the awarding of state contracts to architects.*

*Id.* at 1026 (emphasis added). *See United States v. McNeive*, 536 F.2d 1245, 1250 (8th Cir. 1976)(reversing conviction of city plumbing inspector because charged scheme did not interfere with his discretionary functions or with the legislative functions of the city).[3] *See also United States v. Panarella*, 277 F.3d 678 (3d Cir.)(upholding conviction where senator both spoke and voted against proposed legislation that would have harmed defendant's interests), *cert. denied*, 537 U.S. 819 (2002).

Here, nothing in Celona's activities directed toward advocating with municipal officials that they comply with the applicable protocols which required that, in all except emergency situations, they comply with the patient's choice as to the hospital to which they would be conveyed implicated in any way Celona's discretionary legislative decisionmaking, nor did Celona's facilitation of meetings between RWMC and Blue Cross/Blue Shield and United. These activities did not, in short,

---

3

*Rabbitt* and *McNeive*, the First Circuit said in *Sawyer I*, "illustrate that although a public official might engage in reprehensible misconduct *related to an official position*, the conviction of that official for honest services fraud cannot stand where the conduct does not actually deprive the public of its right to her honest services, and it is not shown to intend that result." 85 F.3d at 725 (emphasis added).

fall within the scope of Celona's official duties over which he had discretionary decisionmaking authority and cannot, therefore, form the predicate for an honest services fraud conviction of Urciuoli under either a "bribery" theory or under an undisclosed-conflict-of-interest theory.

*United States v. Potter*, 463 F.3d 9 (1st Cir. 2006), is not to the contrary. In *Potter*, the defendants argued that the government had not proven that they sought to have the Rhode Island Speaker of the House misuse his official power because he routinely recused himself in all matters which might affect the interests of Lincoln Park because of his law partner's representation of that entity. Rejecting that argument, the Court stated: "It is common knowledge that powerful legislative leaders are not dependent on their own votes to make things happen. The honest services that a legislator owes to citizens fairly include his informal and behind-the-scenes influence *on legislation*." *Id.* at 18 (emphasis added). *See also id.* (noting the link between defendants' proposed payment and "specific legislative ends"). Here, neither the destination of rescue runs nor the contractual negotiations between RWMC and Blue Cross and United were in any way related to Celona's official duties. They did not involve legislative decisionmaking, either directly – such as through Celona's discretionary decisions regarding how to vote on legislative matters – or indirectly – such as through any efforts to influence the course of legislation or to influence the votes of other legislators. Thus, in tasking Celona to intercede with municipalities regarding the rescue run issue and in requesting that he set up meetings between Urciuoli and the CEOs of Blue Cross and United, Urciuoli did not "inten[d] to cause [Celona] to alter his official acts." *Woodward*, 149 F.3d at 55, 70; *Sawyer I*, 85 F.3d at 741. Celona's actions with respect to these matters did not deprive the public of "disinterested decisionmaking" in his official capacity, nor were they intended to do so, whether viewed from the perspective of the bribery or the undisclosed-conflict-of-interest forms of honest

services fraud. There was, in sum, with respect to these activities, no intent to influence or affect Celona's *official duties*. *See Sawyer II*, 239 F.3d at 41 (defendant must have intended to influence legislator in his official action); *Sawyer I*, 85 F.3d at 732 (defendant must have the intent to affect a legislator's performance of an official act).

Urciuoli's challenge to the Court's instructions and its concomitant failure to instruct the jury as requested in Proposed Instruction No. 13 raises, at a minimum, a "substantial question" regarding the propriety of the Court's instructions to the jury regarding the elements of honest services fraud. If the First Circuit agrees with Urciuoli that this Court's instructions define a legislator's official duties in an erroneously broad manner, that conclusion is likely to result in an order for a new trial. If Urciuoli is correct, then this Court's instructions permitted the jury to convict Urciuoli based upon conduct that falls outside the reach of the federal mail fraud statute. The rescue run issue and the insurance company meetings were a central focus of the government's case – in the indictment, throughout the evidence, and in its closing arguments, and the court's instructions to the jury permitted it to convict Urciuoli based upon these activities by Celona, which fall outside the scope of Celona's official duties.[4] "When a jury has been presented with several bases for conviction, one of

---

[4] The indictment charged that it was part of the conspiracy that Urciuoli "direct[ed] Celona to use his influence, power and authority . . . to influence people and companies who had interests before the Rhode Island General Assembly and were doing business with RWMC and its affiliates in a manner intended to financially benefit RWMC and its affiliates." Indictment ¶19(d). Paragraph 101(d) similarly charged that the same conduct was part of the scheme to defraud. This charged object is, for the reasons addressed in this section, invalid as a matter of law. Urciuoli moved prior to trial to dismiss so much of the indictment as charged honest services fraud in conjunction with the rescue run issue and the insurance company meetings, *see* Memorandum of Law in Support of Defendant Robert A. Urciuoli's Motion to Dismiss the Indictment (Doc. 51). Had the motion been

which is legally erroneous, and it is impossible to tell which ground the jury convicted upon, the conviction cannot stand." *Sawyer I*, 85 F.3d at 730-31. *See Yates v. United States*, 354 U.S. 298, 312 (1957)("In . . . circumstances [where the jury has been charged with a misstatement of the law] we think the proper rule to be applied is that which requires a verdict to be set aside where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected"). Therefore, this issue amply satisfies the requirements for the granting of bail pending appeal.

While this Court has denied Urciuoli's motion for judgment of acquittal or, in the alternative, for a new trial and, in doing so, rejected Urciuoli's challenge to the Court's instructions, the Court need not be convinced that it erred in order to grant a defendant bail pending appeal. Indeed, as addressed in Section I, *supra*, it would be error for the Court to apply such an exacting – and virtually insurmountable – standard. *See Bayko*, 774 F.2d at 522-23 (Congress did not intend "to make the availability of bail pending appeal subject to a 'Catch-22' interpretation. Therefore, we reject the construction which would make bail contingent upon a finding by the district court that it is likely to be reversed").[5]

---

granted, as it should have been, the evidence relating to the rescue run issue and RWMC's negotiations with Blue Cross and United would not have been before the jury. Even if the evidence were arguably admissible under Fed. R. Crim. P. 404(b), and Urciuoli disputes that it would have been, Urciuoli would have been entitled to an instruction limiting the uses to which the jury could put the evidence, *see, e.g., United States v. Escobar-deJesus*, 187 F.3d 148, 169 n.20 (1st Cir. 1999), which would not have included using that conduct as a predicate for mail fraud convictions.

5

For example, district courts which have permitted convictions to stand in the face of challenges to the court's instructions or to the sufficiency of evidence have nonetheless granted bail pending appeal where the defendant intended to renew those challenges on appeal. *See, e.g., United States v. Quinn*, 416 F.Supp.2d 133, 135-36 (D.D.C. 2006); *United States v. Hart*, 906 F.Supp. 102, 106 (N.D.N.Y. 1995); *United States v. Henson*, 663 F.Supp. 1112, 1114 (W.D.Ky. 1987). *See also*

## II. THE ISSUES OF THE COURT'S INSTRUCTIONS TO THE JURY REGARDING COMPLIANCE WITH STATE LAW AND THE SUFFICIENCY OF THE EVIDENCE TO SUPPORT AN HONEST SERVICES CONVICTION PRESENT SUBSTANTIAL QUESTIONS ON APPEAL WHICH, IF DECIDED IN URCIUOLI'S FAVOR, ARE LIKELY TO RESULT IN REVERSAL OF HIS CONVICTIONS OR AN ORDER FOR A NEW TRIAL.

At trial, the government advanced three categories of conduct by Urciuoli and Celona to support its theory of honest services fraud: (1) the rescue runs, (2) the meetings involving Celona, Urciuoli, Blue Cross, and United, and (3) various legislative matters. The first two categories of conduct cannot, for all the reasons addressed in the preceding section, support a conviction for honest services fraud as a matter of law, as they did not involve any official legislative action by Celona. Nor can the evidence regarding Celona's participation in matters relating to general health care legislation form the basis of an honest services violation by Urciuoli. The essence of honest services fraud is the fact that the public is deprived of that to which it is entitled – the public official's honest and faithful service. *See Sawyer I*, 85 F.3d at 724; *see also United States v. Mandel*, 591 F.2d 1347, 1362 (4th Cir. 1979), *cert. denied*, 445 U.S. 961 (1980). It follows, then, that if the legislator's actions conform with the applicable state law governing his conduct, the citizens are not deprived of that official's honest services as a matter of law. As the *en banc* Fifth Circuit has stated:

> We will not lightly infer that Congress intended to leave to courts and prosecutors, in

---

*United States v. Eaken*, 995 F.2d 740, 740-42 (7th Cir. 1993)(granting bail pending appeal on sufficiency of evidence issue); *United States v. Steinhorn*, 927 F.2d 195, 196 (4th Cir. 1991)(granting bail pending appeal on instructions issue); *United States v. Messerlian*, 793 F.2d 94, 96-97 (3d Cir. 1986)(same).

> the first instance, the power to define the range and quality of services a state employer may choose to demand of its employees. We find nothing to suggest that Congress was attempting in §1346 to garner to the federal government the right to impose upon the states a federal vision of appropriate services – to establish, in other words, an ethical regime for state employees. . . . Under the most natural reading of the statute, a federal prosecutor must prove that the conduct of a state official breached a duty respecting the provision of services owed to the official's employer under state law. Stated directly, the official must act or fail to act contrary to the requirements of his job under state law. *This means that if the official does all that is required under state law, alleging that the services were not otherwise done "honestly" does not charge a violation of the mail fraud statute. The statute contemplates that there must first be a breach of a state-owed duty.*

*United States v. Brumley*, 116 F.3d 728, 734 (5th Cir.)(*en banc*)(emphasis added), *cert. denied*, 522 U.S. 1028 (1997).

Here, the evidence established that Urciuoli and Driscoll, through the attorney acting on behalf of RWMC, made disclosure to the Ethics Commission of the potential for conflicts of interest in Celona's legislative duties raised by his consulting agreement. Following that disclosure, the mechanism established by Rhode Island law, *i.e.*, review by the Ethics Commission, took its course. In rendering its decision, the Ethics Commission drew a distinction between unacceptable conflicts of interests – participating in legislation relating to assisted living facilities – and acceptable conflicts of interest – participation in legislation relating to nursing homes, hospitals, and general health care issues. The Ethics Commission expressly permitted Celona to "fully participate and vote" on matters involving "general health care issues of public interest," provided he filed the requisite Section 6 notices. Celona's participation in broad-based, general health care legislation did not, therefore, deprive the citizens of Rhode Island of something to which they were entitled.

All but one of the legislative initiatives charged in the indictment was "broad-based legislation involving general health care issues of public interest," and Celona's participation as to

those bills therefore fell within the parameters of the conduct authorized by the Ethics Commission.[6] Accordingly, Celona's activities with respect to that legislation cannot provide the predicate for an honest services fraud conviction of Urciuoli.

The Court denied Urciuoli's request that the jury be instructed as follows:

> In order for there to be a scheme to defraud the citizens of Rhode Island of a legislator's honest services, you must consider the Rhode Island Code of Ethics as it pertains to legislators and any applicable rulings by the Rhode Island Ethics Commission, such as the ruling involved in this case. Because Rhode Island law expressly permits a legislator to participate and vote on legislation where the legislator has a conflict of interest under some circumstances, you must consider

---

6

As to that one exception, while there was evidence that the bone marrow legislation nominally related to Roger Williams Hospital, Rep. Barr testified that the bill did not have any direct impact on the hospital, financially or otherwise, and that it was never his intent that it would have. *See* Tr. 9/26/06 at 194-96, 203, 205, 207, 217. According to Celona, his activities with respect to that bill were limited to inquiring, and being informed, that there was an error in the bill. Tr. 9/15/06 at 32-35. Even if, however, this bill were to be regarded as falling outside the scope of the activities permitted by the Ethics Commission opinion, Celona's activities with respect to the bone marrow legislation all took place in February, 1999. *See* Indictment ¶¶65-67. The indictment was returned on January 5, 2006. Section 371 conspiracies being subject to a five-year statute of limitations, activities relating to the bone marrow legislation would not supply an overt act in furtherance of the charged conspiracy within the limitations period and could not, therefore, by itself provide a basis for conviction on Count I.

As to all the remaining legislation on which the government relied, the Alzheimer's legislation affected equally all hospitals and nursing homes in Rhode Island. The conversion legislation affected equally all hospital conversions involving for-profit and not-for-profit corporations. The moratorium legislation never made it to a vote, and Celona recused himself with respect to its companion bill. The Cancer Council legislation affected equally all hospitals and other cancer care providers in Rhode Island. The PILOT legislation extended beyond the health care industry to all tax-exempt entities in Providence. The ovarian cancer legislation was not even targeted at hospitals or health care facilities. Moreover, Celona's activities with respect to the Alzheimer's legislation took place in 1998, Indictment ¶¶33-34; his activities with respect to the conversion legislation took place in 1998-99, *id.*, ¶¶39-40, 47-48; his activities with respect to the moratorium legislation took place in 1999-2000, *id.*, ¶¶50-53; his activities with respect to the Cancer Council legislation took place in 1999-2000, *id.*, ¶¶54-60; his activities with respect to the PILOT legislation took place in 1999, *id.*, ¶¶61-64; his activities with respect to the ovarian cancer legislation took place in 2000, *id.*, ¶71. Therefore, none of these activities could supply the requisite overt act in furtherance of the conspiracy charged in Count I.

> whether the alleged scheme in this case violates applicable Rhode Island ethics statutes and the ethics opinion in this case.
>
> R.I. Gen. Laws §36-14-7(b) states that a person subject to the Rhode Island Code of Ethics, such as John Celona, does not have an interest which is in substantial conflict with the proper discharge of his duties in the public interest and of his responsibilities as prescribed by the laws of this state, if any benefit or detriment accrues to him or any business associate, or any business by which the person is employed or which the person represents, as a member of a business or group, or of any significant and definable class of persons within the business or group, to no greater extent than any other similarly situated member of the business or group, or of the significant and definable class of persons within the business occupation or group.
>
> The Rhode Island Ethics Commission expressly permitted Celona to "fully participate and vote" on matters concerning "broad-based legislation involving general health care issues of public interest," so long as he filed a §6 notice disclosing the potential conflict of interest. It determined that Celona's participation in "[g]eneral legislation relating to elderly affairs, nursing home issues and hospital regulations" was permissible under R.I. Gen. Laws §36-14-7(b), because "any benefit or detriment accruing to the Senator and/or the Village/affiliates would affect them to no greater extent than any other similarly situated members of a significant and definable group."
>
> In other words, the Ethics Commission determined that, notwithstanding Celona's relationship with RWMC, Celona's participation in "broad-based legislation involving general health care issues of public interest" was a permissible conflict of interest and that Celona's participation in broad-based, general health care legislation, therefore, did not deprive the citizens of Rhode Island of something to which they were entitled.
>
> Therefore, if you find that Celona's involvement in one or more of the legislative bills referenced in the Indictment affected RWMC or any of its affiliates no more or no less than other similar entities, then you cannot find a violation of the honest services mail fraud doctrine based on Celona's participation in that legislation.

Proposed Instruction No. 15 (Doc. 162). While the Court criticized this instruction during the January 11, 2007, hearing as unduly lengthy and confusing, the gist of the instruction was nonetheless a correct statement of the law, and the jury should have been instructed, whether in the language of Urciuoli's request or in some different form, that if the legislator's conduct comported

with the requirements of state law, then that conduct cannot, as a matter of law, provide the basis for a federal honest services fraud conviction, because the public would have received that to which it was entitled from the legislator in the performance of his official duties. The Court's failure to so instruct the jury, and the issue of the sufficiency of the evidence to support Urciuoli's convictions are "substantial questions" to be raised on appeal, which, if decided in Urciuoli's favor, will likely result in a reversal of his convictions or an order for a new trial. These issues, too, satisfy the requirements for the granting of bail pending appeal.

## CONCLUSION

For all the foregoing reasons, this Court should grant defendant Urciuoli's request that he be permitted to remain free on bail pending appeal.

Respectfully submitted,
By his attorneys,

/s/ Kristie M. Passalaqua
Kristie M. Passalaqua
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, RI 02903
(401) 274-2000
(401) 277-9600 (fax)
kpassalaqua@haslaw.com

Martin G. Weinberg (MA BBO# 519480)
*Pro Hac Vice Counsel*
20 Park Plaza, Suite 905
Boston, MA 02116
(617) 227-3700
(617) 338-9538 (fax)
owlmgw@att.net

Richard M. Egbert (MA BBO# 151800)
*Pro Hac Vice Counsel*
Richard Egbert Law Offices
99 Summer Street, Suite 1800
Boston, MA 02110
(617) 737-8222
(617) 737-8223 (fax)
regbert@egbertlaw.com

Michael J. Connolly (MA BBO# 638811)
*Pro Hac Vice Counsel*
Hinckley, Allen & Snyder LLP
28 State Street
Boston, MA 02109
(617) 345-9000
(617) 345-9020 (fax)
mconnolly@haslaw.com

Dated: January 29, 2007

**CERTIFICATION**

I hereby certify that on January 29, 2007, a copy of the foregoing Motion for Bail Pending Appeal and Incorporated Memorandum of Law was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Kristie M. Passalacqua