UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA :
:
v. : Cr. No. 06-02-T
:
ROBERT A. URCIUOLI and :
FRANCES P. DRISCOLL :

**DEFENDANT ROBERT A. URCIUOLI'S SENTENCING MEMORANDUM**

Defendant Robert A. Urciuoli submits this memorandum for the Court's consideration in conjunction with his sentencing on January 31, 2007. In keeping with the analytical framework prescribed by the First Circuit, this memorandum will first address the advisory guidelines calculations, first arguing that there should not be an 18-level increase in the USSG §2C1.7 base offense level pursuant to USSG §2B1.1(b)(1)(J), based upon a putative "value" obtained of $5.6 million. As this memorandum will demonstrate, imposition of such an enhancement would be erroneous as both a matter of fact and of law, as there is no record support for a conclusion that Roger Williams Medical Center ("RWMC") received a "value" of $5.6 million as the result of Celona's facilitation of a meeting between Urciuoli and Ronald Battista, the CEO of Blue Cross/Blue Shield ("BC/BS"). Because there is *no* evidence that the amount of money paid by BC/BS to RWMC was the result of anything which Celona said or did – indeed, Battista's testimony is unequivocally to the contrary – the offense level enhancement from the §2B1.1 table should be predicated on the value of the payments to Celona, adjusted to reflect the value of the legitimate consulting services performed by Celona.

Second, this memorandum will address grounds for a downward departure, namely, that if the value used to determine the §2C1.7 offense level is the $5.6 million paid to RWMC by BC/BS,

that figure substantially overstates the seriousness of the offense. Finally, this memorandum will address the reasons why the 18 U.S.C. §3553(a) factors warrant a sentence below the applicable guidelines sentencing range ("GSR"), however calculated.

## I. THE APPLICABLE SENTENCING FRAMEWORK.

### A. The First Circuit's Post-*Booker* Sentencing Framework.

After *United States v. Booker*, 543 U.S. 220 (2005), the guidelines "are merely advisory, which means that a district court has considerable leeway to impose a sentence that falls outside of the range suggested by the guidelines." *United States v. Robinson*, 433 F.3d 31, 35 (1st Cir. 2005). *See United States v. Jimenez-Beltre*, 440 F.3d 514, 518 (1st Cir. 2006)(*en banc*)("*Booker*'s remedial solution makes it possible for courts to impose nonguidelines sentences that override the guidelines, subject only to the ultimate requirement of reasonableness"); *United States v. Pho*, 433 F.3d 53, 61 (1st Cir. 2006)("district courts now possess greater flexibility in reaching individual sentencing decisions"). To avoid replicating the mandatory guidelines scheme invalidated in *Booker*, the guidelines are not to be treated as presumptively controlling, but they do "continue to be an important consideration in sentencing that should be addressed in the first instance by the sentencing judge." *Jimenez-Beltre*, 440 F.3d at 518. *See, e.g., United States v. Brown*, 450 F.3d 76, 82 (1st Cir. 2006); *United States v. Navedo-Concepcion*, 450 F.3d 54, 57 (1st Cir. 2006).

Thus, the first task for the sentencing judge in the post-*Booker* universe is to calculate the GSR, "including the resolution of any factual or legal disputes necessary to that calculation," *Jimenez-Beltre*, 440 F.3d at 518, and that guidelines calculation must be correct. *Robinson*, 433 F.3d at 35. Second, the judge must determine whether any departures are warranted under the guidelines. *See, e.g., Jimenez-Beltre*, 440 F.3d at 518. The GSR, "taking applicable departures into account, is the *starting* point for the analysis . . . ." *United States v. Saez*, 444 F.3d 15, 17 (1st Cir.

2006)(emphasis added). *See, e.g., United States v. Anderson*, 452 F.3d 87, 94 (1st Cir. 2006). Once the court has established the GSR, including applicable departures, "it must then evaluate the sentencing factors set out in . . . §3553(a), along with any other relevant considerations." *United States v. Dixon*, 449 F.3d 194, 204 (1st Cir. 2006). *See, e.g., United States v. Zapete-Garcia*, 447 F.3d 57, 59 (1st Cir. 2006); *United States v. Smith*, 445 F.3d 1, 4 (1st Cir. 2006); *Jimenez-Beltre*, 440 F.3d at 518-19. The final determination which the court must make is whether those factors warrant a sentence above or below the GSR, *after* departures have been taken into account. *See, e.g, United States v. Wallace*, 461 F.3d 15, 32 (1st Cir. 2006); *Smith*, 445 F.3d at 5; *Jimenez-Beltre*, 440 F.3d at 518-19.[1] Ultimately, the goal of the sentencing judge must be "to fashion 'a sentence sufficient, but not greater than necessary,' for the achievement of the legitimate objectives of sentencing." *Dixon*, 449 F.3d at 204, *quoting* §3553(a).

**B. Enhancing Urciuoli's Sentence Based Upon Judicial Fact-finding As To the Amount of the "Value Obtained" For Purposes of Applying the §2B1.1 Loss Table Violates the Jury Trial Guarantee of the Sixth Amendment.**

On January 22, 2007, the Supreme Court issued its decision invalidating California's determinative sentencing law as violative of the Sixth Amendment jury trial guarantee. That law "assign[ed] to the trial judge, not to the jury, authority to find the facts that expose a defendant to an

---

[1] That a factor is discouraged or even forbidden under the guidelines does not exclude it from consideration when the court is weighing §3553(a) factors apart from the guidelines. *Smith*, 445 F.3d at 5. Thus, after *Booker*, the Court may also consider formerly discouraged or even prohibited factors such as Urciuoli's age (§5H1.1), his education and vocational skills (§5H1.2), his employment record (§5H1.5), his family ties and responsibilities (§5H1.6), and his charitable and civic contributions (§5H1.11). *See* 18 U.S.C. §3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court . . . may receive and consider for the purpose of imposing an appropriate sentence"). Moreover, a defendant need not make an "extraordinary showing" for a sentence below the GSR to be warranted and reasonable. *United States v. Rivera*, 448 F.3d 82, 85 (1st Cir. 2006). *See also United States v. Vasquez-Rivera*, 470 F.3d 443, 449 (1st Cir. 2006)(*Jimenez-Beltre* "makes it clear that a case need not be unusual for a sentencing court to consider the other factors in 18 U.S.C. §3553(a)").

elevated 'upper term' sentence. The facts so found are neither inherent in the jury's verdict nor embraced by the defendant's plea, and they need only be established by a preponderance of the evidence, not beyond a reasonable doubt." *Cunningham v. California*, 2007 WL 135687 at *4 (U.S. January 22, 2007). The question before the Court was "whether the DSL, by placing sentence-elevating fact-finding within the judge's province, violates a defendant's right to trial by jury safeguarded by the Sixth and Fourteenth Amendments." *Id.* The Court held, by a 6-3 vote, that it did, following the now-familiar trilogy of *Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Blakely v. Washington*, 542 U.S. 296 (2004), and *Booker*.[2]

Although the remedy opinion in *Booker*, which concluded that the Sixth Amendment defect which invalidated the mandatory guidelines would be eliminated if the guidelines were rendered advisory, was not directly impacted by *Cunningham*, the guidelines, like the California statute invalidated in *Cunningham*, "plac[e] sentence-elevating fact-finding within the judge's province"

---

2

In *Apprendi*, the Supreme Court held that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. In *Blakely*, the Court made clear that "statutory maximum" for *Apprendi* purposes is not the maximum sentence allowable under the statute of conviction but is instead

> the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*. . . . In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum sentence he may impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts which the law makes essential to the punishment, . . . and the judge exceeds his proper authority.

*Id.* at 303 (emphasis in original; internal quotation marks omitted). In *Booker*, a 5-4 majority of the Court, following *Blakely*, concluded that the mandatory federal sentencing guidelines violated the Sixth Amendment jury trial guarantee, reiterating that "'[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." 543 U.S. at 244.

and do so by a preponderance of the evidence.[3] Even under the First Circuit's *Jimenez-Beltre* formulation, which eschewed the approach of the circuits which regard a sentence within the guidelines as presumptively reasonable, the advisory guidelines continue to play, both as a matter of law and of practice, a central role in the sentencing determination, as the starting point for the assessment of whether other factors warrant a sentence above or below the GSR. That being the case, it is Urciuoli's position that increasing his guidelines offense level above the base offense level of 10 – the highest level that could be supported by the jury's verdict alone – based upon judicial fact-finding by a preponderance of the evidence violates the Sixth Amendment jury trial guarantee. Accordingly, because the jury made no findings regarding the "value obtained," Urciuoli contends that the Court is precluded from increasing Urciuoli's offense level based upon its own fact-finding by a preponderance of the evidence regarding the "value obtained" as the result of the offense. Urciuoli's offense level should, therefore, be no higher than 10.

## II. THE ADVISORY GUIDELINES CALCULATION SHOULD NOT BE PREDICATED ON THE VALUE OF THE PAYMENTS FROM BC/BS TO RWMC.

Urciuoli's offense level should not be increased by 18 levels based on the $5.6 million paid by BC/BS to RWMC. Instead, Urciuoli's total offense level should be no higher than level 18. The record is devoid of support for the proposition that *any* of the $5.6 million which BC/BS agreed to reimburse RWMC was attributable to Celona's actions. The government has not sustained, and will not be able to sustain, its burden to prove that Celona's involvement in the meetings attended by

---

[3] The three dissenting justices in *Cunningham* found the California sentencing law "indistinguishable in any constitutionally meaningful respect from the advisory Guidelines scheme that the Court approved in *Booker*" because "[b]oth sentencing schemes grant trial judges considerable discretion in sentencing; both subject the exercise of that discretion to review for "reasonableness"; and both – the California law explicitly and the federal scheme implicitly – require a sentencing judge to find some factor to justify a sentence above the minimum that could be imposed based solely on the jury's verdict. 2007 WL 135687 at *17 (Alito, J., dissenting).

Celona, Urciuoli, and Ron Battista, the CEO of BC/BS, had *any* effect whatsoever on the reimbursement payments made by BC/BS to RWMC, let alone that BC/BS's willingness to make reimbursement payments in the amount of $5.6 million was the result of the payments to Celona. Predicating the guidelines calculation on the $5.6 million figure would require the conclusion that BC/BS would not have paid *any* of the $5.6 million to RWMC absent Celona's political influence, a theory squarely contradicted by the testimony of Battista, which established clearly that BC/BS paid *no* additional monies to RWMC because of Celona's involvement. Battista's testimony establishes that there was *no* causal connection between Celona's involvement and the $5.6 million paid by BC/BS to RWMC.

**A. The Evidence at Trial.**

Battista testified that some time in October or November, 2002, Urciuoli spoke with him regarding the hospital's having trouble making ends meet and said that he thought BC/BS was part of the problem; Urciuoli further told him that if the problem was not addressed sooner rather than later, the hospital would cease to operate. Because Urciuoli did not have a history of crying wolf, Battista tended to believe what he said about the hospital's dire situation. Once Urciuoli raised the problem, Battista knew that it had to be addressed and that, as CEO of BC/BS, he had to address it. Tr. 9/26/06 at 229, 232, 236. The two men agreed at that time that there was a need for a meeting at which the problem could be discussed in greater detail. Tr. 9/26/06 at 230. Battista agreed to attend the meeting at Celona's office "because [he] knew what the issue was by that time, Mr. Urciuoli had educated [him] on that fact, and knew that the issue had to be addressed." Tr. 9/26/06 at 232.[4] Battista concluded based on his initial conversation with Urciuoli *alone* that if the hospital

---

4 Battista testified that it was not unprecedented for a legislator to set up a meeting with BC/BS and a provider. Tr. 9/27/06 at 87.

were to become financially insolvent, government processes would step in and reach a political solution; he did not need anyone to tell him this:

> Q. Now, at this time, sir, you had been an employee of Blue Cross since the early 1970's, correct?
> A. Yes.
> Q. You had been president since 1999; but prior to that, you were the executive vice-president, which is another senior position at Blue Cross, correct?
> A. Correct.
> Q. And you felt that you had a very good feeling for the political implications of serious financial issues at a major health care provider based on your experience, correct?
> A. That's correct.
> Q. And you concluded, based upon the conversations you had with Mr. Urciuoli alone, that if Roger Williams Hospital were to collapse, were to become financially insolvent, that the government processes would step in and reach a political solution, correct?
> A. Yes.
> Q. And you knew this from your experience, correct?
> A. That's correct.
> Q. Mr. Urciuoli didn't tell you that, correct?
> A. That's correct. He did not.
> Q. *You didn't need anybody to tell you that, correct?*
> A. *That's correct.*

Tr. 9/27/06 at 60 (emphasis added). Thus, Battista knew *before* any involvement by Celona that there was an issue which he, as CEO of BC/BS, had to address. Celona's participation in the meeting played no role:

> Q. [W]hat consideration, if any, did you give to Senator Celona's participation in the meeting at the time?
> A. *To the best of my recollection, none.* The hospital had a problem; and as the CEO of Blue Cross, I had to address it.

Tr. 9/26/06 at 232 (emphasis added). At the meeting, Celona just made brief introductory remarks regarding the hospital's being in trouble and said that he hoped the parties could address each other's problems; he did not say anything about legislative matters or try to negotiate. Tr. 9/26/06 at 233;

Tr. 9/27/06 at 64-66.[5]

Battista had developed the strategy he intended to pursue before the meeting. Tr. 9/26/06 at 236; Tr. 9/27/06 at 61, 67, 69.[6] That strategy was "both, from Blue Cross' point of view, offensive and defensive. We needed a fact based approach *that would withstand scrutiny regardless of whether or not the process resulted in more dollars or no dollars.*" Tr. 9/26/06 at 234-35 (emphasis added). This was the same approach which "could have been used with any other hospital who was requesting additional dollars." Tr. 9/26/06 at 235. The strategy that Battista devised before the meeting would provide "an objective basis to defend whatever decision Blue Cross made as a result of the review." Tr. 9/27/06 at 61. During the meeting, Battista took the position, from which he did not deviate, that no decisions would be made until an objective and independent outside audit of the hospital's operations was completed. Tr. 9/27/06 at 61-62, 70. Nothing Celona said or did during the meeting caused him to change his position or made him feel any pressure regarding pending legislation:

---

5

Celona confirmed that he told both parties at the meeting that he wanted them to "get along" and wanted each to be treated fairly. Tr. 9/15/06 at 165. He also confirmed that Battista said at the meeting that *if* NBC reported that BC/BS had "shortchanged" RWMC, BC/BS would pay RWMC the additional monies which the outside audit determined were due. *Id.*

6

Battista developed a strategy/proposal before the meeting because he knew "the State of Rhode Island and the authorities who populate it were not about to let a major health care institution go out of business in the State of Rhode Island. That left Blue Cross with two choices, either assist in a potential solution, get something in return, improve quality, perhaps get efficiencies going forward or the second alternative, which was not palatable to us, is have some sort of political solution thrust down our throats simply to save the institution." Tr. 9/26/06 at 236. He was concerned about the political ramifications based on knowledge gained through his 30 years of experience with BC/BS that the state of Rhode Island would not let an institution like Roger Williams Hospital go out of business. Tr. 9/27/06 at 52, 60.

Q. . . . . So to be absolutely clear, there was no mention [at the meeting] of any of the legislative issues . . . by Mr. Celona, correct?
A. No discussion of that, no.
Q. No mention of utilization review or prompt payment, correct?
A. That's correct.

* * * * *

Q. . . . . [A]t no point did Mr. Celona try to negotiate any of the issues that were in dispute, is that correct?
* * * * *
A. My recollection is that he did not try to negotiate the results.
Q. *Was there anything that Senator Celona did in the course of that meeting . . . that caused you to change your position in regard to the issues in play between Roger Williams and Blue Cross?*
A. *No.*

Tr. 9/27/06 at 64, 66 (emphasis added). *See also id.* at 63, 85-86. It is clear from this testimony that Battista went into the meeting with a proposal, from which he did not deviate, for how RWMC's entitlement, *if any*, to additional reimbursement would be determined. Had the result of the independent audit process been a report that indicated that RWMC should not be paid additional monies, Blue Cross would have paid *no* additional monies to RWMC, *regardless* of Celona's interest in the matter. In fact, according to Battista, his strategy was designed in part to provide BC/BS with an objective, defensible justification for declining to pay additional reimbursement to RWMC should the outside audit conclude that no additional monies were due to RWMC.

The amount paid to RWMC was based on a figure computed by an outside, independent consulting firm, which concluded that RWMC deserved additional money. Tr. 9/27/06 at 40, 73. The audit determined that BC/BS should pay RWMC an additional $3.6 million for calendar 2002; that figure was derived by adjusting RWMC's discount on BC/BS's Medicare supplemental product to reflect the average discount being received by other hospitals rather than the lesser discount which RWMC had been receiving. Tr. 9/27/06 at 44. There were also additional adjustments to be made

for 2003, which the independent audit determined to be $2 million. Tr. 9/27/06 at 43, 84-85. These monies were paid after BC/BS and RWMC resolved their outstanding most favored nation issues.

Thus, according to the government's own evidence, Celona's involvement in the matter had no effect on the amount of reimbursement paid by BC/BS to RWMC. Battista knew full well *before* he knew of Celona's interest in the issue what the potential ramifications were of not trying to find a solution – Urciuoli's having raised the issue alone sufficed for Battista to understand that there was a serious issue which he, as CEO of BC/BS, needed to deal with. While it is true, as the government states, that Battista testified that the meeting with Celona confirmed his own pre-existing opinion that there would be political ramifications if the hospital went under, Tr. 9/27/06 at 92, it is clear from his testimony that Celona's involvement was irrelevant to Blue Cross' determination to pay RWMC an additional $5.6 million in reimbursement. At no time did Battista indicate that concern regarding any political ramifications which might be directed at BC/BS by Celona motivated his willingness to address RWMC's financial problems. Quite the contrary: Battista's testimony made it abundantly clear that any amounts to be paid to RWMC would be solely dependent upon the outcome of the independent audit by NBC. If that audit determined that RWMC was entitled to no additional monies, no additional monies would have been paid. Had the audit determined that some amount less than $5.6 million should be paid by Blue Cross, then it would have been that lesser amount that would have been paid. Thus, the record is devoid of support for the proposition that Celona's involvement affected by so much as a penny the amount paid by BC/BS to RWMC.

### B. Urciuoli's Guidelines Offense Level Cannot Be Predicated Upon BC/BS's $5.6 Million Payments to RWMC Because They Did Not Result From Celona's Facilitation of the Meeting.

USSG §2C1.7(b)(1)(A) provides: "If the loss to the government or the value of anything obtained or to be obtained by a public official or others acting with a public official, whichever is

greater . . . exceeded $5,000, increase by the number of levels in from the table in §2B1.1 . . . ." Section 2C1.7 has since been consolidated with §2C1.1, and it is therefore reasonable to look to that section for the definition of "value," which is cast in §2C1.1 in terms of "benefit."[7] *See United States v. Lenoci*, 377 F.3d 246, 255 (2d Cir. 2004)(§§2C1.1 and 2C1.7, "while not identical, are virtually identical"). Application Note 2 to §2C1.1 specifies that the value of the benefit received is the net benefit; for example, if a $150,000 contract on which a $20,000 profit was made was awarded in return for a bribe, the value of the benefit would be $20,000. *See United States v. Quinn*, 359 F.3d 666, 680 (4th Cir. 2004); *United States v. Kant*, 946 F.2d 267, 269 (4th Cir. 1991). To permissibly be counted as part of the value/benefit, the value/benefit must have been received *in return for* the payment. *See United States v. Griffin*, 324 F.3d 330, 366-67 (5th Cir. 2003)(excluding various amounts from the calculation of the value of the benefit because they were not related to the bribe); *United States v. Frega*, 179 F.3d 793, 812 (9th Cir.1999)(referring to "but for" causation); *United States v. Schweitzer*, 5 F.3d 44, 47 (3d Cir.1993)(benefit must be received as the result of the bribe).[8] In sum, the court's task is to determine "the difference between what did happen as a result

---

7

References herein to §2C1.1 are, unless otherwise noted, to the 2003 edition of the guidelines.

8

In *United States v. Jackson*, 876 F.Supp. 1208 (D. Kan. 1994), *aff'd sub nom. United States v. Martinez*, 76 F.3d 1145 (10th Cir. 1996), the court declined to peg the value of the benefit at the amount of insurance overpayments, stressing that the benefit must be *the result of* the bribery scheme, because "[t]he amount of insurance overpayments may be a measure of benefit, but to calculate its net value, one needs to know what Parkview Hospital would have been able to recover or what the patients would have been financially able to pay without the blanket waiver . . . ." *Id.* at 1216. The Court concluded that the government had not met its burden to prove that the bribery conspiracy caused a benefit to the hospital "in some amount capable of reasonable estimation." *Id. See also United States v. Sapoznik*, 161 F.3d 1117, 1119 (7th Cir. 1998)("It is clear that the bribes contributed to illegal gambling; it is profoundly unclear how much they contributed to the profits of illegal gambling"); *United States v. Cohen*, 171 F.3d 796, 803 (3d Cir. 1999)(under §2B1.4 (commercial bribery), court must determine net value derived as the result of bribe); *United States*

of the bribe and what would have happened if not for the bribe." *United States v. Pena*, 268 F.3d 215, 221 (3d Cir. 2001). *See United States v. Leon*, 2 F.Supp.2d 592, 597 (D.N.J. 1998).

Nothing in the guidelines suggests that the Commission intended "value" in §2C1.7 to be interpreted differently from "benefit" in §2C1.1: the value or benefit received *as the result of* the payments. Indeed, the contrary is suggested by its 2004 consolidation of §2C1.7 into §2C1.1. The purpose of §2C1.1 is "to measure the true harm from the crime," *United States v. Muhammad*, 120 F.3d 688, 701 (7th Cir. 1997), and §2C1.7 should be interpreted in the same vein. *See also* §2C1.1, comment. (backg'd)("for deterrence purposes, the punishment should be commensurate with *the gain* to the payer or the recipient of the bribe, whichever is greater" (emphasis added)). Like the §2C1.1 "benefit", the §2C1.7 "value" is to be determined by reference to the §2B1.1 loss table, the purpose of which is to measure the seriousness of the offense. *See* §2B1.1, comment. (backg'd)("loss serves as a measure of the seriousness of the offense and the defendant's relative culpability"). The "true harm" here, if any, can be measured only by an assessment of what additional monies RWMC received from BC/BS that it would not have received absent Celona's involvement. Based on the existing record, the answer is: none.

The government has the burden to prove an amount of value/benefit that resulted from the payments to Celona. *See, e.g., Quinn*, 359 F.3d at 680; *Sapoznik*, 161 F.3d at 1119; *Jackson*, 876 F.Supp. at 1214. It does not do this by simply stating that BC/BS paid a specified gross amount of money to RWMC after the meeting with Celona. There is nothing in the record which remotely suggests that so much as a penny of the reimbursement which BC/BS paid RWMC had any connection to Celona's involvement in the matter or to Celona's facilitation of a meeting between

---

*v. Arnone*, 973 F.Supp. 206, 211 (D.Mass. 1997)(§2B1.4 calculations revolve around what the borrower would have received without the officer's improper assistance).

the parties – a meeting which Battista and Urciuoli had already agreed should take place. Battista's testimony convincingly repudiates any contention that Celona's involvement had the slightest effect on how much BC/BS paid RWMC. In fact, the amount paid by BC/BS to RWMC was determined by outside auditors, and it was the auditors' report that convinced BC/BS that RWMC was deserving of additional reimbursement, not anything that Celona said or did or that his involvement implied.

It cannot therefore in any sense be said that RWMC obtained $5.6 million as the result of depriving the citizens of Rhode Island of the honest services of Celona. Urciuoli should not be assigned the same offense level as a defendant who wrongfully obtained $5.6 million which he would not otherwise have obtained but for his unlawful conduct or whose unlawful conduct caused the government to lose $5.6 million.

### C. Basing Urciuoli's Offense Level On the $5.6 Million BC/BS Payment Would Create An Untenable Disparity Between Celona's Offense Level and That Of Urciuoli and Is Unsupported In the Law.

The government has taken the position in conjunction with Celona's sentencing that the offense level should be based upon the amount of the payments he received, or $260,638.63, which would add 12 levels under §2B1.1, 6 levels *less* than the 18 levels added to Urciuoli's offense level. There is no basis in law or in fact for assigning a different "value obtained" amount to Urciuoli than to Celona. *See, e.g., United States v. Gillam*, 167 F.3d 1273, 1279 (9th Cir. 1999). Indeed, when the Commission consolidated §2C1.7 into §2C1.1, it stated: "offenders who abuse their positions of public trust are inherently more culpable than those who seek to corrupt them, and their offenses present a somewhat greater threat to the integrity of governmental processes." USSG App. C, Amend. 666. Thus, in the view of the Commission, it is Celona who is the more culpable, by virtue of his position as an elected official. Policy, too, therefore, counsels against attributing a greater "value" to Urciuoli than to Celona.

The government, having elected in the case of Celona to identify the applicable "value" for §2C1.7 sentencing purposes as the amount of the payments made to him, should not be heard to argue a different computation for Urciuoli. Not only, as previously addressed, is the $5.6 million not the appropriate measure of the value obtained in any event, but also the disparity produced between the sentences of Celona and Urciuoli by applying a different measure of "value" in each case is wholly unwarranted. If the appropriate starting place for the calculation of the sentences for Celona and for Driscoll[9] is the value of the payments to Celona, there is no principled basis for using a different measure in calculating Urciuoli's offense level, particularly where, in the view of the Commission, Urciuoli is the *less* culpable party.

Thus, the calculation of Urciuoli's offense level must be predicated upon the amount of the payments to Celona, not upon the amount BC/BS paid to RWMC. The gross amount of the payments to Celona are, however, only the starting point of the sentencing calculus. It is undisputed that Celona performed legitimate consulting and other activities on behalf of the Village and promoting RWMC's senior services and continuity of care program. Indeed, the record is replete with instances of such entirely legitimate services performed by Celona for which he was entitled to be compensated.[10] Thus, if the §2B1.1 loss table is to reflect the seriousness of the offense and the

---

9

Urciuoli understands that, with respect to the sentencing of Frances Driscoll, the government took the position that because the "value" of the payments to Celona during Driscoll's tenure at RWMC produced an increase of less than 8 levels under §2B1.1, her offense level should be determined based upon the 8-level increase required under §2C1.7(b)(1)(B) because the offense involved a public official.

10

For example, Richard Gamache, Vice-President and Administrator of Elmwood Extended Care, testified that during a 12-month period, Celona referred 6 patients to the nursing home affiliated with RWMC, for a total revenue of $378,000. Tr. 9/25/06 at 45. He estimated that Celona referred 3-5 patients per year to the nursing home. *Id.* at 47. An additional document that was not admitted indicated that Gamache's analysis was that Celona's referrals would have generated

degree of the defendant's culpability, the gross amount of the payments to Celona must be reduced to reflect the legitimate services he performed, as such payments cannot be deemed to be part of the offense of conviction, as they did not deprive the citizens of Rhode Island of the honest services of Celona but were instead valid payment for legitimate consulting services. Sentencing Urciuoli based on the full amount of the payments to Celona would be valid only if every cent paid to Celona were properly characterized as a political payoff, a conclusion refuted by the record.

Given the legitimate contributions of Celona to the Village and to RWMC's senior services, Urciuoli contends that the payments to Celona for political purposes do not exceed $120,000.[11] Therefore, the most which should be added under the §2B1.1 loss table is 8 levels, and Urciuoli's offense level should be no greater than 18, either under §2C1.7(b)(1)(A) or under §2C1.7(b)(1)(B), which requires the addition of 8 levels if "the offense involved an elected official . . . ." An offense level of 18 corresponds to a guidelines sentencing range of 27-33 months.

---

between $261,000 and $435,000 *per year* in revenue from 1998 to the time he left. *See* Tr. 9/25/06 at 48. Jennifer DeLuca testified that Celona attended marketing events and made presentations for the Village to both potential residents and to health care professionals, Tr.9/28/06 at 16-19, 44-46, 50-53, 56-57, 60, and participated in other marketing events sponsored by the Village, *see, e.g.*, *id.* at 33-35. She also testified that Celona addressed issues relating to the Village on his television show. *See, e.g., id.* at 36-42, 47-49, 53-55. Celona did indeed feature representatives of both the Village and the nursing home on his television shows, generating invaluable publicity, publicity which would have been extremely expensive to generate privately. *See* Tr. 10/2/06 at 153 (government describes Celona show on which Urciuoli and Gamache appeared as "a Tony Robbins infomercial puff piece"). Celona testified that he did as much as he could to promote the Village, attended events at the Village, and spoke to community groups about the Village. Tr. 9/14/06 at 147-48, 174-75. *See also* Tr. 9/18/06 at 148-52, 161-66.

[11] Under the §2B1.1 loss table, an amount of more than $120,000 is necessary to trigger the addition of 10 levels to the base offense level.

## III. A DOWNWARD DEPARTURE IS WARRANTED BECAUSE THE OFFENSE LEVEL DERIVED FROM THE §2B1.1 LOSS TABLE SUBSTANTIALLY OVERSTATES THE SERIOUSNESS OF THE OFFENSE.

Should Urciuoli's sentence be enhanced to a level greater than that for which he has advocated above (base offense level of 10 + 8), Urciuoli will contend that the Court should depart downward because that figure "substantially overstates the seriousness of the offense." §2B1.1, comment. (n.18(C)). This is, in *Koon* parlance, an "encouraged" departure. *See, e.g., United States v. Corry*, 206 F.3d 748, 751 (7th Cir. 2000); *United States v. Roen*, 279 F.Supp.2d 986, 990 (E.D.Wis. 2003). Even if the $5.6 million could permissibly be regarded as the "value obtained" for purposes of §2C1.7, which Urciuoli strenuously contests, Battista's testimony establishes that BC/BS's payment to RWMC would not have differed had Celona never become involved in the process by facilitating a meeting of the parties.

The $5.6 million is not, therefore, an accurate measure of any harm which resulted from the deprivation of Celona's honest services or, concomitantly, of the seriousness of Urciuoli's offense conduct. No one was injured in that amount, and no one gained that amount because of the payments to Celona. Certainly, Urciuoli personally gained no pecuniary benefit from the conduct on which his convictions were predicated. These payments constituted reimbursement to RWMC for services actually rendered to qualifying patients by RWMC. Critically, these payments – determined by an independent outside audit to be fairly due to RWMC – made it possible for RWMC to survive a financial crisis which threatened its very survival and enabled it to continue to provide high quality medical care to the citizens of Rhode Island. While the BC/BS payments unquestionably benefitted RWMC, they also, unlike the usual honest services fraud case, served the substantial public interest in ensuring the continued viability of RWMC and its availability as a community healthcare resource.

Celona's involvement with the $5.6 million payment was, at best, incidental. Sentencing Urciuoli at the same level as a defendant who personally put $5.6 million in his own pocket solely because of corrupt payments to a public official or as a defendant whose corrupt payments directly caused a loss to the government in the amount of $5.6 million would create a gross sentencing disparity which should be remedied through a downward departure.

## IV. THE §3553(a) FACTORS WARRANT THE IMPOSITION OF A SENTENCE BELOW THE ADVISORY GUIDELINES SENTENCING RANGE.

### A. The History and Characteristics of the Defendant (§3553(a)(1)).

The basics of Urciuoli's history and background are recounted in the PSR, and Urciuoli will not repeat that information here. Instead, this memorandum will focus on Urciuoli's close family ties, his outstanding record of contributions to the community, and his generous giving of his time and energies to help others, as eloquently attested in the remarkable outpouring of letters submitted to the Court on Urciuoli's behalf.

Urciuoli's history and characteristics are all overwhelming positive. He has a close-knit and loving family, and his presence in the lives of his wife and children is indispensable to them. Letter after letter describes Urciuoli's devotion to, and close, supportive involvement in the life of, his family and the individuals in it, including his wife of nine years, Donna Paolino Urciuoli, his 26-year old daughter Rebecca, his stepdaughters Mari and Kara, and his elderly father and mother, the latter of whom is disabled by Alzheimer's-related dementia. The love, respect, and devotion which his wife Donna has for him are painfully evident in every word she has written in her letter to the Court. As she summarized, sounding themes of compassion and generosity which recur throughout the letters submitted on Urciuoli's behalf:

> There is no hidden agenda with Robert Urciuoli. He is compassionate. He helps those in need. He believes that giving back to the community is a privilege and a responsibility. He

> is a devoted son. He is an incredible father to his daughter. He is an unbelievable stepfather. He is my soul mate, and a loving, thoughtful, and amazing husband. He is a man all are proud to call their friend.

Letter of Donna M. Paolino Urciuoli (Tab 1). An eloquent letter from Urciuoli's step-daughter Mari attests to the deep care and concern shown her by Urciuoli from the early stages of his relationship with her mother, providing her with invaluable love and support throughout her ultimately successful battle with a serious and debilitating eating disorder. She describes Urciuoli as "the most unselfish, trustworthy, calm, caring, and genuine man I have ever met." Letter of Mari M. Bianco (Tab 4). Urciuoli's daughter writes of his central role as "the main adult and mentor in [her] life":

> I am a very fortunate young woman because Robert Urciuoli is my Dad. He has provided me with so much and brought so much love into my life that I don't know what kind of a person I would've become without him. Although I have an adoptive Mother, my Father is the one that I have always gone to when I have problems, needed answers, or just wanted to talk. My Dad's shoulder is the one I cry on and it is his arms that comfort me. He has taught me about honesty, hard work, relationships, and loyalty to friends and family. He always told me "to listen and try hard." I have always worked hard. It is important to me for my Father to be proud of me. It is easy because he is such a good man and has given me so much.

Letter of Rebecca Ann Urciuoli (Tab 6).[12]

Not only has Urciuoli been an exemplary husband, father, son, and devoted family man, he has also devoted virtually all of his adult life – 35 years – to the good of Roger Williams Hospital and the patients and community it serves, developing it from a small, community hospital to a thriving medical center which was named one of the 100 best hospitals in the country in 1996 and

---

12 Urciuoli's father-in-law Joseph R. Paolino describes Urciuoli as "an honorable and caring individual" who "has a long history of going out of his way to help anyone in need" (Tab 2). His son-in-law Angelo J. Bianco regards Urciuoli as "a most exceptional man," whose "warmth and compassion for people is to be revered" (Tab 5). His brother-in-law Joseph R. Paolino, Jr. highlights Urciuoli's "loyalty and devotion to all members of his family," describing him as a "caring, compassionate, honorable human being" (Tab 8). Urciuoli, says his sister Deborah Urciuoli, "stays true to the core values put upon him by his parents regarding family and religion, friends, work ethic and giving back to the community" (Tab 9).

1998. As Theresa Rathbun, an employee of RWMC for 20 years, observes:

> In all my years at Roger Williams I have seen Mr. Urciuoli turn a struggling institution into a strong stable entity. It took all the strength, courage, faith, compassion he could muster to get the job done. . . . He did it with an open mind and heart, and without malice. He has respect and treats all he interacts with with respect. . . . Mr. Urciuoli has always put others and the hospital before himself. I've never known him to be anything but an open honest person deserving of respect and admiration. The only other person walking the lord's green earth that I respect and admire more is my own father. Hard working, honest, compassionate, strength, courage, humble, love for his work, his family, his community. That your Honor is Robert Urciuoli.

Tab 22.[13] Urciuoli's brother-in-law Joseph R. Paolino, Jr. writes:

> Bob's hard work and dedication to Roger Williams impressed me tremendously. He was a very committed non-profit advocate and was always promoting the Hospital and always looking for ways to improve the lives of the hospital's patients.
> * * * *
> Bob has always shown his integrity and commitment to his job and the Hospital he represented. He always worked hard to make Roger Williams fiscally solvent while other hospitals were closing. The health care crisis is real and Bob has worked diligently to make sure Roger Williams would stay strong.

Tab 8. Thomas DeNucci, M.D. states:

> I have never seen someone so passionate about keeping Roger Williams "on the map" and fulfilling a vital role in the community. I am thoroughly convinced that he is responsible for keeping that hospital alive. He is responsible for keeping a relatively small "stand alone" community hospital open, and providing excellent care to the people of the surrounding community and state. And it has not been easy. In this difficult and competitive environment of medical care, Bob dedicated his heart and soul to the hospital.

Tab 42. Stanley Aronson, M.D., former Dean of Brown Medical School, writes:

> Under his supervision, Roger Williams became a major center for superb health care delivery both within its catchment area and beyond. Urciuoli encouraged excellence in clinical care as well as fundamental research in medicine. He was instrumental in developing Rhode Island's first investigative and clinical center for stem cell research. The clinical laboratories

---

[13] On a more personal note, Ms. Rathbun, exemplifying the theme of Urciuoli's generosity and compassion which resounds throughout the letters submitted to the Court, describes Urciuoli's coming upon her in tears in the hospital corridor one day, asking her what was the matter, and, upon hearing that she feared losing her home to foreclosure because of her inability to pay her mortgage, writing her a personal check in the amount needed to save her home.

> at the hospital, during Urciuoli's tenure, evolved into one of the best in the state . . . . The hospital's department of medicine is now staffed by a superb cadre of full time physicians widely known for their clinical excellence.

Tab 46. According to Edward Iannuccilli, M.D., Urciuoli "was the single reason why the Roger Williams Hospital reached the highest academic and patient care status," and his decisions to improve patient care have saved thousands of lives. Tab 51.[14] In addition, absent Urciuoli's intervention, Rhode Island would still be without a single bed for patients needing hospice care in a hospital setting. *See* Letter of Martin M. Temkin (Tab 11); Letter of Analee Wulfkuhle (Tab 43).

Urciuoli's accomplishments at RWMC and his consistent striving to expand the facilities, to attract the best medical talent available, and to provide the best care possible for its patients are matched by his extraordinary contributions to the community over the years. These were not the figure-head activities expected of CEOs but instead reflect a dedication to making a personal contribution well above and beyond the norm. For example, R. Michael Smith, a member of Ernst & Young's Health Sciences Advisory Services Team, writes:

---

14

*See also* Letter of Linda Paolino (Tab 13)("From his first day at Roger Williams, Bob has strived to improve patient care and staff relations. And it is because of his perseverance and devotion that Roger Williams has metamorphosed into a distinguished and quality health care facility"); Letter of Dolores Gallo (Tab 14)(when Urciuoli became a vice-resident of Roger Williams, "it was a very small, older community hospital. With a tremendous deal of hard work, long hours, Bob nurtured an ailing community hospital and transformed it into a state-of-the-art Medical Center . . . . His dedication and commitment to that institution was uncompromised"); Letter of Joan Moran (Tab 20)("Bob's dedication to the hospital, his passion for his work, his expertise in operations and finance have always put him at the top of his peers. I have always been struck by Bob's incredible devotion to Roger Williams, its quality of care, and the employees that serve the institution"); Letter of Robert Davignon (Tab 32)(noting that he had "observed the love that Bob had for the hospital, staff, and patients"); Letter of Ursula Beauregard (Tab 33)("Bob is a man who has dedicated his adult life to the good of the hospital and the community it serves"); Letter of Fred Sataniello (Tab 77)("The quality of care provided by the Center today is a direct result of Bob's dedication to the betterment of Roger Williams. He accomplished this task through his professionalism, outgoing personality and his individual attention to people and their problems").

> CEOs of well-respected institutions are always asked, and expected to serve, of course, and some of their volunteerism is invested to bring returns to their own institutions, but few have amassed Mr. Urciuoli's record of distinguished and diverse community service . . . . He could have invested much less and still been a significant contributor to society, but he didn't . . . he rarely said no, and went above and beyond to volunteer where leadership and clout to get things done was needed (Untabbed letter).

As letter after letter attests, when Bob Urciuoli signed on to support an organization or a cause, he threw himself into it wholeheartedly, investing his personal time and efforts in the success of the venture and the achievement of its goals for the betterment of the community and individuals in it.[15] In 1997, he was the recipient of the Red Cross of Rhode Island's Outstanding Community Service Award. In 2002, the Public Education Fund honored him with its Friend of Education award.[16]

---

15

*See, e.g.*, Letter of Jane and Edward Ricci (Tab 15)(Urciuoli is "known for his generous spirit of giving within the community"); Letter of Melinda Penney (Tab 18)("his concern, compassion and loyalty for others reaches to causes far and wide"); Letter of Joseph Nagle (Tab 23)(noting that Urciuoli has given generously of his time and financial support for numerous charities); Letter of Linda Rossi (Tab 24)(Urciuoli has an "outstanding commitment to help others regardless of their social or economic status in the community" and is known for his many good deeds); Letter of Mary Warlop (Tab 25)(Urciuoli speaks annually at a high school career fair, inspiring students to consider health care as a career choice); Letter of Ellen Piccerelli (Tab 26)(Urciuoli has worked to serve the people of Rhode Island for more than thirty years); Letter of Hillary Salmons (Tab 40)(Urciuoli chaired the HELP Coalition, a group that invested hospital and college funds to improve the health and education of poor youth in Providence and advocated for the creation of the Health & Science High School); Letter of Alan Weinberg (Tab 41)(Urciuoli is "dedicated to improving the welfare of those less fortunate than he"); Letter of Analee Wulfkuhle (Tab 43)(Urciuoli has a "true belief that his job is to bring people and institutions together to make things happen for the good of all"); Letter of Michael Lally (Tab 44)(Urciuoli "dedicated himself selflessly over the years in so many ways"); Letter of Charles Calenda, M.D. (Tab 48)(listing charitable and civic organization in which Urciuoli has been involved); Letter of Rhode Islanders Sponsoring Education (Tab 57)(discussing Urciuoli's contributions to RISE); Letter of R. Michael Smith (untabbed)(discussing Urciuoli's professional and civic contributions).

16

Over the years, Urciuoli has, among other activities, been a trustee of the U.R.I. Foundation, a member of the U.R.I. College of Business Administration Advisory Council, the chairman of HELP, the chairman of the Education Partnership, the chairman of the Rhode Island Scholars Program, the chairman of the Governance Committee of Governor Carcieri's Education Task Force, the chairman and member of the board of trustees of the Hospital Association of Rhode Island, a member of the board of the Greater Providence Chamber of Commerce, a member of the

What is perhaps most striking about the letters submitted on behalf of Urciuoli is that so many of these individuals, from widely divergent walks of life and acting independently, chose the same exemplary characteristics to describe who Bob Urciuoli is as a human being: generous, kind, caring, compassionate, and always ready and willing to go out of his way to help others.[17] And these are not mere adulatory labels; letter after letter recounts examples Urciuoli's going out of his way to help individuals – finding the best medical care for friends, family, and even complete strangers, lending support and bringing comfort to both patients and their families, providing mentoring and encouragement to others.[18]

---

board of the Rekindling the Dream Foundation, a member of the Trustee Council of Leadership Rhode Island, a member of the Providence College President's Council, a member of the RIPAC board of trustees, co-chairman of the Rhode Island Academic Medicine Coalition, and a member of the Delta Dental board of trustees.

17 *See, e.g.,* Letter of Russell Ekeblad (Tab 16)("honest, intelligent, caring, and compassionate"); Letter of Dante Pennacchia (Tab 17)("humble, modest and willing to put himself out to help someone"); Letter of Melinda Penney (Tab 18)("his willingness to help other selflessly has benefitted so many . . . ."; "a man of integrity, character and grace"); Letter of Marilyn Picerelli (Tab 21)("smart, funny, steadfast, and above all else, unselfish"); Letter of Joseph Nagle (Tab 23) ("honest, caring, and generous"); Letter of Linda Rossi (Tab 24)("kindness and fairness"); Letter of Ellen Piccerelli (Tab 26)("one of the most honorable people I have ever met;" "kind, intelligent, hard working and always the gentleman"); Letter of Jacqueline Brosco (Tab 27)("kind, down to earth and always concerned about everyone else before himself"); Letter of Richard Angelone (Tab 29)("generous, caring, and decent man"); Letter of James Palumbo (Tab 30)("a person of upstanding character, continually demonstrating loyalty and compassion"); Letter of Tanya Ney (Tab 31)("kind, giving, gentle and wonderful human being"); Letter of Robert Adelstein (Tab 35)(a "compassionate concerned individual," "willing to be of assistance wherever he can," who "very quietly, very deliberately went out of his way to help a stranger"); Letter of Analee Wulfkuhle (Tab 43)("unpretentious, genuine, and sincerely caring man"); Letter of William Kapos (Tab 50)("honest, generous and caring, always putting the needs of others first"); Letter of Robert Palumbo (Tab 64) ("one of the most compassionate men I have ever met;" "[h]e cares deeply for people and has always been available to anyone who needs his help").

18 *See, e.g.,* Letters of Jane and Edward Ricci (Tab 15); Russell Ekeblad (Tab 16); Dante Pennacchia (Tab 17); Linda Fischer (Tab 19); Joan Moran (Tab 20); Marilyn Picerelli (Tab 21); Ellen Piccerelli (Tab 26); Vin DiNapoli (Tab 28); Richard Angelone (Tab 29); Tanya Ney (Tab 31); Robert Davignon (Tab 32); Robert Adelstein (Tab 35); Daniel Baudouin (Tab 54); Timothy Moran

Robert Urciuoli is a remarkable man. A professional success, yet he is consistently humble, modest, and self-effacing. He has dedicated his life to caring for others – professionally, through the medium of RWMC, and personally, through his care, support, and attention to the needs of others. He has given unstintingly of his time, his effort, and his very large heart to help not only his family and friends but also countless people in the community and community-based institutions and organizations. Urciuoli's history and characteristics all call out for a sentence below the advisory guidelines sentencing range. The appropriateness of such a sentence becomes even more evident when the remaining §3553(a) factors are considered.

**B. The Nature and Circumstances of the Offense.**

Unlike most cases of honest services fraud, the conduct based upon which Urciuoli was convicted was not motivated by thought of or desire for personal gain, and certainly Urciuoli derived none. Instead, Urciuoli was motivated at all times to advance the interests of RWMC, a valuable community asset in which he had invested almost his entire adult working life, and its continued ability to continue to provide high-quality health care to citizens of the state of Rhode Island and elsewhere. As Scott Laurans wrote:

> Bob's position at Roger Williams Hospital was very secure, and his more recent efforts were not to advance his career but to advance the interests of the hospital. There was little for Bob to gain personally, and he could have relaxed during these last years rather than to have been as aggressive in promoting the interests of the hospital, which speaks to his love of the institution and his competitive spirit.

Letter of Scott Laurans, Tab 36. Urciuoli's conduct was the product of his devotion to RWMC, its staff, and its patients, and not of personal greed or avarice.

No person or entity lost money or property unfairly or fraudulently as the result of Urciuoli's conduct, nor did any person or entity gain any unfair or fraudulent benefit as the result of Urciuoli's

---

(Tab 65).

conduct. Urciuoli's availing himself of Celona's assistance in the matter of the rescue run issue was intended to do no more than influence the municipalities involved to obey the law and bring to RWMC patients who requested to be taken there, as required by Department of Health protocols. Celona's facilitation of meetings with BC/BS and United CEOs had no effect on the monies ultimately paid to RWMC by either insurer.[19] Indeed, many of the activities which Celona undertook on behalf of RWMC were unquestionably in the public interest, such as motivating communities to honor patient choice when conducting rescue runs[20] and ensuring the continued viability of Roger Williams Hospital as an invaluable community health care resource.[21] This latter is no mere hyperbole: Roger Williams was facing a financial crisis which threatened its very existence, and it

19

Battista's testimony relative to the BC/BS negotiations is summarized at pages 6-10, *supra*. Nothing in the record would support the proposition that United changed its position in any way because of Celona's involvement or that it agreed to pay RWMC more in reimbursement than it otherwise would have had it not been for Celona's involvement. Indeed, Kelly Sheridan's testimony demonstrates quite the contrary. It is more than reasonable to infer that the government did not call Steve Farrell, United's CEO, as a witness because his testimony would have confirmed that nothing that Celona said or did had any effect on the ultimate outcome of the contract negotiations between RWMC and United. While Celona did, during his testimony, puff up his role in these matters, his self-aggrandizing portrayal of the level of his influence is flatly belied by the testimony of Battista and Sheridan. This Court has already expressed substantial doubt about the veracity of at least some of Celona's testimony. *See* Tr. 9/29/06 at 47 ("it doesn't matter whether Senator Celona exaggerated the things he claims to have done in furtherance of the conspiracy, which it seems to me he clearly did, or even whether he misrepresented or lied about some of those things, and certainly there's some reason to think that he may have done that as well); *id.* at 49 ("it's true that he may have exaggerated or even misrepresented some of the things that he did . . . .").

20

Celona testified, for example, that a constituent had complained that her mother's request to be taken to Miriam Hospital had not been honored, and he undertook to remedy the situation. Tr. 9/14/06 at 144.

21

The community's health care institutions and their treatment by large insurers is a matter of great public importance. For example, the Providence Journal reported in a September 23, 2006, article that Gov. Carcieri had taken BC/BS to task for being unwilling to provide Landmark with a fair contract.

was very much *in* the public interest to facilitate meetings which might prevent its demise.

**C. Purposes of Sentencing.**

The Court must also consider the purposes of sentencing, which are: "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes by the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." §3553(a)(2). Critically, §3553(a) mandates that the Court impose a sentence "sufficient, *but not greater than necessary*, to comply" with these purposes (emphasis added). The nature and circumstances of the particular offense conduct at issue in this case mitigate in favor of a sentence below the advisory GSR. Respect for the law would be promoted by the individualization of the sentence imposed upon Urciuoli to take account of his exemplary record of contributions to the community and to the provision of quality health care, his selfless devotion to the needs of others, and of the fact that the offense conduct of which Urciuoli was convicted is wholly at odds with his history and character. The Court has received letters from many people who know Urciuoli well and who have expressed their firm convictions that the world would be a better place with Urciuoli able to return to his community and to continue the work of helping others to which he has devoted so much of his life rather than with Urciuoli behind bars. A sentence below the advisory GSR would generate respect for the law by demonstrating that it can be both reasonable and just, not only to Urciuoli, but to his family to which he means so very much, and also to his community.

Any consideration of what is just punishment for the offense of conviction should take into account what Urciuoli has already suffered and will continue to suffer. He has lost his employment, which meant far more to him than simply a job; it represented his ability to work for a cause in which

he believes deeply – the provision of high quality health care to the community – to which he devoted body, heart, mind, and soul for 35 years. His reputation, previously impeccable, has been severely, perhaps irrevocably, damaged. The financial impact of his conviction upon him and his family has been, and will likely continue to be, catastrophic, as has the emotional impact. The thought of being unable to be available to his wife, his daughter, his step-daughters, and his elderly parents whenever they need his love, help, comfort, care, or guidance is inexpressibly painful to him.

A sentence within the GSR is not necessary to protect the public from Urciuoli – it needs no protection from him, as all the information before the Court provides strong assurance that he will not commit crimes in the future. Nor is a sentence within the GSR necessary for purposes of either individual or public deterrence against conduct such as that on which Urciuoli's convictions were based.[22]

## CONCLUSION

Urciuoli asks that this Court impose a sentence that appropriately balances all the §3553(a) factors and which is not greater than necessary to accomplish the purposes of §3553(a)(2). The §3553(a) factors other than the advisory GSR all point squarely to the appropriateness of a sentence below the advisory GSR. Under the circumstances of this case and this defendant, a sentence within the GSR would be neither reasonable nor appropriate. In addition, given the fact that Urciuoli has been terminated from his employment with RWMC and is unlikely again to obtain employment which would be remotely comparable financially, he asks that the Court impose only a minimal fine.

---

[22] Statistics available from the Sentencing Commission for the post-*Booker* portion of fiscal year 2005 (the most recent available) indicate that the average sentence for offenses which fell within the category of "bribery" was 21.2 months. The median was 15 months, which means that there were as many sentences below that number as there were above. Of those defendants, 27.4% were sentenced to straight probation, another 15.9% were sentenced to probation and home confinement.

Respectfully submitted,
By his attorneys,

Kristie M. Passalaqua
/s/ Kristie M. Passalaqua

Kristie M. Passalaqua #6945
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, RI 02903
(401) 274-2000
(401) 277-9600 (fax)
kpassalaqua@haslaw.com

Martin G. Weinberg (MA BBO# 519480)
*Pro Hac Vice Counsel*
20 Park Plaza, Suite 905
Boston, MA 02116
(617) 227-3700
(617) 338-9538 (fax)
owlmgw@att.net

Richard M. Egbert (MA BBO# 151800)
*Pro Hac Vice Counsel*
Richard Egbert Law Offices
99 Summer Street, Suite 1800
Boston, MA 02110
(617) 737-8222
(617) 737-8223 (fax)
regbert@egbertlaw.com

Michael J. Connolly (MA BBO# 638811)
*Pro Hac Vice Counsel*
Hinckley, Allen & Snyder LLP
28 State Street
Boston, MA 02109
(617) 345-9000
(617) 345-9020 (fax)
mconnolly@haslaw.com

Dated: January 24, 2007

**CERTIFICATE OF SERVICE**

To:

Dulce Donovan, Esq.
Luis M. Matos, Esq.
U.S. Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903

Kevin J. Bristow, Esq.
1309 Turks Head Building
Providence, RI 02903

John A. MacFadyen, Esq.
MacFadyen, Gescheidt & O'Brien
The Owen Building
101 Dyer Street
Providence, RI 02903

I hereby certify that I hand-delivered a copy of the within Sentencing Memorandum to the attorneys listed above, on this 24th day of January, 2007.

Kristie M. Passalaq