**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | CR 06-02-1T |
| | : | |
| ROBERT A. URCIUOLI, and | : | |
| FRANCES P. DRISCOLL. | : | |

**UNITED STATES' OBJECTION TO DEFENDANT, ROBERT URCIUOLI'S, SENTENCING MEMORANDUM IN SUPPORT OF A REVISION TO THE SENTENCING GUIDELINE RANGE, OR, ALTERNATIVELY, A SENTENCE OUTSIDE THE GUIDELINE RANGE**

On January 24, 2007, defendant ROBERT A. URCIUOLI filed a Sentencing Memorandum in Support of a revision to the sentencing guideline range, or, alternatively, a sentence outside the guideline range. The United States objects to URCIUOLI's request for the reasons stated in the accompanying memorandum of law and filed simultaneously herewith.

Respectfully submitted,
UNITED STATES OF AMERICA,

By their Attorneys,
ROBERT CLARK CORRENTE
United States Attorney

LUIS M. MATOS
Assistant U.S. Attorney
Chief, Criminal Division
United States Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
(401)709-5000 - phone
(401)709-5001 - fax
luis.matos@usdoj.gov

DULCE DONOVAN
Assistant U.S. Attorney
United States Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
(401)709-5000 - phone
(401)709-5001 - fax
dulce.donovan@usdoj.gov

**CERTIFICATE OF E-SERVICE**

I hereby certify that on this 29th day of January, 2007, I caused the Government's Objection to Defendant, Robert A. Urciuoli's, Sentencing Memorandum in Support of a Revision to the Sentencing Guideline Range, or, Alternatively, a Sentence Outside the Guideline Range to be forwarded by first class regular mail to:

Richard M. Egbert, Esq.
99 Summer Street
Suite 1800
Boston, MA 02110

Martin G. Weinberg
Martin G. Weinberg P.C.
The Statler Bldg
20 Park Plaza
Suite 905
Boston, MA 02116

By hand delivery:
Michael J. Connolly
Kristie Passalacqua, Esq.
Hinckley Allen Snyder LLP
Fleet Center
Providence, RI 02903

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | CR 06-02-1T |
| | : | |
| ROBERT A. URCIUOLI, and | : | |
| FRANCES P. DRISCOLL. | : | |

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF ITS OBJECTION TO DEFENDANT, ROBERT URCIUOLI'S, SENTENCING MEMORANDUM IN SUPPORT OF A REVISION TO THE SENTENCING GUIDELINE RANGE, OR, ALTERNATIVELY, A SENTENCE OUTSIDE THE GUIDELINE RANGE**

Defendant, Robert Urciuoli, has been convicted of one count of conspiracy to commit mail fraud by depriving the citizens of the State of Rhode Island of the honest services of John Celona and 35 counts of mail fraud. The Presentence Report ("PSR") has calculated a total offense level of 28, criminal history category I, which results in a sentencing range of 78 to 97 months. Defendant has filed a memorandum objecting to the guideline calculation, or, alternatively, requesting a sentence outside the guideline range. Because the guideline range is properly calculated and because defendant's circumstances do not warrant a sentence outside the guideline range, the United States objects to defendant's memorandum.

I. Sentencing Framework

In the wake of the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), the Sentencing Guidelines are advisory, not mandatory. However, the guidelines are not just "one factor" for the Court to consider. The First Circuit has made plain that "the guidelines continue [] to be an important consideration in sentencing." United States v. Jimenez-Beltre, 440 F.3d 514, 518 (1st Cir. 2006). Moreover, "the guidelines cannot be called just 'another factor' in

the statutory list, 18 U.S.C. §3553(a), because they are the only integration of the multiple factors, and with important exceptions, their calculations were based upon the actual sentences of many judges." Id. (emphasis in original). Nevertheless, "[a] court may sentence below the guidelines because the guideline sentence appears unreasonable in the 'particular case.'" United States v. Thurston, 456 F.3d 211, 218-19 (1st Cir. 2006) (quoting Jimenez-Beltre, 440 F.3d at 518). "[T]he reasonableness of a below-guideline sentence [is judged] on a sliding scale: 'the farther the judge's sentence departs from the guidelines sentence the more compelling the justification based on the factors in 3553(a) that the judge must offer . . . .'" Id. (quoting United States v. Dean, 414 F.3d 725, 729 (1st Cir. 2005).

Defendant claims that the Supreme Court's recent decision in Cunningham v. California, __ U.S.__ 2007 WL 135687 (U.S., January 22, 2007), precludes the Court from finding an offense conduct level greater that 10 because any additional levels would require unconstitutional judicial fact-finding. Cunningham is not applicable here.

In Cunningham, the Supreme Court held that California's sentencing system violates the Sixth Amendment rule adopted in Apprendi v. New Jersey, 530 U.S. 466 (2000), because it authorizes judges to impose enhanced sentences based on facts not found by the jury or admitted by the defendant. Under California law, statutes defining criminal offenses give the sentencing court three options: the court can impose a lower term, a middle term, or an upper term. The sentencing statute provides that "the court shall order imposition of the middle term, unless there are circumstances in aggravation or mitigation of the crime." The court may impose the upper term "only if, after a consideration of all the relevant facts," - which the court finds by a preponderance of the evidence - "the circumstances in aggravation outweigh the circumstances in

mitigation." Writing for the majority, Justice Ginsburg concluded that because a California court may impose an upper-term sentence only if it finds a fact that is not "inherent in the jury's verdict" or "embraced by the defendant's plea," the middle-term sentence is the "statutory maximum" for purposes of applying the Apprendi rule, and imposition of a higher sentence based on a fact found by the sentencing court violates the Sixth Amendment right to jury trial. Cunningham is distinguishable because, unlike the post-Booker Federal system of advisory Sentencing Guidelines, the California statute imposes mandatory constraints on the sentencing court's discretion and "does not resemble the advisory system the Booker Court had in view." Id. at 14. "Under California's system, judges are not free to exercise their 'discretion' to select a specific sentence within a defined range." Id. quoting Booker at 233. The present Federal sentencing system, which does not require a rote application of the guidelines, does not violate the Sixth Amendment and, hence, should be followed in this case. See Cunningham at 10 (According to Booker judges should no longer be held to the sentencing range indicated in the guidelines, but they would be obliged to "take account of" that range along with the sentencing goals Congress enumerated in the SRA at 18 U.S.C. § 3553(a).)

II. The Guideline Range is Properly Calculated

Defendant argues that the guideline range should not be increased by 18 levels because the $5.6 million dollars that RWMC obtained from Blue Cross Blue Shield in 2003 can not be attributed to John Celona's participation in the negotiations. Defendant is wrong because the evidence at trial showed that Urciuoli believed that Celona was an integral part of the process during negotiations with Blue Cross and with United Health Care. Neither was coming to the table as eagerly as Urciuoli wished, hence, Celona's participation was essential to receipt of the

additional monies.

USSG § 2C1.7(b)(1)(A) requires that:

> If the loss to the government, <u>or the value of anything obtained or to be obtained by a public official or others acting with a public official</u>, whichever is greater (I) exceeded $2,000 but did not exceed $5,000, increase by 1 level; or (ii) exceeded $5,000, increase by the number of levels from the table in §2B1.1 (Theft, Property Destruction, and Fraud) corresponding to that amount.

<u>Id</u>. (Emphasis added).

In this case the evidence is clear that Urciuoli used Celona in order to obtain financial benefits to RWMC. Much of that benefit is not easily quantified – such as the value of the additional rescue runs, the value of eliminating the cancer council as a competitor, the value to be derived from killing the PILOT legislation, and the value of killing Hospital Conversion Act legislation. However, at minium, what has been quantified is the value of Celona's intervention in the Blue Cross negotiations.

As a backdrop, Celona's participation on behalf of RWMC <u>vis</u> <u>a</u> <u>vis</u> Blue Cross extends beyond the 2003 negotiations. Celona was involved in advocating RWMC's concerns regarding Prompt Payment legislation and Utilization review. <u>See</u> Tr. 9/15/06 at 125, 127; Government Trial Exhibit ("GX") 383 (" If you have any areas to focus on other than the obvious, such as the hospital prompt payer issue, et cetera, please let me know so that I can attempt to articulate the points from the hospital perspective."); GX 430 (I have been told by HARI that utilization review legislation is their main focus, that prompt payment will not be this year. I'll try to contact you tomorrow to make sure that this is in the best interest of RWMC."). In addition, prior to meeting with Ron Battista, Celona had previously met with Tom Lynch in order to influence Blue Cross

payments to RWMC. GX 469 ( E-mail from Celona to Urciuoli dated December 21, 2001; "Bob, I hope I didn't lay it on Tom Lynch too much yesterday, but it was done in a systematic fashion in order to get them 'in line.' Needless to say, I'll keep up the pressure. Regards, John." and corresponding response from Urciuoli to Celona: "You didn't. He deserved to get cranked around again – Thanks for your help!"). On other occasions Celona asked Urciuoli if he needed his intervention with Lynn Urbani, also a senior executive at Blue Cross. GX 484, 488.

However, while Urciuoli was able to obtain meetings with Blue Cross personnel, everyone who testified at trial, except for Battista, agreed that Battista rarely engaged Urciuoli and the two had a poor relationship.[1] Urciuoli told Celona that "they had no relationship" and "did not get along." Therefore, he asked Celona to set up some meetings with him. Tr. 9/15/06 at 161, 162. Urciuoli's secretary, Sheila Capobianco testified that Battista was not returning Urciuoli's phone calls at the time that Celona became involved in setting up a meeting between Urciuoli and Battista. Tr. 9/12/06 at 54. According to Jim McGuirk, Urciuoli's relationship with Battista "blew hot and cold" and at the time that Urciuoli was seeking additional reimbursement from Blue Cross, "Ron Battista was not interested in addressing this issue." Tr. 9/21/06 at 63.

According to Battista, the issue first came up when Urciuoli either called him or stopped by his office and claimed that RWMC was experiencing deep financial problems. Specifically, Urciuoli stated RWMC was experiencing an $8 million shortfall and needed additional reimbursement from Blue Cross. Tr. 9/26/06 at 229. At the time that Urciuoli approached Battista, RWMC and Blue Cross had a contract in place. Tr. 9/26/06 at 228. Hence, when

---

[1] Battista described their relationship as "cordial." Tr. 9/26/06 at 228. He also testified that he did not remember avoiding Urcuioli's calls. Tr. 9/27/06 at 45

Urciuoli approached him, Blue Cross had no contractual obligation to provide additional payments to RWMC. However, Battista testified that he came up with a strategy to require an audit by NBC consultants in order to determine if additional payments should be made to RWMC. Battista's strategy was both "offensive and defensive." First he wanted a fact-based inquiry to verify losses but he also wanted RWMC to improve its medical efficiencies. Second, he wanted RWMC to agree to a Most Favored Nation ("MFN") clause that would ensure Blue Cross paid RWMC no more than its competitors, primarily United Health Care. Tr. 9/26/06 at 235. Battista was concerned that if he did not address the problem, a "political solution would be thrust down" their "throats to save the institution." Tr. 9/26/06 at 236; See also Tr. 9/27/06 at 52. Hence, he was convinced that there would be "political ramifications" if RWMC went out of business. Tr. 9/27/06 at 92.

Battista testified that when he first discussed the issue with Urciuoli he agreed to a meeting. However, the meeting took place in November of 2002, after Celona's intervention, and after a member of Battista's staff advised him to attend. Tr. 9/26/06 at 230. Celona set up the meetings in order to utilize the "power" of his office. Tr. 9/15/06 at 164. Battista knew that MFN legislation had been recently passed by the legislature which was not favorable to Blue Cross and that Celona was part of the leadership. Tr. 9/26/06 231, 238. Battista also knew that it was important to respond to a legislator if he wanted to meet. Tr. 9/27/06 at 39. As a result of the meeting, Battista knew that at least one politician was interested in the issue. Tr. 9/26/06 at 237. Indeed, Celona's participation "affirmed" Battista's "opinion that there would be political ramifications if, in fact, the hospital went under." Tr. 9/27/06 at 92.

Eventually the audit was conducted and NBC Consultants determined that RWMC had been underpaid by approximately $5.6 million. However, Blue Cross did not pay immediately. In fact, Battista avoided Urciuoli's calls. Hence, Celona's intervention was again required because Battista was refusing to pay. Indeed, Battista had no contractual obligation to pay.

Kimberly O'Connell, in-house counsel at RWMC, testified that in June of 2003, she learned from Jim McGuirk that Urciuoli was planning on using Celona to obtain a meeting with Battista. McGuirk had advised Urciuoli against the meeting. Tr. 9/21/06 at 66. O'Connell asked Urciuoli about the matter and testified that:

> [Urciuoli] said that Ron Battista . . . was being [difficult] about returning promised reimbursement to the hospital, that Ron Battista had made the hospital go through an independent audit. The independent audit had determined that the hospital was under reimbursed by Blue Cross and Blue Cross owed the hospital about $3 million. He said that Blue Cross had told the hospital that they were going to pay the hospital that money based upon the audit and that Ron Battista was dragging his feet on that and wouldn't return his calls and would not send the money that he had promised over to the hospital. So he said that John Celona had offered to facilitate a meeting between the hospital and Blue Cross to try to move the situation forward.

Tr. 9/26/06 at 11.

Urciuoli assured O'Connell that Celona would not be negotiating, but she nonetheless told Urciuoli to "be careful . . . because it looked odd." Tr. 9/26/06 at 13. Urciuoli responded with "words to the effect 'I don't care how it looks. Blue Cross owes us', 'us' meaning the hospital, 'the money and I need to move this forward'. " Id.

Hence, although Urciuoli now claims that the matter was allegedly resolved as a result of the audit, Battista was nonetheless summoned to Celona's office in the summer of 2003. At the

meeting, Battista reported that $3.6 million was going to be paid, but that the remainder, $2 million, would be withheld until RWMC agreed to a MFN audit. Tr. 9/27/06 at 40, 49; GX 574. Urciuoli claims that Celona's involvement in the matter had no effect on the eventual resolution,[2] however, even Sheila Capobianco noted that "after the meeting, eventually the issue seemed to go away." Tr. 9/12/06 at 56.

However, it was not fully resolved because Blue Cross was withholding $2 million because of the MFN issue at a time when RWMC was also negotiating a new contract with United. That negotiation was critical for two reasons: (1) to increase reimbursements to RWMC; and, (2) to obtain United's agreement to a MFN audit so that RWMC could recover the additional monies from Blue Cross.

As with Battista, Urciuoli was not getting on well with United CEO Steve Farrell and asked Celona to set up a meeting in order to "get this young kid in line as far as what the payments should be." Tr. 9/15/06 at 167, 171. So Celona, on Urciuoli's direction, called United's lobbyist, Kelly Sheridan and took the unusual step of holding a meeting, in his office, while the Senate was out of session. Tr. 9/15/06 at 168, 169. Kelly Sheridan confirmed that Celona called to set up a meeting and that Celona stated "United individuals did not really get it." Tr. 9/27/06 at 118. Sheridan set up the meeting because it would not be "appropriate to refuse him a few minutes." Tr. 9/27/06 at 122. United had a lot of legislation that passed through Celona's committee, including the recently passed MFN legislation. Tr. 9/27/06 at 123.

The meeting was held on August 29, 2003. GX 522. After the meeting, negotiations

---

[2] For instance, Urciuoli notes that Battista claimed there was nothing that Celona did to change his position. Tr. 9/27/06 at 66.

remained at such a stalemate that Urciuoli again asked for Celona's intervention:

> Celona: One time I was out of town, and he called me early in the morning on my cell phone. He was very upset that nothing was moving. And he said, you know, You better get a hold of Kelly Sheridan.
>
> Q. And do what?
>
> A. Get him moving on it.
>
> Q. Had you called Mr. Sheridan?
>
> A. Yes, I did.
>
> Q. And what had you said to Mr. Sheridan?
>
> A. I just reiterated what I had told him in the past, that they had to move on their figures of reimbursements between themselves and Roger Williams with the contract.

Tr. 9/15/06 at 176.

Celona contacted Sheridan on Urciuoli's behalf and reported to Urciuoli, on October 24, 2003: "Bob, it is Friday, October 24th, and I just spoke with Kelly Sheridan, and he told me that he had Farrell call yesterday to up the United figure. Did he contact you, and do you want me to keep pressing? Please advise." Tr. 9/15/06 at 175, 176, GX 528. While Kelly Sheridan took issue with the language used by Celona in the e-mail to Urciuoli, he agreed that Celona called him to "convey that the numbers being offered were still inadequate." Tr. 9/27/06 at 133. And, it is undisputed that after the call from Celona to Sheridan, a second meeting was scheduled for October 24, 2003 at Celona's office but was cancelled, because the contract had been ironed out. Tr. 9/15/06 at 177. As a result, United agreed to increase reimbursement to RWMC by 25% and, also importantly, agreed to a MFN audit, which allowed RWMC to receive the outstanding $2 million from Blue Cross.

The evidence at trial made clear that Urciuoli believed that the value to be obtained by Celona's intervention was at least $5.6 million. Urciuoli claims that the reimbursement was dependent solely on the NBC audit. Clearly that was not the case. Blue Cross was under no contractual obligation to make additional payments to RWMC. Battista was aware of potential political ramifications, yet continued to avoid Urciuoli. Celona was called in, and, Battista eventually agreed to pay $3.6 million but withheld $2 million that was supposedly warranted by the audit because he wanted an MFN audit. Hence, even after the audit, only a partial payment was made. Battista got his MFN audit and Urciuoli got the additional $2 million, after Celona intervened in the United negotiations. Hence, the value to RWMC of Celona's activities on Blue Cross alone, exclusive of all his other efforts over his 5 years on the payroll is at least $5.6 million. Alternatively, it is $2 million, the amount withheld by Battista pending a satisfactory result on MFN.

III. Defendant's Argument of Sentence Disparity is Misplaced Here.

Defendant claims that a potential disparity between his sentence and that of Celona and Frances Driscoll is unwarranted. In support, Defendant cites United States v,. Gillam 167 F.3d 1273 (9th Cir. 1999), but that case simply stands for the proposition that the benefit received by the payor of a bribe, and not the amount of the bribe, is the appropriate measure for sentencing purposes, as it is here. Id. at 1279.

Here, the perceived disparity arises primarily as a factor of time, acceptance of responsibility, and cooperation – all factors than inure to the benefit of John Celona and not to that of Urciuoli. As the government expects will be addressed at John Celona's sentencing, Celona plead guilty to his participation in three schemes, including the RWMC scheme. At the

time that Celona plead, the RWMC investigation was on-going and the amount of benefit derived by RWMC had not been fully investigated. Accordingly, at that time the only numbers that were concretely ascertained were the payments to Celona. Hence, those amounts were included in the plea agreement. It may be that at Celona's sentencing, the Court relies upon a different measure. Indeed the United States has provided the Court with factual support for alternative measures, but that final determination is for the Court.

In addition, Celona has plead guilty, he has accepted responsibility and has cooperated extensively in this matter, including testifying at trial. Hence, while Celona's criminal conduct is reprehensible and must certainly be addressed in a just way, Celona and Urciuoli will arrive before this Court on January 31st under different circumstances. Likewise, Driscoll is not comparable to Urciuoli for the simple fact that she left RWMC in May of 2000 and the benefit obtained from Blue Cross was hustled by Celona and Urciuoli in 2003. The different circumstances of both Celona and Driscoll do not provide a basis to avoid the application of the proper measure required by the guidelines.

Urciuoli, however, is not even content with having his sentence based upon the total amount of payments made to Celona. He claims that the amount used should be no more than $120,000. He provides no support for how he arrives at that number other than restating his tired argument that Celona performed some legitimate services for the Village of Elmhurst. There is no support for using such a lower number in the guidelines or in the evidence. The evidence is clear that the purpose of RWMC's payments to Celona was to buy his political influence. At most, the services he arguably provided to the Village simply furthered the deception regarding the true purpose of his employment. Hence, if the Court finds that the payments to Celona are

the appropriate measure, the total payments, $260,000, should be used.

IV. A Downward Departure is Not Warranted.

Urciuoli claims that the $5.6 million figure substantially overstates the seriousness of the offense. In United States v. Rivera, the First Circuit explained the role that encouraged, discouraged, and forbidden factors play in the departure analysis. With respect to discouraged factors, such as age, education, employment, and family ties, the Court stated that "such circumstances could remove a case from the heartland, but only if they are present in a manner that is unusual or special." 994 F.2d 942, 948 (1st Cir. 1993). However, as addressed above, the more logical argument here is that the $5.6 million understates the seriousness of this offense. Urciuoli kept Celona on the payroll for approximately five years, paying him every month to carry out his political bidding. The $5.6 million number represents Celona's activities over approximately a eight-month period, from November of 2002 to June of 2003. It does not begin to capture the value of Celona to Urciuoli and RWMC, or what Urciuoli perceived to be his value for the preceding four years. In addition, his actions can not be justified by the perverse argument that this is not like the usual honest services case because it "served a substantial public interest in ensuring the continued viability of RWMC and it availability as a community healthcare resource." Urciuoli Memo at 16.

Defendant's conduct was pervasive and can not be camouflaged by its professed altruism. As will be further explored below, the real beneficiary of the services was Robert Urciuoli. By supporting RWMC, he ensured the viability of his $400,000 salary, benefits and bonuses that exceeded an additional $200,000, his expense account and his lifestyle. Hence, no departure is warranted.

V. Section 3553(a) Does Not Warrant a Sentence Below the Guideline Range.

Urciuoli requests a sentence below the guideline range primarily because of his professed positive history and character. The defendant can offer no compelling justification for a sentence outside the advisory guideline range. When one weighs all of the information contained in the Presentence Report against the factors set forth in 18 U.S.C. § 3553(a), the balance is tipped squarely in favor of a guideline sentence.

The § 3553(a) factors begin with the "nature and circumstances of the offense." 18 U.S.C. §3553(a)(1). Here, defendant continues to ignore the seriousness of his offense. He played an essential role in corrupting a public official for his own pecuniary interest. He claims that his crime was not motivated by a desire for personal gain but for his devotion to the health care community. In essence, he makes an "ends justify the means" argument. The argument is belied by the evidence in this case. Indeed, one of the very first items that Celona was tasked to work on was to kill Senate Bill 98-S 2796, a bill which prohibited directors, trustees, or officers from serving on the board of a newly converted hospital. The bill, if passed and if RWMC had ever merged, could have significantly impacted Urciuoli's ability to remain as an officer of the surviving institution and to continue to be paid handsomely to remain as president. In addition, as stated above, he didn't simply take advantage of Celona's services for a limited purpose. He and France Driscoll used him repeatedly. Hence, even if he could claim an altruistic purpose on any particular occasion, the nature, duration, and pervasiveness of the conduct completely undermine the argument.

Section 3553(a) next directs a sentencing court to consider the history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1). There is nothing exceptional about defendant's

history and characteristics when compared to other defendants in his circumstances. His crime is not a crime of violence. It is a crime that by definition, is typically committed by someone of a similar background – someone who is in a position to obtain political favors and has access to the means to obtain such. Hence, it is not unusual that someone in that position enjoys the social standing and support that Urciuoli is now relying upon to mitigate his sentence. Indeed, the crime, as charged and proven, required that the public be deceived about the nature of the relationship between Celona and Urciuoli. He, in this sense, is much like typical white collar criminal. He had no excuse -- societal, upbringing, or educational – to engage in such conduct. In addition, contrary to his assertions, his history and characteristics are not "overwhelmingly positive." Urciuoli Memo at 17.

Urciuoli conveniently ignores his expense account indiscretions while under the employ of RWMC. As the Court has previously been made aware, in 1998 Urciuoli was the subject of an in-house investigation regarding his improper use of his RWMC expense account for personal use (the "Saylor Report"). This is a man who claims that he was tirelessly devoted to RWMC yet saw fit to charge the hospital for a family jaunt to the Scottsdale Princess in Arizona by claiming that he had gone to a conference – a conference that the Saylor Report found never took place. What is incredible is that even after the Saylor Report, after he had to pay back the money, he continued to use Celona. He plowed ahead, perhaps emboldened by the fact that the Hospital Board kept him on. Not only is Urciuoli not any different from similarly situated defendants, he has shown that he holds himself above public reproach. That should not be the case here.

The remaining Section 3553(a) factors relevant here -- the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just

punishment for the offense, to afford adequate deterrence to criminal conduct and to protect the public from the further crimes of the defendant, 18 U.S.C. §§ 3553(a)(2)(A-C) -- likewise provide the defendant no comfort here. To the contrary, the guideline calculation here only begins to address the seriousness of this case because this case is not simply about how much money the hospital received but about the harm that such conduct causes to the general faith and trust that the citizens have in governmental institutions. This case requires a sentence that addresses the harm perpetrated by the defendant upon the public trust. A sentence within the guideline range is required to address such harm.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court adopt offense conduct calculation (level 28) contained in the PSR and sentence defendant within that range.

Respectfully submitted,
UNITED STATES OF AMERICA,

By their Attorneys,
ROBERT CLARK CORRENTE
United States Attorney

LUIS M. MATOS
Assistant U.S. Attorney
Chief, Criminal Division
United States Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
(401)709-5000 - phone
(401)709-5001 - fax
luis.matos@usdoj.gov

DULCE DONOVAN
Assistant U.S. Attorney
United States Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
(401)709-5000 - phone
(401)709-5001 - fax
dulce.donovan@usdoj.gov

**CERTIFICATE OF E-SERVICE**

I hereby certify that on this 29th day of January, 2007, I caused the Government's Objection to Defendant, Robert A. Urciuoli's, Sentencing Memorandum in Support of a Revision to the Sentencing Guideline Range, or, Alternatively, a Sentence Outside the Guideline Range to be forwarded by first class regular mail to:

Richard M. Egbert, Esq.
99 Summer Street
Suite 1800
Boston, MA 02110

Martin G. Weinberg
Martin G. Weinberg P.C.
The Statler Bldg
20 Park Plaza
Suite 905
Boston, MA 02116

By hand delivery:
Michael J. Connolly
Kristie Passalacqua, Esq.
Hinckley Allen Snyder LLP
Fleet Center
Providence, RI 02903