# United States Court of Appeals
## For the First Circuit

---

No. 07-1297

UNITED STATES OF AMERICA,

Appellee,

v.

ROBERT A. URCIUOLI,

Defendant, Appellant.

---

No. 07-1327

UNITED STATES OF AMERICA,

Appellee,

v.

FRANCES P. DRISCOLL,

Defendant, Appellant.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ernest C. Torres, U.S. District Judge]

---

Before

Boudin, Chief Judge,

Torruella, Circuit Judge,

and Stahl, Senior Circuit Judge.

---

Martin G. Weinberg with whom Kimberly Homan was on brief for appellant Robert A. Urciuoli.

John A. MacFadyen with whom B. Jean Rosiello and MacFadyen, Gescheidt & O'Brien were on brief for appellant Frances P. Driscoll.

Donald C. Lockhart, Assistant United States Attorney, with whom Robert Clark Corrente, United States Attorney, Luis M. Matos, First Assistant United States Attorney, and Dulce Donovan, Chief, Civil Division, were on consolidated brief for appellee.

---

January 18, 2008

---

**BOUDIN, Chief Judge.** Robert Urciuoli and Frances Driscoll, defendants in the district court and now appellants, served respectively as CEO and Senior Vice President of Rhode Island's Roger Williams Medical Center ("RWMC"). Its subsidiaries included Roger Williams Hospital; a nursing home known as Elmhurst Extended Care Facilities; and Roger Williams Realty, which half-owned an assisted living facility called the Village at Elmhurst ("the Village"). During a legislative battle in which RWMC had an interest, the two executives became acquainted with Rhode Island state senator John Celona.

In Rhode Island's "citizen legislature," legislators serve part-time, are modestly paid and ordinarily have other jobs. Celona operated a lawnmower business. The lawnmower business ran into trouble, and (during or just after the legislative battle affecting RWMC) Celona approached Urciuoli about obtaining employment at RWMC. Ultimately, in February 1998, Celona signed a contract, disclosed in public filings, that purported to employ him as a consultant to the Village.

Thereafter Celona did engage in some work on behalf of the Village (e.g., making some referrals and highlighting the facility on his television program). But Celona also engaged in certain other activities between his hire in 1998 and the termination of the employment in early 2004. These activities, the

subject of later criminal proceedings and this appeal, can be divided into three categories.

> Celona communicated with Urciuoli and Driscoll about various pieces of legislation; defendants allegedly asked Celona to try to "kill" certain bills and otherwise to promote RWMC's interests with respect to pending legislative matters;
>
> Celona lobbied a number of municipal officials (mayors and fire chiefs) in order to increase the number of patients brought to Roger Williams Hospital by ambulance service ("rescue runs"); and
>
> Celona facilitated meetings at his government office between Urciuoli and representatives of two major insurance companies, pressing the parties to resolve longstanding disputes about reimbursements owed to RWMC.

Celona did not disclose in any of these instances that he was acting on behalf of RWMC or its hospital. That alleged connection came to light after other, unrelated corruption charges involving Celona emerged.

Urciuoli, Driscoll, Peter Sangermano (the manager of the Village) and RWMC itself were thereafter indicted in the federal district court in Rhode Island on counts of conspiracy to commit "honest services" mail fraud and various counts of such mail fraud; 18 U.S.C. §§ 371, 1341, 1346 (2000). In substance, the government claimed that the executives had devised a scheme beginning in 1998, and ending in 2004, to offer Celona a disguised bribe in the form of a sham or largely sham job at one of RWMC's subsidiaries; in

exchange, the government claimed, Celona advanced RWMC's financial interests by exploiting his public office in the three ways described above.

Celona pled guilty to mail fraud based in part on the conduct alleged. RWMC made its own plea bargain. The three remaining individual defendants went to trial. Each faced the conspiracy count and one or more mail fraud counts based on the premise of a single fraudulent scheme to deprive Rhode Island citizens of the honest services of Celona; individual mail fraud counts designated particular mailings as carrying out the scheme. Urciuoli was charged in most of these counts; Driscoll, who had left RWMC in 2000 and had nothing to do with the insurance phase of the case, was charged only in the conspiracy count and one of the substantive counts.

At trial, the prosecution contended that Celona's employment by the Village was a sham. It offered evidence that Celona's work for the Village was minimal given his ample salary ($700 per week at the start, and eventually as much as $1,000 per week); that he reported to Urciuoli and Driscoll rather than to Village management; that his salary was covered by RWMC rather than the Village; and that his limited work for the Village decreased over the years. Celona was, on the prosecution's theory, being paid by RWMC for his influence on legislation, his lobbying of the mayors, and his pressuring of the insurance companies.

After deliberating for seven days, the jury found Urciuoli guilty on one count of conspiracy to commit mail fraud, 18 U.S.C. § 371, and on thirty-five counts of mail fraud, id. §§ 1341, 1346; Driscoll was convicted of a single count of mail fraud, on the theory that she aided and abetted Urciuoli. Sangermano was acquitted. Urciuoli was sentenced to 36 months in jail; Driscoll to 8 months in jail and 8 in home confinement. We stayed execution of the sentences pending these appeals.

The cloak of office instruction. On appeal, defendants do not dispute that the evidence was adequate to convict them of honest services mail fraud so far as the convictions may have rested on bribing Celona to influence legislation; but they say that the jury instructions wrongly allowed for conviction based on Celona's lobbying of mayors and his meetings with insurance companies, conduct that they claim does not constitute a federal crime.

This instruction issue, which we review de novo, United States v. Woodward, 149 F.3d 46, 68-69 (1st Cir. 1998), cert. denied, 525 U.S. 1138 (1999), turns on how broadly the statute should be read as to functions other than the enacting of legislation; closely related is the question whether the specific episodes in question (the lobbying of mayors and the insurance activities) fall within the statute, also a legal issue open to de novo review. Cf. United States v. Sawyer, 85 F.3d 713, 726-27 (1st

Cir. 1996) ("Sawyer I"). Defendants did not seek a directed verdict as to these episodes, presumably because the indictment did not assign the disputed conduct to distinct counts but bundled it into a single overall scheme along with the alleged buying of Celona's influence on legislation.

The federal mail fraud statute, 18 U.S.C. § 1341, is built upon a single, archaic 204-word sentence which, reduced to its essence, makes it unlawful to use the mails in relation to "any scheme or artifice to defraud." The statute has undergone "repeated periods of rapid expansion and contraction." Coffee, Modern Mail Fraud: The Restoration of the Public/Private Distinction, 35 Am. Crim. L. Rev. 427, 427 (1998). Its application to political misconduct and corruption, as opposed to ordinary private fraud (e.g., bank fraud, commercial scams), has been especially fraught.[1]

Notably, after the Supreme Court held the statute inapplicable to cases of political corruption that involve no loss of money or tangible property, McNally v. United States, 483 U.S. 350, 358-60 (1987), Congress overturned this construction by enacting section 1346; the new provision, passed with scant legislative history, defined the term "scheme or artifice to

[1]Other federal statutes criminalize various corrupt practices--like the federal bribery and gratuity statutes, 18 U.S.C. §§ 201, 666--but these are limited in ways that section 1341 is not. E.g., United States v. Sun-Diamond Growers of Cal., 526 U.S. 398 (1999).

defraud" to include "a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346; see Sawyer I, 85 F.3d at 723-24. Prosecutors have sought to sweep much abusive political conduct within this proscription; in a number of cases courts have been more guarded.

The central problem is that the concept of "honest services" is vague and undefined by the statute. So, as one moves beyond core misconduct covered by the statute (e.g., taking a bribe for a legislative vote), difficult questions arise in giving coherent content to the phrase through judicial glosses. Closely related concerns are assuring fair notice to those governed by the statute, see Bouie v. City of Columbia, 378 U.S. 347, 350 (1964), and cabining the statute--a serious crime with severe penalties--lest it embrace every kind of legal or ethical abuse remotely connected to the holding of a governmental position. Sawyer I, 85 F.3d at 725 (statute "does not encompass every instance of official misconduct that results in the official's personal gain"); see also United States v. McNeive, 536 F.2d 1245, 1252 (8th Cir. 1976).

This court has wrestled with the statute in a number of cases. We have held that the obligations it imposes attach not only to formal official action like votes but also the informal exercise of influence on bills by a legislator, United States v. Potter, 463 F.3d 9, 18 (1st Cir. 2006), and that it prohibits influence-buying short of formal bribes, United States v. Sawyer,

239 F.3d 31, 40 nn. 8-9 (1st Cir. 2001) ("Sawyer II"); but our decisions also rejected a claim that the statute was violated merely by unlawful gratuities to a legislator, Sawyer I, 85 F.3d at 729, or by an IRS employee who accessed confidential computerized tax files for his own amusement and in violation of ordinary confidentiality restrictions, United States v. Czubinski, 106 F.3d 1069, 1077 (1st Cir. 1997). Although one might prefer a more clearly drafted statute, the Supreme Court has regularly used judicial glosses to clarify and focus language in criminal statutes of even greater complexity and breadth. E.g., Reves v. Ernst & Young, 507 U.S. 170, 177-79 (1993) (RICO).

The issue immediately before us concerns Celona's acceptance of undisclosed payments for two sets of activities. In the first, he contacted mayors and other local officials urging them to comply with Rhode Island law governing patient entitlement to be taken by ambulance to the hospital of the patient's choice. Apparently under Rhode Island law Celona could have done this openly for pay; but he did not disclose the private payment, he used official stationery for some of his communications, and those dealing with him knew he was a senator and had little reason to be aware of his private connection to RWMC itself.

In the second, Celona played a role--its extent is disputed--in summoning to meetings officials of Blue Cross/Blue Shield, which was at odds with RWMC on certain payment issues, and

in urging them to come to terms. Some of the meetings were held on legislative premises, Celona was then head of a senate committee responsible for health legislation, and there was evidence that at one point Celona told a Blue Cross lobbyist that "unless [RWMC] is treated fairly, Blue Cross won't get treated fairly." Blue Cross was not told that Celona was being paid by RWMC. A second insurer, United Health, was similarly summoned but it came to terms with RWMC after only one meeting with Celona and a follow up contact by him.

Urciuoli effectively sought to rule both sets of episodes out of the case by asking the court to instruct the jury as follows: that to deprive Rhode Island citizens of Celona's honest services the object of the scheme had to be performance of

> his legislative duties; i.e., scheduling hearings, assigning bills to the hearing calendar and subsequent executive sessions, advocating bills at executive sessions, guiding and taking other action to advance bills through the Committee, and voting on legislation.

This proposed language, read in light of the examples given, comes close to restricting the statute to the enacting of legislation alone.

Although working and voting on legislation is the main official activity of a legislator and our earlier decisions refer to it constantly, it is not the only official function as to which "honest service" was owed by Celona as a senator. For example, a

committee chair could hire incompetent assistants in exchange for kickbacks or divert public funds entrusted to him. Assuming other elements were present (e.g., scienter, use of the mails), an honest services offense could be made out in those scenarios. So the proffered instruction was too narrow and was properly not given. United States v. Prigmore, 243 F.3d 1, 17 (1st Cir. 2001).

The related and stronger claim is that, over defense objection, the court instructed the jury that the statute extended not only to formal exercises of official power (like voting) but also to any actions done under the "cloak of office."[2] The "cloak of office" phrase is not inherently a novel or objectionable way of describing purportedly official action; but in this setting it permitted the jury readily to consider as potentially criminal conduct both Celona's approach of the mayors and his facilitation of the insurance meetings; if either set of activities was outside the reach of the statute, then the convictions are suspect.

We conclude for the reasons given below that the ambulance run advocacy with the mayors cannot qualify as a

---

[2]The jury was instructed as follows:

> "The honest services that an elected official owes to citizens is not limited to the official's formal votes on legislation. It includes the official's behind-the-scenes activities and influence in the legislation, and it also includes other actions that the official takes in an official capacity, not what he does as a private individual but what he does under the cloak of his office."

deprivation of the "honest services" owed to the public. Unlike most conduct typically the subject of the case law, urging local officials to obey state law is not easily described as a deprivation of honest services, actually or potentially harmful to the citizens of Rhode Island.[3] Unobvious harms are imaginable--as, for example, if Celona was pressing on mayors a dishonest interpretation of the law or false statistic--but the government has not made such an argument and the instructions given did not impose such a limitation.

Nor was Celona's advocacy something for which payment would be inherently improper because it biased his judgment in making an official decision on a matter before him--for example, a bribe for a vote or a kickback for hiring an employee. Under Rhode Island law, apparently Celona as a part-time legislator could have been openly paid by RWMC to advocate with local officials. There is a state statute that prohibits government officials from accepting outside employment impairing "independence of judgment," R.I. Gen. Laws § 36-14-5 (1997), but this apparently is not taken to restrict legislators from private employment involving contact with courts or agencies.

---

[3]Typical cases involve votes paid for by bribes or based on private undisclosed financial interests of the legislator, United States v. Jennings, 487 F.3d 564, 578-79 (8th Cir. 2007), awarding of contracts based on bribes, United States v. Kemp, 500 F.3d 257, 265 (3d Cir. 2007), and the filing of false financial disclosure forms or other non-disclosures in relation to official duties, Woodward, 149 F.3d at 62-63.

The government says that a legislator's informal duties commonly extend to representing constituents with local officials and engaging in oversight functions and so to this extent should be regarded as official; but Celona's conduct falls in a borderland where analogies can easily be drawn both to public and private conduct and there is no indication that Celona invoked any purported oversight authority or threatened to use official powers in support of his advocacy. The government says the mayors can be affected by state legislation, but it did not show by context or threat that Celona sought deliberately to exploit this leverage.

Certainly his title and (possibly improper) use of senate letterhead assured him access and attention, cf. Sawyer I, 85 F.3d at 731 n.15; but his position guaranteed that in any event and its invisible force would have existed even if he emphasized that he was present solely as a paid advocate. Indeed, even the legitimate work that Celona performed on behalf of the Village traded in part on the reputation, network and influence that comes with political office. That much is an unavoidable result of Rhode Island's decision to retain a system of government in which legislators hold outside employment without very stringent restrictions.

There is not very much direct precedent but in United States v. Rabbitt, 583 F.2d 1014 (8th Cir. 1978), cert. denied, 439 U.S. 1116 (1979), the Eighth Circuit rejected a mail fraud count based on kickbacks paid to a state house speaker for merely

recommending to other state officials, over whom the speaker had no authority, an architectural firm for work on state projects. Rabbitt was perhaps a close case,[4] but the explicit kickback scheme there involved was markedly more abusive than urging local mayors or fire chiefs to comply with state law. In all events, whether or not Rabbitt is correct, we think the rescue run lobbying of mayors was not a crime even if the facts are taken most favorably to the government.

By contrast, Celona's conduct vis a vis the insurers was closely related to his official functions including legislation. In March 2000, Celona told Driscoll that a proposed bill requiring payment of insurance reimbursements was being held up to see if a private resolution could be managed. When the dispute between RWMC and Blue Cross over bill payments developed in 2001 and 2002, Celona had become chair of a senate committee with considerable power over health care legislation, and both Blue Cross and United were regularly concerned with matters affected by the committee. Here, there is evidence that Urciuoli and Celona sought to exploit this connection to the legislative process.

---

[4]Its reasoning was criticized by Judge Posner, United States v. Holzer, 816 F.2d 304, 309 (7th Cir. 1987), and it is in tension with another Seventh Circuit case in which an aide to the mayor recommended awarding a contract to a company in which he held a concealed interest. United States v. Bush, 522 F.2d 641, 647-48 (7th Cir. 1975), cert. denied, 424 U.S. 977 (1976).

At Urciuoli's behest, Celona became involved with negotiations between RWMC and the insurers, and he did so confessedly to bring pressure on the latter to settle on terms favorable to RWMC. As already recounted, the government offered evidence that Celona in a 2001 meeting with Urciuoli and a Blue Cross lobbyist delivered a barely veiled warning of potential legislative trouble to Blue Cross if it did not settle. When Celona later told Urciuoli that he had put considerable pressure on the lobbyist, Urciuoli replied approvingly that he deserved to be "cranked around."

In addition, Celona held two negotiating sessions in his state house office, one in 2002 and the other in 2003, which included Urciuoli and the Blue Cross CEO. In these meetings Celona could be seen as a committee chair hoping to resolve amicably a matter that might otherwise require legislation. The Blue Cross CEO testified at trial that without a compromise he expected that a "political solution [would be] thrust down our throats simply to save" RWMC. Urciuoli urges that the government has cobbled together unrelated incidents occurring over a period of several years; but the jury could easily view them as a deliberate scheme.

Some of the evidence was disputed, including the alleged veiled threat and the extent of Celona's active participation at the meetings. But considerable evidence, including the communications between Urciuoli and Celona, supported the

government's view that, with active help from Celona, Urciuoli was deliberately seeking to invoke the threat of Celona's power over legislation. If the jury accepted the government's evidence, it is hard to see why the jury could not also conclude that Celona was misusing his official power over legislation--part of the honest services he owed to the citizens--to coerce Blue Cross and United into settlements with RWMC.

So we conclude that the instructions were over-broad insofar as they licensed the jury to consider the rescue run advocacy as a deprivation of honest services, but that the insurance episodes were properly considered as potentially criminal--as, needless to say, were Celona's actions in promoting or blocking legislation to favor RWMC. The latter alone, involving multiple episodes over a substantial period, probably would have assured conviction, at least or especially of Urciuoli. We have not described the latter in detail only because defendants do not contest the sufficiency of the evidence or deny that such activities would violate the statute.

Thus an argument could be made for regarding the jury's consideration of the ambulance run evidence as harmless in the sense that the convictions would arguably have occurred without it. But the ambulance evidence got a good deal of emphasis in the government's case in chief, and the government essentially concedes in its brief that the evidence should not be regarded as harmless

if we conclude that the rescue run conduct could not comprise a deprivation of honest services. Nor does it seek to distinguish between the two defendants even though their posture vis a vis the various sets of episodes is somewhat different and Driscoll's involvement more limited. Accordingly, a new trial is necessary.

On remand, an issue may remain as to the proper instructions relating to the insurance episode. On the government's version of what happened, Celona's action could be viewed as receipt of payment for misusing his powers as a legislator at Urciuoli's behest. But Urciuoli disputes some aspects of the government's version, and the possibility exists that the government may prove some but not all of the facts that it alleges, leaving the jury to determine whether the proven facts make out the offense.

Conceptually, the government's allegations may add up to bribery but the central wrong is not the usual problem of buying votes. The core misconduct, if it occurred, was paying Celona to use his legislative powers as a threat to extract favorable treatment for RWMC from the insurers. How this notion should be conveyed to the jury is a matter for the parties to propose and for the district judge to resolve in the first instance; but this is not a common subject of the honest services case law and some consideration might be given to helping the jury focus on the

nature of the possible wrongdoing in relation to whatever facts it may find.

The government adds that Celona did not disclose to the insurers that he was being paid by RWMC, but while non-disclosure can sometimes constitute an independent violation of the statute,[5] here the non-disclosure was in some sense a sideshow to the real harm--the use of legislative threats for private ends. Celona did not recommend specific terms of settlement under a pretense of neutrality, nor is it obvious why disclosure of Celona's relationship with RWMC would have resulted in less pressure on the insurance companies to settle. The government is free to develop such a theory on remand, but we think it unpromising.

State Law Instructions. Although we remand for a new trial, two separate claims of error could easily recur and so we address them as well. One relates to instructions as to the role of state law; the other, addressed in the next section, concerns the aiding and abetting instructions.

---

[5]The case law does establish that concealment of a material conflict of interest can under some circumstances constitute honest services fraud. E.g., Jennings, 487 F.3d at 579 (legislator voted on and authored legislation to aid company in which he had secret financial interest); United States v. Panarella, 277 F.3d 678, 691 (3d Cir.) (legislator lied on his financial disclosure forms while voting to benefit company that secretly employed him as a consultant), cert. denied, 537 U.S. 819 (2002); Woodward, 149 F.3d at 62 (legislator, in violation of state law, failed to disclose gratuities received from lobbyist).

Urciuoli and Driscoll sought to argue in the district court that state law permitted Celona to vote on legislation affecting RWMC, despite his employment by a partly owned subsidiary of RWMC, so long as the legislation affected RWMC no more than any other hospital provider. R.I. Gen. Laws § 36-14-7. At trial they sought a jury instruction to that effect; the district court refused and instead charged that state law was irrelevant (except as it might bear on intent). Objections were raised both to the refusal and to the instruction actually given.

The relationship between state law and the federal honest services statute is unsettled. The Fifth Circuit has held that section 1346 extends only to conduct that independently violates state law. United States v. Brumley, 116 F.3d 728 (5th Cir.) (en banc), cert. denied, 522 U.S. 1028 (1997). Other circuits have denied that state law plays any necessary role. E.g., United States v. Margiotta, 688 F.2d 108, 124 (2d Cir. 1982) ("[A] violation of local law is not an essential element . . . ."), cert. denied, 461 U.S. 913 (1983); United States v. Keane, 522 F.2d 534, 545 (7th Cir. 1975), cert. denied, 424 U.S. 976 (1976). It is plain that sections 1341 and 1346 enact a federal crime--but beyond that, broad generalizations may be unsafe.

Conceivably in some circumstances, state law might bear on what "services" are owed by a state legislator. But just how far violation of state law might be a premise for honest services

fraud, cf. Sawyer, 85 F.3d at 728, or, alternatively, might "immunize" conduct that would otherwise be a federal crime, are tricky questions and may depend inter alia on precisely what the government has charged.[6] The issue could be pertinent here if the government in this case had chosen to proceed on the theory that a conflict of interest alone (as opposed to a bribe or concealment of a conflict) was a basis for conviction.

But the government's position throughout was that Celona was being paid for performing official acts--specifically, that the case was one of quid pro quo bribery with payments routed through the Village as a disguise. Nothing in Rhode Island law purports to authorize or protect such conduct. Further, the instructions given to the jury did not easily permit conviction based solely on conflict-of-interest theory; in fact the district court stressed that "[w]hat is wrong and what is unlawful is for a person to make payments to a public official with the intent to cause that official to act in his official capacity in a way that benefits the person making the payments."

---

[6]See Sawyer II, 239 F.3d at 42; Sawyer I, 85 F.3d at 728; Woodward, 149 F.3d at 62. See generally Brown, Should Federalism Shield Corruption? Mail Fraud, State Law and Post-Lopez Analysis, 82 Cornell L. Rev. 225 (1997). Cf. Fallon, Meltzer & Shapiro, Hart & Wechsler's The Federal Courts and the Federal System 527-41 (5th ed. 2003) (discussing the arguably analogous relationship between federal due process rights and state-created property and liberty interests).

Nevertheless, the defendants do point to some indications that the jury could have been confused. They note that the jury was also told that lack of "independent judgment" and "disinterested service" are the evils at which the statute aims to strike; by extrapolation, conflicts of interest might then also be illegal. In addition, the indictment referred to "conflict of interest" and Celona testified that he wrongfully acted while under a conflict of interest.

Given the government's theory of the case and taking the instructions as a whole, see Woodward, 149 F.3d at 69, we doubt that the jury convicted based solely on the conflict of interest and without finding bribery for official acts. Certainly, the most obvious basis for conviction was payment for helping to advance or obstruct legislation, and the least obvious was the notion that Celona merely acted under a conflict of interest. However, as we are remanding for a new trial, precautions against any such possible confusion can easily be taken at the retrial.

Aiding and Abetting Instruction. This brings us finally to the argument, raised by Driscoll alone, that the instructions did not clearly explain the intent requirement of the aiding and abetting charge. This argument was not raised in objections to the instructions; review, therefore, is only for plain error. United States v. Olano, 507 U.S. 725, 731-32 (1993).

In Learned Hand's classic and oft-quoted formulation, to be guilty of aiding and abetting one must "in some sort associate himself with the venture, . . . participate in it as in something that he wishes to bring about, . . . seek by his action to make it succeed." United States v. Peoni, 100 F.2d 401, 402 (2d Cir. 1938). The district court in this case instructed that "the Government has to prove that the defendant intended to assist in the commission of the crime or to cause it to be committed." The jury was also told that to be found guilty of aiding and abetting, Driscoll must have "willfully" acted to facilitate the crime; that word had earlier been defined as "knowingly, voluntarily and with an intent to commit the act."

Driscoll now objects that this articulation was too terse, that the instructions should have included the "shared" intent language found in some of our opinions and in the First Circuit Pattern Jury Instructions. E.g., United States v. Keene, 341 F.3d 78, 84 (1st Cir. 2003) (defendant must have "consciously shared the principal's knowledge").[7] At the very least, she says, Learned Hand's language should have been tracked more closely.

---

[7]The pattern instructions charge that the government must prove beyond a reasonable doubt "that [defendant] consciously shared the other person's knowledge of the underlying criminal act, intended to help [him/her], and [willfully] took part in the endeavor, seeking to make it succeed." First Circuit Criminal Pattern Jury Instructions § 4.18.02 (1998). The pattern instructions, although often helpful, were not prepared or mandated by this court. See id. Preface; United States v. Tse, 375 F.3d 148, 157-58 (1st Cir. 2004).

Whatever else one might say, the instruction given was assuredly not "plain" error.

There is no single prescribed way to get the aiding and abetting concept across, and what is required might depend on the particulars of the case. For example, if (in the presence of the aider and abettor) the principal said to the victim, "I am going to shoot you" and asked the aider and abettor to hand the principal a gun, fine distinctions may be unnecessary. But suppose the alleged aider and abettor says that he was in the other room when the shooting threat was uttered and had no idea that the gun was about to be used for murder. If the defendant's version is right, an "intent" to hand over the gun would not be enough.

The problem can easily arise in a fraudulent scheme. While not all parts of the puzzle need be known by each defendant, a defendant must have enough knowledge to establish the necessary scienter. "[T]he government could not simply show that [defendants] participated in a transaction that turned out to be part of a fraudulent scheme. The government also had to show [defendants'] 'willful participation in [the] scheme with knowledge of its fraudulent nature and with intent that these illicit objectives be achieved.'" United States v. Bailey, 859 F.2d 1265,

1273 (7th Cir. 1988) (quoting United States v. Price, 623 F.2d 587, 591 (9th Cir. 1980)), cert. denied, 488 U.S. 1010 (1989).[8]

In all events, counsel is now alert to the issue, and we are confident it can be resolved in the district court in a satisfactory manner. Since the government contends in its brief that there "is no meaningful distinction" between the instruction given and the model charge in the pattern instruction, we assume it will not object on retrial to the use of the pattern charge or comparable language that specifically addresses the issue of knowledge.

The case was ably tried by the district judge, and the instruction as applied to the ambulance runs is an issue that could reasonably be debated. It is frustrating not to be able (yet) to reduce the "honest services" concept to a simple formula specific enough to give clear cut answers to borderline problems. But it is in the nature of sections 1341 and 1346, at least as applied to political activities, that the problems generated sometimes have to be settled one at a time until an accretion of concrete precedents forms a pattern that can be usefully articulated.

---

[8]See also United States v. Bryza, 522 F.2d 414, 421 (7th Cir. 1975) ("Whether or not the defendant had the specific criminal intent to defraud is governed by the conduct and state of mind of the schemer rather than the objects of the scheme."), cert. denied, 426 U.S. 912 (1976); United States v. Pearlstein, 576 F.2d 531, 537 (3d Cir. 1978) ("[D]efendants must either have devised the fraudulent scheme themselves . . . or have wilfully participated in it with knowledge of its fraudulent nature.").

The convictions and sentences of the defendants are vacated and the matter remanded for further proceedings consistent with this decision.

It is so ordered.