UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Cr. No. 06-02- ML |
| | : | |
| ROBERT A. URCIUOLI and | : | |
| FRANCES P. DRISCOLL | : | |

**DEFENDANT ROBERT A. URCIUOLI'S**
**RENEWED MOTION TO DISMISS THE INDICTMENT UNDER THE FIFTH AND SIXTH AMENDMENTS OR, IN THE ALTERNATIVE, FOR A STAY**

NOW COMES Defendant Robert A. Urciuoli ("Urciuoli") and respectfully requests that this Court dismiss the Indictment under the Fifth and Sixth amendments. The Indictment must be dismissed as to Urciuoli because the Government has engaged in conduct vis-à-vis Roger Williams Medical Center ("RWMC")[1] that violates both Urciuoli's Sixth Amendment right to counsel of his choice and his fundamental right to fairness in a criminal proceeding under the Fifth Amendment. Urciuoli requests that the Court hold an evidentiary hearing so that Urciuoli can determine the extent of the Government's interference with, and violation of, his constitutional rights. In the alternative, Urciuoli respectfully seeks a stay of these proceedings to allow him to seek a declaratory judgment, by way of arbitration,[2] compelling RWMC to honor its obligations to provide indemnification and advancement of fees to Urciuoli.

In support of this motion, Urciuoli relies on his accompanying Memorandum of Law, which is filed herewith and incorporated herein by reference. Urciuoli further relies on the

---

[1] RWMC is the parent company to Roger Williams Hospital and other affiliates.
[2] Urciuoli has an arbitration clause in his employment contract with RWMC.

Declarations of Robert A. Urciuoli and Richard Licht, which are also filed herewith and incorporated herein by reference.

Mr. Urciuoli hereby requests oral argument in connection with this Motion. Counsel for Mr. Urciuoli estimates that one hour (1 hour) will be required for same.

WHEREFORE, Defendant Robert A. Urciuoli respectfully requests that the Court hold an evidentiary hearing so that Urciuoli may be given the opportunity to establish the extent of the Government's interference with and violation of his constitutional rights. Following the hearing, Urciuoli requests that the Court enter an order dismissing the Indictment as to Urciuoli. In the alternative, Urciuoli requests the Court to stay the criminal proceeding to allow Urciuoli to pursue a declaratory judgment by way of arbitration compelling RWMC to honor its obligation to provide indemnification and advancement of fees to Urciuoli.

Respectfully submitted,

ROBERT A. URCIUOLI

By his Attorneys,

/s/ Kristie M. Passalacqua
Kristie M. Passalacqua, Bar No. 6945
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, RI 02903
(401) 274-2000
(401) 277-9600 (fax)
kpassalacqua@haslaw.com

Michael J. Connolly (MA BBO # 638811)
*Pro Hac Vice Counsel*
Hinckley, Allen & Snyder LLP
28 State Street
Boston, MA 02109
(617) 345-9000
(617) 345-9020 (fax)
mconnolly@haslaw.com

**CERTIFICATION**

I hereby certify that on May 14, 2008, a copy of the foregoing Motion was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Kristie M. Passalacqua

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Cr. No. 06-02- ML |
| | : | |
| ROBERT A. URCIUOLI and | : | |
| FRANCES P. DRISCOLL | : | |

**DEFENDANT ROBERT A. URCIUOLI'S MEMORANDUM IN SUPPORT OF HIS RENEWED MOTION TO DISMISS THE INDICTMENT UNDER THE FIFTH AND SIXTH AMENDMENTS OR, IN THE ALTERNATIVE, FOR A STAY**

NOW COMES Defendant Robert A. Urciuoli ("Urciuoli") and respectfully submits this Memorandum of Law in Support of his Motion to Dismiss the Indictment under the Fifth and Sixth amendments. As set forth more fully below, the Indictment must be dismissed as to Urciuoli because the Government has engaged in conduct vis-à-vis Roger Williams Medical Center ("RWMC")[1] that violates both Urciuoli's Sixth Amendment right to counsel of his choice and his fundamental right to fairness in a criminal proceeding under the Fifth Amendment. Urciuoli requests that the Court hold an evidentiary hearing so that Urciuoli can determine the extent of the Government's interference with, and violation of, his constitutional rights.

In the alternative, Urciuoli respectfully seeks a stay of these proceedings to allow him to seek a declaratory judgment, by way of arbitration,[2] compelling RWMC to honor its obligations to provide indemnification and advancement of fees to Urciuoli.

[1] RWMC is the parent company to Roger Williams Hospital and other affiliates.
[2] Urciuoli has an arbitration clause in his employment contract with RWMC.

## INTRODUCTION

The grand jury investigation in this matter was conducted during the period when the Department of Justice directed prosecutors, under the so-called Thompson Memorandum, to consider whether an organization was advancing legal fees to an employee the Government deemed "culpable" in deciding whether to prosecute the organization. Consistent with the Thompson Memorandum, the Government in this case waged an ultimately successful campaign to force RWMC to fire Urciuoli and sever its contractual obligation to indemnify him for the cost of his defense, as well as the advancement of those fees. Before RWMC was indicted, it resisted Government pressure to terminate Urciuoli and sever advancement of his fees, based on the strength of its conviction that neither it nor Urciuoli had violated the law. Once RWMC was indicted and faced with imminent financial collapse, however, the RWMC Board of Trustees (the "Board") succumbed to the Government's demand and stipulated to the personal guilt of Urciuoli and co-defendant Frances P. Driscoll ("Driscoll"), even though it required the Board to completely reverse its long-held, well-informed position that the two had not engaged in wrongdoing. By pressuring RWMC to "admit" Urciuoli's guilt, the Government forced RWMC to terminate Urciuoli's right to indemnification and advancement of attorney's fees, to which he was entitled by contract, statutory law, and established policy and practice at RWMC. In doing so, the Government violated Urciuoli's constitutional right to representation by defense counsel of his choice and his fundamental right as a criminal defendant to a fair trial.

The Supreme Court has long protected a defendant's right to fairness in the criminal process. It has grounded this protection primarily in the Due Process Clause as well as more specific provisions of the Bill of Rights, including the Confrontation and Assistance of Counsel Clauses of the Sixth Amendment. As two United States District Courts recently have

recognized, where the Government engages in conduct that callously interferes with a criminal defendant's access to funds that would pay for his defense and otherwise interferes with his entitlement to be treated fairly throughout the criminal process, the entire criminal proceeding is contaminated and dismissal of the indictment is warranted.[3]

## PROCEDURAL HISTORY

Urciuoli filed a motion to dismiss on the same grounds as those presented here before Judge Torres shortly before the first trial in this matter commenced (the "Original Motion to Dismiss").[4] The Original Motion to Dismiss was denied by Judge Torres, immediately following argument of counsel in an oral decision from the bench. The principal ground stated by the Court for denying the motion was that Urciuoli was then represented by two law firms, the undersigned counsel and The Law Offices of Richard M. Egbert, whom the Court found to have mounted a vigorous defense up to that point in the proceeding. Thus, without reaching the issue of whether there was any Government interference, Judge Torres reasoned that Urciuoli had not been prejudiced by any alleged Government interference with his rights. The Court denied the motion without conducting an evidentiary hearing. See Order dated August 31, 2006 (Docket #148).

Because of developments in the law that have occurred since the first motion was decided, as well as changes in Urciuoli's personal circumstances, this motion rests on far firmer grounds than its predecessor. The legal basis for the instant motion has been significantly strengthened based on decisions in two cases involving similar government interference, which

---

[3] See United States v. Stein, 453 F.Supp.2d 330 (S.D.N.Y. 2006) ("Stein I"); United States v. Stein, 495 F.Supp.2d 390 (S.D.N.Y. 2007) ("Stein II"); United States v. Rosen, 487 F.Supp.2d 721 (E.D.Va. 2007).

[4] The reason the Original Motion to Dismiss was not filed until shortly before the first trial is that the legal basis for the motion was recognized for the first time by Judge Kaplan of the Southern District of New York in a decision rendered on June 26, 2006, approximately five (5) weeks before the motion was made in this case. See Docket # 124, filed July 31, 2006.

established that the Thompson Memorandum is "fraught with the risk of constitutional harm." Rosen, 487 F. Supp. 2d at 723; see also Stein I, 435 F.Supp.2d 330 and Stein II, 495 F.Supp.2d 390 (seminal decisions by Judge Kaplan of the Southern District of New York in which the indictments of thirteen defendants were dismissed on grounds nearly identical to those raised here). In addition, the facts underlying the instant motion are far more compelling at this time in that Urciuoli's personal financial circumstances have significantly deteriorated since the initial version of this motion was filed. As the accompanying Declaration of Urciuoli reflects, Urciuoli is not able to afford counsel of his choice to defend this case.

Furthermore, newly available evidence, in the form of the accompanying Declaration of former RWMC Trustee Richard Licht, has shed more light on the Government's coercive role in cutting off Urciuoli's access to indemnification and advancement of legal fees, in violation of his Fifth and Sixth Amendment rights. In his Declaration, Mr. Licht attests to his understanding of the threat from the Government as follows: "if the Hospital did not terminate Mr. Urciuoli and immediately stop indemnifying him for his legal fees, the Hospital would be prosecuted." Declaration of Richard Licht ("Licht Decl."), ¶ 23. Mr. Licht further attests that, "It was apparent to the Board members that if the charges were not dropped the viability of the Hospital was at risk." Id. ¶ 24. The Licht Declaration highlights both the need for an evidentiary hearing and the merits of the instant motion.

## FACTUAL BACKGROUND

### A. The Thompson Memorandum

In 2002, in the wake of high profile corporate scandals such as the Enron case, the President issued an Executive Order which established a Corporate Fraud Task Force headed by United States Deputy Attorney General Larry D. Thompson. On January 20, 2003, Mr.

Thompson issued a document entitled *Principles of Federal Prosecution of Business Organizations* (the "Thompson Memorandum") that was binding on all federal prosecutors. See Exhibit A. The Thompson Memorandum sets forth nine factors that federal prosecutors must consider in determining whether to charge a corporation or other business organization. One such factor is the corporation's cooperation with the Government. The Thompson Memorandum provides in relevant part:

> Another factor to be weighed by the prosecutor is whether the corporation appears to be protecting its culpable employees and agents. Thus, while cases will differ depending upon the circumstances, a corporation's promise of support to culpable employees and agents, either *through the advancing of attorneys fees, through retaining the employees without sanction for their misconduct*, or through providing information to the employees about the government's investigation pursuant to a joint defense agreement, may be considered by the prosecutor in weighing the extent and value of a corporation's cooperation.

Id.

During the pre-indictment period, numerous meetings were held between Government attorneys and the lead FBI case agent Dennis Aiken on the one hand, and counsel for RWMC on the other. During several of those meetings, the undersigned counsel for Urciuoli is informed that the Government referenced the Thompson Memorandum as setting forth the factors it would consider in determining whether or not to indict RWMC. This is unsurprising in view of the fact that the Thompson Memorandum imposed binding guidelines on the United States Attorney's Office. Thus, by virtue of the protocol for assessing an organization's cooperation under the Thompson Memorandum and the repeated references to the Thompson Memorandum by the prosecution team during its meeting with RWMC representatives, RWMC faced continuous pressure from the Government to terminate Urciuoli and sever Urciuoli's rights to indemnification and advancement of legal fees throughout the pre-indictment period, as well as after it was indicted.

**B. Urciuoli's Right to Indemnification and Advancement of Attorney's Fees**

Both Urciuoli's employment contract with RWMC and Rhode Island statutory law provide for indemnification for legal fees. Urciuoli's employment contract with RWMC provided in relevant part as follows:

> 15. Indemnification. During the period of his employment hereunder, [RWMC and its affiliates] agree[] to indemnify [Urciuoli] in his capacity as an officer of [RWMC and its affiliates], and as an officer and member of the Board of Directors of any subsidiary or affiliate of [RWMC and its affiliates] for which [Urciuoli] is rendering services at the request of [RWMC and its affiliates], all to the maximum extent permitted under the laws of the State of Rhode Island.

See Exhibit B. In addition to the above established contractual obligation, it was the established practice of RWMC to advance fees to employees entitled to indemnification. See Declaration of Robert A. Urciuoli ("Urciuoli Decl."), ¶ 3.

In connection with a state grand jury investigation relating to the same issues involved in this matter, Urciuoli was provided with indemnification and advancement of fees by RWMC. Indeed, at the outset of this investigation, Urciuoli hired counsel at the direction of RWMC's counsel. Urciuoli Decl., ¶ 6. From that time until the January 26, 2006 meeting, when the Board voted to terminate Urciuoli, RWMC abided by its contractual and statutory obligation to indemnify Urciuoli, and its established practice of advancement of fees. Id. at ¶ 7. Upon information and belief, RWMC also advanced fees to Driscoll. Id.

Rhode Island is one of the many states having statutes addressing the indemnification of corporate directors, officers, employees and other agents. Both the Rhode Island Nonprofit Corporation Act and the Rhode Island Business Corporation Act provide for the indemnification of officers and directors of corporations serving at the request of a corporation. See R.I. Gen. Laws 1956 §§ 7-6-6 (Rhode Island Nonprofit Corporation Act) and 7-1.2-814 (Rhode Island Business Corporation Act).

### C. RWMC's Pre-Indictment Position

The federal investigation of former Rhode Island State Senator John Celona's consulting relationship with RWMC began in or around early 2005. Throughout the pre-indictment period of this investigation, RWMC, through the Board, vigorously denied that it had violated any criminal law, and publicly maintained the innocence of both Urciuoli, who at the time was its President and Chief Executive Officer, and Driscoll, a former executive Vice President. See Exhibit C. Indeed, Urciuoli's counsel is informed that RWMC refused to accept the Government's offer to enter into a deferred prosecution agreement before it was indicted because the proposed agreement required RWMC to acknowledge that Urciuoli and Driscoll had committed the crimes alleged in the Indictment. RWMC continued to support Urciuoli and stand by its conviction that Urciuoli and Driscoll had done nothing wrong, even though its Board was fully informed of the allegations contained in the Indictment and the underlying evidence supporting the allegations.[5]

### D. The Indictment of RWMC

On January 5, 2006, a grand jury returned a thirty-eight (38) count Indictment against Urciuoli, RWMC, Driscoll and Peter J. Sangermano, Jr. Count 1 of the Indictment alleged a conspiracy to defraud the citizens of Rhode Island of Celona's honest services in violation of 18 U.S.C. §§ 371, 1341 and 1346. See Indictment ¶¶ 13-94. Counts 2 through 38 alleged substantive mail fraud violations involving the same alleged scheme. Id. at ¶¶ 95-107.

After RWMC was indicted, the Board was confronted with potentially catastrophic financial consequences, including the possible loss of its ability to obtain Medicare and Medicaid reimbursement. In addition, the Board faced overwhelming pressure to resolve the case from its

---

[5] The undersigned counsel respectfully submits that all representations of facts set forth herein are based on undersigned counsel's information and belief, and that evidence of all such assertions will be offered at an evidentiary hearing, if allowed by the Court.

lenders, its financial benefactors, its medical staff, and even the Governor of the State of Rhode Island. Licht Decl. ¶¶ 20-24.

**E. Deferred Prosecution Agreement**

Faced with the prospect of imminent financial collapse, the RWMC Board capitulated to the Government's demand that it admit Urciuoli's and Driscoll's guilt. On January 26, 2006, the Board agreed to the terms of a Deferred Prosecution Agreement (the "DPA"). See Exhibit D. A true and accurate copy of the DPA is attached hereto Exhibit E. Under the terms of the DPA, RWMC "admit[ed] that the government ha[d] sufficient evidence to prove that Urciuoli and Driscoll committed the offenses charged in the Indictment," id., even though the Board had steadfastly and categorically denied those allegations before RWMC's very existence was threatened by the Indictment. No new evidence was brought to the attention of the Board that could have warranted the reversal of its position.[6] The Government put RWMC in a position where it had no choice but to stipulate that Urciuoli and Driscoll had violated the law, terminate Urciuoli for cause, and discontinue indemnification and advancement of fees to Urciuoli and Driscoll.

The Government was well-aware that the DPA would deprive Urciuoli, and Driscoll, of their right to defend themselves using all resources rightfully available to them. The consequences of RWMC entering into the DPA were predictable because they were unavoidable. First, RWMC was required to terminate Urciuoli as a natural result of its agreement that Urciuoli had committed conspiracy to commit honest services mail fraud and mail fraud. Second,

[6] Counsel for Urciuoli is informed that the Government allowed RWMC's counsel to read the grand jury testimony of Attorney James McGuirk, in order to give the Board a pretextual justification for the termination of Urciuoli. The McGuirk grand jury testimony was later disclosed through discovery. Attorney McGuirk was fully debriefed by counsel for RWMC after his grand jury testimony. Afterwards, RWMC's counsel shared with the Board and the undersigned counsel the substance of McGuirk's testimony. A comparison of the McGuirk debriefing to McGuirk's grand jury testimony reveals that there was no information in McGuirk's grand jury testimony that was not already well known to the RWMC Board, through its counsel, before it was indicted. Any contention, therefore, that the Board's change in position as to Urciuoli is based on revelations from the McGuirk testimony would be illusory.

because RWMC agreed to fully cooperate with the Government and stipulated that Urciuoli was culpable, it had no choice but to comply with the provision in the Thompson Memorandum calling for severance of indemnification and advancement of legal fees as to culpable employees.

**F. The McNulty Memorandum**

Shortly after the initial trial in this case, the Department of Justice reversed the Thompson Memorandum requirement that prosecutors consider whether an organization is indemnifying and advancing fees to employees under investigation in deciding whether the organization should be charged. See Stein II, 495 F.Supp.2d at 396-96. On December 12, 2006, the Department of Justice issued a revised version of the Thompson Memorandum, known as the McNulty Memorandum. Id. Under the guidelines set forth in the McNulty Memorandum, "[p]rosecutors generally should not take into account whether a corporation is advancing attorneys' fees to employees or agents under investigation and indictment . . . ." Id. The revocation of the indemnification provision of the Thompson Memorandum was, apparently, in response to the mounting outcry from powerful voices in the legal community - - including the President of the ABA, the American College of Trial Lawyers, the United States Chamber of Commerce, as well as numerous scholarly commentators - - that the policy clearly violated the constitutional rights of targeted employees. Id. at 398-99. Those concerns were ratified by the only two courts -- in Stein and Rosen -- to have issued published decisions on the issue. Those decisions are discussed further below.

* * * *

Judge Torres rendered his ruling on this issue without the benefit of either the recent court decisions that support this motion or the reversal of the Department of Justice mandatory

guideline that led to the dismissal of Urciuoli and the termination of his rights to indemnification and advancement of fees.

Urciuoli now finds himself once again facing the daunting task of preparing to defend himself against serious criminal charges, deprived of resources that - - absent the Government's unconstitutional interference with his rights - - would otherwise be available to him. In short, the recognized risk of constitutional harm inherent in the Thompson Memorandum was realized in this case. As Judge Kaplan observed, "This is intolerable in a society that holds itself out to the world as a paragon of justice." Stein II, 495 F.Supp.2d at 427-28.

## ARGUMENT

The Indictment must be dismissed as to Urciuoli because the Government has engaged in actions that interfered with both his Sixth Amendment Right to be represented how he chooses and his fundamental right under the Fifth Amendment to fairness in a criminal proceeding. It is impossible to qualitatively assess the affect on the criminal process of the Government's interference. Rather, the nature of the rights at stake is so important and fundamental that interference with them contaminates the entire criminal process -- from beginning to end. See Stein I, 435 F.Supp.2d at 356 (court found that the Thompson Memorandum violated the defendant's Fifth and Sixth Amendment rights). Thus, dismissal of the indictment is the proper remedy. Id. at 382.

## A. The Government Violated Urciuoli's Sixth Amendment Right to Counsel By Causing RWMC to Cut Off Payment of Legal Fees Upon Indictment

### 1. The Thompson Memorandum and the Government's Actions Violated Urciuoli's Sixth Amendment Right to Counsel

The Thompson Memorandum and the Government's actions with respect to RWMC violated Urciuoli's Sixth Amendment right to counsel. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . have the Assistance of Counsel for his defense." U.S. CONST. AMEND VI. This guarantees more than the mere presence of a lawyer at a criminal trial; it protects, among other things, an individual's right to choose the lawyer or lawyers he or she desires and to use one's own funds to mount the defense that one wishes to present. See, e.g., Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 624 (1989); Wheat v. United States, 486 U.S. 153, 164 (1988). Moreover, a defendant's exercise of his Sixth Amendment right to counsel is not to be feared or avoided by the Government:

> No system worth preserving should have to fear that if an accused is permitted to consult with a lawyer, he will become aware of, and exercise those rights. If the exercise of constitutional rights will thwart the effectiveness of a system of law enforcement, there is something very wrong with that system.

Escobedo v. Illinois, 378 U.S. 478, 490 (1964).

The Sixth Amendment protects a defendant's right to spend his own money, or money to which the defendant has a right, toward counsel of choice. Caplin & Drysdale, 491 U.S. at 624; United States v. Rosen, 487 F. Supp. 2d at 727. In a recent case involving the same issue, the Court in Rosen ruled that to prevail on a Sixth Amendment claim defendants must prove: "(i) that they had retained counsel of choice to represent them with funds of their own or funds to which they had a right, (ii ) that the government wrongfully interfered with their right to be represented by counsel of choice, (iii) that the right to be free from government interference with

retained counsel had attached at time of the interference, (iv) the interference prejudiced defendants." 487 F.Supp.2d at 727. Each element is considered below.

***a. Defendant's Right to Fee Advances***

The Rosen Court ruled that, for purposes of the first element stated above, the defendant's right to have fees advanced may be based simply on the employer's practice of advancing fees. Id. at 727-28. Here, Urciuoli had a contractual right to be indemnified for his expenses in defending any claims or charges brought against him by reason of his employment by RWMC. RWMC had an established practice of advancing such fees to its employees. Urciuoli Decl., ¶ 3. The law protects such interests against unjustified and improper interference. See generally Kirch v. Liberty Media Corp., 449 F.3d 388 (2d Cir. 2006) (recognizing tort of interference with prospective economic advantage and inducement of breach of contract); Reilly v. Natwest Mkts. Group, Inc., 178 F. Supp. 2d 420, 429 (S.D.N.Y. 2001) (recognizing that interference with prospective economic advantage covers interference with the ability to pursue legal remedies against another party).

In Stein I, Judge Kaplan held that KPMG's practice of advancing and paying legal fees for its employees, in connection with proceedings arising within the scope of the employee's job duties, created an expectation that their expenses in defending any such claims or charges would be paid by the firm. See Stein I, 435 F.Supp.2d at 367. The Stein I court held that both the expectation, and any benefits that would flow from that expectation, were, in every material sense, those employees' property, which they were entitled to spend on their defense. Id. Here, the Government's violation of Urciuoli's right to counsel of his choice is even more clear-cut. Unlike the KPMG defendants, Urciuoli had a contractual right under his employment contract with RWMC to indemnification of legal fees, and, like KPMG, RWMC had a practice of

advancing legal fees in connection with defense costs -- which it followed as to Urciuoli until the Government interfered.

*b. Wrongful Interference*

"The next element [a] defendant[ ] must show is that the government wrongfully interfered with [his] Sixth Amendment right to use their own funds to retain counsel of choice." Rosen, 487 F. Supp. 2d at 730. The Rosen court ruled that "pressuring or coercing [an employer] to cease advancing fees" no doubt amounts to government interference with a defendant's contractual rights. Id. Applying the concepts underlying tortious interference with contract law, the court found that such government pressure amounts to wrongful interference by the government. Id. at 731. It explained that "when the government's interests are weighed against defendant's the result is thoroughly one-sided: the government has no legitimate interest in arrangements for third parties to advance defendants' attorney fees," unless the advancement amounted to obstruction of justice. Id. "In contrast, defendants have an undeniably strong interest -- indeed, one protected by the Constitution -- in presenting a defense via counsel of their choice, and in obtaining, without government interference, the contractually guaranteed fee advances that allow them to do so." Id.

Here, the record includes sworn statements from a RWMC Board member indicating that the Government pressured RWMC to terminate Urciuoli and cease advancing fees to him, by way of threatening prosecution of RWMC. Licht Decl., ¶ 24-26. While Mr. Licht's sworn statement is enough, Urciuoli respectfully requests an opportunity to expand the record on this issue by way of an evidentiary hearing, as was allowed by the Court in the Stein I case.

Further, it is apparent that the Thompson Memorandum factored prominently into RWMC's decision to enter into the DPA. As noted above, the Government expressly raised the

Thompson Memorandum in pre-indictment negotiations with counsel for RWMC. Indeed, RWMC's counsel addressed every Thompson Memorandum factor in the memorandum it submitted to the Government defending itself. See Exhibit D. As recently noted in Stein I:

> Few if any competent defense lawyers would advise a corporate client at risk of indictment that it should feel free to advance legal fees to individuals in the face of the language of the Thompson Memorandum itself. It would be irresponsible to take the chance that prosecutors might view it as 'protecting...culpable employees and agents'...
>
> As KPMG's new chief legal officer, former U.S. District Judge Sven Erik Holmes, testified, he thought it indispensable (as would any defense lawyer) 'to be able to say at the right time with the right audience, we're in full compliance with the Thompson Memorandum.'"

435 F.Supp.2d at 364. Given the circumstances of this case, there can be no doubt that the Thompson Memorandum policy drove the Government to force RWMC to terminate Urciuoli and sever his and Driscoll's rights to indemnification and advancement of legal fees.

***c. Attachment of the Right***

It is well settled that the right to counsel applies to criminal prosecutions, not criminal investigations, and thus the right typically attaches "at the first formal charging proceeding . . . after which the right applied at all critical stages of the criminal proceedings." United States v. Hylton, 349 F. 3d 781,787 (4th Cir. 2003). The Rosen court acknowledged that "where, as here, an individual is a target or subject of an investigation, and he is in fact spending his own funds (or third-party funds to which he had a right) to retain counsel of his choice, his constitutional right to spend such funds has clearly attached." 487 F.Supp.2d at 733. The Court concluded that the Government coerced the employer to halt fee advancement for the purpose of undermining defendant's relationship with counsel once the indictment issued. The Government thereby violated the defendant's right to expand their own resources towards counsel once the right attached. Id. That is enough to establish a Sixth Amendment claim. Id.

### *d. Prejudice*

As mentioned above, Judge Torres denied the initial motion on this issue because he found that Urciuoli had adequate representation. While, as explained below, it is respectfully submitted that Judge Torres applied the incorrect standard, even under Judge Torres' standard, Urciuoli's financial condition has significantly deteriorated since the first trial. Urciuoli Decl., ¶ 10. Whereas he was represented by two firms of his choice at the time Judge Torres heard the motion, that is no longer the case. Urciuoli does not have the resources to engage a second counsel of his choice and his limited resources will constrain the defense he is able to mount with existing counsel. See Stein II, 495 F.Supp.2d at 416-17 (the court found prejudice where defendants were not able to continue paying a second law firm.)

While there is more than enough evidence of prejudice set forth in the Urciuoli Declaration, as a matter of law, it is not necessary that Urciuoli show that he has been prejudiced by the Government's interference with his right to be represented as he chooses. United States v. Gonzalez-Lopez, 126 S. Ct. 2557, 165 L. Ed. 2d 409, 419 (2006). Deprivation of the right to counsel is complete when the defendant is erroneously prevented from being represented by the lawyer he wants and in the manner he chooses, regardless of the quality of the representation he received. Id. ("To argue otherwise is to confuse the right to counsel of choice -- which is the right to a particular lawyer regardless of comparative effectiveness -- with the right to effective counsel -- which imposes a baseline requirement of competence on whatever lawyer is chosen or appointed."). Here, the Government has interfered with Urciuoli's right to be represented as he chooses because the Government's improper conduct and the Thompson Memorandum created a significant risk that Urciuoli's ability to present the defense of his choice has been compromised.

See Stein I, 435 F.Supp.2d at 371. This violation, like a deprivation of the right to counsel of his choice, is complete irrespective of the quality of the representation he receives. Id.

There are two distinct types of constitutional errors; trial errors, which occur during the presentation of evidence at trial; and structural errors, which are overarching and permeate the entire proceeding. Arizona v. Fulminante, 499 U.S. 279, 307-10 (1991). No prejudice is required where, as here, the defect is structural -- i.e., a defect that affects and contaminates the entire criminal proceeding. Id. at 309; Stein I, 435 F.Supp.2d at 370. Structural errors defy analysis by harmless-error standards. Id. They affect the entire conduct of the trial from beginning to end. Id. Here, the Government's conduct and the Thompson Memorandum have threatened to contaminate the entire proceeding. Properly defending this case, in all its complexity, has required, and will continue to require, substantial financial resources. There are thousands of pages of documents and thousands of pages of transcripts and interview reports that must be reviewed and analyzed, and dozens of witnesses who must be interviewed. The Government has unlimited resources. Urciuoli, on the other hand, has limited and ever-diminishing resources. Urciuoli has been unemployed, with the exception of limited consulting work, since he was terminated by RWMC in January of 2006. Urciuoli Decl., ¶ 9. The Government's interference has substantially limited what Urciuoli can pay his lawyers to do, and has substantially affected strategic decisions along the way. In such circumstances, demonstrating prejudice after the fact would be all but impossible, which is why such an error is said to threaten to taint the entire criminal proceeding. Stein I, 435 F.Supp.2d at 370. The Supreme Court has spoken on this issue:

> We have little trouble concluding that erroneous deprivation of the right to counsel of choice, with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as structural error. Different attorneys will pursue different strategies with regard to investigation and discovery, development of the theory of

> defense, selection of the jury, presentation of the witnesses, and style of witness examination and jury argument. And the choice of attorney will affect whether and on what terms the defendant cooperates with the prosecution, plea bargains, or decides instead to go to trial. In light of those myriad aspects of representation, the erroneous denial of counsel bears directly on the framework within which the trial proceeds – or indeed on whether it proceeds at all. It is impossible to know what different choices the rejected counsel would have made, and then to quantify the impact of those different choices on the outcome of the proceedings. Many counseled decisions, including those involving plea bargains and cooperation with the government, do not even concern the conduct of the trial at all. Harmless-error analysis in such a context would be a speculative inquiry into what might have occurred in an alternate universe.

Gonzalez-Lopez, 126 S. Ct. 2557, 165 L. Ed. 2d at 420 (internal citations omitted).

The same reasoning applies here. Virtually everything Urciuoli has done in this case has been influenced by the extent of the resources available to him. There simply would be no way to know, after the fact, whether the outcome has been influenced by limitations improperly placed upon the availability of resources.

Further, the Government's interference with Urciuoli's ability to mount a defense "creates an appearance of impropriety that diminishes faith in the fairness of the criminal justice system in general." Young v. United States ex rel. Vuitton et Fils S.A., 481 U.S. 787, 811 (1987). This injury to the criminal justice system is not dependent on whether or not Urciuoli ultimately is convicted or would have been convicted even if the Government had not interfered with his constitutional right to counsel. Thus, there is no need for a particularized showing of prejudice here. While a defendant does not have a constitutional right to the most expensive lawyer or to unlimited defense funds, Government interference with those resources that a defendant does have, or legally may obtain, fundamentally alters the structure of the adversary process. Stein I, 435 F.Supp.2d at 372.

### 2. ***Ex Parte* Proffer to Court**

Notwithstanding the fact that, as a matter of law, Urciuoli is not required to demonstrate that he has been prejudiced by the Government's interference with his right to be represented as he chooses, if the Court so desires, the undersigned counsel is prepared to make a proffer to the Court describing what aspects of pretrial investigation and trial preparation Urciuoli has not been, and will not be able to, pursue as a result of the Government's interference with his Fifth and Sixth Amendment rights. Further, the undersigned counsel is prepared to provide an *ex parte* disclosure to the Court detailing how additional defense strategies, including but not limited to investigative support, expert consultation and support and technology support, would enhance Urciuoli's defense if indemnification was to recommence.

## B. The Government Violated Urciuoli's Fundamental Right to Fairness in a Criminal Proceeding

### 1. **Nature of the Right**

Defendants have the right, under the Due Process Clause of the Fifth Amendment, to fundamental fairness throughout the criminal process. The Due Process Clause has been interpreted to provide not only procedural protection for deprivations of life, liberty and property, but also substantive protection for fundamental rights -- those that are so essential to individual liberty that they cannot be infringed by the Government unless the infringement is narrowly tailored to serve a compelling state interest. See, e.g., Washington v. Glucksberg, 521 U.S. 702, 721 (1997).

While the right to fairness in criminal proceedings has not been explicitly so characterized by the Supreme Court, the Supreme Court's repeated recognition of the constitutional mandate of fairness in criminal proceedings strongly suggests that this right is "fundamental" for substantive due process purposes. See Stein I, 435 F.Supp.2d at 360-61; see

also Glucksberg, 521 U.S. at 721 (internal citations and quotations omitted) ("[N]either liberty nor justice would exist" if fairness to criminal defendants were sacrificed.); United States v. Curran, 724 F. Supp. 1239, 1241 (C.D. Ill. 1989), rev'd on other grounds, United States v. Spears, 965 F.2d 262 (7th Cir. 1992), cert. denied, 506 U.S. 989 (1992) ("What can be more basic to the scheme of constitutional rights precious to us than the right to fairness throughout the proceedings in a criminal case?"). The Stein I and Stein II decisions held that a criminal defendant has a fundamental constitutional right to obtain and use resources lawfully available to him or her in order to prepare a defense, free of intentional interference with or deliberate indifference to the rights of the defendants. Stein II, 495 F.Supp.2d at 415.

### 2. The Government's Actions With Respect to RWMC Violate the Substantive Due Process Right to Fairness in the Criminal Process

The Government's pressure on RWMC to enter into the DPA, which would -- and did -- necessarily have the effect of cutting off Urciuoli's legal fees, impinged upon Urciuoli's ability to defend himself. See Stein I, 435 F.Supp.2d at 367. To prepare for and try a case of this complexity requires substantial resources, yet the Government interfered with the ability of Urciuoli to obtain resources he otherwise would have had. This has affected Urciuoli's ability to thoroughly prepare his defense by limiting the means lawfully available to him. The Government's actions are therefore subject to strict scrutiny. Id.

To survive strict scrutiny, Government action must be narrowly tailored to achieve a compelling Government interest. See, e.g., Glucksberg, 521 U.S. at 721. The Government's actions with respect to the provision in the DPA whereby RWMC was required to admit to Urciuoli and Driscoll's guilt cannot pass strict scrutiny under the Due Process Clause because it was not narrowly tailored to serve a compelling governmental interest. Whether or not the Government agents in this case were acting pursuant to the Thompson Memorandum, they

understood that the threat inherent in their actions and the pressure they exerted on RWMC to enter into the DPA would produce exactly the result that occurred -- RWMC's determination to cut off the payment of legal fees for Urciuoli. These actions cannot withstand strict scrutiny under the Due Process Clause. Stein I, 435 F.Supp.2d at 364.

Judge Kaplan ruled that the Thompson Memorandum's provision regarding the advancement of legal fees fails strict scrutiny because it is not narrowly tailored to achieve a compelling objective. Id. In so holding, Judge Kaplan noted that the Thompson Memorandum discourages and, as a practical matter, often prevents companies from providing employees and former employees with the financial means to exercise their constitutional rights to defend themselves. Id. Judge Kaplan further noted that it does so in the face of indemnification statutes that expressly permit business entities to provide those means because the states have determined that legitimate public interest may be served. Id.; see, e.g., R.I. Gen. Laws §§ 7-6-6 and 7-1.2-814. Judge Kaplan found that the Thompson Memorandum improperly discourages employees from exercising their constitutional right to defend themselves even where companies obstruct nothing and, to the contrary, do everything within their power to make a clean breast of the facts to the Government and to take responsibility for any offenses they may have committed. Stein I, 435 F.Supp.2d at 364. It therefore burdens excessively the constitutional rights of the individuals whose ability to defend themselves it impairs and, accordingly, fails strict scrutiny. Id.

### 3. The Terms of the DPA Improperly Interfere with Urciuoli's Constitutional Right to a Fair Trial

In addition to necessarily having the effect of cutting off Urciuoli's legal fees, the Government's pressure on RWMC to enter into the DPA threatens to impermissibly restrict the

testimony of witnesses at the trial in this matter. Paragraph 37 of the DPA states, in relevant part:

Public Statements

> 37. RWMC agrees that it shall not, through its attorneys, agents, officers, directors, trustees or employees, make any statement, in litigation or otherwise, contradicting RWMC's admissions or its representations in this Agreement . . . Any such contradictory statement by RWMC . . . shall constitute a material breach of this Agreement and RWMC thereafter shall be subject to prosecution . . . .

See Exhibit E.

As discussed above, the DPA, by its terms, required RWMC to "admit" that the Government has sufficient evidence to prove that Urciuoli and Driscoll committed the offenses charged in the Indictment. It would seem, then, that through Paragraph 37 of the DPA, the Government is attempting to block testimony at trial that is favorable to Urciuoli. The Government should not be permitted to dictate the contents of a witness' testimony in a criminal proceeding. Allowing it to do so here would constitute a clear violation of Urciuoli's Fifth Amendment right to a fair trial. See, e.g., United States v. Morrison, 535 F.2d 223, 226 (3d Cir.1976); United States v. Smith, 478 F.2d 976, 978-79 (D.C.Cir.1973).

**C. An Evidentiary Hearing is Necessary to Determine the Effect of the Government's Actions on Urciuoli's Constitutional Rights**

An evidentiary hearing is necessary to determine the effect the Government's actions and the Thompson Memorandum had on Urciuoli's Sixth Amendment right to counsel of his choice and fundamental right to procedural fairness in this case. At the hearing, Urciuoli would offer evidence of the following factors, all of which were given prominent consideration by the Court in Stein I.

> First, what information was requested by the Government, formally and informally, about Urciuoli's employment agreement, Urciuoli's employment status, and RWMC's

indemnification of and advancement of fees to Urciuoli during pre-indictment and post-indictment discussions and negotiations with RWMC.

Second, what substantive issues were negotiated between the Government and RWMC regarding possible plea agreements and/or deferred prosecution agreements.

Third, the basis for RWMC's decision, prior to Indictment, not to terminate Urciuoli, and to continue to indemnify and advance legal fees to Urciuoli and Driscoll, and its determination that neither Urciuoli nor Driscoll had violated the law.

Fourth, the basis for RWMC's decision after it was indicted to terminate Urciuoli and to repudiate its obligation to indemnify and advance legal fees to Urciuoli and Driscoll.

Counsel for Urciuoli has requested this information from the Government and RWMC. See Exhibit F, attached hereto. However, it is clear that neither the Government nor RWMC will provide this information absent the compulsory process that would attend a hearing. See Exhibit G, attached hereto.

Here, as in Stein, a hearing and subpoena power are necessary to determine the effect the Government's actions and the Thompson Memorandum had on Urciuoli's Sixth Amendment right to counsel of his choice and his fundamental right to fairness in a criminal proceeding. See Stein I, 435 F.Supp.2d at 352. Without hearing evidence on the above factors, the Court will not be able to fully evaluate the merits of this motion.

**CONCLUSION**

For all of the foregoing reasons, Defendant Robert A. Urciuoli respectfully requests that the Court hold an evidentiary hearing so that Urciuoli may be given the opportunity to establish the extent of the Government's interference with and violation of his constitutional rights. Following the hearing, Urciuoli requests that the Court enter an order dismissing the Indictment as to Urciuoli. In the alternative, Urciuoli requests the Court to stay the criminal proceeding to allow Urciuoli to pursue a declaratory judgment by way of arbitration compelling RWMC to honor its obligation to provide indemnification and advancement of fees to Urciuoli.

Respectfully submitted,

ROBERT A. URCIUOLI

By his Attorneys,

/s/ Kristie Passalacqua
Kristie M. Passalacqua, Bar No. 6945
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, RI 02903
(401) 274-2000
(401) 277-9600 (fax)
kpassalacqua@haslaw.com

Michael J. Connolly (MA BBO # 638811)
*Pro Hac Vice Counsel*
Hinckley, Allen & Snyder LLP
28 State Street
Boston, MA 02109
(617) 345-9000
(617) 345-9020 (fax)
mconnolly@haslaw.com

## CERTIFICATION

I hereby certify that on May 14, 2008, a copy of the foregoing Memorandum of Law was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Kristie M. Passalacqua