# EXHIBIT A

**EXHIBIT A**

Testimony of James McGuirk:

Q: The first document that Frances Driscoll prepared indicated that the objective was to work for Roger Williams Medical Center; is that correct?

A: Correct.

Q: And the first document that you prepared states that the objective is to heighten awareness amongst seniors (the elderly) of the greater Providence community as to the programs and services available at the Villages at Elmhurst and Waterman Lake. Do you see that?

A: Yes.

Q: Who made that change from Roger Williams Medical Center to Villages?

A: I did.

Q: And why did you make that change?

A: Because I thought that Fran had it wrong. I didn't know why she put the medical center in there. Our entire conversation with Bob, we didn't have any place to use Senator Celona except the Village at Elmhurst to exploit his elderly relations. So I changed all the references to the medical center to Village at Elmhurst, and we added Waterman Lake.

Q: And that was based on your understanding of what the relationship was supposed to be; is that correct?

A: That's correct.

Q: And you obtained that understanding from whom?

A: From Bob.

See Trial Tr. 9/20/06, at pp. 213:9-25; 214:1-11.

Q: And when you sent this information to the Ethics Commission, based on your conversations with Robert Urciuoli and Frances Driscoll, who did you believe John Celona was working for?

A: The Village at Elmhurst.

Q: And were you told by either Robert Urciuoli or Frances Driscoll that John Celona was working on rescue run issues related to the hospital?

A: No.

See Trial Tr. 9/21/06, at p. 39:14-22.

Q: Were you told by Robert Urciuoli and Frances Driscoll that John Celona had been working on legislation affecting Alzheimer's units and whether they – whether assisted living facilities could be licensed to have Alzheimer's units?

A: No.

* * * * *

Q: And, Mr. McGuirk, were you told by Frances Driscoll or Robert Urciuoli that John Celona was working to kill Senate Bill 2796 relating to the Hospital Conversion Act?

A: No.

Q: Did you ever ask Robert Urciuoli or Frances Driscoll if John Celona was doing anything other than working for the Village at Elmhurst and carrying out the duties contained in the consulting agreement?

A: No.

Id. at p. 40:1-24.

Q: And did you tell Ms. D'Arezzo that John Celona was doing anything other than working for The Village at Elmhurst when you had that conversation with her?

A: No.

Id. at p. 42:2-5.

Q: When you were asked to work on the consulting agreement, did Bob Urciuoli or Fran Driscoll give you any updates regarding what John Celona had been doing pursuant to his consulting agreement other than what you learned back in 1997?

A: No.

Q: Did they tell you that he was working on rescue runs?

* * * * *

A: No.

* * * * *

Q: . . . did you learn from Robert Urciuoli or had you learned by then from Robert Urciuoli or France Driscoll that John Celona was working on rescue run issues?

A: No.

Q: Had you learned from them that John Celona had been working on any legislative issues of interest to the hospital?

A: No.

Q: Had you learned from them or from Peter Sangermano . . . that John Celona had been working on legislative issues of interest to the Village at Elmhurst?

A: No.

Id. at pp. 58:16-25; 59:15-25; 60:1-3.

Testimony of Katherine D'Arezzo:

Q: And what did [the letter to the Ethics Commission] say Mr. Celona would be doing for the Village?

A: The letter outlined different categories of services that Senator Celona would be providing for the Village at Elmhurst, and the crux of those responsibilities and duties would be to be aware of the various services that both the Village at Elmhurst assisted living facility offered and the Elmhurst Extended Care nursing home offered . . .

* * * * *

And, lastly, I believe he indicated that one of the last areas of duties and responsibilities would be to keep abreast of issues, legislative issues on the federal, state and local level that could impact the provision of services by the Village or Extended Care with a particularized focus on areas relating to assisted living facilities and an attempt to license or regulate assisted living facilities.

See Trial Tr. 9/12/06, at pp. 122:4-25; 123:1-6.

Q: Is there any mention in [McGuirk's letter to the Ethics Commission] of Mr. Celona performing services on behalf of Roger Williams Medical Center?

* * * * *

A: There's no mention of the provision of services to the medical center.

Q: Is there any mention in [McGuirk's letter to the Ethics Commission] of the fact that Roger Williams Medical Center would be funding the Village's payments to Mr. Celona?

A: No, there is not.

Q: Is there any mention in [McGuirk's letter to the Ethics Commission] that, although he would be working for the Village, Mr. Celona would be reporting to someone who worked for Roger Williams Medical Center?

A: No.

Id. at pp. 125:13-25; 126:1-6.

Q: Did Mr. McGuirk during your phone conversation with him on April 15th indicate that Mr. Celona would be performing services for any other entities other than the Village at Elmhurst and Elmhurst Extended Care?

A: No, he did not.

Q: Did [Mr. McGuirk] indicate during his April 15, 1998 conversation with you that Mr. Celona would be performing services other than those that were outlined in the consulting agreement?

A: No, he did not.

Id. at pp. 131:16-25; 132:1.

Q: And what information did you rely on in drafting the advisory opinion in response to Mr. McGuirk's request?

A: With regard to Mr. McGuirk's request, I relied solely upon the information provided in the actual request letter, the information provided in the consulting agreement, which was attached as an exhibit thereto, and the information he provided to me in our subsequent telephone conversation.

Id. at p. 135:16-24.

Q: Based on the information that Mr. McGuirk presented to you in the letter [to the Ethics Commission], the information contained in the consulting agreement and the information that he communicated to you during your phone conversation, did you conduct an analysis of whether John Celona could work on general health care legislation that was of interest to Roger Williams Medical Center?

A: No, I did not.

Q: Why not?

A: That wasn't one of the questions posed in the request for an advisory opinion.

Q: Based on the information that was provided in Mr. McGuirk's April 6, 1998 letter, the consulting agreement and your conversation with him, did you conduct an analysis of whether John Celona could work on general health care legislation while being paid by Roger Williams Medical Center?

A: No, I did not.

Q: And why not?

A: Information regarding him working for Roger Williams Medical Center was not contained in the advisory opinion request letter or in my subsequent contact with Mr. McGuirk, so it was not addressed.

Q: What were the terms of the draft advisory opinion . . . ?

A: The draft advisory opinion addressed the three questions posed in Mr. McGuirk's initial request for an advisory opinion, namely, as to the first category of legislation presented, whether or not he could participate on assisted living facility legislation where there would be a particular direct financial impact upon the Village at Elmhurst or Senator Celona as their agent, the answer was in the negative. He would not be allowed to participate in such legislation and would have to recuse from participation and file a notice of recusal, otherwise known as a Section 6 statement.

Id. at pp. 136:1-25; 137:1-12.

Q: And what did you conclude with respect to whether Mr. Celona would participate and vote on legislation relating to assisted living facilities in general?

A: As to the second question, the commission declined to apply a class exception that we sometimes apply to allow people to participate in matters where it would impact them, their family member, business associate or employer to no greater or lesser extent than any other member of a group or occupation or profession. Here we specifically declined to apply the class exception given the fact that the Village at Elmhurst was only one of approximately 20 assisted living facilities in the State of Rhode Island and it had unique facts regarding its existence as an assisted living facility that the commission would not feel comfortable opining on a class exception analysis. So the answer was that he could not participate on any proposed legislation regarding assisted living facilities regardless of the fact that he may believe that there was no greater or lesser impact to the assisted living facility he worked for versus any other assisted living facility.

Q: And how about with respect to the third category of inquiry presented by Mr. McGuirk?

A: With regard to the third category on general health care issues, the commission, and the draft recommendation that I prepared for the commission, the answer was that he could, in fact, participate on broad-based legislation regarding general health care issues that would impact everyone, essentially, matters relating to elderly affairs, nursing home, general health care issues that would impact all corners of the health care industry because the class of persons that would be affected by such legislation was, in fact, so large.

Id. at pp. 137:24-25; 138:1-25; 139:1-8.

Q: And what is Mr. McGuirk concerned about in [the fax dated April 20, 1998 from McGuirk to the Ethics Commission in response to his receipt of the draft advisory opinion for Senator Celona that had been mailed to him a few days prior]?

* * * * *

A: Mr. McGuirk had concerns with the Ethics Commission's draft response as to the second and third categories of legislation that we indicated Senator Celona should take certain action or refrain from action on.

Q: Specifically, what was his concern with respect to the second category of legislation?

A: As to assisted living facility legislation in general, he believed that Senator Celona was the person in the best position to judge whether or not, in fact, a particular piece of assisted living facilities legislation would impact the Village at Elmhurst or Elmhurst Extended Care, I guess the Village itself as the assisted living facility, to a greater or lesser extent than all other members of that class of assisted living facilities. And he believed that it was not proper to require Senator Celona to recuse himself from such legislation. He believed he should be able to freely participate unless Senator Celona himself determined that there would be a more particularized impact to his employer.

Id. at pp. 141:2-25; 142:1-9.

Q: With respect to the third category of legislation that was the subject of Mr. McGuirk's initial inquiry to the commission, what was his concern about the commission's recommendation in the draft opinion?

A: Mr. McGuirk agreed with the commission's recommendation that he could participate in general health care issues but indicated his one objection that the senator should not be required to file the Section 6 recusal statements, given that at the end of the legislative session, he would be inundated with forms to fill out

and it really wouldn't be practical for him to have to comport with that requirement.

Id. at pp. 143:22-25; 144:1-8.

Q: What's the date on the [final] advisory opinion?

A: The advisory opinion is dated April 23, 1998.

Q: And the advisory opinion that the commission issued was based on an analysis of what employment relationship?

A: Consulting arrangement between Senator John Celona and the Village at Elmhurst and the Elmhurst Extended Care facility.

Q: Is the advisory opinion issued on April 23, 1998 an opinion on whether John Celona could participate in general health care legislation given an employment relationship with Roger Williams Medical Center?

A: No, it is not.

Q: Is the advisory opinion issued by the commission on April 23, 1998 an opinion on whether Mr. Celona could engage in legislation affecting assisted living facilities generally based on employment of Mr. Celona by Roger Williams Medical Center?

A: No, it is not.

* * * * *

Q: Ms. D'Arezzo, is [the advisory opinion issued by the commission on April 23, 1998] an opinion on what official actions Mr. Celona could take on behalf of Roger Williams Medical Center?

A: No, it is not.

Id. at pp. 146:9-25; 147:1-14.