UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | CR 06-02MML |
| | : | |
| ROBERT A. URCIUOLI and | : | |
| FRANCES P. DRISCOLL | : | |

**UNITED STATES' MOTION TO EXCLUDE CERTAIN TESTIMONY OF RICHARD GAMACHE, AND APRIL 27, 2005 MEMORANDA AND RELATED DOCUMENTS**

United States of America, through undersigned counsel, respectfully moves the Court to exclude certain testimony of Richard Gamache, several April 27, 2005, memoranda he authored for Roger Williams Medical Center's (RWMC) general counsel and defendant Urciuoli, and related documents. The bases for the United States' motion are detailed in the accompanying memorandum of law filed simultaneously herewith.

Respectfully submitted,

ROBERT CLARK CORRENTE
United States Attorney

/s/ Luis M. Matos
LUIS M. MATOS
First Assistant U.S. Attorney
United States Attorney's Office
50 Kennedy Plaza
Providence, RI 02903
(401) 709-5000 - phone
(401) 709-5001 - fax
luis.matos@usdoj.gov

/s/ Dulce Donovan
DULCE DONOVAN
Assistant U.S. Attorney
United States Attorney's Office
50 Kennedy Plaza
Providence, RI 02903
(401) 709-5000 - phone
(401) 709-5001 - fax
dulce.donovan@usdoj.gov

**CERTIFICATION**

I hereby certify that on August 15, 2008, I electronically filed this Motion To Exclude Certain Testimony with the Clerk of the US District Court for the District of Rhode Island using the CM/ECF System. The following participants have received notice electronically:

Kristie M. Passalacqua, Esq.
Michael Connolly, Esq.
Joseph Whelan, Esq.
Hinckley, Allen & Snyder
1500 Fleet Center
Providence, RI 02903

Howard M. Cooper, Esq.
Todd & Weld LLP
28 State Street
Boston, MA 02109

John A. MacFadyen, Esq.
MacFadyen, Gescheidt & O'Brien
101 Dyer Street
Providence, RI 02903

Kevin Bristow, Esq.
76 Westminster Street
Providence, RI 02903

Larry Tipton
One Center Place, Suite 220
Boston, MA 02108

/s/ Luis M. Matos

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | CR 06-02MML |
| | : | |
| ROBERT A. URCIUOLI and | : | |
| FRANCES P. DRISCOLL | : | |

**UNITED STATES' MOTION TO EXCLUDE CERTAIN TESTIMONY OF RICHARD GAMACHE, AND APRIL 27, 2005 MEMORANDA AND RELATED DOCUMENTS**

## I. Introduction

The United States of America, through undersigned counsel, respectfully moves the Court to exclude certain testimony of Richard Gamache, several April 27, 2005, memoranda he authored to Roger Williams Medical Center's (RWMC) general counsel and defendant Urciuoli, and related documents. At defendants' first trial, the United States called Richard Gamache, the administrator for Elmhurst Extended Care. Gamache testified on direct that despite the fact that he had been the administrator of Elmhurst Extended Care, hereinafter also referred to as ("the nursing home") since approximately 1999, he did not become aware that John Celona possessed consulting responsibilities related to the nursing home until December of 2002. Ex. 1, Tr. 9/25/06:18-19, 34. In cross-examining Gamache, counsel for Urciuoli elicited testimony that in an April 27, 2005, memorandum, Gamache described a 12-month "audit" conducted by Elmhurst "to estimate John Celona's referral patterns." [1] Because the memorandum was created after the dates of the scheme alleged in the Indictment, the memorandum is not relevant to the issues at trial. In addition, the information contained in the memorandum, as well as Gamache's

---

[1] There are in fact several memoranda dated April 27, 2005, which contain the same or similar facts with only slight differences between them. See Exs. 2-5.

testimony concerning the same, is hearsay. Furthermore, Urciuoli is unable to provide the requisite foundation to warrant introduction of Gamache's testimony concerning the "audit" that was performed or any documents purportedly memorializing its findings. For all these reasons, Gamache's testimony concerning his April 27, 2005, memorandum, the memoranda themselves and other related documents, should be excluded from admission at trial.

## II. Factual and Procedural Background

The Indictment alleges that from in or about August of 1997, continuing until on or about January 8, 2004, defendants engaged in a scheme to defraud the public of the honest services of John Celona. The Indictment alleges, in essence, that defendants defrauded the public of John Celona's honest services by, among other things, causing him to enter into a consulting agreement which falsely stated that he was being hired to work as a consultant on senior affairs on behalf of Elmhurst Extended Care and the Village of Elmhurst. Indict. ¶¶ 24, 103. Elmhurst Extended Care is a nursing home owned and operated by RWMC. Indict. ¶ 4. RWMC was a part-owner of the Village at Elmhurst, an assisted living facility. Id. ¶ 5. Richard Gamache has been the vice-president, administrator, of Elmhurst Extended Care since 1999. Ex. 1, 9/25/06: 18-19. For a brief period of time from March of 2001 to October 2001 his title was amended vice-president of continuum of care after which it reverted to vice-president, administrator. Id. at 19-20.

On or about April 27, 2005, in response to a request by RWMC's general counsel, Kimberly O'Connell, and defendant Urciuoli, Gamache met with the admissions director of Elmhurst Extended Care to "figure out" which referrals to the nursing home were from John Celona. Id. at 44. Gamache and the admissions director looked at a 12-month period of time,

from March of 2002 through February of 2003, "to estimate John Celona's referral patterns to the nursing home." Ex. 2, 4/27/05 Mem. (emphasis added). Gamache then took the 12-month analysis and used that "to project either way because, you know, he had started actually before I started at Elmhurst. And so I don't know the exact number of referrals, but I assumed that there were others either before or after that 12-month period of time." Ex. 1, Tr. 9/25/06: 45 (emphasis added). Gamache then "gave a conservative estimate of what [he] thought would be true over the rest of the time." Id. at 47. Gamache estimated that based on John Celona's alleged referral of 6 patients during the 12-month period looked at, it was appropriate to estimate that Celona referred 3-5 people for all the other years his contract was in place. Id. at 47. Gamache memorialized the admissions' department's findings in three memoranda dated April 27, 2005, addressed to O'Connell, and Urciuoli. Exs. 2-4. Notably, although Gamache's April 27, 2005 memoranda state that this referral pattern was "typical" of Celona's relationship to Elmhurst, Gamache also states that Elmhurst's admission's office found only 9 total referrals allegedly attributable to Celona from July 2001, to March 25, 2004, thus undermining Gamache's own testimony that a 3-5 patient per year estimate was appropriate for the years preceding and subsequent to the "audited" year. Exs. 2, 3.

Gamache also testified that based on this "12-month analysis," he determined that Celona's alleged referrals generated $378,000 in revenue. Ex. 1, Tr. 9/25/06: 45. Gamache did not provide evidence concerning the basis for his conclusion concerning the amount of revenue generated, other than stating it was based on the finding that Celona referred 6 people to the nursing home in a 12-month period. Gamache's April 27, 2005, memoranda also include this $378,000 figure. In addition, the memoranda "assume" based on Gamache's estimate of an

additional 3-5 patients referred each year, additional revenue generate by Celona's referrals. Ex. 4.

At the previous trial, Urciuoli sought the introduction of Gamache's testimony in order to show that "Celona was kept throughout his tenure at the nursing home, and indeed, Mr. Urciuoli wanted to keep him even after the adverse publicity surfaced, because he was very successful at generating business." Ex. 1, Tr. 9/25/06: 48-49. At the time, the United States objected because, despite Urciuoli's counsel's argument to the contrary, the memoranda were generated in 2005, long after Urciuoli terminated Celona's contract with the Village. Ex. 6. In fact, counsel for Urciuoli admitted that he "assume[d] it was generated in the aftermath of [Celona's] termination and in light of the accusations that were published in the newspaper at the time about whether or not he was given – I think the allegation at the time was that he was given a no-show job in return for his position on the Conversion Act. And so what the hospital did, among other things, was to go back and look at the records to see whether it was a no show job." Ex. 1, Tr. 9/25/06: 86-87. At the time, Judge Torres sustained the United States' objection to one of the memorandum's introduction because the reliability of the evidence was undermined by the fact that the memorandum was generated to show a particular thing. Id. at 87.

## III. Argument

### A. The April 27, 2005, Memoranda Are Not Relevant to the Issues to Be Tried and Should Be Excluded

The memoranda Gamache authored were created after the relevant time frame alleged in the Indictment. Despite Urciuoli's counsel's proffer to Judge Torres that the memoranda constituted evidence supporting Urciuoli's position that he kept Celona on the payroll because he

was "very successful in generating business," the memoranda were authored after Celona's contract was terminated. Gamache admits that prior to 2005, Urciuoli never asked him to ascertain the number of referrals that Celona provided to Elmhurst Extended Care. Id. at 107. The only issue at trial to which the information contained in the memoranda could be relevant, is to Urciuoli's intent in continuing Celona's contract. However, there is no evidence that Urciuoli was aware of Celona's alleged referrals to the nursing home prior to 2005, thus, undermining his counsel's claim that he relied on those numbers to continue Celona's contract and keep him on the payroll.[2] Absent some evidence that Urciuoli was aware of Celona's alleged referrals to the nursing home during the relevant time frame, or the amount of supposed revenue generated by the referrals, the information concerning the referrals is not relevant to his intent in continuing to pay Celona and should be excluded from evidence at trial.

**B. Gamache's Testimony, the April 27, 2005, Memoranda and Related Document, Concerning the "Audit" Are Inadmissible Hearsay Pursuant to Rule of Evidence 802**

It is far from clear that the information to which Gamache testified at the first trial is information that was within his own personal knowledge as required pursuant to Rule of Evidence 602. ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.") In his April 27, 2005, memoranda, Gamache states that "the admissions department had identified" patients referred by Celona and that "the admissions department audited a twelve month period." Exs. 3 and 4

[2] At the first trial, Judge Torres inquired: "And is there going to be some evidence that he communicated this to Mr. Urciuoli?" Mr. Connolly: " . . . That information, what was conveyed to Mr. Urciuoli by Mr. Gamache during the relevant period of time, is not something that I can say I have knowledge of. It's not in 302s." Id. at 49.

(emphasis added). Indeed, when he first reported on the "audit" to RWMC's general counsel and Urciuoli, Gamache was mistaken in his understanding of the relevant time period looked at by the nursing home's admissions' office. As a result, Gamache "had the admissions department do additional research." Ex. 3. In response to Urciuoli's recent issuance of Rule 17(c) subpoena, Gamache, on behalf of RWMC reported that three additional individuals assisted with the creation of the April 27, 2005, memoranda. Ex. 7. Thus, the April 27, 2005, memoranda likely constitute double hearsay.

Furthermore, it is not clear what documents, if any, were relied upon to create the Gamache April 27, 2005, memoranda. In response to Urciuoli's Rule 17(c) subpoena, RWMC has produced all the admission records which reflect, refer or relate to the "at least nine individuals" referred by Celona and which Gamache noted in his April 27, 2005 memoranda and the statement by Gamache that Elmhurst Extended care's "admission records indicate that [Celona] referred between 3-5 patients per year." None of the documents produced by RWMC reflect this information and thus, the basis for Gamache's statements remain a mystery.

In any event, Gamache's April 27, 2005, memoranda, and any related documents in which he is reporting the findings of the admissions department's search, are hearsay. Presumably, since there is no evidence that Urciuoli actually knew any of the information contained in the April 27, 2005 memoranda, he intends to introduce the documents in order to prove that John Celona provided services of value to Elmhurst Extended Care. These documents are not the source of the information and do nothing more than summarize someone else's findings, which do not appear to be based on even any business records maintained by RWMC. Thus, they are clearly out-of-court statements offered to prove the truth of the matter asserted

within. The unreliability of the information contained in the memoranda is underscored by the fact that despite Urciuoli's extensive Rule 17(c) subpoena seeking any and all documents which underlie the findings in the April 27, 2005, memoranda, none of the documents produced by RWMC reflect any referrals by John Celona to Elmhurst Extended Care, thus casting serious doubt on Gamache's conclusions.

### C. Gamache's Testimony Concerning the Audit, the April 27, 2005, Memoranda, and Related Documents, Lack the Necessary Foundation Required for Introduction

Based on RWMC's response to Urciuoli's Rule 17(c) subpoena, no documents exist which support the statements in the April 27, 2005, memoranda that Celona referred 9, or 3-5 patients per year to Elmhurst Extended Care. Thus, at trial, putting aside the fact that any testimony by Gamache on these issues would constitute hearsay, Urciuoli would be unable to lay the proper foundation required prior to Gamache testifying to the number of admissions attributable to Celona. For the same reasons, Urciuoli would be unable to lay the proper foundation prior to introducing the Gamache memoranda and related documents. Similarly, if no adequate basis exists to admit Gamache's testimony concerning the <u>number</u> of referrals attributable to Celona, Urciuoli will also be unable to lay the proper foundation prior to the introduction concerning any purported <u>revenue</u> generate by those referrals.

In addition, as detailed above, given the date that the memoranda were created and the purpose for which they were created, the memoranda are not admissible under Rule of Evidence 803(6) as memoranda or records made at or near the events in the regular course of business. In addition, given the demonstrated untrustworthiness of the information contained within the memoranda, they are also not admissible under the residual hearsay exception delineated in

Federal Rule of Evidence 807. Thus, for all these reasons, Gamache's testimony concerning the number of referrals John Celona allegedly made to the Village at Elmhurst, the April 27, 2005, memoranda and related documents purporting to contain such information, should be excluded from admission at trial.

## IV. Conclusion

Based on the foregoing, the United States respectfully requests that the Court exclude any testimony by Richard Gamache concerning the number of referrals John Celona made to Elmhurst Extended Care, the April 27, 2005, memoranda purporting to detail the nursing home's audit of Celona referrals, and any revenue generated and all related documents.

Respectfully submitted,

ROBERT CLARK CORRENTE
United States Attorney

/s/ Luis M. Matos
LUIS M. MATOS
First Assistant U.S. Attorney
United States Attorney's Office
50 Kennedy Plaza
Providence, RI 02903
(401) 709-5000 - phone
(401) 709-5001 - fax
luis.matos@usdoj.gov

/s/ Dulce Donovan
DULCE DONOVAN
Assistant U.S. Attorney
United States Attorney's Office
50 Kennedy Plaza
Providence, RI 02903
(401) 709-5000 - phone
(401) 709-5001 - fax
dulce.donovan@usdoj.gov

**CERTIFICATION**

I hereby certify that on August 15, 2008, I electronically filed this Memorandum In Support of Motion To Exclude Certain Testimony with the Clerk of the US District Court for the District of Rhode Island using the CM/ECF System. The following participants have received notice electronically:

Kristie M. Passalacqua, Esq.
Michael Connolly, Esq.
Joseph Whelan, Esq.
Hinckley, Allen & Snyder
1500 Fleet Center
Providence, RI 02903

Howard M. Cooper, Esq.
Todd & Weld LLP
28 State Street
Boston, MA 02109

John A. MacFadyen, Esq.
MacFadyen, Gescheidt & O'Brien
101 Dyer Street
Providence, RI 02903

Kevin Bristow, Esq.
76 Westminster Street
Providence, RI 02903

Larry Tipton
One Center Place, Suite 220
Boston, MA 02108

/s/ Luis M. Matos

# EXHIBIT 1

THE COURT: The date of the statement he made to Magistrate Judge Martin?
MR. EGBERT: Please.
MR. MATOS: I believe I stated it, your Honor, but it was July 28, 2005.
MR. EGBERT: Thank you.
THE COURT: You may step down, Mr. McGuirk.
MS. DONOVAN: Your Honor, the United States calls Richard Gamache.
RICHARD GAMACHE, GOVERNMENT WITNESS, SWORN
THE CLERK: Would you please state your name and spell your last name for the record.
THE WITNESS: Richard Gamache, R-I-C-H-A-R-D, G-A-M-A-C-H-E.
DIRECT EXAMINATION
BY MS. DONOVAN:
Q. Good morning, Mr. Gamache.
A. Hi.
Q. Where are you currently employed?
A. Elmhurst Extended Care.
Q. What's your position with Elmhurst Extended Care?
A. I am vice president, administrator.
Q. And what are your duties as vice president, administrator?
A. I oversee the nursing home on behalf of Roger



Williams Medical Center.
Q. How long have you held that position?
A. Seven years.
Q. And before coming to Elmhurst Extended Care, could you give us a little bit of information about your background.
A. I've been in this business over 20 years.
Q. When you say this business, what do you mean?
A. Nursing homes, running nursing homes for over 20 years and have run several nursing homes in different states, mostly here in Rhode Island.
Q. Have you held any other titles other than vice president of administration for Elmhurst Extended Care since your tenure with Roger Williams Medical Center?
A. Yes. For a period of time, March to October of 2001, I believe, I was vice president, continuum of care.
Q. And what did that involve?
A. I was responsible for connecting the spectrum of services offered by Roger Williams Medical Center. And my specific duties, in addition to the nursing home and the Philip Hulitar Hospice Center, were to oversee rehab in the hospital, discharge planning, pastoral care, social services and serve as liaison to the Village at Elmhurst. Also Roger Williams home care was



under me for that period of time.
Q. How did it come about that your title changed in October 2001 to vice president of continuum of care?
A. It was March 2001, not October.
Q. Excuse me, March.
A. It was really the work of some consultants who had been hired to work with the medical center on its overall strategic plan and direction, and at that time they felt that I had sort of a vision for how things could work on the continuum and recommended that I be put in that position.
Q. Who hired you initially when you came to work for Elmhurst Extended Care, Mr. Gamache?
A. I worked for Bob Urciuoli for the entire time that I was there, and Guy Medaglia was the individual who had done all the interviewing and recommendations up until I met with Bob.
Q. And when you met with Mr. Urciuoli, did you meet with him as part of the interview process?
A. Yes.
Q. And did you meet with him also once you came on board?
A. Yes.
Q. When you first came on board, did Mr. Urciuoli tell you that Senator John Celona had a consulting



contract that included consulting responsibilities for Elmhurst Extended Care?
A. No, not that I recall.
Q. And when you -- strike that. Who informed you that your title was going to change in March of 2001 to vice president of continuum of care?
A. It may have been Guy Medaglia at first because they were working on the organizational chart; but, you know, ultimately the decision was made by Bob.
Q. And did you have discussions at that time with Bob when your duties changed to include the vice president of continuum of care duties?
A. Yes.
Q. And at that time when you became vice president of continuum of care in March of 2001, did Mr. Urciuoli tell you that Senator John Celona had a consulting contract which included consulting responsibilities for the -- for Elmhurst Extended Care?
A. I don't recall specifically.
Q. Why did you -- why did your title in October of 2001 change back from the vice president of continuum of care to vice president for administration for Elmhurst Extended Care?
A. It was my request. And it was a difficult time during the operation of the nursing home where I felt

that I needed to be there full time, and really the continuum of care position was not something that was very satisfying to me.
Q. And why wasn't it satisfying for you?
A. Well, I was spending a lot of time doing things that are outside of my realm of expertise or comfort zone, spending a lot of time sort of hiring the right people to run those departments that I was responsible for. And I felt like my contributions could be -- were better, more effective at the nursing home.
Q. Was part of the reason that you requested the change because you didn't have adequate resources to fulfill what you felt were your obligations?
MR. CONNOLLY: Objection.
MR. BRISTOW: Objection.
THE COURT: Just a moment. Sustained.
Q. Were there any other reasons why you asked to have your title changed back to vice president of administration at Elmhurst Extended Care?
A. I had gone to Bob and talked about my frustration in that role; that I felt that this was a role that, perhaps if we looked at it, I should have an assistant administrator to run the day-to-day operation of the nursing home so I could be allowed to do more.
So in that regard, I needed more time to do this



job; but it was really, you know, my request because I was frustrated and really, you know, said to him, actually, that I appreciated the opportunity for the promotion, but I'm a nursing home guy, not a hospital guy, and that's what I'm interested in doing, is running the nursing home.
Q. At some point, Mr. Gamache, after beginning to work for Elmhurst Extended Care, did you hear the name John Celona?
A. Sure.
Q. When did John Celona's name first come to your attention?
A. It's hard to recall specifically.
Q. What was the context in which you first heard his name mentioned?
A. It may have -- probably was in a meeting early on.
Q. Do you recall what kind of meeting? Do you recall attending any meetings with John Celona early on in your tenure with the medical center?
A. Well, I believe that early on I did a presentation for the strategic planning group, and I believe that he was there.
Q. What's the strategic planning group?
A. This is the group of individuals who oversee the strategic plan for the medical center.



Q. Meaning what exactly?
A. Well, this is the group of -- made up of administration and physicians and some board members who work on setting out the roadmap for the next few years of the organization. They'll set specific goals and objectives; and then there are committees that work on achieving those, report at that meeting at strategic planning.
Q. Do you recall how soon after you started you made this presentation to the strategic planning committee?
A. I think it might have been the fall of 1999, but I'm not certain.
Q. And who other than Mr. Celona was in attendance at the meeting, if you recall those individuals by name?
A. Individuals by name? I remember Stephen Schiff was there, a physician who I know. And the members of the -- the vice presidents I believe were all there. I remember that Fran Driscoll, Guy Medaglia, Domenic DeCristofano, Bob Urciuoli was there, I believe Herb Cummings, who was then the chairman of the board, and I'm not sure beyond those specifically.
Q. Did anyone introduce you to Mr. Celona at that time?
A. I don't remember.
Q. Do you --



A. I think -- I don't --
Q. That's fine. Did you have an understanding -- did you know why Mr. Celona was at the meeting?
A. No.
Q. Did he participate in the meeting?
A. Not that I recall.
Q. Do you recall when you next heard the name John Celona in connection with your job duties at the medical center?
A. Well, it may have been the --
MR. CONNOLLY: Objection to speculation, your Honor.
THE COURT: If you recall --
A. I don't recall specifically. I'm sorry.
Q. At some point in your position, did Mr. Urciuoli task you with responsibilities specifically relating to the Village at Elmhurst?
A. Yes.
Q. And what specifically did he ask you to do with respect to the Village at Elmhurst?
A. Well, it was familiarize myself with their financial operation and their budget going forward.
Q. Do you recollect at all what time period it was in which he made that request of you, Mr. Gamache?
A. It was probably -- well, I think 2001. I think

early 2001, is my best recollection.
Q. In the course -- what did he ask you to do specifically?
A. To become familiar with their financial operation. The Village at Elmhurst owed Roger Williams Medical Center money, and I was to look at the financials and to gain an understanding of them and to be àble to maybe explain and participate as to when that money might be paid back.
Q. In the course of -- what did you do in order to fulfill that request of Mr. Urciuoli's that you familiarize yourself with the finances of the Village?
A. I began to meet with their chief finance officer, who was Phillip Smart, I believe.
Q. Did you review any documents in connection with those responsibilities?
A. I did. We reviewed the budget, and we reviewed the financial statements.
Q. And in the course of reviewing those documents, did the name John Celona come up?
A. Yes. There was a line item in the budget for John Celona.
Q. And is that the first time that you learned that John Celona had a financial connection to the Village at Elmhurst?



A. That was where I sort of put it all together, yes.
Q. When you say put it all together, what do you mean?
A. I may have known some relationship, but I sort of didn't make the full connection until I saw that.
Q. Some relationship between whom?
A. Between the Village and Senator Celona.
Q. At the time that you first saw Mr. Celona's name as a line item in one of the financial reports for the Village or the budget, did you have any discussions with Mr. Urciuoli at that time about Mr. Celona?
A. No. I do remember --
Q. With Mr. Urciuoli at that time.
A. No. Not at that time, no.
Q. When do you first recall discussing Mr. Celona with Robert Urciuoli?
A. I can't recall specifically. I remember what we talked about, but I can't recall when that was.
Q. What did you talk about?
A. We talked about -- I was looking for grant money to fund some projects that I wanted to do at the nursing home, and --
Q. Do you recall, Mr. Gamache, if that conversation was before or after you had seen Mr. Celona's name in the -- as a line item in the Village at Elmhurst



budget?
A. I can't recall.
Q. I'm sorry I interrupted you. You started to describe your first conversation with Mr. Urciuoli about Mr. Celona.
A. Well, I don't know that it was the first; but, you know, it was one where I talked with Bob about accessing grant money, and he suggested that I contact John Celona to see if he had some avenues that I could explore.
Q. And at that time did Mr. Urciuoli tell you that he was a consultant to the Village at Elmhurst?
A. Not that I recall.
Q. Did he tell you that he -- his consulting or that he had a consulting relationship with Elmhurst Extended Care?
A. Not that I recall. Sorry.
Q. Did you contact Mr. Celona after speaking with Mr. Urciuoli?
A. I did.
Q. And tell us about that conversation.
A. He made some recommendations for me to follow up with a few possible grant sources, nothing that came to fruition but, you know, some names of people and foundations that I should contact.



Q. And what was your understanding about in what capacity you were contacting Mr. Celona?
MR. CONNOLLY: Objection.
THE COURT: Sustained.
Q. After speaking with Mr. Urciuoli, what was your understanding as to why he had referred you to -- did he tell you why he was referring you to Mr. Celona?
A. Not specifically, no.
Q. When you spoke with Mr. Celona, did he tell you that he had a consulting relationship in which some of his responsibilities related to your facility, Elmhurst Extended Care, at that time?
A. No, not that I recall.
Q. Did you have any additional contact with Mr. Celona?
A. Yes.
Q. And describe that for us, please.
A. Well, I had worked with Dennis Moore, who was the vice president of public relations at the medical center, and he had -- we had agreed to set up a dinner meeting where I would present to Rhode Island legislators about the funding crisis in nursing homes.
And John Celona was in attendance for that meeting and was sympathetic to the cause and spoke with Dennis Moore about having me go on his television show.

Q. The dinner that you just described, who was invited to that dinner?
A. There were I think about 40 representatives and senators from the State of Rhode Island, and it was attended by about 25 or so.
Q. One of those being Mr. Celona?
A. Yes.
Q. When was that dinner, Mr. Gamache?
A. I believe it was 2000, maybe fall of 2000.
Q. And you mentioned something about going on a cable program of Mr. Celona's?
A. Yes.
Q. Did you go on his show?
A. I did.
Q. Was there anyone else on the show with you?
A. Yes, Bob was with me on the show.
Q. And how soon was that after you had the meeting for legislators regarding --
A. I don't recall. I would say a month or two.
Q. Did you have any other contact with Mr. Celona?
A. I did. There was a nursing home bill that would increase funding and change the principles of reimbursement for nursing homes, and we -- Elmhurst hosted a breakfast meeting, legislative meeting, on behalf of several area nursing homes, and I was the



presenter.
And we had invited, again, a good number of senators and representatives to help to bring this issue to the forefront, and only Senator Celona attended.
Q. But he was one of a number of legislators that was invited; correct?
A. Yes.
Q. Let me just go back to the fall of 2000 meeting. Did Mr. Celona's attendance at that meeting differ significantly in your eyes than the attendance of any other legislators that attended that meeting?
A. Not from my perspective.
Q. At that time did he discuss with you that he was, again, a consultant whose responsibilities included the Elmhurst Extended Care?
A. No. Actually, we didn't speak at the meeting. He was in the audience, and he spoke with Dennis Moore about having me come on the television show.
Q. Did you have any other contact with Mr. Celona?
A. I'm certain that I saw him and said hello and spoke to him and those kinds of things, but nothing specific.
Q. When would you see him and say hello, what types of situations?



A. I had seen him in the parking lot of the Village at Elmhurst. I'd see him there or I'd see his car there. And, you know, occasionally I would see him connected with some event related to the hospital, whether it be a ribbon cutting or a fundraiser, you know, those kinds of things.
Q. You'd see his car in the parking lot. Did you see him?
A. The reason I knew it was his car was because I had seen him with the car. So at some point I did see him with the car.
Q. Did you talk to him at that time?
A. Just pleasantries.
Q. And -- strike that. Mr. Gamache, what has the occupancy rate of the -- of Elmhurst Extended Care been on average since you began your tenure there?
A. On average, it's been about 97 percent.
MS. DONOVAN: Miss Anderson, would you call up Government's Exhibit 506.
And, your Honor, Government's 506 I believe is in evidence, if it could be displayed to the jury, please.
Q. Mr. Gamache --
THE COURT: Just a moment.
(Pause)



Q. Mr. Gamache, I have some questions for you before you --
A. I'm sorry.
MS. DONOVAN: That's okay.
MR. EGBERT: Could you hold for just one second? I'm sorry. If you don't mind, your Honor, this monitor's not working.
Q. Mr. Gamache, do you see the document that's displayed on your monitor?
A. I do, yes.
Q. Have you seen that before?
A. Yes.
Q. And do you recall receiving this in the course of your employment?
A. Are there other pages to it?
MS. DONOVAN: Yes. Miss Anderson, if you could call up the second page.
THE COURT: Could you give Mr. Gamache Exhibit 506, please.
A. Yes.
Q. The date on the first page of the memo is December 12th, 2002. Do you believe that you received it on or about that date?
A. Yes.
Q. And what is it, please?

A. It is the consulting agreement between John Celona and the Village at Elmhurst and Elmhurst Extended Care.
Q. And prior to receiving Government's Exhibit 506 on or about December 12th, 2002, had you ever seen a copy of the consulting agreement between John Celona and the Village at Elmhurst?
A. Not that I recall, no.
Q. And was the first time that you learned that John Celona's consulting duties included Elmhurst Extended Care the date that we've been talking about, December 12th, 2002?
A. Around that, yes. You know, I think that this was the first time that I saw it in writing and. . .
Q. Is that the first time -- is upon seeing the consulting agreement the first time that you understood that John Celona's consulting duties included your organization?
A. Yes.
Q. Elmhurst Extended Care?
A. Yes.
Q. And prior to that time, no one had discussed that fact with you; correct?
A. Not about the nursing home, no. I knew at that time that he was consulting for the Village, but I didn't know about the nursing home.



Q. You didn't know that he was a consultant to your entity?
A. That's correct, not until this.
MS. DONOVAN: No further questions, your Honor.

CROSS-EXAMINATION

BY MR. CONNOLLY:
Q. Good morning, Mr. Gamache.
A. Good morning.
Q. I'm Michael Connolly. I'm here on behalf of Mr. Urciuoli. Mr. Gamache, I want to start with one of the points that Ms. Donovan made in regard to the occupancy rate at the nursing home. You indicated that it had, on average, a 97 percent occupancy rate?
A. Yes.
Q. Which was a relatively high rate in comparison to the statewide average; correct?
A. Yes.
Q. Now, can you give us, in your own opinion, the reasons why the nursing home had such a high occupancy rate.
A. Well, part of it is the relationship with the hospital. You know, it has a natural connection with the entities that are connected to Roger Williams Medical Center, so that there is flow of different patients through the system.



And when they need access to different parts of care, we're there for them. And, you know, that's part of the reason why occupancy is up, also because it's a good nursing home.
Q. In your opinion, based upon your knowledge of the other nursing homes in Rhode Island and your knowledge of Elmhurst Extended Care, how does it compare to the others in terms of quality of care and cleanliness and those types of issues?
MS. DONOVAN: Objection.
THE COURT: Sustained.
Q. I believe that -- perhaps you didn't talk about the issue of turnover, but is there an issue of turnover that you have to deal with at the nursing home?
MS. DONOVAN: Objection. Scope.
THE COURT: Is this related to something that Ms. Donovan asked on direct?
MR. CONNOLLY: Yes, directly, your Honor.
THE COURT: I'll give you a little chance to show that. Overruled. You may answer.
A. Turnover is a significant problem in nursing homes.
Q. And the care provided by Elmhurst Extended Care is not limited to long-term care; is that correct?



A. No. We also have subacute care and Alzheimer's care and hospice care.
Q. And the subacute care and the other types of care, are they sometimes shorter than long term?
A. Yes. Subacute has an average length of stay of two to three weeks, for example.
Q. And so is it important for you and the people who work for you at the nursing home to work on generating new business based upon referrals?
A. Yes.
Q. And is that something that you devote significant resources toward?
A. Devote -- I devote resources to it.
Q. And it's necessary to do that in order to keep the occupancy rate as high as it has been on average; is that correct?
A. That's correct.
Q. Now, you indicated that you believed the first time that you learned that Mr. Celona worked for any entity related to the hospital, and I would include in that the Village at Elmhurst, did you understand that the Village at Elmhurst had a relationship with the hospital?
A. Yes. Uh-huh.
Q. Did you regard it as one of the hospital's

affiliates?
A. Yes.
Q. And the first person who told you that Mr. Celona worked for one of the affiliates was Mr. Urciuoli; correct?
A. I don't recall.
Q. It could have been somebody else?
A. It could have.
Q. All right. But did you have conversations with Mr. Urciuoli about the fact that Mr. Celona worked for the Village or any of the other affiliates?
A. Yes.
Q. And when he told you that, did he tell you to keep it a secret?
A. No.
MS. DONOVAN: Objection.
THE COURT: The question was answered.
Q. Did he convey to you in any way that you shouldn't talk to anybody else about that?
MS. DONOVAN: Objection.
THE COURT: Overruled.
A. No.
Q. So the understanding you took from those exchanges with Mr. Urciuoli was that you could talk to anybody you wished about Mr. Celona's duties for the Village or



any of the other entities; is that correct?
MS. DONOVAN: Objection.
THE COURT: Sustained.
Q. Now, I believe that you testified about -- I know that you testified about a meeting which you described as a strategic planning committee meeting; correct?
A. Yes.
Q. And I believe you testified that that was a meeting that occurred in the fall of 1999; correct?
A. Yes.
Q. And if I did my math correctly, you said you've been with the nursing home for about seven years; is that correct?
A. Uh-huh.
Q. So that would mean that this meeting occurred shortly after you started working for --
A. I started in August of '99.
Q. All right. So this was one of your first major presentations?
A. It was.
Q. And you indicated that present at this strategic planning committee meeting were some members of the board of trustees of the hospital?
A. Yes.
Q. And some executives with the hospital?



A. Yes.
Q. And then you said John Celona was there; correct?
A. Yes.
Q. Were there any other senators there?
A. No.
Q. Representatives?
A. No.
Q. Was there anybody at that meeting who you knew to be outside of the employment of the hospital or one of its affiliates?
MS. DONOVAN: Objection, your Honor.
THE COURT: Grounds?
MS. DONOVAN: It's the form of the question.
THE COURT: Overruled. You may answer.
A. Well, board members are not employees of the medical center. However, they have a connection. So everyone there is connected to the medical center.
Q. So, to your knowledge, everybody at that meeting was either a member of the hospital board of trustees, an employee of the hospital or one of its affiliates and John Celona; correct?
MS. DONOVAN: Objection.
THE COURT: Overruled.
A. Yes.
Q. And what you were talking about at that meeting



was the future business goals and strategies that would be pursued by the hospital and its affiliates; correct?
A. That's correct.
Q. Did you understand that to be kind of confidential business information that you were discussing with the people present?
MS. DONOVAN: Objection.
THE COURT: Sustained.
Q. Was that information, the information that you presented at the strategic planning meeting, do you know if that was disseminated to the public at that time?
A. Well, I had presented it to Bob one on one, and he wanted me to present it to the group.
Q. All right. And so did you view it to be an internal hospital meeting?
A. Well, it's an internal hospital committee. You know, there was nothing covert about it. It was sort of my vision for how the continuum of care could work in that organization, and he wanted me to present it to the group.
Q. Now, you mentioned that there was a presentation that you made to a group of legislators in the fall of 2000 where I believe you were addressing a legislative issue having to do with the payment of -- was it

nursing assistants?
A. Yes. It was a direct pass-through piece of legislation that, if passed, would allow us to increase the wages of front-line caregivers in nursing homes.
Q. And Mr. Celona was one of the individuals who was present at that meeting; correct?
A. That's correct, yes.
Q. And after that meeting, he approached Dennis Moore; correct?
A. Yes.
Q. Now, Dennis Moore at that point in time was the vice president of public relations for the hospital; correct?
A. That's correct.
Q. He had succeeded in the position of Mrs. Driscoll; correct?
A. Yes. Uh-huh.
Q. And it was your understanding that Mr. Celona approached Mr. Moore to suggest that you appear on Mr. Celona's television program; correct?
A. That's correct.
Q. And you subsequently did so with Mr. Urciuoli; correct?
A. Yes.
Q. And one of the things that you discussed on that



television program was your perceived need for legislation that would provide for additional compensation for nursing assistants; correct?
MS. DONOVAN: Objection. Beyond the scope.
THE COURT: Sustained. Sustained.
Q. Let me ask you this, Mr. Gamache. Did you -- the issue that was covered during the meeting that Mr. Celona attended, was that issue also covered on the television program?
MS. DONOVAN: Same objection.
THE COURT: Hasn't the jury seen the video of that television program?
MR. CONNOLLY: I want to make that connection, your Honor. I don't know that they concluded that that is the same television show.
THE COURT: So it's just one question you want to ask?
MR. CONNOLLY: Yes.
THE COURT: Overruled.
A. Yes.
Q. Now, Mr. Gamache, did you see the presentation that was made on that television program as a promotional exercise that was good for getting the name of Elmhurst Extended Care out to the public?
MS. DONOVAN: Objection.



THE COURT: Sustained.
Q. Mr. Gamache, you are familiar with the fact, sir, are you not, that over the years Mr. Celona referred numerous people to the nursing home itself?
MS. DONOVAN: Objection.
THE COURT: Overruled.
A. Yes.
Q. And, in fact, you had some analysis done in order to try to measure the impact of the -- the financial impact of the referrals made by Mr. Celona; correct?
A. Correct.
Q. And you, in fact, had an audit conducted by the admissions department at Elmhurst Extended Care which covered a 12-month period; correct?
MS. DONOVAN: Objection.
THE COURT: Grounds?
MS. DONOVAN: Form.
THE COURT: Overruled. You may answer.
A. I wouldn't characterize it as an audit, but I met with the admissions director and said, Let's go through and figure out which of these referrals were from John Celona. And then I took the information to the business office and said, Of these referrals, you know, what has been the revenue from these people?
Q. And what you determined was that, on average,



Mr. Celona referred to the nursing home conservatively between three and five patients per year; correct?
MS. DONOVAN: Objection. Hearsay.
THE COURT: Overruled.
A. I did a 12-month analysis and then used that to project either way because, you know, he had started actually before I started at Elmhurst. And so I don't know the exact number of referrals, but I assumed that there were others either before or after that 12-month period of time.
Q. And you determined that during that 12-month period of time that there had been six referrals that had been made by Mr. Celona to the hospital; correct?
A. That's correct. To the nursing home, not to the hospital.
Q. I misspoke. I apologize. And as to that -- to those six individuals referred during that 12-month period, you determined that the total revenue generated was $378,000; correct?
A. That's correct.
Q. And that was for a one-year period; correct?
A. Well, it was for those people referred during 12 months. So if those people had been there either -- some had been there short term, a couple weeks, some had been there maybe for longer than 12 months. I

mean, I don't remember specifically. It could have been just outside of 12 months; but approximately, yes.
Q. Okay. And then you -- and you determined that that was a fairly typical pattern of referrals based upon the nursing home's relationship with Mr. Celona; correct?
MS. DONOVAN: Objection.
THE COURT: Sustained.
Q. Did you reach a conclusion as to how that 12-month period that you looked at compared to other periods of time?
MS. DONOVAN: Objection.
THE COURT: You may answer that yes or no. Either you did or did not reach a conclusion.
A. Yes.
Q. And what was your conclusion?
MS. DONOVAN: Objection.
THE COURT: Sustained.
MR. CONNOLLY: Your Honor, I'd like to be heard on this.
THE COURT: Well, you might avoid it, Mr. Connolly, by asking him how he reached the conclusion so that we'll have some idea as to the basis for the conclusion.
Q. Mr. Gamache, how did you reach the conclusion that



you reached in regard to comparing the 12-month period you looked at to other periods of time?
A. I used the numbers from that 12-month period and then gave a conservative estimate of what I thought would be true over the rest of the time.
Q. Based upon the information that you referred to earlier from the nursing home's admissions department?
A. Yes.
Q. And the nursing home's business department?
A. I believe my document says that there were six referred during that 12-month period, and then I estimated three to five per year. I was a little more conservative in the estimation.
Q. And what did you determine was the range of revenues generated on a per-year basis based upon that analysis?
MS. DONOVAN: Objection. Foundation.
THE COURT: Sustained.
Q. Did you reach a determination as to a range of revenues --
A. Yes.
Q. -- that was received by the nursing home based upon the analysis you just articulated?
A. Yes.
Q. And what did you determine in that regard?



MS. DONOVAN: Same objection, your Honor.
THE COURT: Sustained.
MR. CONNOLLY: Your Honor, I --
THE COURT: What is the purpose for which you're offering this, Mr. Connolly?
MR. CONNOLLY: The purpose, your Honor, at the risk of going into a narrative, is to show --
THE COURT: Approach the sidebar.
(Bench conference held on the record)
MR. CONNOLLY: Your Honor, there are two documents that have been provided to us by the hospital. The first one shows an audit that was conducted during the 12-month period. You just heard testimony about that.
There's a second document where he lays out more of the analysis that was developed by the business office, and the conclusion that I would like him to testify to is the fact that he determined that the referrals would generate between 261,000 and 435,000 per year from 1998 until the time he left.
THE COURT: I understand that's what you're trying to show; but my question is, what is the purpose for which you're seeking to show it?
MR. CONNOLLY: The purpose is to show, your Honor, and this goes right to the heart of our defense



in this case, and that is that Mr. Celona was kept, throughout his tenure at the nursing home, and indeed Mr. Urciuoli wanted to keep him even after the adverse publicity surfaced, because he was very successful in generating business. And this is just for the nursing home.
THE COURT: So your purpose, then, is to show what motivated Mr. Urciuoli in keeping him, not to show that these projections are accurate?
MR. CONNOLLY: Yes, your Honor.
THE COURT: And is there going to be some evidence that he communicated this to Mr. Urciuoli?
MR. CONNOLLY: Your Honor, to be honest, I have not been able to speak to Mr. Gamache because counsel -- the hospital has prevented us.
That information, what was conveyed to Mr. Urciuoli by Mr. Gamache during the relevant period of time, is not something that I can say I have knowledge of. It's not in 302s.
MS. DONOVAN: May I also just raise a point? The memos that he's talking about are from 2005. So if the argument is that this was provided as a means for justifying, he was already gone by that period. Mr. Celona was already gone by that period of time. There's no evidence in these which forms of basis of

Page 50

questioning.
THE COURT: I'm going to sustain the objection now. We can follow this up at the recess if you'd like.
(End of bench conference)
Q. Mr. Gamache, you indicated that there was a point in time that Mr. Urciuoli asked you to review financial records pertaining to the operations of the Village at Elmhurst; correct?
A. Correct.
Q. And at the time that Mr. Urciuoli got you to do that, he said to you that he wanted somebody to keep an eye on the Village at Elmhurst whom he could trust; correct?
A. Words to that effect, yes.
Q. And he was telling you that because he was saying, I trust you, Mr. Gamache, and I'd like you to look at those financial operations; correct?
MS. DONOVAN: Objection.
THE COURT: Sustained.
Q. Did he tell you why he needed somebody who he could trust?
MS. DONOVAN: Objection. Same objection.
THE COURT: Overruled. You may answer.
A. Well, he wanted to -- the Village had been unable

Page 51

to make money and to pay back some of the money that they had borrowed from the hospital, from Roger Williams Realty. So I think that he wanted a fresh set of eyes and someone who was, you know, close to him and understood somewhat the operation.
MS. DONOVAN: Your Honor, I object to the answer.
THE COURT: The question was what he told you, Mr. Gamache, not what you think was going through his mind. What did he tell you?
THE WITNESS: I can't recall specifically.
Q. Now, do you know whether ultimately the Village at Elmhurst was a successful venture for the investment in that entity by Roger Williams Realty?
MS. DONOVAN: Objection, your Honor.
THE COURT: Read that question back, please.
(Pending question read)
THE COURT: Sustained.
MR. CONNOLLY: Your Honor, maybe I could address that point as well at the next break.
Q. Mr. Gamache, you mentioned that for a period of time during your tenure at the hospital, you were -- your title was vice president of the continuum of care; correct?
A. Correct.

Page 52

Q. Now, the continuum of care was a business strategy which, to your knowledge, predated your tenure at the hospital; correct?
A. That is correct.
Q. It had been something that the hospital had implemented as much as a decade prior to your arrival; correct?
MS. DONOVAN: Objection.
THE COURT: Sustained.
Q. But in any event, when you started working at the nursing home, you worked toward implementing the continuum of care; correct?
A. Yes.
Q. And part of your work in that regard involved referring nursing home patients to the Village at Elmhurst?
A. Yes. There was traffic that flowed throughout.
Q. And did you understand that there were patients from the Village at Elmhurst who would receive care at the hospital and ultimately end up as residents at the nursing home?
A. Yes.
Q. Was that a fairly regular occurrence in your experience?
MS. DONOVAN: Objection.

Page 53

THE COURT: Overruled. You may answer.
A. Yes.
Q. A positive source of revenue and profits for the nursing home from your perspective?
MS. DONOVAN: Objection.
THE COURT: Overruled.
A. Yes.
MR. CONNOLLY: Your Honor, if I could put a document on the ELMO. For the record, this is a document that has been marked as Urciuoli Exhibit TTTTTTTTTTTTTTT.
Q. I'm showing you the top half of that document. I can show you the bottom half after you've read it if you need to. I'm going to ask you questions about the top half, Mr. Gamache.
(Witness peruses document)
A. Okay.
Q. Do you recognize that e-mail, sir?
A. I do.
Q. Have you seen it before?
A. Well, I didn't recall seeing it until just recently, but my name is on there, so -- and I recognize some of the language in here are actually examples that I've given in presentations.
Q. And the text of the e-mail, is that something that

Page 54

you prepared?
A. No.
Q. Were you aware of that e-mail when it was sent?
A. No.
Q. Let me ask you to take a look at the bottom of the e-mail.
MS. DONOVAN: Your Honor, I'm going to object as being beyond the scope of direct.
THE COURT: I don't know what Mr. Connolly's getting at yet, but what is the question? You want him to look at the bottom, and what is the question?
MR. CONNOLLY: I want to ask whether he's received that e-mail before. I believe he has, your Honor.
A. Yes. My name is on it, so. . .
Q. All right. And did you want to look at the text on the second page just quickly to let me know if you recall having received that in the past.
(Witness peruses document)
A. Well, I don't recall specifically seeing this; but my name is on it, so I must have gotten it through e-mail.
Q. Do you believe that you received that in the ordinary course of business?
A. Yes.

Page 55

MS. DONOVAN: Objection.
THE COURT: He answered the question.
MR. CONNOLLY: Your Honor, we would offer this into evidence.
MS. DONOVAN: Objection. It's beyond the scope.
THE COURT: Sustained.
Q. Mr. Gamache, I want to lastly ask you about --
MR. CONNOLLY: Your Honor, if I may mark that third issue to address with the Court at the recess.
Q. The Government showed you Exhibit 506, which is in evidence.
A. Uh-huh.
Q. Exhibit 506 is a memo that Mr. Urciuoli sent to you and Ms. O'Connell and Mr. Schibler about the renewal of Mr. Celona's contract; correct?
A. That's correct.
Q. And here Mr. Urciuoli is pointing out that the costs in this contract would be shared as between what he describes as the hospital's share of $700 and the Village Retirement Communities' share as $300; correct?
A. Yes.
Q. And attached to this exhibit is the consulting agreement itself that is the subject of the first page of the memo; correct?
A. That's correct.

Page 56

MR. CONNOLLY: Your Honor, may I have the document, which is in evidence, shown to the jury.
Q. Now, listed on this, just so we can orient ourselves as to a time frame, the document is signed by Mr. Celona and Mr. Sangermano in 2002. Do you see that, December of 2002?
A. (Nods affirmatively).
MS. DONOVAN: Objection, your Honor. This is beyond.
THE COURT: Sustained. Do you want to be heard on that one, too, Mr. Connolly, at the recess?
MR. CONNOLLY: Yes, your Honor. This was a document that was shown to the witness.
THE COURT: On direct?
MR. CONNOLLY: Yes.
THE COURT: Is that right?
MS. DONOVAN: Limited questions, your Honor.
THE COURT: Overruled, then.
Q. Now, the contract itself identifies responsibilities on the first page carrying over to the second page; correct?
A. Yes.
Q. And if we look at these responsibilities, develop and implement a plan designed to educate area senior citizens as to the programs and services currently

Page 57

offered, would Mr. Celona be able to perform that service without being physically present at the nursing home?
MS. DONOVAN: Objection.
THE COURT: At the nursing home?
MR. CONNOLLY: Yes. I believe on direct examination, your Honor, there were several questions along the lines of how often did you see Mr. Celona and what were you aware of in terms of what he was doing.
THE COURT: You object?
MS. DONOVAN: I do, your Honor.
THE COURT: We'll take that up at the recess, also.
MR. CONNOLLY: That's my last line of inquiry, your Honor. Thank you.
THE COURT: All right. Mr. Bristow, Mr. Pappalardo, do you have any questions?
MR. BRISTOW: I have no questions, your Honor. Thank you.
MR. PAPPALARDO: I have none, your Honor.
THE COURT: Do you have any redirect, Ms. Donovan?
MS. DONOVAN: Only possibly based on the outcome of some of the Court's rulings, your Honor.
THE COURT: You may step down temporarily,

Mr. Gamache. We may have to get back to you later on. You may call your next witness.

MS. DONOVAN: Your Honor, the United States calls Dean Martins.

DEAN MARTINS, GOVERNMENT WITNESS, SWORN

THE CLERK: Would you please state your name and spell your last name for the record.

THE WITNESS: Sure. Dean Eric Martins, D-E-A-N, E-R-I-C, M-A-R-T-I-N-S.

DIRECT EXAMINATION

BY MS. DONOVAN:

Q. Good morning, Mr. Martins.

A. Good morning.

Q. Mr. Martins, were you at some point employed by Village Retirement Communities?

A. Yes.

Q. When were you employed there?

A. Approximately June of 1998 until July, August of 1999.

Q. What was your title?

A. Chief financial officer.

Q. And what were your duties as chief financial officer?

A. Everything encompassing anything to do with any financial matters of the Village.



Q. What did your duties involve on sort of a day-to-day basis?

A. Overseeing the comptroller, assistant comptroller, numerous bookkeepers, people who ran our accounts payable, day-to-day paying of the bills, overlooking our large loans that we were looking to undertake from the various -- to support the various Villages, projects that were being built.

Q. At the time that you started in June of 1998, how many assisted living facilities were being operated by Village Retirement Communities?

A. There was two operating. A third was being built at the time.

Q. What were the two that were operating?

A. The Village at Waterman Lake in Greenville and the Village at Elmhurst, which was in Providence; and Hillsgrove, which was in Warwick, was being built.

Q. After you started as CFO in June of 1998, did you end up having -- did you have a discussion with Peter Sangermano about John Celona?

A. Yes.

Q. How soon after you started did you have that conversation with Mr. Sangermano?

A. I would say it was in the first couple weeks.

Q. And what prompted the conversation?

Page 84

you expect to be with this witness?
MR. PAPPALARDO: Five minutes, your Honor, maybe.
THE COURT: I think we'll take our morning recess.
Do any other defense counsel have questions for this witness?
Do you have any redirect, Ms. Donovan?
MS. DONOVAN: Maybe one or two, your Honor.
THE COURT: We'll take our morning recess.
MR. EGBERT: Judge, I didn't stand, but I may have a couple of questions.
THE COURT: Members of the jury may return to the jury room for the morning recess.
(The jury is not present for the following)
THE COURT: You may step down, Mr. Martins.
All right. We have several items you wanted to be heard on, Mr. Connolly. I don't think some of them should take very long. One was a question that you wanted to ask about financial projections that were done by Mr. Gamache.
MR. CONNOLLY: Yes, your Honor. We've been provided with memoranda which indicate that Mr. Gamache, based upon information from the departments that he supervised, determined that there

Page 85

was approximately 378,000 in revenues that were attributable to a one-year period which was audited which he did testify about; but then he also looked at, given the relationship with Celona the other years, he made a projection of a range of revenues that was generated as to those other years. And the range as to which he expressed that range was 1998 up through the time that Mr. Celona left.
Now, your Honor, this is information which is relevant in that a central part of the Government's theory is that Mr. Celona's job had nothing to do with promoting the nursing home or little to do with promoting the nursing home and the Village.
And, in fact, I believe there was a significant number of questions on direct examination which went to that very point.
This directly refutes that in that it was -- there is evidence from the person who managed the nursing home that there was significant revenues throughout the relevant period of time.
The Court, I believe, raised a concern about whether or not I had personal knowledge based upon the discovery in this case as to whether or not Mr. Gamache directly conveyed this to Mr. Urciuoli. And I would submit that we shouldn't be required to make that

Page 86

connection in that Mr. Gamache was a person who was made aware of the consulting relationship with Mr. Celona, in fact he was involved in renewing one of the agreements, and, therefore, had a responsibility for understanding what his success was and, in the absence of success, make that known to Mr. Urciuoli.
So at a minimum here, there's a reasonable inference that makes this evidence highly relevant, and that is that the manager of the nursing home knew of significant revenues being generated by Mr. Celona's referrals to the nursing home.
THE COURT: Well, Mr. Gamache has already testified as to what revenues Mr. Celona had generated. What we're talking about now is projections as to what he expected Mr. Celona would generate at some time in the future. There's no basis for the projection, so I --
MR. CONNOLLY: It's actually --
THE COURT: Second of all, Ms. Donovan stated, and I don't know if you disagree with this, but she stated that this came after Mr. Celona's affiliation terminated.
MR. CONNOLLY: Your Honor, the information in the memo that's been provided to us was prepared after he was terminated, but that doesn't mean that the

Page 87

information didn't exist prior to his termination.
And it wasn't a projection into the future. It was an approximation of the range that was generated historically. So it is --
THE COURT: Why was this information produced after Mr. Celona left?
MR. CONNOLLY: You know, I don't know why it was generated. I assume it was generated in the aftermath of his termination and in light of the accusations that were published in the newspaper at the time about whether or not he was given -- I think the allegation at the time was that he was given a no-show job in return for his position on the Conversion Act.
And so what the hospital did, among other things, was to go back and look at the records to see whether it was a no-show job or not. And this is powerful evidence to show that it was anything but a no-show job.
THE COURT: That certainly undermines the reliability of the evidence if it was generated afterwards to show a particular thing. So the sustaining of the objection stands.
The second issue you wanted to talk about was whether Mr. Gamache thought that the Village was a successful venture for Roger Williams.

MR. CONNOLLY: Whether he knew it was, your Honor. The information, and I don't know whether he was aware of this or not, but the financial records showed that the Village ultimately generated about $4 million for the hospital given the profit distributions and the revenues generated at the time that it was sold.

Mr. Gamache, we heard testimony on direct examination, was expressly detailed to stay on top of the finances of the Village, work with Mr. Sangermano and Mr. Smart at the Village to monitor its operations and to report back to Mr. Urciuoli.

The fact that the Village -- during periods of its operation, the records that the Government has showed us, there were periods when it didn't make money. I believe some of those have been referenced in the course of the Government's case; but overall the Village was a highly profitable and successful endeavor.

And so -- and the magnitude of that profitability, I submit, is relevant in this case when we're talking about a person whose job was to promote the Village and who was paid between 35 and 40 thousand dollars a year to do that.

So that evidence is relevant, and I believe it's



reasonable to expect that this manager would have that evidence.

THE COURT: Ms. Donovan.

MS. DONOVAN: Your Honor, the objection is a foundation one. I don't think he's the appropriate person to be testifying about the overall financial success of the Village, which ties in to whether it was a successful venture for the medical center overall.

The items that he was tasked with performing for Mr. Urciuoli, as I understood the testimony, was that he was going to be reviewing the budgets. The financial picture that he's being asked to testify to is way more complex than I think what he has a basis for knowing.

THE COURT: I think you have the wrong witness here, Mr. Connolly. You can certainly call someone to bring out that point if you wish. So that ruling also stands.

The next item is Exhibit TTTTTTTTTTTTTTT, which was an e-mail that Mr. Gamache said was addressed to him. He doesn't recall receiving it but thinks he probably did since it was addressed to him.

What is your argument on that?

MR. CONNOLLY: Your Honor, if I can grab a copy of the e-mail. Your Honor, on the monitor right now is



the bottom half of the e-mail, and the Court can see that it originated from David Balasco of HARI and then was disseminated to a number of executives at various hospitals, including numerous executives at Roger Williams. This witness testified that he received a copy of it.

And what it shows is that Senator Celona was actively involved in advocating positions taken by the Hospital Association of Rhode Island before the General Assembly.

THE COURT: Why wouldn't that be hearsay?

MR. CONNOLLY: Your Honor, we're actually not offering this for the truth of the matter asserted. We're offering this to show that Mr. Celona has often been portrayed in the course of this trial, including by Mr. Celona himself, as doing the bidding of the hospital on issues where their records, this included, show that he was actually advocating issues that were issues embraced by the entire industry as advocated by HARI. And that information --

THE COURT: You can certainly bring Mr. Balasco in to say that, or anyone else that you wish, to say that Mr. Celona was acting on behalf of HARI and that a lot of these things for hospitals in general and not for Roger Williams in particular.



MR. CONNOLLY: We could, your Honor, but I thought it appropriate to make the point with this witness, who received a copy of this e-mail, the fact that the actions of Mr. Celona on behalf of HARI were something that was widely distributed within the hospital itself through the hospital's management team.

THE COURT: That ruling also stands.

Next we have Exhibit 506, which you wanted to be heard on. That was a Government exhibit. I think the problem was or the issue was the questions that you were asking on it.

MR. CONNOLLY: Your Honor, the consulting agreement sets forth a number of duties that Mr. Celona was tasked with doing, and the duties are of a nature that it would not require him to be present at the nursing home, if I could put it on the screen so the Court can see.

They include educating senior citizens to programs and services offered, educating area physicians and their staffs about services and programs, and you can go on down the line, keep the name of the Village and the nursing home out before the surrounding communities and exposing the programs in new affiliated service areas. It goes on.

These are all services, your Honor, that by

their very nature couldn't be performed within the confines of the nursing home or the hospital's campus. They, by their very nature, would have to be performed by Mr. Celona off-site.

During direct examination of this witness, one of the points that was made was the frequency with which Mr. Celona was observed at the nursing home. And we believe the reason the Government asked those questions was to make the point that he wasn't around and inferentially, therefore, he wasn't doing his job under the consulting agreement.

I think it's important for the jury to understand from a witness who had responsibility for one of the two organizations named in the contract that he didn't have to be there in order to do his job. In fact --

THE COURT: So all you want to ask him, then, is whether in order to perform those functions he had to be at the nursing home?

MR. CONNOLLY: Yes, your Honor.

THE COURT: What do you have to say about that, Ms. Donovan?

MS. DONOVAN: Your Honor, the witness has testified that he didn't know that Mr. Celona was working for him. He doesn't even -- he hasn't



evidenced any familiarity with any of the terms of the consulting agreement in terms of what they actually tasked Mr. Celona with.

THE COURT: It was right there.

MS. DONOVAN: I know it is, but whether you had to be there or not is speculative when we don't have some testimony or basis for even him knowing what those things involved.

THE COURT: It's not speculative. He was the administrator of the nursing home. He ought to know what kinds of things had to be done at the nursing home and what kinds of things would be done someplace else.

MS. DONOVAN: I also don't believe that I asked him or he testified about Mr. Celona's presence at Elmhurst Extended Care. He testified and I asked him about him seeing his car in the parking lot of the Village at Elmhurst and that he saw him at ribbon cuttings around Roger Williams Medical Center.

THE COURT: You asked Mr. Gamache these questions?

MS. DONOVAN: I did. I asked him if he had seen him at the medical center, and he talked about seeing his car in the parking lot and seeing him at ribbon cuttings.

THE COURT: This is, again, another very



peripheral point; but I'll allow you to ask him those limited questions, Mr. Connolly, as to whether -- I don't even know if he knows what these duties involve, but I'll allow you to ask him whether any of these things would have required his presence at the nursing home or whether they are things that would be done elsewhere.

MR. CONNOLLY: Thank you. Your Honor, just anticipating a possible objection that might be made during that inquiry, one of the points that I intended to make by way of a leading question is that he did observe Mr. Celona's car present at the Village at Elmhurst on one or two occasions each month.

And I want to make that point in the context of this because, while these duties did not require him to be there, he was, in fact, present one to two times a month in the parking lot at the Village at Elmhurst; and that's part of that line of inquiry.

THE COURT: Do you object to that?

MS. DONOVAN: No.

THE COURT: All right. We'll take what's left of our morning recess.

(Recess)

(The jury is present for the following)

THE COURT: Mr. Pappalardo, you may continue.



MR. PAPPALARDO: Thank you, your Honor.

Q. Mr. Martins, the so-called moratorium legislation was really -- in the period of time in 1999 was an amendment to existing legislation, was it not, or do you know that?

A. Yes, it was an amendment.

Q. It was an amendment. It was a proposed amendment; right?

A. Yes.

Q. So the legislation was in place, and they were looking for an extension of time essentially for that; right?

A. Yes.

Q. Now, you said you had some phone contact with Senator Celona, and you were familiar with his voice because he would call from time to time asking where his payments were?

A. Yes.

Q. And when you mentioned that legislation to him on the phone, did he tell you that he was -- did he tell you that he was recused from that legislation at all?

A. No, he did not.

Q. And on the phone, you started to explain that -- at least your position on the legislation to him, and he indicated that he was aware, and that was the end of

the phone call; right? He didn't say in the phone call, for instance, I'm going to do X, I'm going to do Y, I'm going to do Z?
A. No.
Q. In fact, he didn't say he would do anything, did he?
A. Not that I recall.
Q. And similarly, when you had a conversation -- when you recall a conversation you say you had with him in the State House, you were introduced to Senator Celona, is that the first time you met?
A. Yes.
Q. And you weren't there for the purpose of seeing Celona, were you?
A. Not at all.
Q. You were there for the purpose of, as were others, contacting legislators that they were familiar with that could perhaps be spoken to in connection with the merits of the legislation or proposed legislation; right?
A. Not on that day.
Q. Not on that day? Okay. But when you met him in person, he introduced himself to you; right?
A. Yes.
Q. And he didn't say anything that he was going to



do, did he?
A. I recollect him saying good luck, but I don't recall any --
Q. He said good luck, and it was, you know, that he would be speaking to other senators and that sort of thing?
A. Yes.
Q. It was basically -- it wasn't a substantive conversation, was it?
A. No, it wasn't.
Q. In fact, he was just acknowledging you as the person that he had spoken to over the phone, and he was off on other business; right?
A. Yes.
Q. As a matter of fact, there was a hearing that day on this bill, wasn't there?
A. Yes.
Q. As a matter of fact, he did not attend, did he?
A. It was in the General Assembly as I recall.
Q. In the General Assembly, but he was not present for that hearing, was he?
A. No.
Q. And you're not aware of anything he did in connection with this legislation, are you?
A. No.



Q. Now, this proposed amendment to the moratorium, this would have applied only to the Village at Waterman Lake; isn't that fair to say?
A. As I later read the legislation, yes.
Q. It couldn't have applied to the Village at Elmhurst, could it?
A. No.
MR. PAPPALARDO: Thank you, your Honor.
THE COURT: Any other defense counsel have questions for this witness?
MR. BRISTOW: I have no questions, your Honor. Thank you.
MR. EGBERT: No, your Honor.
THE COURT: Any redirect?
MS. DONOVAN: Briefly.

REDIRECT EXAMINATION

BY MS. DONOVAN:
Q. Mr. Martins, you were just asked about whether the moratorium legislation could have affected the Village at Elmhurst. Do you recall that question?
A. Yes.
Q. And you stated something in your answer about as you later read the legislation.
A. Yes.
Q. What time frame are you talking about later



reading the legislation?
A. The exact legislation I read was during the grand jury when I read it. That was the first time I read it.
Q. So at the time that you had a discussion with Mr. Celona, did you have an understanding about the impact that the legislation would have on the Village at Elmhurst?
MR. PAPPALARDO: Objection, your Honor.
THE COURT: Sustained.
Q. What was your understanding when you -- strike that. When you spoke to Mr. Celona in or about February of 1999, did you communicate to him your belief on the -- on whether the legislation would impact the Village at Elmhurst specifically?
MR. PAPPALARDO: Objection, your Honor.
THE COURT: Grounds?
MR. PAPPALARDO: First of all, your Honor, it's leading. Second of all, it was covered on direct, and it wasn't part of the cross. He's testified about his knowledge of the bill.
THE COURT: Overruled. You may answer.
A. I'm sorry. Could you ask the question one more time.
THE COURT: Did you tell Mr. Celona what effect,

if any, you thought this bill might have on the Village at Elmhurst?

THE WITNESS: Specifically, no.

Q. And, Mr. Martins, I believe on cross-examination you were asked about what Mr. Celona indicated to you during your phone conversation with him in or about 19 -- February of 1999 he would do with respect to the moratorium legislation. Do you recall that question from Mr. Pappalardo?

A. Yes.

Q. And I believe that you testified that he didn't indicate what he was going to do one way or the other; is that correct?

A. Yes.

Q. Do you still have your grand jury testimony there in front of you?

A. Yes.

Q. Would you take a look at page 18, please, starting with the question beginning on line 15. Just read it to yourself.

(Witness peruses document)

Q. At the time that you testified in the grand jury on November 17th, 2005, were you asked about what Mr. Celona represented he was going to do with respect to the legislation?



A. Yes.

Q. And at that time, what did you testify he represented he was going to do with respect to the legislation on the Senate side?

A. He would make some inquiries.

Q. Mr. Pappalardo asked you several questions about the operating accounts for the Village at Elmhurst. Do you recall that line of questioning?

A. Yes.

Q. And he asked you questions about the types of expenses that were paid from the operating account?

A. Yes.

Q. I believe you testified that employee salaries were paid from the operating account?

A. Yes.

Q. Were the marketing and public relations expenses also paid from the operating account for the Village?

A. I'm sorry, I don't recall. I think they were paid separately out of the Senior Lifestyles, but I'm not sure.

MS. DONOVAN: I have no further questions.

THE COURT: You may step down, Mr. Martins.

We're going to bring Mr. Gamache back for a brief cameo appearance.

(Pause)



THE COURT: Mr. Gamache, do you understand you're still under oath?

THE WITNESS: Yes, I do.

MR. CONNOLLY: Thank you, your Honor.

RICHARD GAMACHE, GOVERNMENT WITNESS, RESUMES

CONTINUED CROSS-EXAMINATION

BY MR. CONNOLLY:

Q. Mr. Gamache, you were asked questions during the examination by the Government about the presence that you're aware of Mr. Celona at the nursing home or on the Roger Williams campus. Do you recall that, sir?

A. Yes.

Q. And you testified that you recall seeing his car parked in the Village at Elmhurst parking lot; correct?

A. That's correct.

Q. In fact, you would see his car there once or twice a month each month; isn't that true?

A. Yes.

Q. Now, I want to direct your attention. We have on the screen the lower half of Government's Exhibit 506, which is in evidence.

MR. CONNOLLY: Your Honor, may the jury be shown what's on the screen.

Q. You're not going to need that document right now, Mr. Gamache. Mr. Gamache, I'm pointing to some of the



responsibilities which are set forth in the consulting agreement. This is the one that you were involved in having executed; correct?

A. 2002. Yup.

Q. Walking through these, the duty of educating senior citizens as to programs and services currently offered by the Village or the nursing home, would that require Mr. Celona to be physically present at the nursing home to do?

A. No.

Q. In fact, he couldn't do it at the nursing home. He would have to be out in the area where senior citizens reside; correct?

A. That's correct.

Q. Secondly, educate area physicians and their staff as to the programs and services offered. Here again, that's something he couldn't do within the confines of the nursing home or the Village; correct?

A. Correct.

Q. He would have to be outside of the Roger Williams campus. Thirdly, keep the name of the Village at Elmhurst and Elmhurst in front of senior citizens from the surrounding communities. Again, would that require him to be off-campus?

A. Yes.

Q. Last thing on this page, expose the services and programs offered by the Village at Elmhurst. It says "at Elmhurst," but it should say "and Elmhurst"; correct?
A. Yes.
Q. Because the "and" is referring to the nursing home; right?
A. Yes.
Q. To new affiliated services. Here again, that would require him to be off-site; correct?
A. Correct.
Q. Moving to the next page at the top, can you see all of that now?
A. Yes, I can.
Q. Be a representative of the Village at Elmhurst and Elmhurst to area senior citizens' organizations and programs. Here again, that's an exercise that would require him to be out in the community; correct?
A. Correct.
Q. And the last duty listed here is keeping abreast of legislative issues and regulations at state, local and federal levels that impact or could impact the Village delivery of care, and it goes on. That is something that could be done from any location; correct?



MS. DONOVAN: Objection.
THE COURT: Grounds?
MS. DONOVAN: It doesn't specifically reference his entity.
THE COURT: Overruled. You may answer.
A. Yes.
Q. So the duties which we've just walked through in the contract that Mr. Celona executed with your involvement wouldn't require him to be present at the nursing home or the Village; correct?
MS. DONOVAN: Objection.
THE COURT: Sustained.
MR. CONNOLLY: Nothing further, your Honor. Thank you.
THE COURT: Is there any redirect?
MS. DONOVAN: Briefly.

REDIRECT EXAMINATION

BY MS. DONOVAN:
Q. Mr. Gamache, let's stay with the document that Mr. Connolly was just asking you about. Do you see it on your screen there?
A. Yes, I do.
Q. Let's take the first one. Was Mr. Celona -- did he ever report to you about his efforts to educate senior citizens as to the programs and services being



offered by Elmhurst Extended Care?
A. No.
Q. And isn't it correct that your testimony is that it wasn't until December of 2002 that you were even aware that he was, in fact, contracted to provide those services on behalf of Elmhurst Extended Care; correct?
MR. CONNOLLY: Your Honor, I object on the grounds that it's beyond the scope of the cross and it's also an area that was covered on direct examination.
THE COURT: Sustained.
Q. Mr. Gamache, Mr. Connolly asked you about some calculations that your staff undertook relating to Mr. Celona's referrals to Elmhurst Extended Care; correct?
MR. CONNOLLY: Object, your Honor. I believe redirect has already been conducted by the Government. I didn't ask about that in the limited recross which the Court allowed.
THE COURT: Was there redirect already? I don't think there was redirect. I thought Ms. Donovan said she had no redirect depending on what you got into.
MR. CONNOLLY: Meaning she waived redirect as to everything except what I just covered.
THE COURT: Well, that's true. Sustained.



MS. DONOVAN: Your Honor, it was waived to understand the scope of what was going to be allowed with respect to this particular line of questioning.
THE COURT: Well, if you segue into things that were not covered on Mr. Connolly's -- on second thought, I'm going to allow Ms. Donovan to go into anything that was covered on cross by counsel.
Q. Mr. Gamache, do you recall those questions being asked by Mr. Connolly?
A. Yes.
Q. Prior to 2005, were you ever asked by Robert Urciuoli to ascertain the number of referrals that Mr. Celona provided to Elmhurst Extended Care?
A. No.
Q. And, in fact, the, quote, unquote, audit that Mr. Connolly referred to in your line of questioning your staff did not conduct until the spring of 2005; correct?
A. Correct.
MS. DONOVAN: No further questions.
THE COURT: You may step down, Mr. Gamache.
You may call your next witness.
MS. DONOVAN: Your Honor, the United States calls Robert Budway.

# EXHIBIT 2

**O'Connell, Kimberly A**

**From:** Gamache, Richard E
**Sent:** Wednesday, April 27, 2005 5:26 PM
**To:** O'Connell, Kimberly A

# Memorandum

**Date:** 4/27/2005
**To:** Kim O'Connell, Vice President/General Counsel
**Cc:** Bob Urciuoli, President and CEO
**From:** Richard Gamache, Vice president/Administrator
**RE:** John Celona referrals to Elmhurst

---

The Admissions Department at Elmhurst audited a twelve month period (3/02-2/03) to estimate John Celona's referral patterns to the nursing home.

During that time, at least six individuals were referred and admitted to Elmhurst. Of the six, four were short-term referrals who either returned to the community following rehab or passed away. Two were long-term residents (one is still a resident here).

Total receipts from these individuals equal $378,000.

Although this audit is for a twelve month period, these referral patterns were typical of our relationship with John Celona.

If you need more specific data, please contact me.

# EXHIBIT 3

**O'Connell, Kimberly A**

**From:** Gamache, Richard E
**Sent:** Wednesday, April 27, 2005 5:58 PM
**To:** O'Connell, Kimberly A
**Cc:** Urciuoli, Robert A

# Memorandum

**Date:** 4/27/2005
**To:** Kim O'Connell, Vice President/General Counsel
**Cc:** Bob Urciuoli, President and CEO
**From:** Richard Gamache, Vice president/Administrator
**RE:** John Celona referrals to Elmhurst

In an e-mail dated 3/25/04 from me regarding John Celona's value to Elmhurst over the last few years I indicated that the Admissions department had identified nine individuals who were personally referred to Elmhurst by Senator Celona. I did not, however, clarify the time frame of this activity. Therefore, I had the admissions department do additional research to provide back-up for this information.

The time frame for the nine referrals was from July 2001 to the memorandum date of March 25, 2004.

Further review indicated six specific individuals who were personally referred by the Senator during a twelve month period. (see attached)

This does not include our estimate that several other people from the community sought admission here due to hearing about us from the Senator. Nor does it include the other contributions to our organization listed on the e-mail of 3/25/04.

# EXHIBIT 4

**O'Connell, Kimberly A**

**From:** Gamache, Richard E
**Sent:** Wednesday, May 04, 2005 3:39 PM
**To:** O'Connell, Kimberly A
**Cc:** Urciuoli, Robert A
**Subject:** John Celona referral patterns

# Memorandum

**Date:** 4/27/2005
**To:** Kim O'Connell, Vice President/General Counsel
**Cc:** Bob Urciuoli, President and CEO
**From:** Richard Gamache, Vice president/Administrator
**RE:** John Celona referrals to Elmhurst

In an e-mail dated 3/25/04 from me regarding John Celona's value to Elmhurst over the last few years I indicated that the Admissions department had identified at least nine individuals who were personally referred to Elmhurst by Senator Celona. I did not, however, clarify the time frame of this activity. Therefore, I had the admissions department do additional research to provide back-up for this information.

The time frame for the nine referrals was from July 2001 to the memorandum date of March 25, 2004.

Here is some additional information regarding John Celona's referrals:

- Our admission records indicate that he referred between 3-5 patients per year.
- The average length of stay is 1.3 years.
- Our average blended rate is 183.50
- Therefore we can assume that his referrals would generate revenue between $261,212. (For 3 patients) and $435,354. (For 5 patients) per year from 1998 to 2004.
- As an example:

    1. The Admissions Department audited a twelve month period (3/02-2/03) to estimate John Celona's referral pattern. During that time at least six individuals were referred and admitted to Elmhurst. Of the six, four were short-term referrals who either returned to the community following rehab or passed away. Two were long term residents (one is still here). Total revenue generated from these individuals is $378,000. Although this audit is for a twelve month period, these referral patterns were typical of our relationship



DES-001.009

with John Celona.

If you need additional information please contact me.

# EXHIBIT 5

## O'Connell, Kimberly A

**From:** Gamache, Richard E
**Sent:** Friday, April 29, 2005 4:41 PM
**To:** O'Connell, Kimberly A
**Subject:** FW: Revenue Assumptions for John Celona Referrals

-----Original Message-----
**From:** O'Connell, Kimberly A
**Sent:** Friday, April 29, 2005 4:39 PM
**To:** Gamache, Richard E
**Subject:** FW: Revenue Assumptions for John Celona Referrals

-----Original Message-----
**From:** Gamache, Richard E
**Sent:** Friday, April 29, 2005 4:34 PM
**To:** O'Connell, Kimberly A
**Subject:** Revenue Assumptions for John Celona Referrals

Kim,
In response to your request, here are some basic assumptions regarding the admissions to Elmhurst that were referred by Senator Celona:

- Our admission records indicate that he referred between 3-5 patients per year.
- The average length of stay is 1.3 years.
- Our average blended rate is 183.50.
- Therefore we can assume that his referrals would generate revenue between $261,212. (for 3 patients), and $435,354. (for 5 patients) per year from 1998 to mid 2004.

If you need additional information please contact me.

**Gamache, Richard E**

---

**From:** O'Connell, Kimberly A
**Sent:** Friday, April 29, 2005 4:39 PM
**To:** Gamache, Richard E
**Subject:** FW: Revenue Assumptions for John Celona Referrals

-----Original Message-----
**From:** Gamache, Richard E
**Sent:** Friday, April 29, 2005 4:34 PM
**To:** O'Connell, Kimberly A
**Subject:** Revenue Assumptions for John Celona Referrals

Kim,
In response to your request, here are some basic assumptions regarding the admissions to Elmhurst that were referred by Senator Celona:

- Our admission records indicate that he referred between 3-5 patients per year.
- The average length of stay is 1.3 years.
- Our average blended rate is 183.50.
- Therefore we can assume that his referrals would generate revenue between $261,212. (for 3 patients), and $435,354. (for 5 patients) per year from 1998 to mid 2004.

If you need additional information please contact me.

**Gamache, Richard E**

**From:** O'Connell, Kimberly A
**Sent:** Friday, March 26, 2004 9:49 AM
**To:** Gamache, Richard E
**Subject:** RE: re: Sen John Celona

Thanks

-----Original Message-----
**From:** Gamache, Richard E
**Sent:** Thursday, March 25, 2004 8:48 AM
**To:** O'Connell, Kimberly A
**Cc:** Capobianco, Sheila M
**Subject:** re: Sen John Celona

FYI, here is a partial list of things Sen. John Celona did for Elmhurst over the last few years:
1. I consulted with John regarding how to access grant money for the expansion of our Alzheimer's program and the Eden Alternative project.
2. He encouraged his colleagues in the House and Senate to attend Legislative gatherings that I hosted here to educate lawmakers regarding the problem of underfunding in Nursing homes.
3. He attended meetings regarding the Medicaid funding crisis, and helped to encourage staff to contact their legislators.
4. The Admission staff reports that he referred at least nine individuals, who were living in the community, to Elmhurst for admission.
5. Although John did not report to me, my understanding is that he did outreach at Senior Centers and the community at large, and his pattern of referring people is evidence that he was assisting our organization.

# EXHIBIT 6

The Village
AT ELMHURST
*Catered Retirement Living*

January 8, 2004

Senator John Celona
51 Pinewood Drive
North Providence, Rhode Island 02904

Dear Senator:

I wanted to take this opportunity to thank you for the valuable services you have provided over the past few years to The Village at Elmhurst. Your efforts have been instrumental in educating our senior population as to the variety of beneficial services available to seniors at the Village at Elmhurst.

At this time the Village at Elmhurst is an established and mature community and we have decided that the nature of the services that we will need going forward has changed. Accordingly, please accept this letter as formal notice that the Consulting Agreement will not be renewed and will expire on January 31, 2004.

Again we thank you for your assistance.

Sincerely,

Village At Elmhurst, LLC

By:____________________
Peter J. Sangermano

700 Smith Street
Providence, RI 02908
401-521-0090

# EXHIBIT 7

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA

v. Cr. No. 06-02-ML

ROBERT A. URCIUOLI
FRANCES P. DRISCOLL,

**ROGER WILLIAMS MEDICAL CENTER'S COMPLIANCE WITH AND RESPONSE TO SUBPOENA DUCES TECUM UNDER RULE 17 (c), FED. R. CRIM. P ATTACHMENT B**

Now comes the Roger Williams Medical Center and in compliance with the Rule 17(c) subpoena duces tecum issued by defendant, Robert A. Urciuoli responds as follows:

1. Attachment A contains the responsive documents to the requests outlined in the subpoena;
2. Attachment B contains the affidavits of compliance of Richard E. Gamache and Addy Kane.

Respectfully Submitted,
ROGER WILLIAMS MEDICAL CENTER and
ROGER WILLIAMS HOSPITAL,
By their attorneys,

Marc DeSisto (#2757)
DESISTO LAW
211 Angell Street
P.O. Box 2563
Providence, RI 02906-2563
Phone: (401) 272-4442
Fax: (401) 272-9937
Email: marc@desistolaw.com

CERTIFICATION OF SERVICE

I hereby certify that a true and accurate copy of the within was hand-delivered on this 13th day of August, 2008 to:

Kristie M. Passalacqua, Esq. (#6945)
Hinckley, Allen & Snyder, LLP
50 Kennedy Plaza, Ste. 1500
Providence, RI 02903
401-274-2000
401-277-9600 fax
kpassalacqua@haslaw.com

Luis M. Matos
First Assistant U.S. Attorney
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903
401-709-5000
401-709-5001 fax
Luis.matos@usdoj.gov

Laura Souza

ELMHURST
Extended Care

50 Maude Street
Providence
Rhode Island 02908-4325
(401) 456-2600
(401) 456-6554 FAX

July 30, 2008

RESPONSE TO ATTACHMENT A

(6) The identities of the individuals who assisted with the creation of the Gamache memo and information contained in the memo are:

Jeffrey French
Elaine Lanni
Jean Doyle

Respectfully submitted,

Richard Gamache
Vice President / Administrator