UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

IN THE MATTER OF:

ROGER WILLIAMS MEDICAL CENTER

Testimony of RAYMOND F. MURPHY, JR., a witness herein, heard before the SPECIAL JUNE 2005 GRAND JURY on THURSDAY, NOVEMBER 17, 2005, 1:50 P.M., at the John O. Pastore Federal Building, Two Exchange Terrace, Providence, Rhode Island.

PRESENTED BY:

LUIS M. MATOS, ESQUIRE
ASSISTANT U.S. ATTORNEY

Vivian S. Dafoulas, RMR-CRR

East Greenwich, RI 02818-2064

(401) 885-0992

A. Okay.

Q. Mr. Murphy, you are under oath. I will advise you that as a witness under oath, you have an obligation to testify truthfully and that if you do not provide truthful testimony to the grand jury, that you could be subject to federal criminal charges such as perjury or making false statements; do you understand that?

A. I do.

Q. Do you have any questions before I get started, Mr. Murphy?

A. No.

Q. Mr. Murphy, what is your occupation?

A. I'm a certified public accountant.

Q. Do you work for yourself or do you work for a company, sir?

A. I'm a partner in Sullivan & Company, a Providence accounting firm.

Q. How long have you been with -- a partner with Sullivan & Company?

A. Over 15 years.

Q. Mr. Murphy, do you also have a relationship with Roger Williams Medical Center?

A. I do.

Q. What is your relationship with Roger

Williams Medical Center?

A. I am a trustee, I'm chairman of the finance committee and I serve on a couple of other committees.

Q. By being a trustee, you mean you're on the Board of Trustees?

A. Yes.

Q. How long have you been on the Board of Trustees?

A. About 20 years.

Q. And you are still on the board?

A. Yes.

Q. How did you first come on the board?

A. My former wife was a trustee of the hospital and her term was up and she said to me that perhaps I should be on that board because I would understand the -- the hospital is very complex. She thought I'd make a good trustee, so she suggested to the hospital that they invite me and they did.

Q. Who was the president of the hospital at the time?

A. I believe it was a man named Vito Ralo (phonetic).

Q. And approximately what year was it when you went on the board?

to certain activities or something to that effect?

A. I have no recollection.

Q. You have no recollection of that? Once the Saylor report was presented to the executive committee and Bob Urciuoli had an opportunity to in essence defend himself, do you remember what the executive committee decided to do?

A. The executive committee asked him to repay certain funds to the hospital. The executive committee asked Mr. Cummings to come on as a paid chairman and the executive committee suggested that there were certain recommendations that the Saylor report had that they be adopted.

Q. Was there a discussion as to whether Mr. Urciuoli should be let go?

A. Yes.

Q. And -- and specifically what was your position as to whether Mr. Urciuoli should be let go?

A. I was very angry and my immediate reaction was to fire him.

Q. And what were you angry about, sir?

A. That he knew better.

Q. And your immediate reaction was to fire him?

Q. Was there anyone else on the executive committee that similarly initially thought he should be fired that you know?

A. I think many people did.

Q. Which other people?

A. I don't remember.

Q. Do you remember what Brad Gorham thought?

A. Not specifically.

Q. Do you remember what Ray Mancini thought?

A. I think Ray Mancini thought he should be fired.

Q. How about Mr. Cummings?

A. Yes.

Q. Thought he should be fired?

A. Probably.

Q. There is another individual. I can't think of his name. Who else was on the executive committee?

A. Dean Chobanian.

Q. What is his name?

A. Aram Chobanian. He's the Dean of the Boston University Medical School.

Q. He was on the executive committee?

A. Yes.

Q. He thought he should be fired?

O'Dowd and only after Mr. Saylor finds that there had been no conference because he thought to call down there does he admit to anyone that there had been no conference.

Under those circumstances, how plausible or how believable did you think at the time it was that it was simply a mistake on his part?

A. We accepted his explanation that it was a mistake.

Q. What did you personally think?

A. I accepted it.

Q. If one of your employees at Sullivan & Company gave you the same explanation, what would you have done?

A. Fired them.

Q. And if one of Mr. Urciuoli's employees had given the same explanation?

A. Same thing.

Q. Would you have believed them that it was simply a mistake?

A. Probably not.

Q. So you believe Urciuoli but not your own employees?

A. Urciuoli worked for the hospital for 25 years. He had an unblemished record. We gave him a

pass.

Q. That wasn't the only item on the Saylor report, was it?

A. No. There were a lot of them.

Q. You gave him more than one pass?

A. That's correct.

Q. What was it about Bob Urciuoli that was so special that he gets these passes that nobody else would have gotten?

A. We needed him.

Q. So back to the original question, did you give him a pass because you needed him or did you give him a pass because you believed him?

A. Both.

Q. You wouldn't believe your own employees but you believed him?

A. Well, I'm only talking about -- I don't have the experience of my employee.

Q. Back to Dr. O'Dowd and discussions about fraud, do you remember whether there were conclusions or not conclusions at those board meetings as to whether Bob Urciuoli committed fraud against the hospital?

A. I don't believe there were any such conclusions. I don't think we would have approved