UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Cr. No. 06-02- ML |
| | : | |
| ROBERT A. URCIUOLI and<br>FRANCES P. DRISCOLL | :<br>: | |

**DEFENDANT ROBERT A. URCIUOLI'S NOTICE OF NEW AUTHORITY AND RENEWAL OF HIS REQUEST FOR EVIDENTIARY HEARING**

Defendant Robert A. Urciuoli ("Mr. Urciuoli") respectfully submits this Notice of New Authority and renews his request for an evidentiary hearing to determine whether the Government's interference with his right to indemnification and advancement of legal fees violated his constitutional rights. As grounds for this request, Mr. Urciuoli states as follows:

On August 28, 2008, the Second Circuit affirmed the decision of the United States District Court for the Southern District of New York (Kaplan, J.) in U.S. v. Stein, 435 F. Supp. 2d 330 (S.D.N.Y. 2006) ("Stein I") dismissing an indictment against thirteen former partners and employees of the accounting firm KPMG, LLP. U.S. v. Stein, 07-3042-cr, 2008 WL 3982104 (2d Cir. August 28, 2008). A copy of the Second Circuit's decision is attached hereto as Exhibit A.

In Stein I, Judge Kaplan found that, absent pressure from the government, KPMG would have paid the defendants' legal fees and expenses without regard to cost. 435 F.Supp.2d at 367-73. Based on this and other findings of fact, Judge Kaplan ruled that the government deprived the defendants of their right to counsel under the Sixth Amendment by causing KPMG to impose conditions on the advancement of legal fees to defendants, to cap the fees, and ultimately to end

payment. Id. Judge Kaplan also ruled that the government deprived the defendants of their right to substantive due process under the Fifth Amendment. Id. at 360-65. A copy of the Second Circuit's decision is attached hereto as Exhibit A.

The Second Circuit's affirmance of Stein I makes clear that Mr. Urciuoli should be given a chance to establish the extent of the Government's interference with and violation of his constitutional rights -- notwithstanding the Government's representation that there was no agreement that required Roger Williams Medical Center to stop payment or advancement of his legal fees.

Mr. Urciuoli believes in good faith that, given an evidentiary hearing, he could meet the criteria for dismissal established by the Stein decisions, even recognizing that he has put together a team for trial which is working to defend him.

Mr. Uricuoli recognizes that the Court has denied his Motion to Dismiss the Indictment Under the Fifth and Sixth Amendment already and does not wish to burden the Court with a more lengthy filing on the eve of trial unless the Court indicates that such a filing should be made.

WHEREFORE, Defendant Robert A. Urciuoli respectfully submits this Notice of New Authority and renews his request for an evidentiary hearing to determine whether the Government's interference with his right to indemnification and advancement of legal fees violated his constitutional rights.

Respectfully submitted,

ROBERT A. URCIUOLI

/s/ Kristie M. Passalacqua
Kristie M. Passalacqua (R.I. Bar No. 6945)
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, RI 02903
(401) 274-2000
(401) 277-9600 (fax)
kpassalacqua@haslaw.com

Michael J. Connolly (MA BBO # 638811)
*Pro Hac Vice Counsel*
Hinckley, Allen & Snyder LLP
28 State Street
Boston, MA 02109
(617) 345-9000
(617) 345-9020
mconnolly@haslaw.com

Howard M. Cooper (MA BBO # 543842)
*Pro Hac Vice Counsel*
Todd & Weld LLP
28 State Street
Boston, MA 02109
(617) 624-4713
(617) 227-5777
hcooper@toddweld.com

Dated: September 8, 2008

## CERTIFICATION

I hereby certify that on September 8, 2008, a copy of the foregoing pleading was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Kristie M. Passalacqua

# Exhibit A

**H**U.S. v. Stein
C.A.2 (N.Y.),2008.
Only the Westlaw citation is currently available.
United States Court of Appeals,Second Circuit.
UNITED STATES of America, Appellant,
v.
Jeffrey STEIN, John Lanning, Richard Smith, Jeffrey Eischeid, Philip Wiesner, Mark Watson, Larry Delap, Steven Gremminger, Gregg Ritchie, Randy Bickham, Carol G. Warley, Carl Hasting, and Richard Rosenthal, Defendants-Appellees.
**Docket No. 07-3042-cr.**

Argued: March 25, 2008.
Decided: Aug. 28, 2008.

**Background:** Government indicted employees of accounting firm, alleging accounting fraud. The United States District Court for the Southern District of New York, Kaplan, J., 435 F.Supp.2d 330, dismissed the indictment. Government appealed.

**Holdings:** The Court of Appeals, Dennis Jacobs, Chief Judge, held that:
(1) dismissal of indictment would be required to cure any violation, by the government, of employees' Sixth Amendment right to counsel;
(2) accounting firm's adoption and enforcement of fees policy amounted to state action;
(3) government's pre-indictment conduct was not immune from employees' Sixth Amendment claims; and
(4) employees were deprived of their Sixth Amendment right to counsel.

Affirmed.

**[1] Criminal Law 110 ⚷1858**

110 Criminal Law
110XXXI Counsel
110XXXI(B) Right of Defendant to Counsel
110XXXI(B)11 Deprivation or Allowance of Counsel
110k1858 k. Assisting and Compensating Counsel. Most Cited Cases
District court did not clearly err in finding that government memo, providing that advancement of funds to cover legal fees of accounting firm employees suspected of committing accounting fraud would be considered as negative factor in assessing whether employer was sufficiently cooperating with government investigation to forestall indictment, was a threat that accounting firm would be indicted unless it ceased advancing legal fees to its employees, supporting employees' Sixth Amendment claim against the government; since accounting firm was faced with fatal prospect of indictment, it could be expected to do all it could, assisted by sophisticated counsel, to placate and appease the government. U.S.C.A. Const.Amend. 6.

**[2] Criminal Law 110 ⚷1858**

110 Criminal Law
110XXXI Counsel
110XXXI(B) Right of Defendant to Counsel
110XXXI(B)11 Deprivation or Allowance of Counsel
110k1858 k. Assisting and Compensating Counsel. Most Cited Cases
District court did not clearly err in finding that prosecutors, acting under Department of Justice (DOJ) policy, deliberately reinforced threat inherent in government memo that accounting firm would be indicted unless it ceased advancing legal fees to employees involved in grand jury investigation of fraudulent tax shelters, supporting employees' Sixth Amendment claim against the government; prosecutors declined to sign off on accounting firm's prior arrangement to pay legal fees, and instead asked accounting firm to ascertain whether it had a legal obligation to advance fees. U.S.C.A. Const.Amend. 6.

**[3] Criminal Law 110 ⚷1858**

110 Criminal Law
110XXXI Counsel
110XXXI(B) Right of Defendant to Counsel
110XXXI(B)11 Deprivation or Allowance of Counsel
110k1858 k. Assisting and Compensating Counsel. Most Cited Cases

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

District court did not clearly err in finding that the government conducted itself in a manner that evidenced a desire to minimize the involvement of defense attorneys in grand jury investigation of fraudulent tax shelters of employees of accounting firm, supporting employees' Sixth Amendment claim against the government; assistant United States attorney (AUSA) demanded that accounting firm tell its employees to be "totally open" with the United States Attorney's Office (USAO), even if it meant admitting criminal wrongdoing, and prosecutors repeatedly used accounting firm's law firm to threaten to withhold legal fees from employees who refused to proffer, even if defense counsel had recommended that an employee invoke the Fifth Amendment privilege. U.S.C.A. Const.Amends. 5, 6.

**[4] Criminal Law 110 🔑1858**

110 Criminal Law
110XXXI Counsel
110XXXI(B) Right of Defendant to Counsel
110XXXI(B)11 Deprivation or Allowance of Counsel
110k1858 k. Assisting and Compensating Counsel. Most Cited Cases

District court did not clearly err in finding that absent government memo, providing that advancement of funds to cover legal fees of accounting firm employees suspected of committing accounting fraud would be considered as negative factor in assessing whether employer was sufficiently cooperating with government investigation to forestall indictment, and prosecutors' conduct of enforcing memo's threat and conducting themselves in a manner evidencing a desire to minimize involvement of defense attorneys in the fraud investigation, accounting firm would have advanced fees to its employees without condition or cap, supporting employees' Sixth Amendment claim against the government; accounting firm had a longstanding voluntary practice of advancing and paying employees' legal fees without regard to costs or considerations and without a cap or condition of cooperation with the government. U.S.C.A. Const.Amend. 6.

**[5] Indictment and Information 210 🔑144.1(2)**

210 Indictment and Information
210IX Motion to Dismiss
210k144.1 Grounds
210k144.1(2) k. Grand or Petit Jury Irregularities. Most Cited Cases

Dismissal of indictment against accounting firm employees allegedly involved in accounting fraud would be required to cure any violation, by the government, of employees' Sixth Amendment right to counsel, where government's conduct caused accounting firm to impose conditions on the advancement of legal fees to its employees, and absent governmental interference, accounting firm would have advanced unlimited legal fees unconditionally. U.S.C.A. Const.Amend. 6.

**[6] Criminal Law 110 🔑1862**

110 Criminal Law
110XXXI Counsel
110XXXI(B) Right of Defendant to Counsel
110XXXI(B)11 Deprivation or Allowance of Counsel
110k1860 Effect of Representation or Deprivation of Rights
110k1862 k. Remedies. Most Cited Cases

Cases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests; therefore, a court must identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial. U.S.C.A. Const.Amend. 6.

**[7] Indictment and Information 210 🔑144.1(1)**

210 Indictment and Information
210IX Motion to Dismiss
210k144.1 Grounds
210k144.1(1) k. In General. Most Cited Cases

Dismissal of an indictment for a Sixth Amendment deprivation is a remedy of last resort, and is appropriate only where necessary to restore the defendant to the circumstances that would have existed had there been no constitutional error. U.S.C.A. Const.Amend. 6.

**[8] Civil Rights 78 🔑1448**

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

78 Civil Rights
78III Federal Remedies in General
78k1448 k. Judgment and Relief in General. Most Cited Cases
The appropriate remedy for a constitutional violation is one that as much as possible restores the defendant to the circumstances that would have existed had there been no constitutional error.

**[9] Criminal Law 110 ⚷1858**

110 Criminal Law
110XXXI Counsel
110XXXI(B) Right of Defendant to Counsel
110XXXI(B)11 Deprivation or Allowance of Counsel
110k1858 k. Assisting and Compensating Counsel. Most Cited Cases
Accounting firm's adoption and enforcement of fees policy, which imposed conditions on advancement of legal fees to its employees involved in accounting fraud investigation, amounted to state action, and therefore the government could be held responsible for alleged deprivation of employees' Sixth Amendment right to counsel; government issued memo emphasizing decision to forestall indictment against the firm would be determined in part based upon whether, in advancing legal fees, the firm appeared to be protecting culpable employees and agents, prosecutors reinforced memo's message by inquiring into the firm's fees obligations, and prosecutors became entwined in the control of the accounting firm to ensure the fees policy was enforced by intervening in accounting firm's decisionmaking, expressing their disappointment with the tone of the accounting firm's first advisory memorandum, and declaring that the problems had to be remedied. U.S.C.A. Const.Amend. 6.

**[10] Criminal Law 110 ⚷1139**

110 Criminal Law
110XXIV Review
110XXIV(L) Scope of Review in General
110XXIV(L)13 Review De Novo
110k1139 k. In General. Most Cited Cases
When the district court's dismissal of an indictment raises questions of constitutional interpretation, an appellate court reviews the district court's decision de novo.

**[11] Constitutional Law 92 ⚷1061**

92 Constitutional Law
92VII Constitutional Rights in General
92VII(A) In General
92k1061 k. Applicability to Governmental or Private Action; State Action. Most Cited Cases
Actions of a private entity are attributable to the state if there is a sufficiently close nexus between the state and the challenged action of the entity so that the action of the latter may be fairly treated as that of the state itself.

**[12] Constitutional Law 92 ⚷1061**

92 Constitutional Law
92VII Constitutional Rights in General
92VII(A) In General
92k1061 k. Applicability to Governmental or Private Action; State Action. Most Cited Cases
The "close nexus" test, used to determine if the actions of a private entity can be attributed to the state, is not satisfied when the state merely approves of or acquiesces in the initiatives of the private entity, or when an entity is merely subject to governmental regulation.

**[13] Constitutional Law 92 ⚷1061**

92 Constitutional Law
92VII Constitutional Rights in General
92VII(A) In General
92k1061 k. Applicability to Governmental or Private Action; State Action. Most Cited Cases
The purpose of the close nexus test, used to determine if the actions of a private entity can be attributed to the state, is to assure that constitutional standards are invoked only when it can be said that the state is responsible for the specific conduct of which the plaintiff complains; such responsibility is normally found when the state has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the state.

**[14] Constitutional Law 92 ⚷1061**

92 Constitutional Law
92VII Constitutional Rights in General

92VII(A) In General
92k1061 k. Applicability to Governmental or Private Action; State Action. Most Cited Cases
A nexus of state action exists between a private entity and the state, allowing the private entity's actions to be attributed to the state, when the state exercises coercive power, is entwined in the management or control of the private actor, or provides the private actor with significant encouragement, either overt or covert, or when the private actor operates as a willful participant in joint activity with the state or its agents, is controlled by an agency of the state, has been delegated a public function by the state, or is entwined with governmental policies.

**[15] Criminal Law 110 1858**

110 Criminal Law
110XXXI Counsel
110XXXI(B) Right of Defendant to Counsel
110XXXI(B)11 Deprivation or Allowance of Counsel
110k1858 k. Assisting and Compensating Counsel. Most Cited Cases
Government's conduct in forcing accounting firm to adopt fee policy, which imposed conditions on advancement of legal fees to its employees involved in accounting fraud investigation, and compelling the firm to enforce it, was not immune from employees' Sixth Amendment claims that they were deprived their right to counsel, even though virtually all of the government's conduct occurred before the employees were indicted; based on government's conduct it was virtually certain that the accounting firm would terminate the employees' fees upon indictment. U.S.C.A. Const.Amend. 6.

**[16] Criminal Law 110 1719**

110 Criminal Law
110XXXI Counsel
110XXXI(B) Right of Defendant to Counsel
110XXXI(B)2 Stage of Proceedings as Affecting Right
110k1719 k. Adversary or Judicial Proceedings. Most Cited Cases
The Sixth Amendment right of the accused to assistance of counsel in all criminal prosecutions is limited by its terms: it does not attach until a prosecution is commenced. U.S.C.A. Const.Amend. 6.

**[17] Criminal Law 110 1719**

110 Criminal Law
110XXXI Counsel
110XXXI(B) Right of Defendant to Counsel
110XXXI(B)2 Stage of Proceedings as Affecting Right
110k1719 k. Adversary or Judicial Proceedings. Most Cited Cases
Attachment of the Sixth Amendment right to counsel, which occurs after prosecution is commenced, refers to when the Sixth Amendment right may be asserted; it does not concern the separate question of what the right guarantees, i.e., what the substantive guarantee of the Sixth Amendment is at that stage of the prosecution. U.S.C.A. Const.Amend. 6.

**[18] Criminal Law 110 1820**

110 Criminal Law
110XXXI Counsel
110XXXI(B) Right of Defendant to Counsel
110XXXI(B)9 Choice of Counsel
110k1820 k. In General. Most Cited Cases
The Sixth Amendment guarantees the defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds; an element of this right is the right of a defendant who does not require appointed counsel to choose who will represent him. U.S.C.A. Const.Amend. 6.

**[19] Criminal Law 110 1820**

110 Criminal Law
110XXXI Counsel
110XXXI(B) Right of Defendant to Counsel
110XXXI(B)9 Choice of Counsel
110k1820 k. In General. Most Cited Cases

**Criminal Law 110 1873**

110 Criminal Law
110XXXI Counsel
110XXXI(C) Adequacy of Representation
110XXXI(C)1 In General

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

110k1872 General Qualifications of Counsel
110k1873 k. In General. Most Cited Cases
Although the Sixth Amendment right to counsel of choice has been regarded as the root meaning of the constitutional guarantee, the right is qualified: the attorney must be admitted to the bar, willing to represent the defendant, free from certain conflicts of interest, compliant with the rules of the court, and so on. U.S.C.A. Const.Amend. 6.

**[20] Criminal Law 110 ⚷1850**

110 Criminal Law
110XXXI Counsel
110XXXI(B) Right of Defendant to Counsel
110XXXI(B)11 Deprivation or Allowance of Counsel
110k1850 k. In General. Most Cited Cases
The government must honor a defendant's Sixth Amendment right to counsel, which means more than simply that the state cannot prevent the accused from obtaining the assistance of counsel; the Sixth Amendment also imposes on the state an affirmative obligation to respect and preserve the accused's choice to seek this assistance, and, at the very least, the prosecutor and police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel. U.S.C.A. Const.Amend. 6.

**[21] Criminal Law 110 ⚷1853**

110 Criminal Law
110XXXI Counsel
110XXXI(B) Right of Defendant to Counsel
110XXXI(B)11 Deprivation or Allowance of Counsel
110k1853 k. Interference in Attorney-Client Relationship. Most Cited Cases
The government violates the Sixth Amendment when it intrudes on the attorney-client relationship, preventing defense counsel from participating fully and fairly in the adversary factfinding process. U.S.C.A. Const.Amend. 6.

**[22] Criminal Law 110 ⚷1858**

110 Criminal Law
110XXXI Counsel
110XXXI(B) Right of Defendant to Counsel
110XXXI(B)11 Deprivation or Allowance of Counsel
110k1858 k. Assisting and Compensating Counsel. Most Cited Cases
Although there is no Sixth Amendment right for a defendant to obtain counsel using tainted funds, a defendant still possesses a qualified Sixth Amendment right to use wholly legitimate funds to hire the attorney of his choice. U.S.C.A. Const.Amend. 6.

**[23] Criminal Law 110 ⚷1858**

110 Criminal Law
110XXXI Counsel
110XXXI(B) Right of Defendant to Counsel
110XXXI(B)11 Deprivation or Allowance of Counsel
110k1858 k. Assisting and Compensating Counsel. Most Cited Cases
In a nutshell, the Sixth Amendment protects against unjustified governmental interference with the right to defend oneself using whatever assets one has or might reasonably and lawfully obtain. U.S.C.A. Const.Amend. 6.

**[24] Criminal Law 110 ⚷1850**

110 Criminal Law
110XXXI Counsel
110XXXI(B) Right of Defendant to Counsel
110XXXI(B)11 Deprivation or Allowance of Counsel
110k1850 k. In General. Most Cited Cases

**Criminal Law 110 ⚷1858**

110 Criminal Law
110XXXI Counsel
110XXXI(B) Right of Defendant to Counsel
110XXXI(B)11 Deprivation or Allowance of Counsel
110k1858 k. Assisting and Compensating Counsel. Most Cited Cases
The Sixth Amendment prohibits the government from impeding the supply of defense resources, even

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

if voluntary or gratis, absent justification. U.S.C.A. Const.Amend. 6.

**[25] Criminal Law 110 1780**

110 Criminal Law
110XXXI Counsel
110XXXI(B) Right of Defendant to Counsel
110XXXI(B)6 Conflict of Interest
110k1780 k. In General. Most Cited Cases

**Criminal Law 110 1820**

110 Criminal Law
110XXXI Counsel
110XXXI(B) Right of Defendant to Counsel
110XXXI(B)9 Choice of Counsel
110k1820 k. In General. Most Cited Cases

The government is sometimes allowed to interfere with defendants' choice or relationship with counsel, such as to prevent certain conflicts of interest. U.S.C.A. Const.Amend. 6.

**[26] Criminal Law 110 1858**

110 Criminal Law
110XXXI Counsel
110XXXI(B) Right of Defendant to Counsel
110XXXI(B)11 Deprivation or Allowance of Counsel
110k1858 k. Assisting and Compensating Counsel. Most Cited Cases

Accounting firm employees indicted on accounting fraud charges were unable to retain the counsel of their choosing as a result of government forcing accounting firm to implement fee policy terminating legal fee advancements to employees upon indictment, and therefore employees were deprived of their Sixth Amendment right to counsel of choice, absent legitimate justification by the government. U.S.C.A. Const.Amend. 6.

**[27] Criminal Law 110 1166.10(1)**

110 Criminal Law
110XXIV Review
110XXIV(Q) Harmless and Reversible Error
110k1166.5 Conduct of Trial in General
110k1166.10 Counsel for Accused
110k1166.10(1) k. In General. Most Cited Cases

A defendant who is deprived of counsel of choice without justification need not show how his or her defense was impacted; such errors are structural and are not subject to harmless-error review. U.S.C.A. Const.Amend. 6.

**[28] Criminal Law 110 1858**

110 Criminal Law
110XXXI Counsel
110XXXI(B) Right of Defendant to Counsel
110XXXI(B)11 Deprivation or Allowance of Counsel
110k1858 k. Assisting and Compensating Counsel. Most Cited Cases

Government unjustifiably interfered with indicted accounting firm employees' relationship with counsel and their ability to defend themselves in accounting fraud proceeding by forcing accounting firm to implement fee policy terminating legal fee advancements to employees upon indictment, and therefore employees were deprived of their Sixth Amendment right to counsel; post-indictment termination of fees caused employees to restrict the activities of their counsel, and thus limited the scope of their pre-trial investigation and preparation. U.S.C.A. Const.Amend. 6.

The United States appeals from an order of the United States District Court for the Southern District of New York (Kaplan, *J.*), dismissing an indictment against Defendants-Appellees, thirteen former partners and employees of accounting firm KPMG, LLP. We affirm the district court's ruling that the government deprived Defendants-Appellees of their right to counsel under the Sixth Amendment by causing KPMG to place conditions on the advancement of legal fees to Defendants-Appellees, and to cap the fees and ultimately end them. Because the government failed to cure the Sixth Amendment violation, and because no other remedy will return Defendants-Appellees to the status quo ante, we affirm the dismissal of the indictment. In a separate summary order filed today, we dismiss as moot the government's appeal from the order of the district court suppressing proffer statements made by Defendants-Appellees Richard Smith and Mark Watson.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Karl Metzner, Assistant United States Attorney (Michael J. Garcia, United States Attorney, Southern District of New York, on the brief; John M. Hillebrecht, Margaret Garnett, Katherine Polk Failla, Assistant United States Attorneys, of counsel), United States Attorney's Office for the Southern District of New York, New York, NY, for Appellant.
Seth P. Waxman (Paul A. Engelmayer, Danielle Spinelli, Catherine M.A. Carroll, Daniel S. Volchok, on the brief), Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C., David Spears, Spears & Imes LLP, New York, NY, Craig Margolis, Vinson & Elkins LLP, Washington, D.C., Michael J. Madigan, Orrick, Herrington & Sutcliffe LLP, Washington, D.C., Robert H. Hotz, Jr., Akin Gump Strauss Hauer and Feld LLP, New York, NY, Caroline Rule, Robert S. Fink, Fran Obeid, Kostelanetz & Fink, LLP, New York, NY, George D. Niespolo, Esq., Stephen H. Sutro, Esq., Duane Morris LLP, San Francisco, CA, Susan R. Necheles, Hafetz & Necheles, New York, NY, for Appellees Stein, Lanning, Smith, Bickham and Rosenthal.
Stanley S. Arkin (Sean R. O'Brien, Joseph V. DiBlasi, Elizabeth A. Fitzwater, on the brief), Arkin Kaplan Rice LLP, New York, NY, for Appellee Eischeid.
John S. Martin, Jr. (Otto G. Obermaier, on the brief), Martin & Obermaier, LLC, New York, NY; Daniel C. Richman, of counsel, New York, NY, Ronald E. DePetris, Marion Bachrach, DePetris & Bachrach, LLP, New York, NY, Diana D. Parker, Law Offices of Diana D. Parker, New York, NY, John R. Wing, Lankler Siffert & Wohl LLP, New York, NY, John F. Kaley, Doar Rieck Kaley & Mack, New York, NY, James R. Devita, Bryan Cave LLP, New York, NY, John A. Townsend, Townsend & Jones, Houston, TX, for Appellees Wiesner, DeLap, Gremminger and Warley.
Michael S. Kim (Leif T. Simonson, on the brief), Kobre & Kim LLP, New York, NY, for Appellee Watson.
Ted W. Cassman (Cristina C. Arguedas, Raphael M. Goldman, Michael W. Anderson, on the brief), Arguedas, Cassman & Headley, LLP, Berkeley, CA; Ann C. Moorman, Law Offices of Ann C. Moorman, of counsel, Berkeley, CA, for Appellee Ritchie.
Russell M. Gioiella (Richard M. Asche, on the brief), Litman, Asche & Gioiella, LLP, New York, NY, for Appellee Hasting.
Mark I. Levy (Sean M. Green, on the brief), Kilpatrick Stockton LLP, Washington, D.C., for Amici Curiae Association of Corporate Counsel and Chamber of Commerce of the United States of America.
Walter Dellinger (Pamela Harris, Karl R. Thompson, Brianne J. Gorod, on the brief), O'Melveny & Myers LLP, Washington, D.C., for Amici Curiae Former Attorneys General and United States Attorneys.
Ira M. Feinberg, Hogan & Hartson LLP, New York, NY, for Amici Curiae Former United States Attorneys, First Assistants and Criminal Division Chiefs.
Lewis J. Liman (Molly M. Lens, on the brief), Cleary Gottlieb Steen & Hamilton LLP, New York, NY; Paul B. Bergman, New York, NY, for Amici Curiae New York Council of Defense Lawyers, New York State Bar Association, and National Association of Criminal Defense Lawyers.
Mark A. Kirsch (Kara Morrow, Tamar Bruger, Stephen M. Nickelsburg, on the brief), Clifford Chance U.S. LLP, New York, NY; Ira D. Hammerman, Kevin M. Carroll, for Amicus Curiae Securities Industry and Financial Markets Association.
Michael J. Gilbert (Steven B. Feirson, on the brief), Dechert LLP, New York, NY; Daniel J. Popeo, for Amicus Curiae Washington Legal Foundation.

Before JACOBS, Chief Judge, FEINBERG and HALL, Circuit Judges.

DENNIS JACOBS, Chief Judge:
***1** The United States appeals from an order of the United States District Court for the Southern District of New York (Kaplan, *J.*), dismissing an indictment against thirteen former partners and employees of the accounting firm KPMG, LLP. Judge Kaplan found that, absent pressure from the government, KPMG would have paid defendants' legal fees and expenses without regard to cost. Based on this and other findings of fact, Judge Kaplan ruled that the government deprived defendants of their right to counsel under the Sixth Amendment by causing KPMG to impose conditions on the advancement of legal fees to defendants, to cap the fees, and ultimately to end payment. *See United States v. Stein,* 435 F.Supp.2d 330, 367-73 (S.D.N.Y.2006) ("*Stein I* "). Judge Kaplan also ruled that the government deprived defendants of their right to substantive due process under the Fifth Amendment.[FN1] *Id.* at 360-65.

We hold that KPMG's adoption and enforcement of a policy under which it conditioned, capped and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ultimately ceased advancing legal fees to defendants followed as a direct consequence of the government's overwhelming influence, and that KPMG's conduct therefore amounted to state action. We further hold that the government thus unjustifiably interfered with defendants' relationship with counsel and their ability to mount a defense, in violation of the Sixth Amendment, and that the government did not cure the violation. Because no other remedy will return defendants to the status quo ante, we affirm the dismissal of the indictment as to all thirteen defendants.[FN2] In light of this disposition, we do not reach the district court's Fifth Amendment ruling.

## BACKGROUND

### The Thompson Memorandum

In January 2003, then-United States Deputy Attorney General Larry D. Thompson promulgated a policy statement, *Principles of Federal Prosecution of Business Organizations* (the "Thompson Memorandum"), which articulated "principles" to govern the Department's discretion in bringing prosecutions against business organizations. The Thompson Memorandum was closely based on a predecessor document issued in 1999 by then-U.S. Deputy Attorney General Eric Holder, *Federal Prosecution of Corporations. See* Stein I, 435 F.Supp.2d at 336-37. Along with the familiar factors governing charging decisions, the Thompson Memorandum identifies nine additional considerations, including the company's "timely and voluntary disclosure of wrongdoing and its willingness to cooperate in the investigation of its agents."Mem. from Larry D. Thompson, Deputy Att'y Gen., U.S. Dep't of Justice, *Principles of Federal Prosecution ofBusiness Organizations* (Jan. 20, 2003), at II. The Memorandum explains that prosecutors should inquire

> whether the corporation appears to be protecting its culpable employees and agents [and that] a corporation's promise of support to culpable employees and agents, either *through the advancing of attorneys fees,* through retaining the employees without sanction for their misconduct, or through providing information to the employees about the government's investigation pursuant to a joint defense agreement, may be considered by the prosecutor in weighing the extent and value of a corporation's cooperation.

***2** *Id.* at VI (emphasis added and footnote omitted). A footnote appended to the highlighted phrase explains that because certain states require companies to advance legal fees for their officers, "a corporation's compliance with governing law should not be considered a failure to cooperate."*Id.* at VI n. 4. In December 2006-after the events in this prosecution had transpired-the Department of Justice replaced the Thompson Memorandum with the McNulty Memorandum, under which prosecutors may consider a company's fee advancement policy only where the circumstances indicate that it is "intended to impede a criminal investigation," and even then only with the approval of the Deputy Attorney General. Mem. from Paul J. McNulty, Deputy Att'y Gen., U.S. Dep't of Justice, *Principles of Federal Prosecution of Business Organizations* (Dec. 12, 2006), at VII n. 3.

### Commencement of the Federal Investigation

After Senate subcommittee hearings in 2002 concerning KPMG's possible involvement in creating and marketing fraudulent tax shelters, KPMG retained Robert S. Bennett of the law firm Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") to formulate a "cooperative approach" for KPMG to use in dealing with federal authorities. Stein I, 435 F.Supp.2d at 339. Bennett's strategy included "a decision to 'clean house'-a determination to ask Jeffrey Stein, Richard Smith, and Jeffrey Eischeid, all senior KPMG partners who had testified before the Senate and all now [Defendants-Appellees] here-to leave their positions as deputy chair and chief operating officer of the firm, vice chair-tax services, and a partner in personal financial planning, respectively ."*Id.* Smith was transferred and Eischeid was put on administrative leave.*Id.* at 339 n. 22.Stein resigned with arrangements for a three-year $100,000-per-month consultancy, and an agreement that KPMG would pay for Stein's representation in any actions brought against Stein arising from his activities at the firm. *Id.* at 339.KPMG negotiated a contract with Smith that included a similar clause; but that agreement was never executed. *Stein IV,* 495 F.Supp.2d at 408.

In February 2004, KPMG officials learned that the firm and 20 to 30 of its top partners and employees

were subjects of a grand jury investigation of fraudulent tax shelters. Stein I, 435 F.Supp.2d at 341. On February 18, 2004, KPMG's CEO announced to all partners that the firm was aware of the United States Attorney's Office's ("USAO") investigation and that "[a]ny present or former members of the firm asked to appear will be represented by competent coun[sel] *at the firm's expense.*" *Stein IV*, 495 F.Supp.2d at 407 (first alteration in original and internal quotation marks omitted).

**The February 25, 2004 Meeting**

In preparation for a meeting with Skadden on February 25, 2004, the prosecutors-including Assistant United States Attorneys ("AUSAs") Shirah Neiman and Justin Weddle-decided to ask whether KPMG would advance legal fees to employees under investigation. Stein I, 435 F.Supp.2d at 341. Bennett started the meeting by announcing that KPMG had resolved to "clean house," that KPMG "would cooperate fully with the government's investigation," and that its goal was not to protect individual employees but rather to save the firm from being indicted. *Id.* AUSA Weddle inquired about the firm's plans for advancing fees and about any legal obligation to do so. *Id.* Later on, AUSA Neiman added that the government would "take into account" the firm's legal obligations to advance fees, but that "the Thompson Memorandum [w]as a point that had to be considered."*Id.* Bennett then advised that although KPMG was still investigating its legal obligations to advance fees, its "common practice" was to do so. *Id.* at 342.However, Bennett explained, KPMG would not pay legal fees for any partner who refused to cooperate or "took the Fifth," so long as KPMG had the legal authority to do so. *Id.*

***3** Later in the meeting, AUSA Weddle asked Bennett to ascertain KPMG's legal obligations to advance attorneys' fees. AUSA Neiman added that "misconduct" should not or cannot "be rewarded" under "federal guidelines." *Id.* One Skadden attorney's notes attributed to AUSA Weddle the prediction that, if KPMG had discretion regarding fees, the government would "look at that under a microscope."*Id.* at 344 (emphasis omitted).

Skadden then reported back to KPMG. In notes of the meeting, a KPMG executive wrote the words "[p]aying legal fees" and "[s]everance" next to "not a sign of cooperation." *Stein IV*, 495 F.Supp.2d at 408.

**Communications Between the Prosecutors and KPMG**

On March 2, 2004, Bennett told AUSA Weddle that although KPMG believed it had no legal obligation to advance fees, "it would be a big problem" for the firm not to do so given its partnership structure. Stein I, 435 F.Supp.2d at 345 (internal quotation marks omitted). But Bennett disclosed KPMG's tentative decision to limit the amount of fees and condition them on employees' cooperation with prosecutors. *Id.*

Two days later, a Skadden lawyer advised counsel for Defendant-Appellee Carol G. Warley (a former KPMG tax partner) that KPMG would advance legal fees if Warley cooperated with the government and declined to invoke her Fifth Amendment privilege against self-incrimination. *Id.*

On a March 11 conference call with Skadden, AUSA Weddle recommended that KPMG tell employees that they should be "totally open" with the USAO, "even if that [meant admitting] criminal wrongdoing," explaining that this would give him good material for cross-examination. *Id.* (alteration in original and internal quotation marks omitted). That same day, Skadden wrote to counsel for the KPMG employees who had been identified as subjects of the investigation.*Id.* The letter set forth KPMG's new fees policy ("Fees Policy"), pursuant to which advancement of fees and expenses would be

> [i] capped at $400,000 per employee;
>
> [ii] conditioned on the employee's cooperation with the government; and
>
> [iii] terminated when an employee was indicted.

*Id.* at 345-46.The government was copied on this correspondence. *Id.* at 345.

On March 12, KPMG sent a memorandum to certain other employees who had not been identified as subjects, urging them to cooperate with the government, advising them that it might be advantageous for them to exercise their right to counsel, and advising that KPMG would cover

employees' "reasonable fees." *Id.* at 346 n. 62.

The prosecutors expressed by letter their "disappoint[ment] with [the] tone" of this memorandum and its "one-sided presentation of potential issues," and "demanded that KPMG send out a supplemental memorandum in a form they proposed."*Id.* at 346.The government's alternative language, premised on the "assum[ption] that KPMG truly is committed to fully cooperating with the Government's investigation," Letter of David N. Kelley, United States Attorney, Southern District of New York, March 17, 2004, advised employees that they could "meet with investigators without the assistance of counsel,"*Stein I,* 435 F.Supp.2d at 346 (emphasis omitted). KPMG complied, and circulated a memo advising that employees "may deal directly with government representatives without counsel."*Id.* (emphasis omitted).

***4** At a meeting in late March, Skadden asked the prosecutors to notify Skadden in the event any KPMG employee refused to cooperate. *Id.* at 347.Over the following year, the prosecutors regularly informed Skadden whenever a KPMG employee refused to cooperate fully, such as by refusing to proffer or by proffering incompletely (in the government's view).*Id.* Skadden, in turn, informed the employees' lawyers that fee advancement would cease unless the employees cooperated. *Id.* The employees either knuckled under and submitted to interviews, or they were fired and KPMG ceased advancing their fees. For example, Watson and Smith attended proffer sessions after receiving KPMG's March 11 letter announcing the Fees Policy, and after Skadden reiterated to them that fees would be terminated absent cooperation. They did so because (they said, and the district court found) they feared that KPMG would stop advancing attorneys fees-although Watson concedes he attended a first session voluntarily.[FN3]*See United States v. Stein,* 440 F.Supp.2d 315, 330-33 (S.D.N.Y.2006) ("*Stein II*"). As Bennett later assured AUSA Weddle: "Whenever your Office has notified us that individuals have not ... cooperat [ed], KPMG has promptly and without question encouraged them to cooperate and threatened to cease payment of their attorney fees and ... to take personnel action, including termination."Letter of Robert Bennett to United States Attorney's Office, November 2, 2004; *see, e.g., Stein II,* 440 F.Supp.2d at 323 (describing KPMG's termination of Defendant-Appellant Warley after she invoked her Fifth Amendment privilege against self-incrimination).

**KPMG Avoids Indictment**

In an early-March 2005 meeting, then-U.S. Attorney David Kelley told Skadden and top KPMG executives that a non-prosecution agreement was unlikely and that he had reservations about KPMG's level of cooperation: "I've seen a lot better from big companies."Bennett reminded Kelley how KPMG had capped and conditioned its advancement of legal fees. Kelley remained unconvinced.

KPMG moved up the Justice Department's chain of command. At a June 13, 2005 meeting with U.S. Deputy Attorney General James Comey, Bennett stressed KPMG's pressure on employees to cooperate by conditioning legal fees on cooperation; it was, he said, "precedent[ ]setting." *Stein I,* 435 F.Supp.2d at 349 (internal quotation marks omitted). KPMG's entreaties were ultimately successful: on August 29, 2005, the firm entered into a deferred prosecution agreement (the "DPA") under which KPMG admitted extensive wrongdoing, paid a $456 million fine, and committed itself to cooperation in any future government investigation or prosecution. *Id.* at 349-50.

**Indictment of Individual Employees**

On August 29, 2005-the same day KPMG executed the DPA-the government indicted six of the Defendants-Appellees (along with three other KPMG employees): Jeffrey Stein; Richard Smith; Jeffrey Eischeid; John Lanning, Vice Chairman of Tax Services; Philip Wiesner, a former tax partner; and Mark Watson, a tax partner. A superseding indictment filed on October 17, 2005 named ten additional employees, including seven of the Defendants-Appellees: Larry DeLap, a former tax partner in charge of professional practice; Steven Gremminger, a former partner and associate general counsel; former tax partners Gregg Ritchie, Randy Bickham and Carl Hasting; Carol G. Warley; and Richard Rosenthal, a former tax partner and Chief Financial Officer of KPMG.[FN4] Pursuant to the Fees Policy, KPMG promptly stopped advancing legal fees to the indicted employees who were still receiving them. *Id.* at 350.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**Procedural History**

***5** On January 12, 2006, the thirteen defendants (among others) moved to dismiss the indictment based on the government's interference with KPMG's advancement of fees.[FN5] In a submission to the district court, KPMG represented that

> the Thompson memorandum in conjunction with the government's statements relating to payment of legal fees affected KPMG's determination(s) with respect to the advancement of legal fees and other defense costs to present or former partners and employees .... In fact, KPMG is prepared to state that the Thompson memorandum substantially influenced KPMG's decisions with respect to legal fees....

*Stein IV,* 495 F.Supp.2d at 405 (internal quotation marks and emphasis omitted).

At a hearing on March 30, 2006, Judge Kaplan asked the government whether it was "prepared at this point to commit that [it] has no objection whatsoever to KPMG exercising its free and independent business judgment as to whether to advance defense costs to these defendants and that if it were to elect to do so the government would not in any way consider that in determining whether it had complied with the DPA?"The AUSA responded: "That's always been the case, your Honor. That's fine. We have no objection to that.... They can always exercise their business judgment. As you described it, your Honor, that's always been the case. It's the case today, your Honor."

Judge Kaplan ordered discovery and held a three-day evidentiary hearing in May 2006 to ascertain whether the government had contributed to KPMG's adoption of the Fees Policy. The court heard testimony from two prosecutors, one IRS agent, three Skadden attorneys, and one lawyer from KPMG's Office of General Counsel, among others. Numerous documents produced in discovery by both sides were admitted into evidence.

***Stein I***

Judge Kaplan's opinion and order of June 26, 2006 noted, as the parties had stipulated, that KPMG's past practice was to advance legal fees for employees facing regulatory, civil and criminal investigations without condition or cap. *See* Stein I, 435 F.Supp.2d at 340. Starting from that baseline, Judge Kaplan made the following findings of fact. At the February 25, 2004 meeting, Bennett began by "test[ing] the waters to see whether KPMG could adhere to its practice of paying its employees' legal expenses when litigation loomed [by asking] for [the] government's view on the subject."*Id.* at 341 (footnote omitted). It is not clear what AUSA Neiman intended to convey when she said that "misconduct" should not or cannot "be rewarded" under "federal guidelines"; but her statement "was understood by both KPMG and government representatives as a reminder that payment of legal fees by KPMG, beyond any that it might legally be obligated to pay, could well count against KPMG in the government's decision whether to indict the firm."*Id.* at 344 (internal quotation marks omitted)."[W]hile the USAO did not say in so many words that it did not want KPMG to pay legal fees, no one at the meeting could have failed to draw that conclusion."*Id.*

***6** Based on those findings, Judge Kaplan arrived at the following ultimate findings of fact, all of which the government contests on appeal:

> [1] "the Thompson Memorandum caused KPMG to consider departing from its long-standing policy of paying legal fees and expenses of its personnel in all cases and investigations even before it first met with the USAO" and induced KPMG to seek "an indication from the USAO that payment of fees in accordance with its settled practice would not be held against it";
>
> [2] the government made repeated references to the Thompson Memo in an effort to "reinforce[ ] the threat inherent in the Thompson Memorandum";
>
> [3] "the government conducted itself in a manner that evidenced a desire to minimize the involvement of defense attorneys"; and
>
> [4] but for the Thompson Memorandum and the prosecutors' conduct, KPMG would have paid defendants' legal fees and expenses without consideration of cost.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*Id.* at 352-53.

Against that background, Judge Kaplan ruled that a defendant has a fundamental right under the Fifth Amendment to fairness in the criminal process, including the ability to get and deploy in defense all "resources lawfully available to him or her, free of knowing or reckless government interference,"*id.* at 361, and that the government's reasons for infringing that right in this case could not withstand strict scrutiny, *id.* at 362-65.Judge Kaplan also ruled that the same conduct deprived each defendant of the Sixth Amendment right "to choose the lawyer or lawyers he or she desires and to use one's own funds to mount the defense that one wishes to present."*Id.* at 366 (footnote omitted). He reasoned that "the government's law enforcement interests in taking the specific actions in question [do not] sufficiently outweigh the interests of the KPMG Defendants in having the resources needed to defend as they think proper against these charges."*Id.* at 368."[T]he fact that advancement of legal fees occasionally might be part of an obstruction scheme or indicate a lack of full cooperation by a prospective defendant is insufficient to justify the government's interference with the right of individual criminal defendants to obtain resources lawfully available to them in order to defend themselves...."*Id.* at 369.

Judge Kaplan rejected the government's position that defendants have no right to spend "other people's money" on high-priced defense counsel: "[T]he KPMG Defendants had at least an expectation that their expenses in defending any claims or charges brought against them by reason of their employment by KPMG would be paid by the firm," and "any benefits that would have flowed from that expectation-the legal fees at issue now-were, in every material sense, their property, not that of a third party."*Id.* at 367.He further determined that defendants need not show how their defense was impaired: the government's interference with their Sixth Amendment "right to be represented as they choose,""like a deprivation of the right to counsel of their choice, is complete irrespective of the quality of the representation they receive."*Id.* at 369.

*7 As to remedy, Judge Kaplan conceded that dismissal of the indictment would be inappropriate unless other avenues for obtaining fees from KPMG were first exhausted. *Id.* at 373-80.To that end, Judge Kaplan invited defendants to file a civil suit against KPMG under the district court's ancillary jurisdiction. *Id.* at 377-80, 382.The suit was commenced, and Judge Kaplan denied KPMG's motion to dismiss. *United States v. Stein,* 452 F.Supp.2d 230 (S.D.N.Y.2006) ("*Stein III* "). However, this Court ruled that the district court lacked ancillary jurisdiction over the action. *Stein v. KPMG, LLP,* 486 F.3d 753 (2d Cir.2007).

***Stein IV***

Judge Kaplan dismissed the indictment against the thirteen defendants on July 16, 2007. *Stein IV,* 495 F.Supp.2d at 427. He reinforced the ruling in *Stein I* that the government violated defendants' right to substantive due process by holding that the prosecutors' conduct also "independently shock[s] the conscience." *Id.* at 412-15.Judge Kaplan concluded that no remedy other than dismissal of the indictment would put defendants in the position they would have occupied absent the government's misconduct. *Id.* at 419-28.

The government appeals the dismissal of the indictment.

**DISCUSSION**

We review first **[I]** the government's challenges to the district court's factual findings, including its finding that but for the Thompson Memorandum and the prosecutors' conduct KPMG would have paid employees' legal fees-pre-indictment and post-indictment-without regard to cost. Next, because we are hesitant to resolve constitutional questions unnecessarily, **[II]** we inquire whether the government cured the purported Sixth Amendment violation by the AUSA's in-court statement on March 30, 2006 that KPMG was free to decide whether to advance fees. Since we conclude that this statement did not return defendants to the status quo ante,**[III]** we decide whether the promulgation and enforcement of KPMG's Fees Policy amounted to state action under the Constitution and **[IV]** whether the government deprived defendants of their Sixth Amendment right to counsel.

**I**

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The government challenges certain factual findings of the district court. We review those findings for clear error, viewing the evidence in the light most favorable to defendants and asking whether we are left "with the definite and firm conviction that a mistake has been committed."*Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (internal quotation marks omitted).

[1] The government points out that the Thompson Memorandum lists "fees advancement" as just one of many considerations in a complex charging decision, and thus argues that Judge Kaplan overread the Thompson Memorandum as a threat that KPMG would be indicted unless it ceased advancing legal fees to its employees.

Judge Kaplan's finding withstands scrutiny. KPMG was faced with the fatal prospect of indictment; it could be expected to do all it could, assisted by sophisticated counsel, to placate and appease the government. As Judge Kaplan noted, KPMG's chief legal officer, Sven Erik Holmes, testified that he considered it crucial "to be able to say at the right time with the right audience, we're in *full* compliance with the Thompson Memorandum."*Stein I*, 435 F.Supp.2d at 364 (emphasis added and internal quotation marks omitted). Moreover, KPMG's management and counsel had reason to consider the impact of the firm's indictment on the interests of the firm's partners, employees, clients, creditors and retirees.

***8** The government reads the Thompson Memorandum to say that fees advancement is to be considered as a negative factor only when it is part of a campaign to "circle the wagons," *i.e.,* to protect culpable employees and obstruct investigators. And it is true that the Thompson Memorandum instructs a prosecutor to ask "whether the corporation appears to be protecting its culpable employees and agents."But even if the government's reading is plausible, the wording nevertheless empowers prosecutors to determine which employees will be deprived of company-sponsored counsel: prosecutors may reasonably foresee that employees they identify as "culpable" will be cut off from fees.

[2] The government also takes issue with Judge Kaplan's finding that the prosecutors (acting under DOJ policy) deliberately reinforced the threat inherent in the Thompson Memorandum. *Id.* at 352-53.It protests that KPMG considered conditioning legal fees on cooperation even before the February 25, 2004 meeting and that KPMG adopted its Fees Policy free from government influence. However, Judge Kaplan's interpretation of the meeting is supported by the following record evidence. Because withholding of fees would be problematic for a partnership like KPMG, Bennett began by attempting to "sound out" the government's position on the issue. *Stein IV,* 495 F.Supp.2d at 402. The prosecutors declined to sign off on KPMG's prior arrangement. Instead they asked KPMG to ascertain whether it had a legal obligation to advance fees. KPMG responded with its fallback position: conditioning fees on cooperation. *Id.* In Judge Kaplan's view, this was not an official policy announcement, but rather a proposal: Skadden lawyers repeatedly emphasized to the prosecutors that no final decision had been made. One available inference from all this is that the prosecutors' inquiry about KPMG's legal obligations was a routine check for conflicts of interest; but on this record, Judge Kaplan was entitled to see things differently.[FN6]

[3] Nor can we disturb Judge Kaplan's finding that "the government conducted itself in a manner that evidenced a desire to minimize the involvement of defense attorneys."*Stein I*, 435 F.Supp.2d at 353. During the March 11 phone call between the prosecutors and Skadden, AUSA Weddle demanded that KPMG tell its employees to be "totally open" with the USAO, "even if that [meant admitting] criminal wrongdoing," so that he could gather material for cross-examination. *Id.* at 345 (alterations in original and internal quotation marks omitted). On March 12, the prosecutors prevailed upon KPMG to supplement its first advisory letter with another, which clarified that employees could meet with the government without counsel. In addition, prosecutors repeatedly used Skadden to threaten to withhold legal fees from employees who refused to proffer-even if defense counsel had recommended that an employee invoke the Fifth Amendment privilege. Judge Kaplan could reasonably reject the government's version of these events.

***9** [4] Finally, we cannot say that the district court's ultimate finding of fact-that absent the Thompson Memorandum and the prosecutors' conduct KPMG

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

would have advanced fees without condition or cap-was clearly erroneous. The government itself stipulated in *Stein I* that KPMG had a "longstanding voluntary practice" of advancing and paying employees' legal fees "without regard to economic costs or considerations" and "without a preset cap or condition of cooperation with the government ... in any civil, criminal or regulatory proceeding" arising from activities within the scope of employment.*Id.* at 340 (internal quotation marks omitted). Although it "is far from certain" that KPMG is *legally* obligated to advance defendants' legal fees, *Stein v. KPMG, LLP,* 486 F.3d 753, 762 n. 3 (2d Cir.2007), a firm may have potent incentives to advance fees, such as the ability to recruit and retain skilled professionals in a profession fraught with legal risk. Also, there is evidence that, before the prosecutors' intervention, KPMG executed an agreement under which it would advance Stein's legal fees without cap or condition (and negotiated toward an identical agreement with Smith). And while the government maintains that the civil, criminal and regulatory investigations confronting KPMG constituted an unprecedented state of affairs that might have caused KPMG to adopt new and different policies, Judge Kaplan was not required to agree. Indeed, KPMG itself represented to the court that the Thompson Memorandum and the prosecutors' conduct "substantially influenced [its] determination(s) with respect to the advancement of legal fees."

For the foregoing reasons, we cannot disturb Judge Kaplan's factual findings, including his finding that, but for the Thompson Memorandum and the prosecutors' conduct, KPMG would have advanced legal fees without condition or cap.

## II

[5] We now consider the government's claim of cure. If the government is correct, the "taint" of the purported Sixth Amendment violation would be "neutralize[d]," dismissal of the indictment would be inappropriate, and we could avoid deciding the constitutional question. *United States v. Morrison,* 449 U.S. 361, 365, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981); *see, e.g., id.* at 366-67 (referring to "[t]he Sixth Amendment violation, *if any* " and concluding that "the violation, *which we assume has occurred,* has had no adverse impact upon the criminal proceedings" (emphases added)).

[6][7]"Cases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests."*Id.* at 364.Therefore, we must "identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial."*Id.* at 365.Dismissal of an indictment is a remedy of last resort, *id.*, and is appropriate only where necessary to "restore[ ] the defendant to the circumstances that would have existed had there been no constitutional error,"*United States v. Carmichael,* 216 F.3d 224, 227 (2d Cir.2000).

***10** In *Stein IV,* Judge Kaplan concluded that dismissal of the indictment as to the thirteen defendants was warranted because no other remedy would restore them to the position they would have enjoyed but for the government's unconstitutional conduct. *Stein IV,* 495 F.Supp.2d at 419-28. Specifically, Judge Kaplan found that the government deprived four defendants-Gremminger, Hasting, Ritchie and Watson-of counsel of their choice. *Id.* at 421 ("[T]hey simply lack the resources to engage the lawyers of their choice, lawyers who had represented them as long as KPMG was paying the bills."(footnote omitted)). Judge Kaplan also found that all thirteen defendants-even those who were still represented by their counsel of choice-were forced by KPMG's withholding of post-indictment legal fees "to limit their defenses ... for economic reasons and that they would not have been so constrained if KPMG paid their expenses."*Id.* at 419.After reviewing defendants' finances and determining the estimated cost of legal representation, Judge Kaplan concluded: "[N]one of the thirteen KPMG Defendants ... has the resources to defend this case as he or she would have defended it had KPMG been paying the cost, even if he or she liquidated all property owned by the defendant."*Id.* at 425.

The government argues that it cured any Sixth Amendment violation on March 30, 2006, when it told the district court that KPMG was free to "exercise [its] business judgment." Therefore, the government contends, the appropriate remedy for any constitutional violation would be to allow defendants to retain their counsel of choice using whatever funds

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

KPMG is willing to provide now. At most, the government claims, all that would be warranted is an adjournment of trial to afford defendants additional time to review documents and consult with counsel and expert witnesses; and since 16 months passed between the government's March 30, 2006 in-court statement and the July 16, 2007 dismissal of the indictment, defendants have already enjoyed this remedy.

Judge Kaplan was unpersuaded. In his view, KPMG is unlikely to pay defendants' legal fees as if the government had never exerted any pressure: KPMG might prefer not to be seen as reversing course and implicitly "admitting that it caved in to government pressure"; the defendants have been "indicted on charges the full scope of which may not previously have been foreseeable to KPMG"-so that defense costs may be larger than expected; and KPMG has since paid a $456 million fine under the DPA, reducing the firm's available resources. Stein I, 435 F.Supp.2d at 374.

We agree with the district court. The prosecutor's isolated and ambiguous statement in a proceeding to which KPMG was not a party (and the nearly 16-month period of legal limbo that ensued) did not restore defendants to the status quo ante.

Judge Kaplan asked whether the government would represent that [i] it has no objection to "KPMG exercising its free and independent business judgment as to whether to advance defense costs" and [ii] "if it were to elect to do so the government would not in any way consider that in determining whether it had complied with the DPA."The AUSA affirmed only the first proposition. *See supra* p. **[18]**. And as to that, the AUSA stated that the government's position had not changed: so the import of that statement depends on what position one thinks the government had previously adopted.

***11** Furthermore, it was unrealistic to expect KPMG to exercise uncoerced judgment in March 2006 as if it had never experienced the government's pressure in the first place. The government's intervention, coupled with the menace inherent in the Thompson Memorandum, altered the decisional dynamic in a way that the district court could find irreparable. Having assumed a supine position in the DPA-under which KPMG must continue to cooperate fully with the government [FN7]-it is not all that likely that the firm would feel free to reverse course.

True, even if KPMG had decided initially to advance legal fees, it might always have changed course later: it is undisputed that KPMG's longstanding fees policy was voluntary and subject to revision. (In fact, in the civil suit KPMG represented that it would not have obligated itself to pay millions of dollars in fees on behalf of an unknown number of employees without regard to the charges ultimately lodged against them.) So, the government argues, even absent government pressure KPMG would not have advanced legal fees indefinitely and without condition.

This is certainly plausible; but it directly contradicts the district court's central finding-which is not clearly erroneous-that "[a]bsent the Thompson Memorandum and the actions of the USAO, KPMG would have paid the legal fees and expenses of all of its partners and employees both prior to and after indictment, without regard to cost."*Id.* at 353.Because we cannot disturb this finding, we cannot accept the government's claim of cure on this score.

* * *

[8] The appropriate remedy for a constitutional violation is "one that as much as possible restores the defendant to the circumstances that would have existed had there been no constitutional error."Carmichael, 216 F.3d at 227. Since it has been found that, absent governmental interference, KPMG would have advanced unlimited legal fees unconditionally, only the unconditional, unlimited advancement of legal fees would restore defendants to the status quo ante.The government's in-court statement and the ensuing 16-month delay were not enough. If there was a Sixth Amendment violation, dismissal of the indictment is required.

## III

[9] Judge Kaplan found that "KPMG's decision to cut off all payments of legal fees and expenses to anyone who was indicted and to limit and to condition such payments prior to indictment upon cooperation with the government *was the direct consequence* of the pressure applied by the Thompson Memorandum and the USAO."Stein I, 435 F.Supp.2d at 353 (emphasis

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

added); *see also* Stein II, 440 F.Supp.2d at 334 (relying on this finding to conclude that KPMG's conduct was fairly attributable to the State for *Fifth* Amendment purposes). The government protests that KPMG's adoption and enforcement of its Fees Policy was private action, outside the ambit of the Sixth Amendment.

[10] When "[t]he district court's dismissal of [an] indictment raises questions of constitutional interpretation, ... we review the district court's decision *de novo*." United States v. King, 276 F.3d 109, 111 (2d Cir.2002).

***12** [11][12][13] Actions of a private entity are attributable to the State if "there is a sufficiently close nexus between the State and the challenged action of the ... entity so that the action of the latter may be fairly treated as that of the State itself."*Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). The "close nexus" test is not satisfied when the state "[m]ere[ly] approv[es] of or acquiesce[s] in the initiatives" of the private entity, *S.F. Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 547, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987) (internal quotation marks omitted and first alteration in original), or when an entity is merely subject to governmental regulation, *see Jackson*, 419 U.S. at 350 & n. 7. "The purpose of the [close-nexus requirement] is to assure that constitutional standards are invoked only when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains."*Blum v. Yaretsky*, 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982). Such responsibility is normally found when the State "has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State."*Id.*

[14] Although Supreme Court cases on this issue "have not been a model of consistency,"*Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 632, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991) (O'Connor, J., dissenting), some principles emerge. "A nexus of state action exists between a private entity and the state when the state exercises coercive power, is entwined in the management or control of the private actor, or provides the private actor with *significant encouragement*, either overt or covert, or when the private actor operates as a *willful participant in joint activity* with the State or its agents, is controlled by an agency of the State, has been delegated a public function by the state, or is *entwined with governmental policies*." *Flagg v. Yonkers Sav. & Loan Ass'n*, 396 F.3d 178, 187 (2d Cir.2005) (emphasis added and internal quotation marks omitted); *see also* *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 615, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (finding state action where "the Government did more than adopt a passive position toward the underlying private conduct" and where it "made plain not only its strong preference for [the private conduct], but also its desire to share the fruits of such intrusions").*But see* *Maher v. Roe*, 432 U.S. 464, 476, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977) ("Constitutional concerns are greatest when the State attempts to impose its will by force of law; the State's *power to encourage* actions deemed to be in the public interest is necessarily far broader."(emphasis added)).

The government argues: KPMG simply took actions in the shadow of an internal DOJ advisory document (the Thompson Memorandum) containing multiple factors and caveats; the government's approval of KPMG's Fees Policy did not render the government responsible for KPMG's actions enforcing it; even if the government had specifically *required* KPMG to adopt a policy that penalized non-cooperation, state action would still have been lacking because KPMG would have retained the power to apply the policy; and although the prosecutors repeatedly informed KPMG when employees were not cooperating, they did so at KPMG's behest, without knowing how KPMG would react. We disagree.

***13** KPMG's adoption and enforcement of the Fees Policy amounted to "state action" because KPMG "operate[d] as a willful participant in joint activity" with the government, and because the USAO "significant[ly] encourage[d]" KPMG to withhold legal fees from defendants upon indictment.[FN8]*Flagg*, 396 F.3d at 187. The government brought home to KPMG that its survival depended on its role in a joint project with the government to advance government prosecutions. The government is therefore legally "responsible for the specific conduct of which the [criminal defendants] complain[ ]."*Blum*, 457 U.S. at 1004 (emphasis omitted).

The government argues that "KPMG's decision to

condition legal fee payments on cooperation, while undoubtedly influenced by the Thompson Memorandum, was not coerced or directed by the Government."But that argument runs up against the district court's factual finding (which we do not disturb) that the fees decision "was the direct consequence" of the Memorandum and the prosecutors' conduct. *Stein I,* 435 F.Supp.2d at 353. Nevertheless, it remains a question of law whether the facts as found by the district court establish state action. *See Blum,* 457 U.S. at 1004 (asking whether the private conduct "must *in law be deemed* to be that of the State" (emphasis added)).

State action is established here as a matter of law because the government forced KPMG to adopt its constricted Fees Policy. The Thompson Memorandum itself-which prosecutors stated would be considered in deciding whether to indict KPMG-emphasizes that cooperation will be assessed in part based upon whether, in advancing counsel fees, "the corporation appears to be protecting its culpable employees and agents."Since defense counsel's objective in a criminal investigation will virtually always be to protect the client, KPMG's risk was that fees for defense counsel would be advanced to someone the government considered culpable. So the only safe course was to allow the government to become (in effect) paymaster.

The prosecutors reinforced this message by inquiring into KPMG's fees obligations, referring to the Thompson Memorandum as "a point that had to be considered," and warning that "misconduct" should not or cannot "be rewarded" under "federal guidelines." *Stein I,* 435 F.Supp.2d at 341-42. The government had KPMG's full attention. It is hardly surprising, then, that KPMG decided to condition payment of fees on employees' cooperation with the government and to terminate fees upon indictment: only that policy would allow KPMG to continue advancing fees while minimizing the risk that prosecutors would view such advancement as obstructive.

To ensure that KPMG's new Fees Policy was enforced, prosecutors became "entwined in the ... control" of KPMG. *Flagg,* 396 F.3d at 187. They intervened in KPMG's decisionmaking, expressing their "disappoint[ment] with [the] tone" of KPMG's first advisory memorandum, *Stein I,* 435 F.Supp.2d at 346, and declaring that "[t]hese problems must be remedied" by a proposed supplemental memorandum specifying that employees could meet with the government without being burdened by counsel. Prosecutors also "made plain" their "strong preference" as to what the firm should do, and their "desire to share the fruits of such intrusions."*Skinner,* 489 U.S. at 615. They did so by regularly "reporting to KPMG the identities of employees who refused to make statements in circumstances in which the USAO knew full well that KPMG would pressure them to talk to prosecutors."*Stein II,* 440 F.Supp.2d at 337. (The government's argument that it could not have known how KPMG would react when informed that certain employees were not cooperating is at best plausible only vis-à-vis the first few employees.) The prosecutors thus steered KPMG toward their preferred fee advancement policy and then supervised its application in individual cases. Such "overt" and "significant encouragement" supports the conclusion that KPMG's conduct is properly attributed to the State.[FN9]

***14** The authorities cited by the government are not to the contrary. The government relies on *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), and *Albert v. Carovano,* 851 F.2d 561 (2d Cir.1988) (en banc), two cases in which state action was held to be lacking. In *Blum,* a class of Medicaid patients unsuccessfully challenged the transfer and discharge decisions of private nursing homes. The patients claimed that the private conduct was attributable to New York State because state regulations required that the nursing homes transfer patients to a facility providing the level of care " 'indicated by the patient's medical condition or needs.'" *Blum,* 457 U.S. at 1007-08 (quoting N.Y. Comp.Codes R. & Regs. tit. 10, §§ 416.9(d)(1), 421.13(d)(1) (1980)). Even though the regulations "*encouraged* for efficiency reasons" the "downward" transfer of patients to "lower levels of care," *id.* at 1008 n. 19 (emphasis added), and even though "federal law require[d] ... state officials [to] review" nursing home assessments and "[a]djust[ ] ... benefit levels in response to a decision to discharge or transfer a patient,"*id.* at 1010, the Supreme Court ruled that state action was lacking. As the Court explained, the "regulations do not require the nursing homes to rely on the [patient care assessment forms designed by New York] in making discharge or transfer decisions," and "do not dictate the decision to discharge or transfer *in a particular case.*" *Id.* at

1008, 1010 (emphasis added). Instead, those decisions "ultimately turn[ed] on medical judgments made by private parties according to professional standards that are not established by the State."*Id.* at 1008.

Likewise, *Albert* declined to deem the disciplinary decisions of a private college to be state action, despite a New York law requiring colleges to adopt disciplinary rules and file them with the state. *Albert,* 851 F.2d at 568-69. We rejected plaintiffs' claim that the college was compelled by New York State to promulgate a disciplinary policy that it would not have adopted otherwise. The policy was not "a rule of conduct imposed by the state," we explained, because "[c]olleges are free to define breaches of public order however they wish, and they need not resort to a particular penalty in any particular case."*Id.* at 564, 568.Moreover, even if the state had mandated a particular rule, "the ultimate power to select a particular sanction in individual cases would, as in [*Blum* ], rest with the private party."*Id.* at 571.That is, there was "nothing in either the legislation or those rules" that "required that *these appellants* be suspended ."*Id.* at 568 (emphasis added).

In *Blum* and *Albert,* it was decisive that [1] actions of the private entity were based on independent criteria (the medical standards; the college rules of conduct), and that [2] the government was not dictating the outcomes of particular cases.

***15** Here, however, [1] KPMG was never "free to define" cooperation independently: AUSA Weddle told Bennett that he had "had a bad experience in the past with a company conditioning payments on a person's cooperation, where the company did not define cooperation as 'tell the truth' the[ ] way we [the prosecutors] define it."KPMG's fees advancement decisions in individual cases thus depended largely on state-influenced standards. In addition, [2] the prosecution designated *particular* employees for deprivation of fees (and, in some cases, termination of employment) by demanding that KPMG threaten and penalize those employees for non-cooperation. As Bennett later reported to the Deputy Attorney General, "[w]henever your Office has notified us that individuals have not ... cooperat[ed], KPMG has promptly and without question encouraged them to cooperate and threatened to cease payment of their attorneys fees and ... to take personnel action, including termination."Furthermore, by indicting the thirteen defendants after inspiring and shaping KPMG's Fees Policy and after exacting KPMG's compliance with it, prosecutors effectively selected which employees would be deprived of attorneys' fees. Having forced the constriction of KPMG's longstanding policy of advancing fees, the government then compelled KPMG to apply the Fees Policy to particular employees both pre- and post-indictment. This conduct finds no protection in *Blum* and *Albert.*

The government also directs us to another line of state action cases: *D.L. Cromwell Investments, Inc. v. NASD Regulation, Inc.,* 279 F.3d 155 (2d Cir.2002), and *United States v. Solomon,* 509 F.2d 863 (2d Cir.1975). These cases involved parallel, cooperative investigations by private regulatory entities and government investigators. In *D.L. Cromwell,* the USAO and the National Association of Securities Dealers ("NASD") simultaneously investigated plaintiff stockbrokers. The plaintiffs sought to enjoin NASD from compelling on-the-record interviews (on pain of expulsion from their profession), arguing under the Fifth Amendment that the NASD inquiry was a tool of the prosecutors.*D.L. Cromwell,* 279 F.3d at 156-57. Plaintiffs pointed to the informal and formal sharing of documents and information between the government and the NASD, *id.* at 157-58, 162, and the fact that the NASD interview demands followed shortly after plaintiffs contested grand jury subpoenas, *id.* at 162.Similarly, in *Solomon,* the New York Stock Exchange ("NYSE") had taken testimony from a trader under threat of suspension or expulsion, and then forwarded his deposition to the SEC pursuant to an SEC subpoena. 509 F.2d at 864-65.

In both cases, we held that there was no state action because the private actors had independent regulatory interests and motives for making their inquiries and for cooperating with parallel investigations being conducted by the government. In *D.L. Cromwell,* the NASD had a preexisting "regulatory duty to investigate questionable securities transactions,"279 F.3d at 163-that is, it would have requested interviews regardless of governmental pressure. And in *Solomon,* the NYSE's efforts were "in pursuance of its own interests and obligations, not as an agent of the [government],"509 F.2d at 869-absent SEC

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

involvement, the NYSE would have investigated anyway. Because the NASD and the NYSE had preexisting and independent investigatory missions, their cooperation with the government was not state action. *See* Lisa Kern Griffin, Compelled Cooperation and the New Corporate Criminal Procedure, 82 N.Y.U. L.Rev. 311, 369 (2007) (observing that *D.L. Cromwell* and *Solomon*"turned in large part on the fact that requests for interviews" were not "generated by governmental persuasion or collusion"). By contrast (as the district court found), absent the prosecutors' involvement and the Thompson Memorandum, KPMG would not have changed its longstanding fee advancement policy or withheld legal fees from defendants upon indictment. *See* Stein I, 435 F.Supp.2d at 353.

***16** The government responds: *Solomon* declined to find state action even though it involved a private entity compelling interviews with one of its members, backed by the explicit threat of expulsion, in the context of continuous coordination between the NYSE and the SEC on the same side. So how can KPMG, an *adversary* of the government, also be its partner? *See* Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 304, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001) ("The state-action doctrine does not convert opponents into virtual agents.").

An adversarial relationship does not normally bespeak partnership. But KPMG faced ruin by indictment and reasonably believed it must do everything in its power to avoid it. The government's threat of indictment was easily sufficient to convert its adversary into its agent. KPMG was not in a position to consider coolly the risk of indictment, weigh the potential significance of the other enumerated factors in the Thompson Memorandum, and decide for itself how to proceed. *See* Griffin, 82 N.Y.U. L.Rev. at 367 ("The threat of [ruinous indictment] brings significant pressure to bear on corporations, and that threat 'provides a sufficient nexus' between a private entity's employment decision at the government's behest and the government itself.").

We therefore conclude that KPMG's adoption and enforcement of the Fees Policy (both before and upon defendants' indictment) amounted to state action. The government may properly be held "responsible for the specific conduct of which the [criminal defendants] complain[ ],"*Blum,* 457 U.S. at 1004 (emphasis omitted), *i.e.,* the deprivation of their Sixth Amendment right to counsel, if the violation is established.

## IV

The district court's ruling on the Sixth Amendment was based on the following analysis (set out here in précis). The Sixth Amendment protects "an individual's right to choose the lawyer or lawyers he or she desires,"*Stein I,* 435 F.Supp.2d at 366 (citing *Wheat v. United States,* 486 U.S. 153, 164, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988)), and "to use one's own funds to mount the defense that one wishes to present,"*id.*(citing *Caplin & Drysdale, Chartered v. United States,* 491 U.S. 617, 624, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989)). The goal is to secure "a defendant's right to spend his own money on a defense."*Id.* at 367.Because defendants reasonably expected to receive legal fees from KPMG, the fees "were, in every material sense, their property."*Id.* The government's interest in retaining discretion to treat as obstruction a company's advancement of legal fees "is insufficient to justify the government's interference with the right of individual criminal defendants to obtain resources lawfully available to them in order to defend themselves."*Id.* at 369.Defendants need not make a "particularized showing" of how their defense was impaired, *id.* at 372, because "[v]irtually everything the defendants do in this case may be influenced by the extent of the resources available to them," such as selection of counsel and "what the KPMG Defendants can pay their lawyers to do,"*id.* at 371-72.Therefore, the Sixth Amendment violation "is complete irrespective of the quality of the representation they receive."*Id.* at 369.[FN10]

### A

***17** [15] Most of the state action relevant here-the promulgation of the Thompson Memorandum, the prosecutors' communications with KPMG regarding the advancement of fees, KPMG's adoption of a Fees Policy with caps and conditions, and KPMG's repeated threats to employees identified by prosecutors as being uncooperative-pre-dated the indictments of August and October 2005.[FN11](Of course, *after* the indictments were filed KPMG ceased advancing fees to all thirteen of the present

defendants who were still receiving fees up to that point. As explained in Part III, this was also state action .) So we must determine how this pre-indictment conduct may bear on defendants' Sixth Amendment claim.

[16][17]"The Sixth Amendment right of the 'accused' to assistance of counsel in 'all criminal prosecutions' is limited by its terms: it does not attach until a prosecution is commenced."*Rothgery v. Gillespie County,* 554 U.S. ----, 128 S.Ct. 2578, 2583, --- L.Ed.2d ---- (2008) (quoting U.S. Const. amend. VI) (some internal quotation marks and footnote omitted). "Attachment" refers to "*when* the [Sixth Amendment] right may be asserted"; it does not concern the separate question of "*what* the right guarantees," *i.e.,*"what the substantive guarantee of the Sixth Amendment" is at that stage of the prosecution. *Id.* at 2592, 2594 (Alito, J., concurring). The Supreme Court has "pegged commencement [of a prosecution] to 'the initiation of adversary judicial criminal proceedings-whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.' " *Id.* at 2583 (majority opinion) (quoting *United States v. Gouveia,* 467 U.S. 180, 188, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984)). "The rule is not 'mere formalism,' but a recognition of the point at which 'the government has committed itself to prosecute,' 'the adverse positions of government and defendant have solidified,' and the accused 'finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law.' " *Id.* (quoting *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972) (plurality opinion)).

Judge Kaplan focused on KPMG's decision to withhold fees upon indictment: "[T]he constitutional violation pertinent to possible dismissal of the indictment was the government's role in KPMG's action in cutting off payment of legal fees *for those who were indicted* as distinct from the limitations on payment of legal fees during the investigative stage."*Stein IV,* 495 F.Supp.2d at 404 n. 54 (emphasis added) (citing *Stein I,* 435 F.Supp.2d at 373). Therefore, Judge Kaplan explained, "[a]ctions by the government that affected *only* the payment of legal fees and defense costs for services rendered prior to the indictment ... do not implicate the Sixth Amendment."*Stein I,* 435 F.Supp.2d at 373 (emphasis added).

By the same token, state action that also (or only) affected the advancement of legal fees for services rendered *post*-indictment does implicate defendants' Sixth Amendment rights, regardless of when the conduct took place:

> ***18** It is true, of course, that the Sixth Amendment right to counsel typically attaches at the initiation of adversarial proceedings-at an arraignment, indictment, preliminary hearing, and so on. But the analysis can not end there. The Thompson Memorandum on its face and the USAO's actions were parts of an effort to limit defendants' access to funds for their defense. Even if this was not among the conscious motives, the Memorandum was adopted and the USAO acted in circumstances in which that result was known to be exceptionally likely. The fact that *events were set in motion prior to indictment with the object of having, or with knowledge that they were likely to have, an unconstitutional effect upon indictment* cannot save the government. This conduct, unless justified, violated the Sixth Amendment.

*Id.* at 366 (emphasis added). In other words, the government's pre-indictment conduct was of a kind that would have post-indictment effects of Sixth Amendment significance, and did.

We endorse this analysis. Although defendants' Sixth Amendment rights attached only upon indictment, the district court properly considered pre-indictment state action that affected defendants post-indictment. When the government acts prior to indictment so as to impair the suspect's relationship with counsel post-indictment, the pre-indictment actions ripen into cognizable Sixth Amendment deprivations upon indictment.[FN12] As Judge Ellis explained in *United States v. Rosen,* 487 F.Supp.2d 721 (E.D.Va.2007), "it is entirely plausible that pernicious effects of the pre-indictment interference continued into the post-indictment period, effectively hobbling defendants' Sixth Amendment rights to retain counsel of choice with funds to which they had a right.... [I]f, as alleged, the government coerced [the employer] into halting fee advances on defendants' behalf and the government did so for the purpose of undermining defendants' relationship with counsel once the indictment issued, the government violated defendants' right to expend their own resources

towards counsel once the right attached."*Id.* at 734.

Since the government forced KPMG to adopt the constricted Fees Policy-including the provision for terminating fee advancement upon indictment-and then compelled KPMG to enforce it, it was virtually certain that KPMG would terminate defendants' fees upon indictment. We therefore reject the government's argument that its actions (virtually all pre-indictment) are immune from scrutiny under the Sixth Amendment.[FN13]

**B**

We now consider "*what* the [Sixth Amendment] right guarantees ." *Rothgery,* 128 S.Ct. at 2592 (Alito, *J.*, concurring).

[18][19] The Sixth Amendment ensures that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence."U.S. Const. amend. VI. Thus "the Sixth Amendment guarantees the defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds."*Caplin & Drysdale, Chartered v. United States,* 491 U.S. 617, 624-25 (1989)."[A]n element of this right is the right of a defendant who does not require appointed counsel to choose who will represent him."*United States v. Gonzalez-Lopez,* 548 U.S. 140, 144, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006).[FN14]

***19** [20] The government must "honor" a defendant's Sixth Amendment right to counsel:

> This means more than simply that the State cannot prevent the accused from obtaining the assistance of counsel. The Sixth Amendment also imposes on the State an affirmative obligation to respect and preserve the accused's choice to seek this assistance.... [A]t the very least, the prosecutor and police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel.

*Maine v. Moulton,* 474 U.S. 159, 170-71, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985). This is intuitive: the right to counsel in an adversarial legal system would mean little if defense counsel could be controlled by the government or vetoed without good reason.

[21] Consistent with this principle of non-interference, courts have identified violations of the Sixth Amendment right to counsel where the government obtains incriminating statements from a defendant outside the presence of counsel and then introduces those statements at trial. *See, e.g., id.* at 176;*Massiah v. United States,* 377 U.S. 201, 206, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Likewise, the government violates the Sixth Amendment when it intrudes on the attorney-client relationship, preventing defense counsel from "participat[ing] fully and fairly in the adversary factfinding process."*Herring v. New York,* 422 U.S. 853, 858, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975); *see, e.g., id.* at 858-59 (holding that a New York statute allowing judges in a criminal bench trial to deny counsel the opportunity to make a closing argument deprived defendant of his Sixth Amendment right to the assistance of counsel); *Geders v. United States,* 425 U.S. 80, 91, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976) (holding that a trial court's order that defendant not consult with his attorney during an overnight recess during trial violated the Sixth Amendment).

Defendants-Appellees do not say that they were deprived of constitutionally effective counsel. *See Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Their claim is that the government unjustifiably interfered with their relationship with counsel and their ability to mount the best defense they could muster.

The government, relying on *Caplin & Drysdale, Chartered v. United States,* 491 U.S. 617 (1989), contends that a defendant has no Sixth Amendment right to a defense funded by someone else's money. In that case, the Supreme Court ruled that a defendant's Sixth Amendment right to retain counsel of choice was not violated when the funds he earmarked for defense were seized under a federal forfeiture statute, because title to the forfeitable assets had vested in the United States. *Id.* at 628;*see also* United States v. Monsanto, 491 U.S. 600, 616, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989) (holding that pretrial restraining order based on showing of probable cause that property is forfeitable "does not 'arbitrarily' interfere with a defendant's 'fair opportunity' to retain counsel").

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[22] The government focuses on the following passage from *Caplin & Drysdale:*

> ***20** Whatever the full extent of the Sixth Amendment's protection of one's right to retain counsel of his choosing, that protection does not go beyond 'the individual's right to spend his own money to obtain the advice and assistance of ... counsel.' *Walters v. National Assn. of Radiation Survivors,* 473 U.S. 305, 370, 105 S.Ct. 3180, 87 L.Ed.2d 220 (1985) (Stevens, J., dissenting). *A defendant has no Sixth Amendment right to spend another person's money for services rendered by an attorney, even if those funds are the only way that that defendant will be able to retain the attorney of his choice.* A robbery suspect, for example, has no Sixth Amendment right to use funds he has stolen from a bank to retain an attorney to defend him if he is apprehended. The money, though in his possession, is not rightfully his ....

*Caplin & Drysdale,* 491 U.S. at 626 (emphasis added and first omission in original). The holding of *Caplin & Drysdale* is narrow: the Sixth Amendment does not prevent the government from reclaiming its property from a defendant even though the defendant had planned to fund his legal defense with it. It is easy to distinguish the case of an employee who reasonably expects to receive attorneys' fees as a benefit or perquisite of employment, whether or not the expectation arises from a legal entitlement. As has been found here as a matter of fact, these defendants *would* have received fees from KPMG but for the government's interference. Although "there is no Sixth Amendment right for a defendant to obtain counsel using tainted funds, [a defendant] still possesses a qualified Sixth Amendment right to use *wholly legitimate funds* to hire the attorney of his choice." *United States v. Farmer,* 274 F.3d 800, 804 (4th Cir.2001) (emphasis added).

[23] It is axiomatic that if defendants had already received fee advances from KPMG, the government could not (absent justification) deliberately interfere with the use of that money to fuel their defenses. And the government concedes that it could not prevent a lawyer from furnishing a defense gratis. *See Caplin & Drysdale,* 491 U.S. at 624-25 ("[T]he Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney ... who is willing to represent the defendant even though he is without funds."). Presumably, such a lawyer could pay another lawyer to represent the defendant (subject, of course, to ethical rules governing third-party payments to counsel, *see United States v. Locascio,* 6 F.3d 924, 932-33 (2d Cir.1993)). And if the Sixth Amendment prohibits the government from interfering with such arrangements, then surely it also prohibits the government from interfering with financial donations by others, such as family members and neighbors-and employers. *See United States v. Inman,* 483 F.2d 738, 739-40 (4th Cir.1973) (per curiam) ("The Sixth Amendment right to counsel includes not only an indigent's right to have the government appoint an attorney to represent him, but also the right of any accused, if he can provide counsel for himself by his own resources *or through the aid of his family or friends,* to be represented by an attorney of his own choosing."(emphasis added)). In a nutshell, the Sixth Amendment protects against unjustified governmental interference with the right to defend oneself using whatever assets one has or might reasonably and lawfully obtain.

***21** [24] The government points out that KPMG's past fee practice was voluntary and subject to change, and that defendants therefore could have had no reasonable expectation of the ongoing advancement of fees. But this argument simply quarrels with Judge Kaplan's finding that absent any state action, KPMG would have paid defendants' legal fees and expenses without regard to cost. *See Stein I,* 435 F.Supp.2d at 353. Defendants were not necessarily entitled to fee advancement as a matter of law, *see Stein v. KPMG, LLP,* 486 F.3d 753, 762 n. 3 (2d Cir.2007) (commenting that defendants' likelihood of success in obtaining a judgment against KPMG for legal fees is "far from certain"); but the Sixth Amendment prohibits the government from impeding the supply of defense resources (even if voluntary or gratis), absent justification. Therefore, unless the government's interference was justified, it violated the Sixth Amendment.

[25] The government is sometimes allowed to interfere with defendants' choice or relationship with counsel, such as to prevent certain conflicts of interest. *See, e.g., United States v. Curcio,* 680 F.2d 881 (2d Cir.1982). However, the government has failed to establish a legitimate justification for

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

interfering with KPMG's advancement of legal fees.

The government argues that it may inquire into third-party payment of legal fees in certain circumstances. For example, in *United States v. Locascio,* we affirmed the disqualification of defendant's counsel based in part on defendant's "benefactor payments" to the attorney to serve as "house counsel" to members of the Gambino organized crime family. Locascio, 6 F.3d at 932. We explained that "the acceptance of such 'benefactor payments' ... raises an ethical question as to whether the attorney's loyalties are with the client or the payor,"*id.*(some internal quotation marks omitted), and that "proof of house counsel can be used by the government to help establish the existence of the criminal enterprise under RICO, by showing the connections among the participants,"*id.* at 932-33.

The government's reliance on *Locascio* is misplaced. There, the attorney's status as "house counsel" "was potentially part of the proof of the Gambino criminal enterprise,"*id.* at 933,*i.e.,* it was evidence going to an element of the crime itself, and it was relevant to ascertaining and preventing potential conflicts of interest, *id.* at 932.But here, the government claims no such compelling justifications.

It is also urged that a company may pretend cooperation while "circling the wagons," that payment of legal fees can advance such a strategy, and that the government has a legitimate interest in being able to assess cooperation using the payment of fees as one factor. Even if that can be a legitimate justification, it would not be in play here: prosecutors testified before the district court that they were never concerned that KPMG was "circling the wagons." Moreover, it is unclear how the circling of wagons is much different from the legitimate melding of a joint defense.

***22** The government conceded at oral argument that it is in the government's interest that every defendant receive the best possible representation he or she can obtain. A company that advances legal fees to employees may stymie prosecutors by affording culpable employees with high-quality representation. But if it is in the government's interest that every defendant receive the best possible representation, it cannot also be in the government's interest to leave defendants naked to their enemies.

[26][27] Judge Kaplan found that defendants Gremminger, Hasting, Ritchie and Watson were unable to retain the counsel of their choosing as a result of the termination of fee advancements upon indictment. *Stein IV,* 495 F.Supp.2d at 421-22. The government does not contest this factual finding, and we will not disturb it. A defendant who is deprived of counsel of choice (without justification) need not show how his or her defense was impacted; such errors are structural and are not subject to harmless-error review. *See* Gonzalez-Lopez, 548 U.S. at 144, 148-52. "[T]he right at stake here is the right to counsel of choice, ... and that right was violated because the deprivation of counsel was erroneous. No additional showing of prejudice is required to make the violation 'complete.' " *Id.* at 146.Of course, a completed constitutional violation may still be remediable. However, as explained in Part II, the government has failed to cure this Sixth Amendment violation. Therefore, the government deprived defendants Gremminger, Hasting, Ritchie and Watson of their Sixth Amendment right to counsel of choice.

[28] The remaining defendants-Bickham, DeLap, Eischeid, Lanning, Rosenthal, Smith, Stein, Warley, and Wiesner-do not claim they were deprived of their chosen counsel. Rather, they assert that the government unjustifiably interfered with their relationship with counsel and their ability to defend themselves. In the district court, the government conceded that these defendants are also entitled to dismissal of the indictment, assuming the correctness of *Stein I. See Stein IV,* 495 F.Supp.2d at 393. We agree: these defendants can easily demonstrate interference in their relationships with counsel and impairment of their ability to mount a defense based on Judge Kaplan's non-erroneous findings that the post-indictment termination of fees "caused them to restrict the activities of their counsel," and thus to limit the scope of their pre-trial investigation and preparation. *Id.* at 418.Defendants were indicted based on a fairly novel theory of criminal liability; they faced substantial penalties; the relevant facts are scattered throughout over 22 million documents regarding the doings of scores of people, *id.* at 417; the subject matter is "extremely complex," *id.* at 418; technical expertise is needed to figure out and explain what happened; and trial was expected to last between six and eight months, *id.*As Judge Kaplan

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

found, these defendants "have been forced to limit their defenses ... for economic reasons and ... they would not have been so constrained if KPMG paid their expenses."*Id.* at 419.We therefore hold that these defendants were also deprived of their right to counsel under the Sixth Amendment.[FN15]

### CONCLUSION

***23** For the foregoing reasons, we AFFIRM the judgment of the district court dismissing defendants' indictment.

FN1. In later decisions, Judge Kaplan ruled that defendants Richard Smith and Mark Watson's proffer session statements were obtained in violation of their Fifth Amendment privilege against self-incrimination, and that their statements would be suppressed, *see* United States v. Stein, 440 F.Supp.2d 315 (S.D.N.Y.2006) ("*Stein II* "); that the court had ancillary jurisdiction over Defendants-Appellees' civil suit against KPMG for advancement of fees, *see* United States v. Stein, 452 F.Supp.2d 230 (S.D.N.Y.2006) ("*Stein III* "), *vacated,* Stein v. KPMG, LLP, 486 F.3d 753 (2d Cir.2007); and that dismissal of the indictment is the appropriate remedy for those constitutional violations, *see* United States v. Stein, 495 F.Supp.2d 390 (S.D.N.Y.2007) ("*Stein IV* ").

FN2. In a separate summary order filed today, we dismiss as moot the government's appeal from the order of the district court suppressing proffer statements made by Defendants-Appellees Smith and Watson.

FN3. As discussed above, in a decision that is the subject of the summary order filed today, the district court held that Defendants-Appellees Smith and Watson's proffer statements were obtained in violation of their Fifth Amendment privilege against self-incrimination and that their statements would be suppressed. *Id.* at 337-38.

FN4. The superseding indictment filed on October 17, 2005 charged 19 defendants in 46 counts for conspiring to defraud the United States and the IRS, tax evasion and obstruction of the internal revenue laws (although not every individual was charged with every offense).

FN5. According to the district court, "[a]ll defendants previously employed by KPMG joined in the motion."*Id.* at 336 n. 5.

FN6. It is unnecessary for us to determine the import of AUSA Neiman's statement that misconduct should not or cannot be rewarded or to decide whether AUSA Weddle actually said that the government would look at discretionary fee advancement "under a microscope." Stein I, 435 F.Supp.2d at 344.

FN7."The cooperation provisions of the DPA ... require KPMG to comply with demands by the USAO ... [or else face] the risk that the government will declare that KPMG breached the DPA and prosecute the criminal information to verdict."Stein I, 435 F.Supp.2d at 350.

FN8. As explained in section IV.A, *infra,* the government's *pre*-indictment conduct was designed to have an effect once defendants were indicted, and it is therefore proper to consider such conduct for purposes of evaluating state action.

FN9. Because the Sixth Amendment attaches only upon indictment, the KPMG conduct attributable to the government is relevant only insofar as it contributed to KPMG's decision to withhold legal fees *upon* defendants' indictment. *See* Part IV, *infra.*Many of KPMG's actions occurred prior to the August and October 2005 indictments. Nevertheless, when the defendants were indicted, KPMG had been so schooled by the government in the necessity of enforcing a particular fee advancement policy that KPMG understood what was expected of it once the indictments came down.

FN10. In *Stein IV,* Judge Kaplan nevertheless expanded his findings as to

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Sixth Amendment harms suffered by particular defendants: defendants Gremminger, Hasting and Watson were deprived of their chosen counsel, "lawyers who had represented them as long as KPMG was paying the bills"; and defendant Ritchie was deprived of the services of Cadwalader Wickersham & Taft, "which was to have played an integral role in his defense."495 F.Supp.2d at 421. In addition:

> All of the [present] KPMG Defendants ... say that KPMG's refusal to pay their post-indictment legal fees has caused them to restrict the activities of their counsel, limited or precluded their attorneys' review of the documents produced by the government in discovery, prevented them from interviewing witnesses, caused them to refrain from retaining expert witnesses, and/or left them without information technology assistance necessary for dealing with the mountains of electronic discovery. The government has not contested these assertions. The Court therefore has no reason to doubt, and hence finds, that all of them have been forced to limit their defenses in the respects claimed for economic reasons and that they would not have been so constrained if KPMG paid their expenses subject only to the usual sort of administrative requirements typically imposed by corporate law departments on outside counsel fees.

> *Id.* at 418-19 (footnote omitted). Judge Kaplan explained that even though many defendants had net assets ranging from $1 million to $5 million, their resources were inadequate "to defend this case as they would have defended it absent the government's actions."*Id.* at 423.

FN11. Again, "state action" includes both conduct by the government and conduct by KPMG that is fairly attributable to the government. *See* Part III, *supra.*

FN12. As Judge Kaplan recognized, the pre-indictment conduct is separately constrained by the Fifth Amendment.

FN13. We need not decide whether KPMG's *pre*-indictment conditioning and capping of fees-conduct we have determined was state action-establishes a Sixth Amendment violation by itself. As discussed below, KPMG's termination of fees upon indictment deprived defendants of their Sixth Amendment right to counsel.

FN14. Although the Sixth Amendment right to counsel of choice "has been regarded as the root meaning of the constitutional guarantee,"*id.* at 147-48, the right is qualified: the attorney must be admitted to the bar, willing to represent the defendant, free from certain conflicts of interest, compliant with the rules of the court, and so on, *see Wheat v. United States,* 486 U.S. 153, 159-60, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988).

FN15. This case does not raise, and therefore we have no occasion to consider, the application of our holding to the following scenario: A defendant moves unsuccessfully in the district court to dismiss the indictment on the same Sixth Amendment theory. The defendant proceeds to trial with his or her chosen attorney, and the attorney is forced to limit the scope of his or her efforts due to the defendant's financial constraints. The defendant is convicted based on overwhelming evidence of his or her guilt.

C.A.2 (N.Y.),2008.
U.S. v. Stein
--- F.3d ----, 2008 WL 3982104 (C.A.2 (N.Y.))

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.