(The jury is present for the following)

THE COURT: Call your next witness, Ms. Donovan.

MS. DONOVAN: Your Honor, the United States calls John Barr.

JOHN BARR, II, GOVERNMENT WITNESS, SWORN

THE CLERK: Would you please state your name and spell your last name for the record.

THE WITNESS: John Douglas Barr, B-A-R-R, II.





DIRECT EXAMINATION

BY MS. DONOVAN:

Q. Good afternoon, Mr. Barr. Mr. Barr, how are you currently employed?

A. I'm a lead inspector for Lead Safe Inspections and Consulting in Lincoln, Rhode Island.

Q. And have you ever held public office in the State of Rhode Island?

A. Yes, I did.

Q. What office did you hold and for what years?

A. I was a member of the Rhode Island House of Representatives. I served the Town of Lincoln during the years 1990 to 1994 and then 1996 to 2002.

Q. When you were a representative, did you know John Celona?

A. Yes.

Q. And how did you know John Celona?

A. I knew John Celona was a state senator from the Town of North Providence.

Q. Did you have a working political relationship with John Celona during your period in the legislature from 1996 to 2002?
A. A working relationship, yes.
Q. What types of contact did you have with him during that period of time?





A. Very limited, just discussing legislation at points in time.
Q. I'm sorry?
A. Just discussing legislation at points in time.
Q. Did you ever work together on any legislation?
A. Work together? Not together, no.
MS. DONOVAN: Miss Anderson, if we could have Government's Exhibit 254, please. The second page, please.
And, your Honor, if this could be displayed to the jury. I believe it's a full exhibit.
Q. Mr. Barr, do you recall in late 1998, early 1999 that you worked on some legislation regarding bone marrow registration?
A. Yes.
Q. In fact, do you see what's displayed on the screen in front of you?
A. Yes.
Q. Is that the legislation that I was just referring to?
A. Yes.

MS. DONOVAN: Miss Anderson, if you could also show Mr. Barr the bottom portion of the document.
A. Yes.
Q. Do you recognize that as the legislation that you





worked on?
A. Yes.
Q. Can you briefly summarize what the legislation involved.
A. Yes. This was drafted and put in in 1999. Going back to 1998, the state had taken dramatic steps, or the Rhode Island General Assembly, in the bone marrow transplant program for kids with leukemia and cancer, things of that nature.
The previous legislation covered those individuals who had health care insurance. What the previous year's bill didn't address are those individuals that didn't have health care but still wanted to register for the bone marrow program.
It was actually cost-prohibitive for them to register to try and help someone that did need bone marrow. So I drafted this legislation that would actually be a vehicle in which an individual that didn't have to -- that wanted to participate in the bone marrow program in the State of Rhode Island but didn't have the $80 per person to do that, that the cost -- my intention was for the state to pick up the cost for that.

Q. Which hospital in the state maintained the bone marrow registration list?





A. Roger Williams.

Q. Do you recall speaking with John Celona about this piece of legislation?

A. Yes.

Q. And how did that come about? Strike that. Do you recall when you spoke to John Celona?

A. It was very early in session of '99.

Q. And how did your conversation with John Celona come about?

A. He actually spent some time hunting me down. He had left messages over at my committee, I was on Corporations Committee, to get -- for me to get in touch with him. I called him when I reached committee. He came over to the House of Representatives, and he asked me about the particulars of this bill.

Q. Had John Celona ever come over to the House of Representatives side to speak with you before?

A. Never.

Q. In your -- you did have a relationship working with other senators throughout your tenure in the legislature; correct?

A. For the most part, I worked with the Lincoln senator, my counterpart. I was in the House, he was in the Senate, and we would work on Lincoln legislation as it pertained to our town. So I did work with the

Lincoln senator.
Q. But with other senators, your contact was more limited?
A. Very limited.
Q. And, in fact, Mr. Celona reaching out to contact you, had he ever done anything like that in the past?
A. Never.
Q. And you testified that -- strike that. Did you testify that it was -- was it the first time that he came over to speak with you about an issue, that he came over from the Senate side to the House to speak with you about an issue?
A. Yes.
Q. And was that unusual in your mind?
A. Well, not unusual that a senator would come over, per se, but it was --
MR. EGBERT: Objection. He's answered it's not unusual.
THE COURT: Overruled. He's explaining his answer. Go ahead.
A. The normal flow of the way business is done, it was outside of the normal flow of the legislative process as I knew it.
Q. And what was your -- what was the normal flow of the legislative process?

MR. EGBERT: Objection.

THE COURT: Overruled. You may answer.

A. Well, because you can't have reps always over in the Senate side and the senators always on the rep side trying to get business done, you went through the legislative leadership team.

So if I had a problem -- if I needed my bill to move on the Senate side, I would contact the House leadership going through the chain of command. I would get in touch with the deputy majority leader, who would get in touch with the senior deputy majority leader, who would get in touch with the majority leader and then the speaker.

And when the speaker conferenced with the Senate majority leader, that's when they worked out some of the particulars. So I'd always, like most of my colleagues, we went -- I went through the chain of command.

Q. And Mr. Celona's contact with you, was that outside of the chain of command?

A. Yes.

Q. And is that what made it unusual?

A. Yes.

Q. What did Mr. Celona say to you when he came over to the House side?

A. He asked me about the bill, asked me if I was looking to move forward on it. I said yes, I was. I believed there was a serious issue. He told me that he had a constituent that had some serious concerns with the bill, wanted to know if I was moving forward with it this year in particular because it's the first time I believe I introduced the bill.

It takes many times to refine the bill, and sometimes it's three or four years before you can actually get a piece of legislation passed.

I told him that -- back up. He said he had some problems because of a constituent and because of the Roger Williams component and did I know that it put all of the financial burden on Roger Williams Hospital.

I did tell him that I believed -- that I knew it was drafted incorrectly and that it would need a sub A. I also knew that it -- because it was drafted incorrectly, when it was assigned to committee, it was assigned to the wrong committee. It was assigned to HEW. It should have went to Finance because it had a fiscal note. And those are some of the points that I articulated to him.

MR. EGBERT: Judge, I'd like to be heard on a matter that we do have to approach the bench.

THE COURT: Right now?



MR. EGBERT: Please.

(Bench conference held on the record)

MR. EGBERT: I was provided a 302 of this person's interview with the FBI and I believe the U.S. Attorney, and I think the interview was not more than a month or so ago but somewhere in that vicinity.

The 302 is directly contrary in all respects to what he's now testifying to. And if the Government knew they were going to put on testimony directly contrary to what the only report that we have is, they should have informed us of it.

In his 302 -- what he's done is he's now comported his testimony to Celona's whereas in the 302 he says that he filed a bill to --

THE COURT: Let's stop there.

MS. DONOVAN: I'm not completely sure what he's referring to. I have the 302 in front of me. I didn't pick up that it was completely contrary. I certainly had -- I mean, I haven't spoken to him since he was interviewed. So I certainly --

MR. EGBERT: How about the agents?

MS. DONOVAN: No one to my knowledge has spoken to the man since he was interviewed. You can ask him that on cross-examination. What he's telling is, in my general recollection, is in substance with what he told



us before.

MR. EGBERT: It's not even close.

THE COURT: Continue your direct. And if the

302 is contrary, you can certainly impeach him. If there's something that comes out here that will require that you be given more time to complete your cross-examination --

MR. EGBERT: Judge, what it does is it totally changes my whole theory of cross. I mean --

THE COURT: Well, if that's the case, we'll give you a chance to pursue that. I'm not going to interrupt the trial now because he's saying something that you think is contrary to his 302. The Government doesn't think so. They say nobody's talked to him.

MR. EGBERT: Will you take a look at the 302?

THE COURT: I will. Where is it? I'm not going to prevent him from testifying.

MR. EGBERT: Just make your own assessment.

THE COURT: We'll deal with this after he finishes his direct.

(End of bench conference)

Q. Mr. Barr, I believe in your previous testimony you made reference to the fact that you knew that the bone marrow legislation was going to need a sub A. What's a sub A?



A. Basically it's a major changing of legislation of the bill. Most of the times in a sub A, it's a -- that's an amendment to the bill. For the most part, that's when you're gutting all of the language in the bill and injecting all new language.

Q. And, again, I apologize, but what was it that was going to require a sub A in this particular instance?
A. Well, it was never my intent to have Roger Williams bear the cost of the bone marrow program. It was always my intent for the Department of Human Services or even through RIteCare to have the uninsured covered through one of those programs. So it was -- that was my intent to amend the bill to that -- that way.
Q. And so as it was drafted, it was Roger Williams Hospital who was going to bear the cost of the uninsured patients that sought to register --
MR. EGBERT: Objection. Go ahead. I'm sorry.
Q. -- on the bone marrow registration list?
A. Yes.
MR. EGBERT: Objection.
THE COURT: The objection's sustained. The jury will disregard the last answer.
When one of the lawyers stands up, Mr. Barr, it means they're going to object. So don't answer the



question until I've had a chance to rule on the objection.
THE WITNESS: Sorry.
Q. Mr. Barr, you testified that it wasn't your intent that Roger Williams would bear the cost. What were you referring to?
A. When we looked at some of the numbers that, as it

pertained to bone marrow, about 200,000 people in the State of Rhode Island didn't have health care insurance. So if they wanted -- if some young kid had leukemia and the community was doing a bone marrow drive to have people register, if they didn't have insurance, when you went to have your bone marrow checked, they would be charged $80.

So it would be like 200,000 people times $80. I forget what the fiscal note was, but in the legislature that's what we would call that, the fiscal note that went with the legislation.

Q. And based on that research, it was your understanding that Roger Williams Hospital was going to bear the cost of those uninsured patients?

MR. EGBERT: Objection.

THE COURT: Sustained. You're leading the witness, Ms. Donovan.

Q. Based on that research, what was your





understanding regarding who was going to bear the cost of those uninsured patients?

MR. EGBERT: Objection.

THE COURT: Overruled. You may answer.

A. Well, it was never my intent for Roger Williams to bear the cost. When I went to have the bill drafted, I'm a layman, I don't know how to draft legislation. I go down to leg. counsel in the General Assembly, and I'd say, We have this section of law, I want to amend

it this way.

And there was a breakdown in communication of how I wanted it drafted. It came up. Even though it seemed to be drafted not in the way that I wanted, I often would submit the legislation to get it in under deadline knowing I could sub A it at a later point and get my true intent in.

Q. And my question was, based on the research that you just referenced in your testimony, did you form an understanding regarding what entity was going to bear the cost of the uninsured patients?

A. Yes. As it came up, it would be Roger Williams bearing the cost.

Q. When Mr. Celona came and spoke to you about the bone marrow registration legislation, did he tell you that he had a financial relationship with Roger





Williams Medical Center?

A. No, he didn't.

Q. When Mr. Celona spoke to you, where was the bill at that time in the legislative process?

A. It was introduced. It was assigned to Health, Education and Welfare. I'm not familiar with the time frame, whether it had been transferred or was about to get transferred to the House Finance Committee.

Q. And what did you tell Mr. Celona that you would do in response to his request?

A. I told him I would hold it.

Q. And why did you do that?
A. The bill -- backing up, even talking to House Finance, there was no fiscal -- there was no financial stream of money to satisfy this. So it would be a very tough sell to get the money appropriated for that fiscal year.
So it was going to take at least another legislative cycle to get that money appropriated if I was going to get this bill through the Assembly. So I knew that I was going to be putting it off.
He asked me if I would put it off until next year. In those instances, it's a personal request that I granted to him knowing that in the future I might need some sort of similar consideration on a piece of





legislation I might have in the future. So that's the way it worked, basically extending a courtesy to a colleague.
Q. That you could get some payback on later?
A. I wouldn't use the word "payback," but John Celona was a very ambitious guy. He was going to end up a committee chair or -- he made no bones that he wanted to be lieutenant governor at some time in the future. And if I had someone who was in a position of power on the Senate side owing me a chip and it was a bill I was putting off anyway and it was my ability to collect a chip on a future time. . .
Q. At the time that John Celona came and spoke with

you, did you know who Robert Urciuoli was?
A. Yes.
Q. Had you spoken to Robert Urciuoli regarding legislative issues in the past?
A. Yes.
Q. Had he approached you in the past regarding legislative issues that were of interest to Roger Williams Hospital?
A. At times, yes.
Q. Did he contact you about the bone marrow registration legislation?
A. No.





Q. He wasn't knocking on your door regarding this legislation?
MR. EGBERT: Objection.
THE COURT: Sustained.
MS. DONOVAN: Your Honor, if I could just have one minute.
(Pause)
MS. DONOVAN: No further questions, your Honor.

CROSS-EXAMINATION

BY MR. EGBERT:
Q. Mr. Barr, in fairness to you, the first time you spoke about this with anyone was about September 1st of 2006 when you spoke with Mr. Aiken and Ms. Donovan; is that correct?
A. No.

Q. Did you speak with anyone from law enforcement about this before that?
A. Yes.
Q. When?
A. Gee, I don't specifically remember the date. It was probably six to eight months ago.
Q. And who was that that you spoke with?
A. Detective Russell from the Rhode Island State Police and also Agent Aiken.
Q. Were they taking notes?





A. I don't believe so.
Q. Pardon?
A. I do not believe so.
Q. Have you ever --
A. No, they weren't.
Q. Ever seen any report of that interaction?
A. No.
Q. Well, in any event, we're taking ourselves back to 1999, about seven years ago; correct?
A. Yes.
Q. And is your memory of the event pretty good?
A. Yes.
Q. I want to show you Government's 254, which I think you saw before. That's the bill.
MR. EGBERT: And could that be displayed to the witness and the jury, your Honor.
Q. Now, do you see the document in front of you? Do

you see it?

A. The what?

Q. Do you see the document on the screen?

A. Yes.

Q. And is that the bill we've been talking about that you introduced?

A. Can I see the number at the top again, please.

MR. EGBERT: Sure. In fact, may I give him a



hard copy?

THE CLERK: I have one.

THE COURT: The clerk has one.

Q. Why don't you look at the hard copy, and we'll keep this on the screen. Is that the bill that you introduced that we're talking about?

A. Yes, it is.

Q. Now, this is the bill that you say was a bill to have the State of Rhode Island pay for uninsured persons who were going to get registered as bone marrow donors; correct?

A. Who wished to participate, yes.

Q. And this bill caused the State of Rhode Island to pay for that; right?

A. No, it didn't.

Q. Did this bill have anything whatsoever to do with charges for bone marrow donors?

A. Well, my understanding is yes.

Q. Show me where in the bill that bill had something

to do with charging people for bone marrow registration.

(Witness peruses document)

A. I guess in the conversations we had, just --

Q. Well, not conversations. Where in the bill is it?

A. I don't see it.





Q. It's not there, is it?

A. No.

Q. So it's clear, is it not, that your memory of this event is not quite accurate? Fair enough?

A. No, that's not correct.

Q. Well, do you think somebody took it out of the bill before it got to us here?

MS. DONOVAN: Objection.

THE COURT: Overruled. You may answer.

A. No, I don't think anyone took it out.

Q. It's fair to say, isn't it, that what this bill is is nothing more than a preamble to an existing bill; correct?

A. It's -- it would be an amendment to an existing bill.

Q. And the first part of it's called preamble; right?

A. Yes.

Q. And what's a preamble to a legislation?

A. You know, I don't know what the -- the Webster dictionary definition, I don't know.

Q. Forget Webster. Forget Webster. Right. Tell me

as a legislator what you understood a preamble to be.
A. Well, all I could say is this draft of legislation right here was not my original intent, so the word "preamble" that was drafted in here is not my





terminology.
Q. In other words, what you're telling us is that, although you intended to file a bill that had the state cover uninsured people for bone marrow donation registration, that's not the bill that was filed; correct?
A. Correct.
Q. And so an error had been made; correct?
A. Correct.
Q. And the error was with legislative counsel; correct?
A. Correct.
Q. When you saw the bill for the first time, did you realize that the error had been made?
A. No.
Q. And did Mr. Celona bring it to your attention?
A. Yes.
Q. Okay. And when he brought --
A. Actually, at that point I think when -- no, I believe before that when I was looking to hear -- put in for hearings for the bill, I noticed that it was drafted incorrectly.
Q. So you noticed it yourself?

A. Yes.

Q. And when you noticed it was drafted incorrectly,





did you go to the House Finance Committee and ask them if you could amend the bill?

A. No, because that's not the way it works.

Q. Okay. So when -- do you recall meeting with Agent Aiken and Assistant United States Attorney Donovan on September 1st of 2006?

A. What was the date?

Q. September 1st.

A. Yes.

Q. And do you recall telling them that you went to the House Finance Committee and inquired if the legislation could be transferred into that committee and amended to have the State of Rhode Island fund the tests for the uninsured through Rite-Aid (sic)?

A. The way the process works --

Q. My question is, did you tell that to Ms. Donovan and Mr. Aiken on September 1st, 2006?

A. That specific sentence, no.

Q. Did you tell them words to that effect?

A. Yes.

Q. Did you tell them that you had -- that you had gone to the House Finance Committee to see if the bill could be amended?

A. I talked to members on the House Finance Committee.

Q. That's the same thing as going to them, basically?
A. No, because I have to request -- in order to go to the House Finance, I had to request a hearing and have a formal -- I didn't do a formal hearing. I had an informal conversation with people on the committee.
Q. You informally went to see if the bill could be amended; right?
A. Correct.
Q. But the amendment -- what the amendment was to do is to fund tests for the uninsured; correct?
A. Fund the registration costs.
Q. Strike that. You're quite right, to have the state fund registration costs for the uninsured; right?
A. Correct.
Q. Now, before -- your understanding was that before your entry of this bill and seeking to have it amended that what was happening in the State of Rhode Island was that those people who sought to be donors but were uninsured and didn't have $80 couldn't register; right?
A. Correct.
Q. There was no provision in the law anywhere that required Roger Williams to pay the registration fee, was there?
A. None in the law, no.
Q. And so the existing state of affairs when you came

into this process was, one, there had been legislative encouragement to get the word out to people that bone marrow donation was a good thing; right?

MS. DONOVAN: Objection.

THE COURT: Overruled.

Q. Right?

A. Yes.

Q. And for the Department of Health and Roger Williams to encourage and educate people to the benefits of being a bone marrow donor; correct?

A. Correct.

Q. And establishment of a bone marrow registration list by Roger Williams Medical Center in conjunction with the Department of Health; correct?

A. Yes.

Q. And up until the moment you filed your bill, the only people who could register were people who were insured, correct, or people who had $80 and chose to part with it; correct?

A. Correct.

Q. And those who wanted to register and sign up for possible bone narrow donation in the future who didn't have $80 and weren't insured you understood couldn't do it; correct?

A. Correct.

Q. And that was your purpose in providing this legislation; correct?
A. Correct.
Q. It was to help those people who couldn't register get registered; right?
A. Yes.
Q. And it had nothing to do whatsoever with Roger Williams Hospital having to pay any registration fees; isn't that correct?
A. I think I said that, yes.
Q. And so when Senator Celona came to you to talk about this bill, what he was talking to you about is the very amendment that you had recognized you wanted to put in in the first place; correct?
A. No, he wasn't talking about the amendment. He came to me and said, I have a constituent that has a problem with this bill. If this bill was to pass, Roger Williams would have to pay.
Q. But you know that's not the case; right?
A. Well, my original look at this bill was that it would be left to Roger Williams, who ran the bone marrow program, that if someone went in there and said you had to allow them to register, that they would end up incurring the cost of the $80.
Q. Where is that in the bill?



A. It wasn't in the bill; but it was my understanding that Roger Williams, being the de facto person running

it, would get stuck with the medical individuals who cannot pay their bills. I forget what the terminology was.
Q. You just told us a minute ago that the uninsured people just don't get registered. Isn't that what you told us just a moment ago, that it was your understanding that those who were uninsured and didn't have $80 just couldn't register?
A. But it doesn't mean they didn't want to register.
Q. I'm not suggesting that they didn't. Hopefully they did. But there was nothing mandating Roger Williams to pay for it?
A. To my knowledge, there was nothing mandated.
Q. In fact, let me show you what's part of Exhibit 275. It's Exhibit 275.
MR. EGBERT: Can that be displayed to both the witness and the jury.
Q. This is a memo from John Celona. And you haven't seen it before, have you?
A. No, I haven't.
Q. Let's go through it for a minute. I spoke to Representative Barr, the sponsor of H 5917, and you are Representative Barr who is the sponsor of that bill;



correct?
A. Correct.
Q. And he told me that the bill was drafted incorrectly by legislative counsel; correct?

MS. DONOVAN: Objection, your Honor.
Q. That's what this say?
MS. DONOVAN: He's never seen it before.
THE COURT: Overruled.
Q. That's what it says; right?
A. Correct.
Q. And that's a true statement. You did tell him that, didn't you?
A. Yes.
Q. And then he goes on to say, his, meaning your, your intent, and you told him that, is that you will amend it to cover the cost of bone marrow registration for those who do not have health insurance coverage; correct?
A. Correct.
Q. And that's actually true, isn't it? That was your intent?
A. I believe that's what I've testified to.
Q. Well, I know. So that's just what you testified here to; correct? Now, it says, Currently the fee for registration is $30. You've testified it's $80?





A. Yes. I was told by people down at the Rhode Island Blood Center, I believe, the woman I dealt with down there, Patricia Lang, she is the one that gave me the $80 figure per person.
Q. In any event, at least you and he, in terms of this memo, disagree on the amount?

A. Well, we never discussed amounts.
Q. I'm saying in terms of what he writes here versus what your understanding was.
A. Yes.
Q. Then he goes on to say, Currently the fee for registration is $30. Health insurance picks up -- health insurers pick up that fee, but for the uninsured, it is an out-of-pocket cost; correct? Now, that's exactly what you understood, too; right?
A. Yes.
Q. And then, Representative Barr told me that will be his intention and amendment. That's not very good English, but basically you understand that to mean that Representative Barr said it was his intention to file the amendment to take care of this uninsured person's problem; correct?
A. Well, that's what he has written here.
Q. Well, that, in fact, is exactly what your intention was; correct?



A. No. He had asked me to hold it, and I held it, and I didn't draft an amendment.
Q. But your intention back at the time was to file an amendment to cover the uninsured; correct?
A. Yes.
Q. And he seemed to know that here in this memo, correct, that that was your intention?
A. Well, he seems -- yeah, he writes that in the

letter.

Q. So either you told him or it was a pretty good guess; right?

A. Well, I told him that the bill would need to be amended if it went forward.

Q. And that it was your intention to amend it; correct?

A. No, I don't believe it was my -- at that point he had asked me to hold it, and I told him that I would hold it. As a matter of fact, he had asked me if I needed his help in working on it next year, he would help me with it; but I never asked for his help, and I redrafted it under a different number with correct language.

Q. Representative Barr, not only did Senator Celona say that in this memo, but that's exactly what you told the FBI and Ms. Donovan on September 1st, '06, isn't

Karen M. Wischnowsky, RPR-RMR-CRR

212

it, that you had gone to Finance and talked to them about amending it?

A. I didn't go to Finance. I went to a member on the Finance Committee to say what was the odds of us getting any money. They said none whatsoever. So I never amended it.

Q. In plain English, you told Ms. Donovan and Mr. Aiken back on September 1st that you went to Finance or people at Finance and asked them could the bill be amended; isn't that true?

MS. DONOVAN: Objection.
THE COURT: Overruled. You may answer.
A. No, not could the bill be amended. Is there any finances available that would fund the bill, that was my primary question, because if there was no finances, then there's no sense in doing an amendment that year.
MR. EGBERT: May I approach the witness?
THE COURT: Yes.
Q. I'm going to show you this document. Can you see where I put a check mark?
A. Uh-huh.
Q. Just read from there on to yourself.
(Witness peruses document)
Q. Have you read it?
A. Yes.





Q. Is that what you told Ms. Donovan and Mr. Aiken on September 1st of 2006?
A. No.
Q. So -- well, strike that. And have you met with Ms. Donovan since that date?
A. No.
Q. Have you met with Mr. Aiken?
A. No.
Q. And have you met with any members of the U.S. Attorney's Office or law enforcement in this case?
A. No.
Q. Had any discussions with them at all?

A. None.
Q. And do you have a lawyer?
A. No.
Q. Now, with regard to this -- strike that. You recognize, don't you, that the amendment that you were proposing, and that is covering uninsureds, that would be good for Roger Williams; right?
MS. DONOVAN: Objection.
A. I don't know that.
THE COURT: The question was answered.
Q. Well, let's figure it out for a minute. If uninsured people walk in to register for bone marrow donation, correct, and they don't have $80, right, then

Karen M. Wischnowsky, RPR-RMR-CRR

214

according to your original testimony, they'd have to leave; right? You have to answer.
A. Yes.
Q. And if they leave, then there would be less registered bone marrow donors; right?
A. Correct.
Q. And Roger Williams Hospital is a bone marrow transplant center; correct?
A. I don't know that.
Q. Well, don't you know that they're the only one in Rhode Island that does bone marrow transplants?
A. No.
MS. DONOVAN: Objection.
Q. Did you have an understanding of why they were the

keeper of the bone marrow registry -- bone marrow donation registry?

A. No.

Q. Well, at least you would agree with this much, that any hospital, any medical center, any health care facility would be in favor of more people registering for potential bone marrow donations than less; right?

MS. DONOVAN: Objection.

THE COURT: Sustained.

Q. Well, when you -- do you know of any reason why a hospital or medical center would not want to see more





people step up to the plate and register for bone marrow donation?

MS. DONOVAN: Objection.

THE COURT: Sustained.

Q. With regard to this bill you've been talking about, so we've just said that -- you said that there's one set of people that, for example, if they couldn't pay, they had to leave. The other set of people that had the $80 but weren't insured, the hospital or registration center gets the $80 whether it be from the person or the insurance company; right?

MS. DONOVAN: Objection.

THE COURT: Overruled. If you know, you can answer.

A. I don't know.

Q. Well, you know this, in comes someone who is

uninsured; right?

MS. DONOVAN: Objection.

Q. But has $80.

THE COURT: Overruled. I don't think Mr. Egbert finished the question. In comes someone who is uninsured.

Q. And has $80 and wants to register. Right? When they pay their $80 or $30, whatever the case may be, that's the same 80 or 30 as the state would have paid





under your bill; correct?

MS. DONOVAN: Objection.

THE COURT: Overruled. You may answer, if you know.

A. Could you restate the question, please.

Q. Yeah. All your bill did was take the uninsured -- strike that. All your bill was intended to do, even though it wasn't written to do it, but you were going to amend it to do it, was to cover the uninsured by state insurance; correct?

MS. DONOVAN: Objection to the form.

THE COURT: Overruled. You may answer.

A. Not state insurance, but just have the state pay for it.

Q. Well, what's Rite-Aid (sic)?

A. RIteCare is a form of insurance, but also I was open and receptive to the Department of Human Services paying the bill, also.

Q. Right. But didn't you tell Ms. Donovan and Mr. Aiken on September 1st that you wanted to amend the bill to have the State of Rhode Island fund these matters for the uninsured through Rite-Aid (sic)?
A. RIteCare.
Q. RIteCare?
A. Yes.





Q. Is that what you told them?
A. Yes, and/or DHS.
Q. Whatever it may be, some public money; right?
A. Yes.
Q. You wanted public money to cover the uninsured; right?
A. Correct.
Q. And so whether the public covered it or the uninsured paid it out of his pocket, there's no financial difference except to the uninsured person. There's no difference to the hospital; right?
MS. DONOVAN: Objection.
THE COURT: Sustained.
Q. When you wrote that particular or determined that particular amendment, you understood it to be fiscally neutral to the hospital; isn't that right?
MS. DONOVAN: Objection.
THE COURT: Overruled. You may answer.
A. It actually wasn't to the hospital. I had no idea the hospital would be picking it up. I dealt only with

Rhode Island Blood Center. And as I knew at the time, it was only the Blood Center that was paying for the uninsured or picking up costs when they ran a blood drive for the bone marrow.

So I never dealt with anything to do with





hospitals, strictly Patricia Lang at the Rhode Island Blood Center.

Q. And so you understood that Roger Williams Medical Center had basically no fiscal interest either way in that particular bill?

MS. DONOVAN: Objection.

THE COURT: Sustained.

Q. I just want to ask you a couple of questions. I'm sure everybody's interested in this. The way the legislature works in Rhode Island, you mean really when a senator wants to go talk to a rep about a bill to say that it might be good or might be bad or you might have made a mistake or that kind of thing, that they're not supposed to come and talk to you personally?

MS. DONOVAN: Objection.

THE COURT: Overruled.

A. It's not that they're not supposed to. In my over five terms over 12 years, John Celona is probably the only senator I can remember that came to me to talk to me about one of my pieces of legislation specifically.

Q. But you said it is -- let me see if I can get your words for a minute. It was contrary to protocol.

Didn't you say something like that?
A. When?
Q. On direct examination. Pardon me. It was outside





the normal flow of the legislative process; right?
A. Yes, usually that's the way it worked.
Q. So, in other words, that's the way you work over there; that if I'm a senator and I happen to have an interest in a bill that you have sponsored and want to go over and talk to you about it, just me and you, so I can give you my thoughts on it, that that's kind of against the rules?
MS. DONOVAN: Objection.
THE COURT: Overruled.
A. It's not against the rules. There are no rules, but there are -- the way the building itself operates.
Q. Unwritten rules?
A. Yes.
Q. Right? It's against the unwritten rules; right?
A. Yes.
Q. And those unwritten rules say that if a legislator wants to exercise his judgment or his intellect or his judgment, that he should go up a chain of command in the Senate to go over to the chain of command in the House to get a message to a legislator that a particular senator thinks a particular bill ought to be written or rewritten in a particular way; is that right?

MS. DONOVAN: Objection.



THE COURT: Overruled, but we're getting close to --

MR. EGBERT: I understand, Judge.

Q. But that's about right; correct?

A. Yeah, that's basically the way it works.

MR. EGBERT: I have nothing further, Judge.

MR. BRISTOW: Nothing, your Honor. Thank you.

THE COURT: Any redirect?

MS. DONOVAN: No, your Honor.

THE COURT: You may step down, Representative Barr.

THE WITNESS: Thank you.

MR. MATOS: Your Honor, the United States calls Mr. Ronald Battista.

RONALD BATTISTA, GOVERNMENT WITNESS, SWORN

THE CLERK: Would you please state your name and spell your last name for the record.

THE WITNESS: Ronald Battista, R-O-N-A-L-D, B-A-T-T-I-S-T-A.

DIRECT EXAMINATION

BY MR. MATOS:

Q. Good afternoon, Mr. Battista.

A. Good afternoon.

Q. Mr. Battista, is it fair to say you're presently retired?